CA No. 16-10010

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CA No. 16-10010 |
| Plaintiff-Appellee, | ) | |
| | ) | D.C. No. 15-00226 EJD |
| v. | ) | |
| | ) | |
| DOUGLAS STROMS YORK, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

**APPELLANT'S EXCERPTS OF RECORD**

**VOLUME II**

STEVEN G. KALAR
Federal Public Defender
GRAHAM ARCHER
Assistant Federal Public Defender
MARA K. GOLDMAN
Research and Writing Attorney
55 South Market Street, Suite 820
San Jose, CA 95113
Telephone: (408) 291-7753

Counsel for Defendant-Appellant
DOUGLAS STROMS YORK

# **TABLE OF CONTENTS**

Document                                                          Bates No.

Notice of Appeal (CR 99). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  00009

Judgment in a Criminal Case (CR 97). . . . . . . . . . . . . . . . . . . . . . . . . .  00010

Transcript of Proceedings, August 25, 2015 (CR 86).. . . . . . . . . . . . . . .  00016

Instructions for Playing Audio File.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  00077

Transcript of Proceedings, August 26, 2015 (CR 112).. . . . . . . . . . . . . .  00078

Transcript of Proceedings, August 27, 2015 (CR 113).. . . . . . . . . . . . . .  00106

Transcript of Proceedings, August 28, 2015 (CR 114).. . . . . . . . . . . . . .  00132

STEVEN G. KALAR
Federal Public Defender
GRAHAM ARCHER
Assistant Federal Public Defender
55 South Market Street, Suite 820
San Jose, CA 95113
Telephone: (408) 291-7753
graham_archer@fd.org

Counsel for Defendant DOUGLAS YORK

**FILED**

*fees waived*

JAN - 7 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

*C/EJD*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-15-00226 EJD |
| Plaintiff, | NOTICE OF APPEAL |
| vs. | |
| DOUGLAS YORK, | |
| Defendant. | |

PLEASE TAKE NOTICE that Douglas York, the defendant in the above-captioned criminal case, hereby appeals his conviction and sentence to the Ninth Circuit Court of Appeals.

Dated: January 7, 2016

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender

s/ Graham Archer
GRAHAM ARCHER
Assistant Federal Public Defender

Notice of Appeal
No. CR 15-00226 EJD                                1

AO 245B (Rev. AO 09/11-CAN 7/14) Judgment in Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Northern District of California

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| Douglas Storms York | ) | USDC Case Number: CR-15-00226-001 EJD |
| | ) | BOP Case Number: DCAN515CR00226-001 |
| | ) | USM Number: 20506-111 |
| | ) | Defendant's Attorney: Graham Archer (AFPD) |

**THE DEFENDANT:**

☐  pleaded guilty to count(s):

☐  pleaded nolo contendere to count(s):  which was accepted by the court.

☑  was found guilty on count: <u>One of the Superseding Indictment</u> after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 912 | False Impersonation of an Employee of the United States | 02/23/2012 | One |
| | | | |
| | | | |

The defendant is sentenced as provided in pages 2 through  6  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s):

☑  Count  2 is previously dismissed on the motion of the United States at trial, August 28, 2015.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/4/2016
Date of Imposition of Judgment

Signature of Judge
The Honorable Edward J. Davila
United States District Judge
Name & Title of Judge

1/6/2016
Date

00010

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT:  Douglas Storms York | Judgment - Page 2 of 6 |
| CASE NUMBER:  CR-15-00226-001 EJD | |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
     12 months and 1 day

☐    The Court makes the following recommendations to the Bureau of Prisons:

☐    The defendant is remanded to the custody of the United States Marshal. The appearance bond is hereby exonerated.

☐    The defendant shall surrender to the United States Marshal for this district:

       ☐    On  (no later than 2:00 pm).

       ☐    as notified by the United States Marshal.

    The appearance bond shall be deemed exonerated upon the surrender of the defendant.

☑    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

       ☑    at  2:00 PM on February 3, 2016.

       ☐    as notified by the United States Marshal.

       ☐    as notified by the Probation or Pretrial Services Office.

    The appearance bond shall be deemed exonerated upon the surrender of the defendant.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Douglas Storms York | Judgment - Page 3 of 6 |
| CASE NUMBER: CR-15-00226-001 EJD | |

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: <u>1 year</u>

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1) The defendant shall not leave the judicial district without the permission of the court or probation officer;
2) The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) The defendant shall support his or her dependents and meet other family responsibilities;
5) The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

00012

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Douglas Storms York | Judgment - Page 4 of 6 |
| CASE NUMBER: CR-15-00226-001 EJD | |

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a mental health treatment program, as directed by the probation officer. The defendant is to pay part or all cost of this treatment, at an amount not to exceed the cost of treatment, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of mental health counseling. The actual co-payment schedule shall be determined by the probation officer.

2. The defendant shall participate in a program of testing and treatment for drug abuse, as directed by the probation officer, until such time as the defendant is released from treatment by the probation officer. The defendant is to pay part or all of the cost of this treatment, at an amount not to exceed the cost of treatment, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of urinalysis and counseling. The actual co-payment schedule shall be determined by the probation officer.

3. The defendant shall abstain from the use of all alcoholic beverages.

4. The defendant shall pay any special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

5. The defendant shall have no contact with the victim, Allan Hessenflow, unless otherwise directed by the probation officer.

6. The defendant shall submit his person, residence, office, vehicle, or any property under his control to a search. Such a search shall be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

7. The defendant shall not own or possess any firearms, ammunition, destructive devices, or other dangerous weapons.

8. The defendant shall cooperate in the collection of DNA as directed by the probation officer.

00013

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Douglas Storms York

Judgment - Page 5 of 6

CASE NUMBER: CR-15-00226-001 EJD

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $100 | Waived | N/A |

☐ The determination of restitution is deferred until . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $  0.00 | $  0.00 |  |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the .

    ☐ the interest requirement is waived for the  is modified as follows:

---

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Douglas Storms York — Judgment - Page 6 of 6
CASE NUMBER: CR-15-00226-001 EJD

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows[*]:

**A** ☑  Lump sum payment of ____$100____ due immediately, balance due

    ☐  not later than  , or
    ☑  in accordance with    ☐ C,   ☐ D, or   ☐ E, and/or   ☑ F below); or

**B** ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐  Payment in equal  (e.g., weekly, monthly, quarterly) installments of  _ over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐  Payment in equal  (e.g., weekly, monthly, quarterly) installments of  _ over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐  Payment during the term of supervised release will commence within  (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑  Special instructions regarding the payment of criminal monetary penalties:
**When incarcerated, payment of criminal monetary penalties are due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk of U.S. District Court, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

☐  The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the defendant's responsibility for the full amount of the restitution ordered.**

---

[*] Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

00015

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                        SAN JOSE DIVISION


 3
       UNITED STATES OF AMERICA,
 4
                 PLAINTIFF,            CASE NO.  CR-15-226-EJD
 5
         VS.                           SAN JOSE, CALIFORNIA
 6
       DOUGLAS STROMS YORK,            AUGUST 25, 2015
 7
                 DEFENDANT.            VOLUME 1
 8
                                       PAGES 1 - 188
 9

10                    TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE EDWARD J. DAVILA
11          UNITED STATES DISTRICT JUDGE AND A JURY

12
                    A-P-P-E-A-R-A-N-C-E-S
13

14     FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY
                             BY:   BRIANNA PENNA
15                                 JEFFREY SCHENK
                             50 ALMADEN BOULEVARD, SUITE 900
16                           SAN JOSE, CALIFORNIA 95113

17
       FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                           BY:   GRAHAM ARCHER
                             55 S. MARKET STREET, SUITE 820
19                           SAN JOSE, CALIFORNIA 95113

20     ALSO PRESENT:         LAKISHA HOLLIMAN
                             AMY SENIA
21
       OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                                 CERTIFICATE NUMBER 8074

23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
       TRANSCRIPT PRODUCED WITH COMPUTER.

25
```

```
 1              THE COURT:  WE'LL JUST SEE.  OKAY.  GREAT.  ALL

 2    RIGHT.  THANK YOU.  WE'LL BE IN RECESS.

 3              (RECESS FROM 2:21 P.M. UNTIL 2:56 P.M.)

 4              THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK YOU

 5    AGAIN FOR YOUR COURTESY.

 6         WE'RE BACK ON THE RECORD IN THE YORK MATTER.  COUNSEL ARE

 7    PRESENT AND THE JURY AND THE ALTERNATES ARE PRESENT.  GOOD

 8    AFTERNOON, LADIES AND GENTLEMEN.  IT IS MY INTENTION TO

 9    PRE-INSTRUCT YOU AT THIS TIME.

10         LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS CASE,

11    AND I WANT TO TAKE A FEW MINUTES TO TELL YOU SOMETHING ABOUT

12    YOUR DUTIES AS JURORS AND TO GIVE YOU SOME PRELIMINARY

13    INSTRUCTIONS.

14         AT THE END OF THE TRIAL I WILL GIVE YOU MORE DETAILED

15    INSTRUCTIONS THAT WILL CONTROL YOUR DELIBERATIONS, AND AS I

16    PREVIOUSLY INDICATED, EACH OF YOU WILL HAVE A COPY OF THE JURY

17    INSTRUCTIONS TO TAKE INTO THE JURY ROOM WITH YOU.

18         WHEN YOU DELIBERATE, IT WILL BE YOUR DUTY TO WEIGH AND TO

19    EVALUATE ALL OF THE EVIDENCE RECEIVED IN THE CASE AND IN THAT

20    PROCESS TO DECIDE THE FACTS.

21         TO THE FACTS AS YOU FIND THEM YOU WILL APPLY THE LAW AS I

22    GIVE IT TO YOU, WHETHER YOU AGREE WITH THE LAW OR NOT.  YOU

23    MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE LAW BEFORE

24    YOU AND MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

25    DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.
```

```
 1           PLEASE DO NOT TAKE ANYTHING THAT I MAY SAY OR DO DURING

 2     THE TRIAL AS INDICATING WHAT I THINK OF THE EVIDENCE OR WHAT

 3     YOUR VERDICT SHOULD BE.  THAT IS ENTIRELY UP TO YOU.

 4           THIS IS A CRIMINAL CASE BROUGHT BY THE UNITED STATES

 5     GOVERNMENT.  THE GOVERNMENT CHARGES THE DEFENDANT IN COUNT 1

 6     WITH A VIOLATION OF 18 UNITED STATES CODE SECTION 912, FALSE

 7     IMPERSONATION OF AN EMPLOYEE OF THE UNITED STATES; AND IN COUNT

 8     2 WITH A VIOLATION OF 47 UNITED STATES CODE SECTION

 9     223(A)(1)(C), TELECOMMUNICATIONS DEVICE HARASSMENT.

10           THE CHARGES AGAINST THE DEFENDANT ARE CONTAINED IN AN

11     INDICTMENT.  THE INDICTMENT SIMPLY DESCRIBES THE CHARGES THAT

12     THE GOVERNMENT BRINGS AGAINST THE DEFENDANT.  THE INDICTMENT IS

13     NOT EVIDENCE AND DOES NOT PROVE ANYTHING.

14           THE DEFENDANT HAS PLEADED NOT GUILTY TO THE CHARGES AND IS

15     PRESUMED INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES THE

16     DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.

17           IN ADDITION, THE DEFENDANT HAS THE RIGHT TO REMAIN SILENT

18     AND NEVER HAS TO PROVE INNOCENCE OR TO PRESENT ANY EVIDENCE.

19           NOW, IN ORDER TO HELP YOU FOLLOW THE EVIDENCE, I JUST WANT

20     TO GIVE YOU A BRIEF SUMMARY OF THE ELEMENTS OF THE OFFENSES

21     WHICH THE GOVERNMENT MUST PROVE TO MAKE ITS CASE.

22           AND, LADIES AND GENTLEMEN, AGAIN, THIS IS A SUMMARY.  IN

23     THE FINAL INSTRUCTIONS, YOU WILL -- I WILL INSTRUCT YOU AGAIN

24     AS TO THE ELEMENTS AND AS TO THE ELEMENTS AND THE THINGS THAT

25     THE GOVERNMENT HAS TO PROVE.
```

1     MR. YORK IS CHARGED IN COUNT 1 WITH FRAUD WHILE

2  IMPERSONATING A FEDERAL EMPLOYEE IN VIOLATION OF TITLE 18

3  UNITED STATES -- SECTION 912 OF THE UNITED STATES CODE.

4     NOW, IN ORDER FOR MR. YORK TO BE FOUND GUILTY OF THIS

5  CHARGE, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

6  ELEMENTS BEYOND A REASONABLE DOUBT:

7     FIRST, THAT MR. YORK FALSELY PRETENDED TO BE AN EMPLOYEE

8  ACTING UNDER THE AUTHORITY OF THE UNITED STATES INTERNAL

9  REVENUE SERVICE, AND THAT MR. YORK ACTED IN SUCH A MANNER AS AN

10  EMPLOYEE OF THE INTERNAL REVENUE SERVICE.

11     MR. YORK IS CHARGED IN COUNT 2 IN THE INDICTMENT WITH

12  INTERSTATE TELECOMMUNICATIONS, HARASSMENT, IN VIOLATION OF 47

13  UNITED STATES CODE SECTION 223(A)(1)(C).

14     IN ORDER TO BE FOUND GUILTY OF THAT CHARGE THE GOVERNMENT

15  MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE

16  DOUBT:

17     THE DEFENDANT, ONE, IN INTERSTATE OR FOREIGN

18  COMMUNICATIONS; TWO, MADE A TELEPHONE CALL OR UTILIZED A

19  TELECOMMUNICATIONS DEVICE; THREE, WITHOUT DISCLOSING HIS

20  IDENTITY; AND, FOUR, INTENDING TO ABUSE, THREATEN OR HARASS ANY

21  PERSON AT THE CALL NUMBER OR WHO RECEIVED THE COMMUNICATIONS.

22     THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

23  FACTS ARE CONSISTS OF:

24     THE SWORN TESTIMONY OF ANY WITNESS;

25     THE EXHIBITS WHICH ARE RECEIVED IN EVIDENCE; AND,

1       ANY FACTS TO WHICH THE PARTIES AGREE.

2       THE FOLLOWING THINGS ARE NOT EVIDENCE, AND YOU MUST NOT

3  CONSIDER THEM AS EVIDENCE IN DECIDING THE FACTS OF THE CASE:

4       STATEMENTS AND ARGUMENTS OF ATTORNEYS;

5       QUESTIONS AND OBJECTIONS OF THE ATTORNEYS;

6       TESTIMONY THAT I INSTRUCT YOU TO DISREGARD; AND,

7       ANYTHING THAT YOU MAY SEE OR HEAR WHEN THE COURT IS NOT IN

8  SESSION, EVEN IF WHAT YOU SEE OR HEAR IS DONE OR SAID BY ONE OF

9  THE PARTIES OR BY ONE OF THE WITNESSES.

10      EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

11  IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A WITNESS ABOUT

12  WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

13      CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE; THAT IS, IT

14  IS PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER

15  FACT.

16      YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

17  EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.

18      THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE

19  GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR

20  YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

21      NOW, BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND

22  SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THIS FACT THAT

23  IT RAINED DURING THE NIGHT.

24      HOWEVER, OTHER EVIDENCE SUCH AS A TURNED ON GARDEN HOSE

25  MAY PROVIDE AN EXPLANATION FOR THE WATER ON THE SIDEWALK.

1   THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED

2   BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE

3   EVIDENCE IN THE LIGHT OF REASON, EXPERIENCE, AND COMMON SENSE.

4   THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

5   RECEIVED IN EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR OFFERS

6   AN EXHIBIT IN EVIDENCE AND A LAWYER ON THE OTHER SIDE THINKS IT

7   IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER MAY

8   OBJECT.

9   IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED

10  OR THE EXHIBIT RECEIVED.

11  IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

12  ANSWERED OR THE EXHIBIT CANNOT BE RECEIVED.

13  WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

14  IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER WOULD

15  HAVE BEEN.

16  SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

17  RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

18  MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

19  CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

20  IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

21  WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

22  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE

23  OF IT.

24  IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

25  INTO ACCOUNT THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR

1    HEAR OR KNOW THE THINGS TESTIFIED TO; THE WITNESS'S MEMORY; THE

2    WITNESS'S MANNER WHILE TESTIFYING; THE WITNESS'S INTEREST IN

3    THE OUTCOME OF THE CASE, IF ANY; THE WITNESS'S BIAS OR

4    PREJUDICE, IF ANY; WHETHER OTHER EVIDENCE CONTRADICTED THE

5    WITNESS'S TESTIMONY; THE REASONABLENESS OF THE WITNESS'S

6    TESTIMONY IN LIGHT OF ALL OF THE EVIDENCE, AND ANY OTHER

7    FACTORS THAT BEAR ON BELIEVABILITY.

8         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

9    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

10   IT.

11        I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

12   FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT DECIDE

13   WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW JURORS

14   HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE CASE.

15        SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

16   THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

17   THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

18   INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

19   THE COURSE OF YOUR JURY DUTY.

20        THUS, UNTIL THE END OF THE CASE OR UNLESS I TELL YOU

21   OTHERWISE, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT

22   LET ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE

23   MERITS OF THE CASE OR ANYTHING TO DO WITH IT.

24        THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING,

25   BY PHONE OR ELECTRONIC MEANS VIA E-MAIL, TEXT MESSAGING OR ANY

1    INTERNET CHAT ROOM, BLOG, WEBSITE OR OTHER FEATURE.

2        THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS

3    UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES TO

4    COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR FAMILY

5    MEMBERS, YOUR EMPLOYER, THE MEDIA, OR PRESS AND THE PEOPLE

6    INVOLVED IN THE TRIAL, ALTHOUGH YOU MAY NOTIFY YOUR FAMILY AND

7    YOUR EMPLOYER THAT YOU HAVE BEEN SEATED AS A JUROR IN THE CASE.

8        IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

9    SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU

10   HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

11   CONTACT TO THE COURT.

12       BECAUSE YOU WILL RECEIVE ALL OF THE EVIDENCE AND LEGAL

13   INSTRUCTION THAT YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT:

14   DO NOT READ, WATCH OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

15   COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT; DO NOT DO

16   ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

17   INTERNET OR USING OTHER REFERENCE MATERIALS; AND DO NOT MAKE

18   ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

19   CASE ON YOUR OWN.

20       THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

21   HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

22   HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

23   RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS AND

24   A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL

25   PROCESS TO START OVER.  IF ANY JUROR IS EXPOSED TO ANY OUTSIDE

1    INFORMATION, PLEASE NOTIFY THE COURT IMMEDIATELY.

2         AT THE END OF THE TRIAL YOU WILL HAVE TO MAKE YOUR

3    DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL

4    NOT HAVE A WRITTEN TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY

5    CLOSE ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

6         IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

7    EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

8    UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

9    THE CASE.  DO NOT LET NOTE-TAKING DISTRACT YOU FROM BEING

10   ATTENTIVE.

11        WHEN YOU LEAVE COURT FOR RECESSES, YOUR NOTES SHOULD BE

12   LEFT IN THE JURY ROOM, AND MS. GARCIA WILL HELP YOU WITH THAT.

13   NO ONE WILL READ YOUR NOTES.

14        WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

15   MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

16   YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF

17   YOUR FELLOW JURORS.

18        THE NEXT PHASE OF THE TRIAL WILL NOW BEGIN.  FIRST, EACH

19   SIDE MAY MAKE AN OPENING STATEMENT.  AN OPENING STATEMENT IS

20   NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND

21   WHAT THE PARTY EXPECTS THE EVIDENCE WILL SHOW.

22        A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.  THE

23   GOVERNMENT WILL THEN PRESENT EVIDENCE, AND COUNSEL FOR THE

24   DEFENSE MAY CROSS-EXAMINE.

25        THEN, IF THE DEFENDANT CHOOSES TO OFFER EVIDENCE, COUNSEL

1    FOR THE GOVERNMENT MAY CROSS-EXAMINE.

2        AFTER THE EVIDENCE HAS BEEN PRESENTED AND THE ATTORNEYS

3    HAVE MADE CLOSING ARGUMENTS I WILL INSTRUCT YOU ON THE LAW THAT

4    APPLIES TO THE CASE.  AFTER THAT YOU WILL GO TO THE JURY ROOM

5    TO DELIBERATE ON YOUR VERDICT.

6        THAT CONCLUDES THE PRELIMINARY INSTRUCTIONS.  LADIES AND

7    GENTLEMEN, I JUST WANTED TO MENTION ONE OTHER THING AND THAT'S

8    THE QUESTION OF TIME, AND I TELL YOU THAT BECAUSE EVEN THOUGH

9    THIS WILL BE A BRIEF TRIAL -- I SHOULD TELL YOU SOMETIMES I

10   THINK STEPHEN HAWKING HAS DONE HIS STUDY IN A COURTROOM BECAUSE

11   TIME IS VERY DIFFERENT IN COURTS THAN THEY ARE IN REAL LIFE.

12       WE MAY TAKE RECESSES, AND I'LL SUGGEST TO YOU THAT WE'LL

13   TAKE A 12 MINUTE OR 15 MINUTE RECESS AND YOU'LL BE ENJOYING

14   THAT TIME AND THEN YOU'LL LOOK AT THE CLOCK AND REALIZE

15   30 MINUTES HAVE GONE BY AND YOU HAVEN'T BEEN SUMMONED.

16       I SHOULD TELL YOU THAT IT DOES OCCUR FREQUENTLY THAT I'LL

17   NEED TO SPEAK WITH THE LAWYERS TO GET THEIR HELP ON AN ISSUE,

18   AND I NEED TO DO THAT OUTSIDE OF YOUR PRESENCE.

19       AND IT ALSO COMES TO PASS THAT SOMETIMES I'M CALLED UPON

20   TO DO OTHER OBLIGATIONS AND DUTIES THAT COME TO MY DESK, AND I

21   MAY HAVE TO DEFER FOR A MOMENT TO TAKE CARE OF THOSE THINGS.

22       SO I APOLOGIZE IN ADVANCE FOR ANY INCONVENIENCE IN REGARDS

23   TO WAITING.

24       I KNOW THAT THESE LAWYERS AND MYSELF WILL DO EVERYTHING WE

25   CAN TO MAKE ANY BREAKS -- MAKE THIS TRIAL AS SEAMLESS AS

1    POSSIBLE WITHOUT TOO MUCH WAITING FOR YOU.

2         BUT I JUST WANT TO GIVE YOU ADVANCED NOTICE.  THIS

3    SOMETIMES HAS HAPPENED.  I HAVEN'T BEEN ENGAGED IN A TRIAL

4    WHERE THERE WASN'T -- HOW SHALL I SAY? -- A NORMAL BREAK FOR

5    WHATEVER REASON, BUT WE'LL TRY TO LIMIT THOSE AS BEST WE CAN.

6         SO THANK YOU VERY MUCH.

7         LET ME ASK THE GOVERNMENT, DO YOU HAVE AN OPENING

8    STATEMENT?

9              MS. PENNA:  YES, YOUR HONOR.

10             THE COURT:  PLEASE PROCEED.

11             **(COUNSEL FOR GOVERNMENT GAVE THEIR OPENING STATEMENT.)**

12             MS. PENNA:  LADIES AND GENTLEMEN OF THE JURY, WE'RE

13   HERE TODAY BECAUSE ON THE AFTERNOON OF FEBRUARY 23RD, 2012, THE

14   DEFENDANT, DOUGLAS YORK, MADE A PHONE CALL AND LEFT A VOICE

15   MESSAGE FOR A MAN NAMED ALLAN HESSENFLOW.

16        YOU WILL HEAR A RECORDING OF THAT VOICE MESSAGE ON WHICH

17   THE DEFENDANT REPRESENTS HIMSELF TO BE AN INTERNAL REVENUE

18   SERVICE, AN I.R.S. AGENT, THAT WAS CONDUCTING A TAX AUDIT AND

19   INVESTIGATING MR. HESSENFLOW'S TAX RECORDS.

20        BY MAKING THIS CALL AND CHOOSING TO LEAVE THIS SPECIFIC

21   VOICE MESSAGE, THE DEFENDANT COMMITTED TWO SEPARATE CRIMES:

22        FIRST, THIS PHONE CALL WAS A CRIME BECAUSE THE DEFENDANT

23   FALSELY IMPERSONATED A GOVERNMENT OFFICER OR EMPLOYEE, AND THIS

24   IS A VIOLATION OF TITLE 18 UNITED STATES CODE SECTION 912:

25        A CRIME TO PRETEND TO BE A GOVERNMENT OFFICER OR EMPLOYEE

1    THAT IS ACTING UNDER THE AUTHORITY OF THE UNITED STATES AND TO

2    THEN ACT IN THAT CHARACTER.

3         THE EVIDENCE HERE WILL SHOW THAT THE DEFENDANT WAS NOT AND

4    HAS NEVER BEEN AN EMPLOYEE OF THE INTERNAL REVENUE SERVICE BUT

5    ON THIS VOICEMAIL HE REPRESENTED THAT HE WAS, IN FACT, AN

6    EMPLOYEE OF THE I.R.S.

7         BEYOND THIS THE EVIDENCE WILL SHOW THAT THE GOVERNMENT --

8    THAT THE DEFENDANT TOOK THIS A STEP FARTHER AND ACTED IN THE

9    CHARACTER OF AN I.R.S. AGENT WHEN HE LEFT THE MESSAGE STATING

10   THAT THE I.R.S. WOULD BE INVESTIGATING MR. HESSENFLOW'S TAX

11   RECORDS AND ALSO REQUESTING CONFIDENTIAL AND PERSONAL TAX

12   INFORMATION FROM MR. HESSENFLOW.

13        THE EVIDENCE WILL ALSO SHOW THAT THE DEFENDANT USED A

14   TELEPHONE SPOOFING SERVICE IN ORDER TO LEAVE THIS VOICE MESSAGE

15   AND TO LEAVE THE MESSAGE.

16        NOW, A TELEPHONE SPOOFING SERVICE IS A SERVICE THAT IS RUN

17   BY A COMPANY CALLED TELETCH INDUSTRIES, AND THEY'RE RUN OUT OF

18   NEW JERSEY.  THIS SERVICE ALLOWS A CALLER TO DISGUISE THEIR

19   VOICE WHEN THEY'RE MAKING A PHONE CALL, AND IT ALSO ALLOWS THEM

20   TO SELECT ANY PHONE NUMBER THAT THEY WANT TO APPEAR ON THE

21   RECIPIENT'S CALLER ID.

22        HERE THE EVIDENCE WILL SHOW THAT THE DEFENDANT DISGUISED

23   HIS VOICE ON THIS VOICE MESSAGE THAT HE LEFT FOR

24   MR. HESSENFLOW.

25        THE EVIDENCE WILL ALSO SHOW THAT THE DEFENDANT SELECTED A

1    PARTICULAR NUMBER TO APPEAR ON MR. HESSENFLOW'S VOICE MESSAGE,

2    AND THIS NUMBER MATCHED THE LAST FOUR DIGITS OF THE I.R.S.

3    PERSONAL INCOME TAX HELP LINE.

4         NOW, THERE IS MORE TO THIS STORY THAN JUST THIS ONE PHONE

5    CALL AND THROUGH THAT WE LEARNED WHY MR. YORK TARGETED

6    MR. HESSENFLOW SPECIFICALLY.  THE REASON THAT THE DEFENDANT

7    SPECIFICALLY TARGETED MR. HESSENFLOW WAS BECAUSE HE SUSPECTED

8    THAT MR. HESSENFLOW WAS IN A RELATIONSHIP WITH HIS THEN

9    ESTRANGED WIFE.

10        NOW, THIS IS NOT A CASE ABOUT A BAD DIVORCE, AND WE'RE NOT

11   HERE TO REOPEN OLD MARITAL DISPUTES.

12        THE REASON THAT WE ARE HERE IS BECAUSE OF THE DEFENDANT'S

13   CONDUCT ON FEBRUARY 23RD, 2012.

14        NOW, A MOMENT AGO I TOLD YOU THAT THE DEFENDANT'S PHONE

15   CALL CAUSED HIM TO COMMIT TWO SEPARATE CRIMES.  THAT FIRST

16   CRIME WAS FALSE IMPERSONATION OF A GOVERNMENT OFFICER OR

17   EMPLOYEE AND THE SECOND CRIME IS INTERSTATE TELECOMMUNICATIONS

18   DEVICE HARASSMENT.

19        NOW, THAT CRIME -- THAT STATUTE REQUIRES THAT A PERSON,

20   THAT THE PERSON MAKE AN INTERSTATE TELEPHONE CALL WITH THE

21   INTENT TO ABUSE, HARASS OR TO THREATEN THE PERSON AT -- IN

22   RECEIPT OF THAT CALL.

23        AND THE STATUTE ALSO REQUIRES THAT THE CALLER DOES NOT

24   REVEAL HIS OR HER NAME.

25        THE EVIDENCE HERE WILL SHOW THAT ON THAT VERY SAME VOICE

00028

1       MESSAGE ON FEBRUARY 23RD, 2012, THE DEFENDANT USING THAT

2       SPOOFING SERVICE DISGUISED HIS VOICE AND SELECTED A FEATURE OF

3       THE SPOOFCARD SERVICE THAT ALLOWED HIM TO DISGUISE HIS VOICE AS

4       APPEARING TO SOUND LIKE A WOMAN AND HE STATED THAT HIS NAME WAS

5       NOT DOUGLAS YORK BUT THAT HE WAS JUDY SMITH WITH THE I.R.S.

6            YOU WILL HEAR EVIDENCE THAT THIS VOICE MESSAGE WAS NOT THE

7       ONLY INSTANCE OF CONTACT FROM THE DEFENDANT TO MR. HESSENFLOW.

8       IN FACT, YOU WILL HEAR DIRECTLY FROM MR. HESSENFLOW WHO, DUE TO

9       THE INCESSANT NATURE OF THE CONTACT THAT HE HAD FROM THE

10      DEFENDANT, BEGAN KEEPING A VERY DETAILED PERSONAL LOG OF EACH

11      AND EVERY ENCOUNTER AND INSTANCE OF CONTACT THAT HE HAD WITH

12      THE DEFENDANT.

13           THE GOVERNMENT HERE HAS THE BURDEN TO PROVE BEYOND A

14      REASONABLE DOUBT THAT THE DEFENDANT COMMITTED THOSE TWO CRIMES.

15           IN SUPPORT OF OUR CASE, YOU WILL BE HEARING FROM A VARIETY

16      OF DIFFERENT WITNESSES, AND WE WILL BE PRESENTING TO YOU A

17      VARIETY OF PIECES OF EVIDENCE IN SUPPORT OF OUR CASE.

18           OVER THE NEXT FEW DAYS YOU WILL HEAR THE VOICEMAIL LEFT ON

19      FEBRUARY 23RD, 2012;

20           YOU WILL HEAR FROM MR. HESSENFLOW, THE MAN WHO RECEIVED

21      THAT VOICE MESSAGE.  MR. HESSENFLOW WILL TELL YOU ABOUT HIS

22      INSTANCES OF CONTACT WITH THE DEFENDANT;

23           MR. HESSENFLOW WILL DISCUSS WITH YOU WHAT STEPS HE TOOK

24      AFTER HE RECEIVED THAT VOICE MESSAGE AND HOW HE CONTACTED LAW

25      ENFORCEMENT;

1    MR. HESSENFLOW WILL ALSO DESCRIBE EXAMPLES OF THE PATTERN

2    OF HARASSMENT THAT -- THE PATTERN OF THE DEFENDANT'S HARASSMENT

3    OF HIM.

4        FOR EXAMPLE, HE WILL TESTIFY TO THE NUMEROUS AND INCESSANT

5    PHONE CALLS AND TEXT MESSAGES THAT HE RECEIVED FROM THE

6    DEFENDANT SOMETIMES IN THE MIDDLE OF THE NIGHT.

7        YOU WILL HEAR ABOUT THE DEFENDANT SOMETIMES PRETENDING TO

8    BE MR. HESSENFLOW WHEN HE POSTED MR. HESSENFLOW'S CAR FOR SALE

9    FOR $1 ON CRAIGSLIST AND LISTED MR. HESSENFLOW'S HOME ADDRESS

10   SUBJECTING MR. HESSENFLOW TO POTENTIAL BUYERS SHOWING UP AT HIS

11   HOUSE.

12       MR. HESSENFLOW, WILL ALSO DISCUSS OTHER INSTANCES OF

13   CONTACT WITH THE DEFENDANT.

14       YOU WILL HEAR FROM A WITNESS NAMED NATHAN COOPER WHO WORKS

15   FOR A COMPANY CALLED TELETCH INDUSTRIES OR SPOOFCARD.

16   NATHAN COOPER WILL EXPLAIN TO YOU HOW THIS SPOOFCARD SERVICE

17   WORKS, AND HE WILL ALSO DISCUSS RECORDS THAT WERE PROVIDED BY

18   THE COMPANY.

19       THROUGH HIS TESTIMONY YOU WILL LEARN THAT THE DEFENDANT

20   CREATED AN ACCOUNT SPOOFCARD USING HIS NAME, HIS CELL PHONE

21   NUMBER, HIS ADDRESS AND OTHER IDENTIFYING INFORMATION.

22       ON FEBRUARY 23RD, 2012, THE DEFENDANT USED HIS SPOOFCARD

23   ACCOUNT TO MAKE THE PHONE CALL AND LEAVE THE VOICE MESSAGE FOR

24   MR. HESSENFLOW.

25       MR. COOPER WILL TELL YOU ABOUT SOME OF THE SPOOFCARD

1    FEATURES THAT THE DEFENDANT ELECTED AND SELECTED TO USE ON THAT

2    VOICEMAIL.

3         MR. COOPER WILL ALSO TESTIFY TO THE LOCATION OF SPOOFCARD

4    SERVERS, AND HE WILL EXPLAIN TO YOU HOW THE CALL ORIGINATED AND

5    ENDED UP IN CALIFORNIA ACTUALLY DID CROSS STATE LINES.

6         THE EVIDENCE WILL SHOW THAT THE IP ADDRESS THAT WAS USED

7    TO CREATE THE SPOOFCARD ACCOUNT MATCHED THE IP ADDRESS THAT

8    POSTED THE CRAIGSLIST AD THAT WE JUST DISCUSSED.

9         LAST, YOU WILL HEAR FROM SPECIAL AGENT DONNA AGUIRRE.

10   SHE'S AN AGENT WITH THE UNITED STATES TREASURY INSPECTOR

11   GENERAL FOR TAX ADMINISTRATION.  YOU MAY HEAR THIS BEING

12   REFERRED TO AS TIGTA.  SHE WILL DESCRIBE TO YOU WHAT SHE

13   LEARNED DURING HER INVESTIGATION OF THE VOICEMAIL ONCE HER

14   AGENCY WAS CONTACTED.

15        AFTER YOU HAVE HEARD FROM ALL OF THESE WITNESSES AND WE

16   HAVE PRESENTED THE EVIDENCE IN SUPPORT OF OUR CASE, I WILL HAVE

17   A CHANCE TO ARGUE TO YOU IN CLOSING THAT THIS TESTIMONY AND

18   THIS EVIDENCE HAS ESTABLISHED WHAT WE, AS THE GOVERNMENT, ARE

19   REQUIRED TO PROVE.

20        AT THE END OF THE TRIAL, WE WILL ASK THAT YOU FIND THAT

21   THE EVIDENCE PROVED BEYOND A REASONABLE DOUBT THAT ON

22   FEBRUARY 23RD, 2012, THE DEFENDANT COMMITTED THE CRIME OF FALSE

23   IMPERSONATION OF A GOVERNMENT OFFICIAL OR EMPLOYEE AND THE

24   CRIME OF INTERSTATE TELECOMMUNICATIONS DEVICE HARASSMENT.

25        BASED ON THIS EVIDENCE, WE ASK THAT YOU WILL FIND THE

00031

1      DEFENDANT DOUGLAS YORK GUILTY OF BOTH COUNTS.

2           THANK YOU, YOUR HONOR.

3                THE COURT:  THANK YOU, COUNSEL.

4      DOES THE DEFENSE HAVE AN OPENING STATEMENT?

5                MR. ARCHER:  YES, YOUR HONOR.  THANK YOU.

6           **(COUNSEL FOR DEFENDANT GAVE THEIR OPENING STATEMENT.)**

7                MR. ARCHER:  THAT'S RIGHT, FOLKS, WE ARE HERE

8      BECAUSE IN 2012 MR. ALLAN HESSENFLOW RECEIVED A SINGLE

9      VOICEMAIL, A RIDICULOUS CRANK CALL THAT HE BELIEVES WAS LEFT BY

10     MR. YORK, AND THE GOVERNMENT THREE YEARS LATER HAS FILED

11     CHARGES AGAINST MR. YORK ALLEGING HIM BEING GUILTY OF

12     IMPERSONATING AN I.R.S. AGENT AND THEN ACTING AS AN I.R.S.

13     AGENT AND ALSO OF HARASSING MR. HESSENFLOW BY LEAVING THAT

14     VOICEMAIL.  THAT'S IT.  YOU'RE ALSO GOING TO HEAR EVIDENCE, OF

15     COURSE, THAT MR. YORK AND MR. HESSENFLOW WERE NOT EXACTLY GOOD

16     FRIENDS.

17          MR. YORK'S CHILDREN WERE STAYING OVER MR. HESSENFLOW'S

18     HOUSE WITH HIS ESTRANGED WIFE, AND THERE WERE COMMUNICATIONS

19     BACK AND FORTH.

20          NO ONE IS UNDER ANY ILLUSION THAT THERE IS ANY LOVE LOST

21     BETWEEN THOSE FOLKS BUT THAT'S NOT A FEDERAL CASE.

22          WHAT HE'S ACCUSED OF IN FEDERAL COURT, THE REASON THE

23     GOVERNMENT IS BRINGING CHARGES HERE IS THAT SINGLE VOICEMAIL,

24     ONE SINGLE CRANK CALL VOICEMAIL, WHICH YOU'LL HEAR IN A COUPLE

25     OF MINUTES.  IT'S NOT A GOOD IMPERSONATION OF MINNIE MOUSE BUT

```
 1        IT'S SOMETHING LIKE THAT.  YOU'LL ALSO HEAR THE WITNESS TESTIFY

 2    THAT HE IMMEDIATELY KNEW IT WASN'T REAL.  MR. HESSENFLOW WILL

 3    TESTIFY HE IMMEDIATELY KNEW IT WASN'T REAL.  ONE SINGLE PRANK

 4    VOICEMAIL IS WHY WE'RE HERE IN FEDERAL COURT AND MR. YORK IS

 5    CHARGED WITH TWO FEDERAL FELONIES.

 6        AT THE END OF THIS TRIAL I WILL BE STANDING RIGHT HERE

 7    AGAIN EXPLAINING TO YOU WHY NOTHING YOU HEARD CONSTITUTES A

 8    FEDERAL CRIME, CERTAINLY NOT THE TWO CHARGED COUNT 1 OR COUNT

 9    2, A PRANK VOICEMAIL THAT THEY ACCUSE MR. YORK OF LEAVING FROM

10    CALIFORNIA TO CALIFORNIA, NOT A FEDERAL CRIME.  THE GOVERNMENT

11    CANNOT PROVE THAT MR. YORK IS GUILTY OF EITHER OF THESE TWO

12    COUNTS.

13        THANK YOU.

14            THE COURT:  THANK YOU, COUNSEL.

15        DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

16            MS. PENNA:  YES, YOUR HONOR.

17        THE UNITED STATES CALLS ALLAN HESSENFLOW.

18            THE COURT:  ALL RIGHT.  THANK YOU.

19        GOOD AFTERNOON, SIR.  WOULD YOU PLEASE COME FORWARD.  AND

20    IF YOU WOULD STAND HERE AND FACE OUR COURTROOM DEPUTY AND WHILE

21    YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

22        (GOVERNMENT'S WITNESS, ALLAN HESSENFLOW, WAS SWORN.)

23            THE WITNESS:  I DO.

24            THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE,

25    SIR.  FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU
```

```
 1    NEED.  THERE'S ALSO SOME WATER THERE I THINK FOR YOUR

 2    REFRESHMENT.

 3         I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

 4    AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

 5    AND THEN SPELL IT PLEASE.

 6         THE WITNESS:  ALLAN HESSENFLOW.  IT'S

 7    H-E-S-S-E-N-F-L-O-W.

 8         THE COURT:  AND IS ALLAN WITH TWO L'S?

 9         THE WITNESS:  YES.

10         THE COURT:  AND AN E?

11         THE WITNESS:  AN A.

12         THE COURT:  ALL RIGHT.  THANK YOU.  AND LET ME ASK

13    YOU TO GET CLOSE TO THAT MICROPHONE.  COUNSEL.

14                        DIRECT EXAMINATION

15    BY MS. PENNA:

16    Q.   GOOD AFTERNOON, MR. HESSENFLOW.  WHERE DO YOU LIVE?

17    A.   IN THE SANTA CRUZ MOUNTAINS.

18    Q.   HOW LONG HAVE YOU LIVED IN THE SANTA CRUZ MOUNTAINS?

19    A.   SINCE 1993.

20    Q.   WHAT DO YOU DO FOR WORK?

21    A.   I'M AN ENGINEER.

22    Q.   WHAT TYPE OF ENGINEER?

23    A.   I DO HARDWARE AND FIRMWARE DESIGN.

24    Q.   HOW LONG HAVE YOU WORKED AS AN ENGINEER?

25    A.   SINCE I GOT OUT OF SCHOOL.
```

1    Q.   SO ABOUT HOW MANY YEARS IS THAT?

2    A.   SINCE THE '80S.

3    Q.   DO YOU KNOW A PERSON NAMED DOUGLAS YORK?

4    A.   YES, I DO.

5    Q.   IS THAT PERSON IN THE COURTROOM TODAY?

6    A.   YES, HE IS.

7    Q.   COULD YOU TELL US WHERE HE'S SITTING AND MAYBE IDENTIFY

8    HIM BY SOMETHING THAT HE'S WEARING?

9    A.   YES.  HE'S SWEARING THE GREY SUIT OVER AT THE TABLE BEHIND

10   YOU.

11           THE COURT:  DOES HE HAVE GLASSES ON?

12           THE WITNESS:  NO.

13           THE COURT:  THANK YOU.

14           MS. PENNA:  LET THE RECORD REFLECT THAT THE WITNESS

15   HAS IDENTIFIED THE DEFENDANT DOUGLAS YORK?

16           THE COURT:  THANK YOU.  THE RECORD WILL SO REFLECT.

17   BY MS. PENNA:

18   Q.   WHEN DID YOU FIRST MEET THE DEFENDANT?

19   A.   IN 2011.

20   Q.   COULD YOU DESCRIBE THE CIRCUMSTANCES OF HOW YOU MET HIM?

21   A.   WELL, I WAS WITH HIS EX-WIFE AT THE TIME, SEPARATED WIFE.

22   Q.   AND WHAT IS HIS EX-WIFE OR ESTRANGED WIFE'S NAME?

23   A.   ANDREA YORK.

24   Q.   ANDREA YORK.  AND HOW DID YOU KNOW ANDREA YORK?

25   A.   I HAD KNOWN HER PROBABLY TEN YEARS PRIOR TO THAT AND JUST

DIRECT HESSENFLOW BY MS. PENNA

1    MET RECENTLY AT A MUTUAL FRIEND'S HOUSE.

2    Q.   AND WERE YOU IN A RELATIONSHIP WITH ANDREA YORK?

3    A.   NOT PRIOR TO THAT.

4    Q.   DID YOU HAVE A FRIENDSHIP?

5    A.   YES.

6    Q.   WHEN DID THE DEFENDANT FIRST START CONTACTING YOU

7    SPECIFICALLY?

8    A.   WELL, THE FIRST PHONE CALLS WERE IN FEBRUARY 2012.

9    Q.   OKAY.  COULD YOU DESCRIBE THAT CONTACT?

10   A.   WELL, WITHOUT REFERRING TO MY LOG, I --

11   Q.   IS THERE SOMETHING THAT WOULD REFRESH YOUR RECOLLECTION?

12   A.   YES, THERE IS.

13   Q.   OKAY.

14        PERMISSION TO APPROACH?

15             THE COURT:  YES.

16   BY MS. PENNA:

17   Q.   COULD YOU ELABORATE ON WHAT TYPE OF CONTACT YOU HAD WITH

18   THE DEFENDANT DURING THIS TIME?

19   A.   WELL, HE STARTED CALLING AND ASKING THINGS LIKE WHERE --

20   WHAT MY ADDRESS IS AND JUST A NUMBER OF SIMILAR CALLS LIKE

21   THAT.

22   Q.   AND YOU SAY THAT THIS CONTACT WAS OVER THE TELEPHONE.  DO

23   YOU KNOW WHEN OR HOW THE DEFENDANT RECEIVED YOUR PHONE NUMBER?

24   A.   NO, I DON'T.

25   Q.   WHAT IS YOUR PHONE NUMBER?

1    A.    IT'S 408-353-6292.

2    Q.    AND DO YOU HAVE MORE THAN ONE PHONE NUMBER?

3    A.    YES, I ALSO HAVE A CELL PHONE.

4    Q.    AND COULD YOU TELL US THAT NUMBER?

5    A.    408-761-2742.

6    Q.    AND WOULD THE DEFENDANT CALL OR TEXT YOU ON BOTH OF THOSE

7    NUMBERS?

8    A.    YES, HE DID.

9    Q.    WHAT NUMBER WOULD THE DEFENDANT CALL YOU FROM?

10   A.    HE CALLED FROM 408-710-9450.

11   Q.    HOW DO YOU KNOW THAT NUMBER?

12   A.    I SAW IT NUMEROUS TIMES ON MY CALLER ID.

13   Q.    AND HOW OFTEN WOULD YOU GET PHONE CALLS FROM THE DEFENDANT

14   IN EARLY FEBRUARY 2012?

15   A.    THERE WERE SEVERAL A DAY.

16   Q.    WHAT TIMES OF DAYS WOULD YOU RECEIVE PHONE CALLS?

17   A.    ALL DAY LONG.

18   Q.    DID YOU EVER GET PHONE CALLS AT NIGHTTIME?

19   A.    YES.

20   Q.    HOW MANY TEXT MESSAGES WOULD YOU RECEIVE FROM THE

21   DEFENDANT IN EARLY FEBRUARY 2012?

22   A.    A FEW.

23   Q.    OKAY.  DID YOU RECEIVE A MEMORABLE VOICEMAIL ON FEBRUARY

24   23RD, 2012?

25   A.    YES, I DID.

1    Q.   CAN YOU DESCRIBE THIS VOICEMAIL?

2    A.   IT WAS A CALL CLAIMING TO BE FROM AN I.R.S. AGENT, AND

3    THEY SAID THAT THEY WERE LOOKING INTO MY RECORDS FOR SEVERAL

4    YEARS AND ASKED ME TO CALL BACK.

5            MS. PENNA:  PERMISSION TO APPROACH, YOUR HONOR?

6            THE COURT:  YES.

7    BY MS. PENNA:

8    Q.   I WOULD LIKE TO SHOW YOU WHAT HAS BEEN MARKED AS

9    GOVERNMENT'S EXHIBIT 4.  DO YOU RECOGNIZE THIS?

10           THE COURT:  COUNSEL, YOU HAVE SEEN THIS?

11           MR. ARCHER:  I HAVE.

12           THE WITNESS:  THIS IS A DISK.

13   BY MS. PENNA:

14   Q.   AND WHAT IS THIS DISK?

15   A.   I BELIEVE THIS IS A RECORDING OF THE PHONE CALL IN

16   QUESTION.

17   Q.   AND HOW DO YOU KNOW THAT IT IS THAT RECORDING?

18   A.   I LISTENED TO IT IN YOUR OFFICE AND INITIALED THE DISK.

19   Q.   OKAY.  THANK YOU.

20        YOUR HONOR, THE GOVERNMENT MOVES TO ADMIT GOVERNMENT'S

21   EXHIBIT 4 INTO EVIDENCE.

22           THE COURT:  ANY OBJECTION?

23           MR. ARCHER:  NO, YOUR HONOR.

24           THE COURT:  IT'S RECEIVED.

25        (GOVERNMENT'S EXHIBIT 4 WAS RECEIVED IN EVIDENCE.)

1          MS. PENNA:  YOUR HONOR, PERMISSION TO PUBLISH THE

2     EXHIBIT?

3          THE COURT:  YOU'RE GOING TO PLAY THE RECORDING?

4          MS. PENNA:  YES, YOUR HONOR.

5          THE COURT:  ALL RIGHT.  IS THERE A TRANSCRIPT OF

6     THIS?

7          MS. PENNA:  THERE IS ON EXHIBIT 4-A, AND IT WILL

8     ALSO BE PLAYING ON THE SCREEN FOR THE JURY.

9          (DIGITAL RECORDING PLAYED.)

10    BY MS. PENNA:

11    Q.  MR. HESSENFLOW, IS THIS THE VOICEMAIL THAT YOU RECEIVED ON

12    FEBRUARY 3RD, 2012?

13    A.  YES, IT IS.

14    Q.  WHAT TIME DID YOU RECEIVE THIS PHONE CALL OR THIS VOICE

15    MESSAGE?

16    A.  AROUND 1:30.

17    Q.  HOW DO YOU KNOW THAT WAS THE TIME THAT YOU RECEIVED IT?

18    A.  WELL, THAT WAS THE TIME THAT WAS RECORDED ON MY ANSWERING

19    MACHINE.

20    Q.  OKAY.  DO YOU REMEMBER WHAT NUMBER APPEARED ON THE CALLER

21    ID?

22    A.  YES.

23    Q.  WHAT NUMBER --

24    A.  ACTUALLY, I REMEMBER THE LAST FOUR DIGITS.

25    Q.  WHAT WERE THE LAST FOUR DIGITS?

1    A.   1040.

2    Q.   AND DOES THAT NUMBER HAVE ANY SIGNIFICANCE TO YOU?

3    A.   YES, IT'S A STANDARD FEDERAL INDIVIDUAL INCOME TAX RETURN.

4    Q.   INCOME TAX RETURN.  ARE YOU REFERRING TO A PHONE NUMBER?

5    A.   NO, THE FORM.

6    Q.   OH, THE FORM.  OKAY.  SO DID YOU RECOGNIZE THE NUMBER AS A

7    WHOLE?

8    A.   I DID NOT.

9    Q.   WHAT DID YOU DO WITH THAT PHONE NUMBER AFTER YOU RECEIVED

10   THE VOICE MESSAGE?

11   A.   I SEARCHED FOR IT WITH GOOGLE.

12   Q.   WHAT DID YOU FIND?

13   A.   I DIDN'T FIND ANYTHING.

14   Q.   AT THIS TIME DID YOU KNOW ONE WAY OR ANOTHER WHETHER, IN

15   FACT, YOU WERE UNDER INVESTIGATION OR AUDIT BY THE I.R.S.?

16   A.   NO.

17   Q.   WHAT DID YOU DO IN RESPONSE TO RECEIVING THE VOICE

18   MESSAGE?

19   A.   WELL, AFTER I FOUND NO INFORMATION ON THE NUMBER SO I WAS

20   FAIRLY CERTAIN IT WASN'T AN I.R.S. OFFICE, I SEARCHED ONLINE

21   FOR WHO TO REPORT THE IMPERSONATION TO.

22   Q.   AND WHO DID YOU FIND?

23   A.   TIGTA.

24   Q.   AND DO YOU KNOW WHAT TIGTA STANDS FOR?

25           MR. ARCHER:  OBJECTION.  RELEVANCE.

00040

```
1              THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION,

2        SIR.

3              THE WITNESS:  TREASURY INSPECTOR GENERAL TAX

4        ADMINISTRATION.

5        BY MS. PENNA:

6        Q.   THANK YOU.  HOW DID YOU CONTACT THEM?

7        A.   I SENT AN E-MAIL.

8        Q.   AND WHEN DID YOU CONTACT THEM?

9        A.   I BELIEVE IT WAS THE DAY AFTER I RECEIVED THE MESSAGE.

10       Q.   MR. HESSENFLOW, THERE IS A BINDER IN FRONT OF YOU.  COULD

11       YOU PLEASE TURN TO WHAT HAS BEEN MARKED AS GOVERNMENT'S

12       EXHIBIT 5.

13             DO YOU RECOGNIZE THIS DOCUMENT?

14       A.   YES.

15       Q.   AND WHAT IS IT?

16       A.   THIS IS THE E-MAIL THAT I SENT TO TIGTA.

17       Q.   HOW WERE YOU ABLE TO TRACK IT?

18       A.   IT HAS MY NAME AND ADDRESS AT THE TOP, AND I RECOGNIZE THE

19       CONTENT.

20             MS. PENNA:  YOUR HONOR, THE GOVERNMENT MOVES TO

21       ADMIT THIS EXHIBIT INTO EVIDENCE.

22             MR. ARCHER:  OBJECTION, HEARSAY AND RELEVANCE.

23             MS. PENNA:  YOUR HONOR, THIS IS AN E-MAIL FROM THE

24       WITNESS THAT HE CAN TESTIFY TO AND IT GOES TO HIS NEXT STEPS

25       AFTER HE SENT THIS E-MAIL.
```

1          THE COURT:  ARE YOU SEEKING TO ADMIT THIS FOR THE

2     TRUTH OF THE MATTER ASSERTED IN THE E-MAIL OR IS THIS --

3          MS. PENNA:  NO, YOUR HONOR.  WE'RE SEEKING TO ADMIT

4     IT TO SHOW THE NEXT STEPS THAT MR. HESSENFLOW MADE AFTER THIS

5     E-MAIL.

6          THE COURT:  HIS SUBSEQUENT CONDUCT?

7          MS. PENNA:  YES, YOUR HONOR.

8          MR. ARCHER:  YOUR HONOR, CAN WE ADDRESS THIS AT

9     SIDE-BAR?

10          THE COURT:  YES.

11          MR. ARCHER:  THANK YOU.

12       (SIDE-BAR CONFERENCE ON THE RECORD.)

13          THE COURT:  WE'RE AT SIDE-BAR WITH COUNSEL.

14          MR. ARCHER:  SO, YOUR HONOR, WE HAVE EXHIBIT

15     NUMBER 5 HAS MR. HESSENFLOW'S TRANSCRIPT OF THIS.  HE CAN

16     TESTIFY THAT HE CONTACTED TIGTA, HE JUST DID, INTRODUCING

17     HEARSAY ALONG WITH HIS TRANSCRIPT OF THE RECORDING EVEN IF IT'S

18     PURPORTEDLY JUST TO SHOW THAT HE ACTUALLY DID CONTACT SOMEBODY.

19     I DON'T KNOW THAT'S IN DISPUTE.  HE REPORTED THIS THE DAY

20     AFTER.

21       PERHAPS IF I WERE TO UNDERMINE THAT ON CROSS THAT THIS

22     COULD BE USED TO REBUT AND ATTACK HIS CREDIBILITY BUT WHY IT

23     WAS INTRODUCED SOME HEARSAY E-MAIL THAT HE WROTE IN 2012 TO

24     ESTABLISH THAT HE TESTIFIED -- I'M SORRY -- TO ESTABLISH THAT

25     HE CONTACTED TIGTA WHEN, IN FACT, HE JUST TESTIFIED TO THAT ON

1    DIRECT, I DON'T SEE THE RELEVANCE OF THAT.  I DON'T SEE THE

2    RELEVANCE OF THIS IF IT'S NOT BEING OFFERED FOR THE TRUTH.  IT

3    CONTAINS A NUMBER OF FACTUAL ASSERTIONS.

4        HE JUST TESTIFIED THAT HE CONTACTED TIGTA, AND WE'RE ALL

5    HERE.

6            MR. SCHENK:  NOT IN DISPUTE IS NOT THE STANDARD THAT

7    WE USE TO DETERMINE WHETHER EVIDENCE SHOULD BE ADMITTED OR NOT.

8        THE FACT THAT AFTER MR. HESSENFLOW RECEIVED HIS VOICE

9    MAIL, AS HE TESTIFIED, ARE THE PROCEDURES THAT HE FOUND ONLINE

10   HOW TO REPORT IMPERSONATIONS.  THIS IS EVIDENCE THAT HE DID

11   THAT, AND, THEREFORE, IT'S CERTAINLY RELEVANT EVIDENCE.

12       THEN THE QUESTION IS IS IT HEARSAY OR IS IT AN

13   OUT-OF-COURT STATEMENT THAT IS OFFERED FOR THE TRUTH AND IF IT

14   ISN'T OFFERED FOR THE TRUTH, IT CERTAINLY ISN'T ADMISSIBLE.

15       THE FACT THAT IT SUPPORTS SOMETHING THAT HE JUST SAID

16   DOESN'T MAKE IT HEARSAY.  IT ONLY BECOMES HEARSAY BECAUSE

17   MR. ARCHER SAYS, "IT'S NOT IN DISPUTE" OR THE WITNESS TESTIFIED

18   TO THESE FACTS, IN FACT, THIS IS ALL INFORMATION THAT

19   MR. ARCHER CAN CROSS-EXAMINE THIS WITNESS AS TO WHETHER THIS

20   COMES IN OR NOT AND THE FACT THAT HE TESTIFIES TO IT.

21           MR. ARCHER:  SO LET'S TAKE THE GOVERNMENT'S PREMISES

22   THAT THE PURPOSE IS TO ESTABLISH THAT HE CONTACTED SOMEBODY.

23   THAT, IN FACT, WOULD BE OFFERED FOR THE TRUTH OF THE MATTER.

24   THE BALANCE OF THIS WOULD BE IRRELEVANT.  THE TRUTH OF THE

25   MATTER BEING ASSERTED HERE IS THAT THIS IS AN E-MAIL THAT SAYS

1    THAT SOMEONE IS CONTACTING SOMEBODY ELSE; RIGHT?  IT'S NOT FOR

2    THE EFFECT ON THE HEARER.

3        WHAT ELSE WOULD IT BE OFFERED TO SHOW IF IT IS NOT FOR

4    SOMETHING ESTABLISHED BY THE CONTENTS OF THIS E-MAIL?

5        WHAT WOULD THE NON-HEARSAY PURPOSE BE IS WHAT MY QUESTION

6    WOULD BE.

7            THE COURT:  I UNDERSTAND.  SO THIS IS A DOCUMENT

8    THAT ON ITS FACE COULD BE HEARSAY AS WE'VE DESCRIBED.  WE'VE

9    BOTH DISCUSSED THE ESSENCE OF HEARSAY IS REGARDING RELIABILITY,

10   AND THAT'S ONE OF THE FACTORS OF THE HEARSAY OBJECTION.  IT

11   GOES TO RELIABILITY OF THE STATEMENT AND AS YOU POINT OUT,

12   MR. ARCHER, THE WITNESS TESTIFIED THAT HE IS -- DID THESE

13   THINGS.

14       WE'VE HEARD THE, WE'VE HEARD THE PHONE CALL.  THERE WAS A

15   CONCURRENT TRANSCRIPT SHOWN TO THE JURY.  THIS IS HIS WRITING,

16   AND I PRESUME THIS IS HIS WRITING AS TO WHAT HE BELIEVES THE

17   PHONE CALL WAS.  PRESUMABLY HE WROTE THIS DOWN.

18       I'M GOING TO ALLOW IT TO COME IN.  I DON'T THINK IT'S -- I

19   THINK IT CORROBORATES HIS TESTIMONY SUCH THAT AND YOU WILL

20   CERTAINLY HAVE AN OPPORTUNITY TO CROSS-EXAMINE ON THIS.  I

21   DON'T THINK THAT THIS IN ANY WAY PRESENTS ANY PREJUDICE, UNFAIR

22   PREJUDICE TO YOUR CLIENT THAT BASICALLY AS YOU POINT OUT IT

23   CORROBORATES WHAT HE DID.

24           MR. ARCHER:  OKAY.  SO THAT HIS -- I APOLOGIZE.  I

25   UNDERSTAND THAT THE COURT HAS JUST INDICATED THE RULING, BUT WE

1    HAVE HERE IN THE E-MAIL THAT HE'S SAYING IF THIS FOLLOWS A

2    GENERAL PATTERN OF HARASSMENT, HOW THIS WOULD COME IN FOR A

3    NON-HEARSAY PURPOSE.  IT'S HOW THE JURY IS GOING TO CONSIDER

4    THIS AND NOT BE PREJUDICED BY THIS.

5         BUT I UNDERSTAND THE COURT'S LIMITING INSTRUCTION, BUT,

6    FRANKLY, IT'S GOING TO BE HARD FOR A JURY TO LOOK AT THIS AND

7    NOT SAY, OH, WELL, THIS IS THE GENERAL PATTERN OF HARASSMENT.

8         THE COURT:  THAT PART OF IT -- AND THANK YOU FOR

9    RAISING IT -- THAT PART OF IT I THINK IT HAS SOME PROBLEMS

10   WITHOUT A FOUNDATION, AND I DON'T KNOW IF THERE'S GOING TO BE A

11   FOUNDATION RAISED.  HE DID INDICATE THAT, HE, THE WITNESS,

12   INDICATED RECEIVING NUMEROUS PHONE CALLS ALREADY.

13        NOW, I THINK, COUNSEL, IF YOU WANT TO ASK ADDITIONAL

14   FOUNDATIONAL QUESTIONS, AND THEN IF HE'S -- IF THAT'S THE

15   GENERAL PATTERN, IF THAT'S WHAT HE DESCRIBES AS HIS GENERAL

16   PATTERN OF HARASSMENT OR HIS OPINION OF WHAT HARASSMENT WAS TO

17   HIM, THEN I THINK IT'S HIS OPINION OF WHAT THE PHONE CALLS

18   WERE, YOU CAN CERTAINLY CROSS-EXAMINE ON THAT.

19        BUT THIS IS BASICALLY HIS REPORT OF RECEIVING THESE CALLS.

20   SO --

21        MR. ARCHER:  RIGHT.  I MEAN, IT'S AN OUT-OF-COURT

22   STATEMENT.  I MEANT --

23        THE COURT:  SURE, SURE.  COUNSEL COULD ASK HIM TO

24   BASICALLY RECITE THIS AND TESTIFY ABOUT AUDIBLY WHAT DID YOU

25   REPORT AND HE COULD READ THIS AND IT WOULD BE IN FRONT OF THE

1     JURY.  I UNDERSTAND THE DIFFERENCE IS THAT THE HARD COPY IS IN

2     FRONT OF THEM AS OPPOSED TO JUST THE PURPLE COPY, BUT I DON'T

3     THINK THERE'S ANY UNFAIR PREJUDICE AS TO JUST ALLOWING THE

4     DOCUMENTS TO COME IN BUT I THINK YOU SHOULD, IF YOU CAN, LAY A

5     FOUNDATION.  I'M NOT GOING TO ADMIT IT JUST YET ABSENT THAT

6     FOUNDATIONAL AS TO GENERAL PATTERN.

7           OKAY?  ALL RIGHT.  THANK YOU.

8           (END OF DISCUSSION AT SIDE-BAR.)

9                 THE COURT:  THANK YOU, COUNSEL.

10          SO, COUNSEL, IF YOU HAVE ANY OTHER ADDITIONAL FOUNDATIONAL

11    QUESTIONS.

12                MS. PENNA:  THANK YOU, YOUR HONOR.

13    Q.    MR. HESSENFLOW, YOU'VE TOLD US THAT THERE WERE NUMEROUS

14    PHONE CALLS AND TEXT MESSAGES THAT YOU RECEIVED FROM THE

15    DEFENDANT AT AROUND THIS TIME.  WERE THERE OTHER INTERACTIONS

16    OR OTHER CONTACT THAT YOU HAD WITH THE DEFENDANT AROUND THIS

17    DATE?

18    A.    LET'S SEE.

19                THE COURT:  SIR, ARE YOU REFERRING TO SOMETHING TO

20    REFRESH YOUR RECOLLECTION?

21                THE WITNESS:  YES.

22                THE COURT:  ALL RIGHT.  THANK YOU.

23                THE WITNESS:  RIGHT AROUND THAT DATE, THE FOLLOWING

24    DAY THERE WAS A CRAIGSLIST POSTING I BELIEVE WAS COMING IN.

25                MS. PENNA:  OKAY.

```
 1       Q.   COULD YOU DESCRIBE THIS CRAIGSLIST POSTING?

 2       A.   IT WAS A POSTING LISTING A 1985 PORSCHE FOR SALE FOR A

 3   DOLLAR AND IT GAVE MY ADDRESS.

 4       Q.   HOW DID YOU SEE THIS POST?

 5       A.   I WAS TOLD ABOUT IT BY A NEIGHBOR WHO HAD SEEN SOMEONE ON

 6   MY ROAD LOOKING FOR MY PLACE AND THAT PERSON HAD A COPY OF THE

 7   CRAIGS AD WITH THEM.

 8       Q.   OKAY.  AND YOU DID NOT MAKE THIS POST?

 9       A.   NO, I DID NOT.

10       Q.   WAS YOUR HOME ADDRESS LISTED?

11       A.   YES, IT WAS.

12       Q.   AND WHAT IS THAT ADDRESS?

13       A.   23097 SUMMIT ROAD.

14       Q.   DID ANYONE SHOW UP TO BUY YOUR CAR?

15            MR. ARCHER:  OBJECTION, RELEVANCE.

16            THE COURT:  OVERRULED.  THAT IS, IF YOU HAD CONTACT

17   WITH.

18            THE WITNESS:  WELL, I SAW ONE PERSON HAD BEEN TO MY

19   HOUSE THAT I SAW ON SURVEILLANCE VIDEO.

20            MR. ARCHER:  OBJECTION, YOUR HONOR.  MAY WE GO

21   SIDE-BAR?

22            THE COURT:  THIS IS IN RELATION TO THE PORSCHE AD?

23            THE WITNESS:  YES.  THERE WAS ANOTHER THAT MY

24   NEIGHBOR HAD TURNED AWAY THAT I DID NOT SEE HIM, AND THERE WAS

25   A THIRD THAT I SAW AT THE MAILBOXES THAT I TURNED AWAY.
```

```
1                    MR. ARCHER:  I WITHDRAW THE OBJECTION.

2      BY MS. PENNA:

3      Q.   MR. HESSENFLOW, DID YOU KEEP TRACK OF YOUR CONTACT THAT

4      YOU HAD WITH THE DEFENDANT?

5      A.   YES, I DID.

6      Q.   WHY DID YOU DECIDE TO DO THAT?

7                    MR. ARCHER:  OBJECTION, RELEVANCE.

8                    THE COURT:  OVERRULED.

9                    THE WITNESS:  BECAUSE EARLIER IN THE AFTERNOON WITH

10     HIM HE WAS AGGRESSIVE.

11     BY MS. PENNA:

12     Q.   WHEN WOULD YOU WRITE DOWN THESE ENTRIES?

13     A.   AS SOON AS I WAS ABLE TO.

14     Q.   CAN YOU DESCRIBE SOME OF THE INSTANCES THAT WOULD SPUR YOU

15     TO MAKE AN ENTRY IN THAT LOG?

16                   MR. ARCHER:  OBJECTION, RELEVANCE.

17                   THE COURT:  OVERRULED.

18                   THE WITNESS:  WELL, I PUT ENTRIES IN FOR EACH OF THE

19     PHONE CALLS THAT I RECEIVED AND EACH TIME SOMETHING ELSE

20     HAPPENED I BELIEVED HE WAS BEHIND SUCH AS THE CRAIGSLIST AD AND

21     THE CALL FROM THE I.R.S. AGENT.

22     BY MS. PENNA:

23     Q.   AND BASED ON THIS, IS THAT THE REASON THAT WHEN YOU

24     RECEIVED THE I.R.S. PHONE CALL YOU -- WHEN YOU SENT AN E-MAIL

25     TO LAW ENFORCEMENT WAS THERE A REASON THAT YOU SPECIFICALLY
```

```
 1    SENT -- REACHED OUT TO THEM?

 2    A.   WELL, YES, I BELIEVED THAT THE CALL WAS -- I DIDN'T KNOW

 3    IT WAS HIM AT THE TIME, BUT I BELIEVED IT WAS ORIGINATED BY

 4    MR. YORK.

 5    Q.   AND WHY DID YOU THINK THAT?

 6    A.   BECAUSE IT FOLLOWED THE SAME PATTERN OF HARASSMENT THAT

 7    HAD BEEN THE PREVIOUS WEEK OF PHONE CALLS THAT HE HAD BEEN

 8    ENGAGED IN.

 9    Q.   SO THE PATTERN OF HARASSMENT HAD BEEN GOING ON FOR HOW

10    LONG PRIOR TO YOUR RECEIVING THAT PHONE CALL?

11              MR. ARCHER:  OBJECTION, ASKED AND ANSWERED.

12              THE COURT:  OVERRULED.

13              THE WITNESS:  WELL, THE PHONE CALLS I'D HAVE TO LOOK

14    AT MY LOG TO SEE.

15              THE COURT:  AND ARE YOU REFERRING TO YOUR LOG NOW TO

16    REFRESH YOUR RECOLLECTION?

17              THE WITNESS:  YES, I AM.

18              THE COURT:  PLEASE GO RIGHT AHEAD.  THANK YOU.

19              THE WITNESS:  AND IT LOOKS LIKE THE PHONE CALLS

20    BEGAN IN MID-FEBRUARY.

21              MS. PENNA:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

22    WOULD MOVE TO PUBLISH EXHIBIT 5, WHICH IS THE E-MAIL THAT WE'VE

23    PREVIOUSLY DISCUSSED.

24              MR. ARCHER:  OBJECTION, HEARSAY.

25              THE COURT:  THANK YOU.  I'LL OVERRULE THE OBJECTION,
```

Case 5:15-cr-00226-EJD Document 867 Filed 10/02/15 Page 44 of 284

```
 1    AND I'LL ADMIT IT NOTING THE OBJECTION.  IT IS ADMITTED, AND IT

 2    MAY BE PUBLISHED.

 3         (GOVERNMENT'S EXHIBIT 5 WAS RECEIVED IN EVIDENCE.)

 4    BY MS. PENNA:

 5    Q.   MR. HESSENFLOW, THIS IS EXHIBIT 5 IN THE BINDER IF YOU CAN

 6    READ THAT BETTER.

 7         WHO IS THIS E-MAIL FROM?

 8    A.   THIS IS FROM ME.

 9    Q.   AND WHEN WAS IT SENT?

10    A.   FEBRUARY 24TH.

11    Q.   AND HOW LONG AFTER YOU RECEIVED THE VOICEMAIL WAS THIS

12    DISCUSSED AND SENT?

13    A.   THE NEXT DAY.

14    Q.   AND WHO WAS THIS SENT TO?

15    A.   TIGTA.

16    Q.   AND WHAT WAS THE SUBJECT OF THIS E-MAIL?

17    A.   IMPERSONATING I.R.S. PERSONNEL.

18    Q.   AND DID YOU CREATE THAT SUBJECT LINE?

19    A.   YES, I DID.

20    Q.   COULD YOU READ THIS E-MAIL TO THE JURY?

21    A.   IT SAYS, "HELLO, ON THURSDAY, FEBRUARY 23, 2012, AT 1:25

22    P.M. I RECEIVED A MESSAGE ON MY HOME PHONE ANSWERING MACHINE

23    CLAIMING TO BE FROM THE I.R.S.  I HAVE KEPT THE RECORDING.  THE

24    NUMBER ON THE CALLER ID WAS 708-565-1040, AND I BELIEVE THAT

25    NUMBER WAS SPOOFED, AND I BELIEVE I KNOW WHO IS BEHIND IT,
```

1   DOUGLAS YORK OF MORGAN HILL, CALIFORNIA, AS THIS FOLLOWS A

2   GENERAL PATTERN OF HARASSMENT FROM HIM."

3        A TRANSCRIPT IS HERE.

4        "HELLO, ALLAN.  MY NAME IS GIGI SMITH.  I'M WITH THE

5   I.R.S., INTERNAL REVENUE SERVICE, AND I'M CALLING YOU (GARBLED)

6   TAX AUDIT SOME INFORMATION (GARBLED) AND WE WOULD LIKE TO CHECK

7   YOUR RECORDS FOR THE FOLLOWING YEARS 2005, 2006, 2007, AND IF

8   YOU COULD PLEASE RETURN MY CALL AT THE NUMBER LISTED ON YOUR

9   CALLER ID THAT WOULD BE APPRECIATED.  AND, ONCE AGAIN, IF WE

10  CANNOT REACH YOU, WE WILL DEFINITELY BE CHECKING INTO YOUR

11  PAST, AND I'LL BE LOOKING INTO YOUR RECORDS.  THANKS A LOT AND

12  WE'LL CALL YOU BACK TOMORROW."

13  Q.   THANK YOU, MR. HESSENFLOW.  DID SOMEONE CONTACT YOU FROM

14  TIGTA IN RESPONSE?

15  A.   YES.

16  Q.   AND WHO WAS THAT?

17  A.   AGENT JOHN HARTMAN.

18  Q.   AND WHAT DID YOU DO IN RESPONSE TO BEING CONTACTED BY THAT

19  PERSON?

20        MR. ARCHER:  RELEVANCE, YOUR HONOR.  OBJECTION.

21        THE COURT:  OVERRULED.

22        THE WITNESS:  HE REQUESTED A COPY OF THE RECORDING

23  WHICH I SENT HIM.

24  BY MS. PENNA:

25  Q.   AND HOW WERE YOU ABLE TO SEND HIM A RECORDING?

1    A.   I HAD USED THE HANDHELD DIGITAL RECORDER TO RECORD A COPY

2    OF IT FROM THE ANSWERING MACHINE AND TRANSFERRED A FILE FROM

3    THAT ONTO MY COMPUTER AND E-MAILED IT TO HIM.

4    Q.   OKAY.  THAT TRANSCRIPT THAT WAS AT THE BOTTOM OF THE

5    MESSAGE, IS THAT SOMETHING THAT YOU WROTE?

6    A.   YES, IT IS.

7    Q.   AND WHEN DID YOU MAKE THAT TRANSCRIPT?

8    A.   EITHER THE END OF EVENING OF THE 23RD OR THE MORNING OF

9    THE 24TH.

10   Q.   AND AT WHAT TIME DID YOU STATE THAT YOU RECEIVED THE

11   VOICEMAIL MESSAGE?

12   A.   1:25 P.M.

13   Q.   YOU WROTE THAT THE NUMBER ON THE CALLER ID WAS A NUMBER

14   STARTING IN 708.  IS THAT THE NUMBER THAT WE DISCUSSED EARLIER?

15   A.   YES, IT IS.

16   Q.   WHY IN THIS E-MAIL DID YOU USE THE WORD "SPOOFED"?

17   A.   I HAD HAD A PREVIOUS INCIDENT WHERE SOMEONE HAD USED A

18   CREDIT CARD, MY CREDIT CARD, TO SEND MONEY TO WESTERN UNION,

19   AND WESTERN UNION TOLD ME THAT THE TRANSMISSION WAS FROM MY

20   HOME PHONE, AND I RESEARCHED HOW THAT WAS POSSIBLE AND FOUND

21   SPOOFING.

22   Q.   AND WHEN WAS THAT?

23   A.   I DON'T RECALL.  IT WAS AT LEAST A YEAR EARLIER THAN THIS.

24   Q.   OKAY.  ARE YOU AWARE OF A FACEBOOK POST THAT PERTAINED TO

25   YOU DURING THIS TIMEFRAME?

1    A.   YES, I AM.

2    Q.   AND CAN YOU DESCRIBE THIS POST?

3         MR. ARCHER:  OBJECTION, RELEVANCE.

4         THE COURT:  OVERRULED.

5         THE WITNESS:  DOUG POSTED MY -- A MESSAGE SAYING

6    THAT HIS GIRLS ARE AT MY PLACE AND IMPLYING I'M A DANGER TO

7    THEM AND GAVE MY ADDRESS.

8    BY MS. PENNA:

9    Q.   COULD YOU PLEASE TURN TO WHAT HAS BEEN MARKED AS

10   GOVERNMENT'S EXHIBIT 8.

11        DO YOU RECOGNIZE THIS DOCUMENT, MR. HESSENFLOW?

12   A.   YES, THAT IS THE FACEBOOK POST.

13   Q.   AND HOW ARE YOU ABLE TO RECOGNIZE IT?

14   A.   IT SHOWS THAT IT IS DOUGLAS YORK'S FACEBOOK PAGE, AND I

15   RECOGNIZE THE POST ITSELF.

16        MR. ARCHER:  OBJECTION, FOUNDATION.

17   BY MS. PENNA:

18   Q.   MR. HESSENFLOW?

19        THE COURT:  I'M SORRY.  I NEED TO RULE ON IT.

20        MS. PENNA:  SORRY.

21        THE COURT:  OVERRULED.  YOU CAN ASK ANOTHER

22   QUESTION.

23        MS. PENNA:  THANK YOU.  SORRY, YOUR HONOR.

24   Q.   MR. HESSENFLOW, HOW DID YOU FIRST SEE THIS POST?

25   A.   I WAS NOTIFIED OF IT BY A FRIEND.

00053

```
 1    Q.   WERE YOU ABLE TO -- HOW DID YOU FIRST SEE THE POST ITSELF?

 2    A.   HE PROVIDED A PRINTOUT.

 3    Q.   AND DOES THIS DOCUMENT REFLECT THAT PRINTOUT THAT YOU

 4    REVIEWED?

 5    A.   YES, IT DOES.

 6         MS. PENNA:  YOUR HONOR, THE GOVERNMENT MOVES TO

 7    ADMIT THIS EXHIBIT.

 8         MR. ARCHER:  OBJECTION, HEARSAY AND FOUNDATION.

 9         THE COURT:  IT WILL BE ADMITTED NOTING YOUR

10    OBJECTION.

11         MS. PENNA:  AND PERMISSION TO PUBLISH IT, YOUR

12    HONOR?

13         THE COURT:  IT MAY BE PUBLISHED.

14    (GOVERNMENT'S EXHIBIT 8 WAS RECEIVED IN EVIDENCE.)

15    BY MS. PENNA:

16    Q.   MR. HESSENFLOW, CAN YOU READ THIS POST TO THE JURY?

17    A.   "MY EX-WIFE TOOK MY GIRLS UP TO HIS PLACE ON THE SUMMIT

18    OFF OF HIGHWAY 17.  MY GIRLS SHOULD HAVE CALLED ME.  EVERY TIME

19    I CALLED MY EX IT WAS RINGING TO THE E-MAIL.  NOW JUST THE

20    VOICEMAIL AND NO REPLY IN TEXTS OR CALLS.  HE ANSWERED THE

21    HOUSE PHONE BUT HUNG UP WHEN I ASKED FOR MY GIRLS.  THEY ALWAYS

22    CALL TO SAY GOODNIGHT.  IF ANYONE IS BY TRAIL RIDGE DRIVE, THE

23    ADDRESS IS 23097 SUMMIT ROAD, LOS GATOS."

24    Q.   THANK YOU.  WHAT DATE DID YOU SEE THIS POST?

25    A.   IT WAS IN MARCH.  I'D HAVE TO LOOK UP THE EXACT DATE.
```

1    Q.   COULD YOU DO THAT.

2    A.   I SAW IT ON MARCH 17TH.

3    Q.   DO YOU REMEMBER IF THE DEFENDANT HAD CALLED YOU ON THAT

4    DATE?

5    A.   HE HAD CALLED THE NIGHT BEFORE.

6    Q.   DO YOU REMEMBER WHAT HAPPENED?  DID YOU SPEAK TO HIM?

7    A.   ONLY VERY BRIEFLY.

8    Q.   OKAY.  WERE HIS DAUGHTERS AT YOUR HOUSE?

9    A.   THEY WERE NOT.

10   Q.   IS THAT YOUR HOME ADDRESS THAT IS LISTED ON THE POSTING?

11   A.   YES, IT IS.

12   Q.   IS THAT THE SAME ADDRESS THAT WAS LISTED PUBLICLY ON THE

13   CRAIGSLIST POSTING?

14   A.   YES, IT IS.

15   Q.   HAD THE DEFENDANT MADE OTHER ALLEGATIONS ABOUT YOU BEING A

16   DANGER TO HIS CHILDREN?

17           MR. ARCHER:  OBJECTION, RELEVANCE.

18           THE COURT:  SUSTAINED.

19       SO YOU TOLD US MARCH 17TH.  WHAT YEAR WAS THAT?

20           THE WITNESS:  2012.

21           MS. PENNA:  NO OBJECTION, YOUR HONOR.  WE'LL MOVE

22   ON.  THANK YOU.

23   Q.   MR. HESSENFLOW, HAD YOU EVER HAD THE CHANCE TO SEE THE

24   DEFENDANT'S PHONE BILL OR OTHER RECORDS?

25   A.   YES, I HAVE.

1    Q.   AND HOW WERE YOU ABLE TO SEE THEM?

2    A.   THEY WERE PROVIDED BY ANDREA YORK.

3    Q.   AND WHEN WAS THIS?

4    A.   I'M NOT SURE OF THE EXACT TIME.  IT WAS APRIL OR MAY OF

5    2012.

6    Q.   AND DID YOU SEE THE PHONE BILL FOR THE MONTH OF FEBRUARY

7    2012?

8              MR. ARCHER:  OBJECTION, RELEVANCE.

9              THE WITNESS:  YES, I DID.

10             THE COURT:  I'M SORRY?

11             MR. ARCHER:  OBJECTION, RELEVANCE.

12             THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

13             THE WITNESS:  YES, I DID.

14   BY MS. PENNA:

15   Q.   WOULD YOU PLEASE TURN TO GOVERNMENT'S EXHIBIT 3 WHICH HAS

16   BEEN ADMITTED INTO EVIDENCE AND PLEASE TURN TO PAGE 310.

17             MR. ARCHER:  YOUR HONOR, TO CLARIFY, GOVERNMENT'S

18   EXHIBIT 3 HAS NOW BEEN ADMITTED INTO EVIDENCE?

19             THE COURT:  IT HAS BEEN ADMITTED.

20             MS. PENNA:  IT HAS BEEN ADMITTED.

21             THE COURT:  LET'S HAVE A SIDE-BAR, PLEASE.

22        (SIDE-BAR CONFERENCE ON THE RECORD.)

23             THE COURT:  WE'RE AT SIDE-BAR OUTSIDE OF THE

24   PRESENCE OF THE JURY.  I THINK THIS REFERENCES THE CONVERSATION

25   THAT WE HAD ABOUT AN AGREEMENT THAT FOUNDATIONAL WITNESSES

 1    WOULD NOT BE REQUIRED.

 2              MR. ARCHER:  IT IS AS TO THE ELEMENTS LAID OUT AND

 3    THE CERTIFICATES PROVIDED BY THE GOVERNMENT FOR THE DOCUMENTS

 4    BUT BEYOND THAT THEM BEING BUSINESS RECORDS OR ANY RELEVANCE,

 5    YOU KNOW, THAT COULD POTENTIALLY BE HEARSAY.

 6              THE COURT:  SO MY RECOLLECTION OF OUR CONVERSATION

 7    DURING OUR PRETRIAL DISCUSSION WAS THAT THERE WAS SOME

 8    AGREEMENT ABOUT THE FOUNDATIONAL ISSUE AND THAT I THINK THE

 9    DEFENSE AGREED THAT WITNESSES WOULD NOT NEED TO BE CALLED OUT

10    FOR BUSINESS RECORD PURPOSES.

11              MR. ARCHER:  UNDERSTOOD.

12              THE COURT:  MY RECOLLECTION WAS THAT THERE WAS STILL

13    A RESERVATION AS TO ANY OF THE SPECIFICS AS TO THE RECORDS.

14    MAYBE I'M WRONG ABOUT THAT, BUT THAT WAS MY --

15              MR. SCHENK:  A COUPLE OF THINGS.  FIRST, THERE

16    COULDN'T BE A HEARSAY OBJECTION ANY LONGER.  THAT'S THE

17    EXCEPTION OF THE BUSINESS RECORDS.  THEY WOULD COME IN IF WE

18    GET OVER THE RELEVANCE HURDLE.  THE RELEVANCE IS THAT THESE

19    RECORDS SHOW THAT THEY ARE FROM THE TIMEFRAME WHEN THEY SHOW

20    THE PHONE CALL AND THAT THEY'RE CLOSE IN TIME AND WHEN THEY

21    SHOW THE PHONE CALLS, THE PATTERN OF THE HARASSING PHONE CALLS

22    THAT THE WITNESS TESTIFIED TO.

23              MR. ARCHER:  IS THE INTENTION TO THEN -- I APOLOGIZE

24    FOR GRABBING AT THE COURT'S COPY BUT IF WE CAN TAKE A LOOK

25    HERE, WE'RE LOOKING AT --

```
1              THE COURT:  YOU SEE, MY QUESTION WAS WHETHER OR

2     NOT -- AND YOU'RE ABSOLUTELY CORRECT THAT THE FOUNDATION LAID

3     IS THAT THIS IS A BUSINESS RECORD AND IT'S OTHERWISE

4     ADMISSIBLE.  IT HASN'T, I GUESS, TECHNICALLY BEEN MOVED INTO

5     EVIDENCE BUT AT THE PRETRIAL CONFERENCE, AND I HATE TO FORMALLY

6     DO IT ON THE RECORD, I THINK.

7          BUT THE OTHER QUESTION IS WHETHER OR NOT THERE WERE OTHER

8     PHONE NUMBERS ON HERE THAT ARE RELEVANT TO THIS CASE.  I DON'T

9     KNOW THE ANSWER TO THAT QUESTION.

10             MR. SCHENK:  I'M CERTAIN THAT THEY ARE BUT NOT IN

11    THE WAY THAT MAKES THE EXHIBIT IRRELEVANT.  ALTHOUGH NUMBERS,

12    IT'S A BANK RECORDS CASE, YOU CAN MOVE THE BANK RECORDS IN EVEN

13    IF THE TRANSACTION IS INVOLVED.

14             THE COURT:  SURE.

15             MR. ARCHER:  OUR QUESTION IS THAT ARE WE INTENDING

16    TO MOVE THEM UP TO MARCH 16TH?  MY QUESTION IS IS IT THE

17    GOVERNMENT'S INTENTION TO MOVE ALL OF THE PHONE RECORDS FROM

18    EVERY PHONE CALL MADE BY MS. BEALE OR HER SON PER THE

19    GOVERNMENT'S THEORY?

20             THE COURT:  WELL, THE DOCUMENT COMES IN BUT THE

21    DISCUSSION WOULD BE ABOUT THE SPECIFIC NUMBERS, I PRESUME.  I

22    DON'T KNOW IF THERE'S GOING TO BE A QUESTION ABOUT NUMBERS THAT

23    ARE NOT RELATED TO THIS CASE.  I'D SUSTAIN A RELEVANCE

24    OBJECTION TO THAT.

25             MS. PENNA:  THERE'S NOT.
```

1              THE COURT:  BUT IF THERE'S OTHER -- IF THERE ARE

2    PHONE CALLS THAT ARE ATTACHED TO THAT THEN IT COMES IN AS A

3    BUSINESS RECORD EXCEPTION AND THE WHOLE DOCUMENT COMES IN, THEN

4    THE QUESTION IS WHETHER OR NOT THESE OTHER INDIVIDUAL LINES OF

5    QUESTIONING AS TO NUMBERS THAT MIGHT NOT BE RELEVANT TO THIS

6    CASE ARE APPROPRIATE FOR THE CASE.

7              MR. ARCHER:  OKAY.

8              MR. SCHENK:  THANK YOU.

9              THE COURT:  ANYTHING FURTHER?

10             MR. ARCHER:  NO.

11             THE COURT:  ALL RIGHT.  THANK YOU.

12        (END OF DISCUSSION AT SIDE-BAR.)

13             THE COURT:  THANK YOU, COUNSEL.  SO LET'S SEE,

14   EXHIBIT 3, YOU'RE MOVING EXHIBIT 3 INTO EVIDENCE?

15             MS. PENNA:  YES, YOUR HONOR.  THANK YOU.

16             THE COURT:  ANY OBJECTION?

17             MR. ARCHER:  NO, YOUR HONOR.

18             THE COURT:  IT'S ADMITTED.

19        (GOVERNMENT'S EXHIBIT 3 WAS RECEIVED IN EVIDENCE.)

20             MS. PENNA:  PERMISSION TO PUBLISH THIS EXHIBIT, YOUR

21   HONOR?

22             THE COURT:  YOU HAVE CERTAIN PORTIONS OF THE

23   EXHIBIT?

24             MS. PENNA:  YES, YOUR HONOR.  AT THIS TIME WE WILL

25   BE PUBLISHING PAGE 310.

```
 1                    THE COURT:  ALL RIGHT.

 2      BY MS. PENNA:

 3      Q.   MR. HESSENFLOW, DO YOU RECOGNIZE THESE RECORDS?

 4      A.   YES, I DO.

 5      Q.   AND WHAT ARE THEY?

 6      A.   IT'S A PHONE BILL.

 7      Q.   IS THIS THE PHONE BILL THAT YOU DISCUSSED THAT YOU

 8      PREVIOUSLY REVIEWED?

 9      A.   YES, IT IS.

10      Q.   COULD YOU PLEASE TURN TO PAGE 311.

11           ARE THESE RECORDS IN THE DEFENDANT'S NAME?

12      A.   NO, THEY'RE IN HIS MOTHER'S NAME.

13      Q.   WHAT IS HIS MOTHER'S NAME?

14      A.   PAMELA BEALE.

15      Q.   AND HOW DO YOU KNOW THAT THIS IS THE DEFENDANT'S CELL

16      PHONE RECORDS?

17      A.   IT'S FOR HIS PHONE NUMBER.

18              MR. ARCHER:  OBJECTION, FOUNDATION.  ASSUMES FACTS

19      NOT IN EVIDENCE.

20              THE COURT:  DO YOU WANT TO LAY A FOUNDATION AS TO

21      THAT, AS TO WHETHER OR NOT THIS IS HIS CELL PHONE.

22              MS. PENNA:  I THINK WE HAVE ESTABLISHED THAT EARLIER

23      IN THE TESTIMONY BUT I'M HAPPY TO REDISCUSS.

24              THE COURT:  WHY DON'T YOU.

25      BY MS. PENNA:
```

1    Q.   MR. HESSENFLOW, DO YOU KNOW MR. YORK'S PHONE NUMBER?

2    A.   YES.

3    Q.   AND WHAT IS THAT PHONE NUMBER?

4    A.   408-710-9450.

5    Q.   AND HOW DO YOU KNOW THAT PHONE NUMBER?

6    A.   HE CALLED ME NUMEROUS TIMES FROM THAT NUMBER.

7    Q.   AND WHEN SOMEONE WOULD CALL YOU FROM THAT PHONE NUMBER AND

8    YOU WOULD PICK UP, WHO WOULD BE ON THE OTHER END?

9    A.   MR. YORK.

10   Q.   AT ANY TIME DID HE TELL YOU THAT WAS HIS CELL PHONE

11   NUMBER?

12   A.   I BELIEVE A TEXT MESSAGE THAT HE SENT ME SAID THAT.

13   Q.   MR. HESSENFLOW, WHAT DID YOU LOOK FOR ON THAT BILL?

14   A.   I --

15            MR. ARCHER:  OBJECTION, RELEVANCE.

16            THE COURT:  OVERRULED.

17            THE WITNESS:  I LOOKED FOR CALLS ON FEBRUARY 23RD

18   AROUND 1:25 P.M.

19   BY MS. PENNA:

20   Q.   WHY AT THAT TIME AND ON THAT DAY?

21   A.   BECAUSE THAT WAS THE TIME OF THE I.R.S. IMPERSONATION

22   CALL.

23   Q.   OKAY.  WHAT DID YOU FIND?

24   A.   I FOUND THAT THERE HAD BEEN TWO CALLS AT THAT TIME BOTH TO

25   AN 866 NUMBER.

1     Q.   AND COULD WE PLEASE TURN TO PAGE 313.

2          COULD YOU IDENTIFY WHERE ON THIS PAGE THE TWO PHONE CALLS

3     ARE THAT YOU JUST MENTIONED?

4     A.   ON 315?  IT WOULD HAVE TO BE EARLIER THAN THAT.

5     Q.   315?

6     A.   YES.  THEY ARE NEAR THE TOP.

7     Q.   MR. HESSENFLOW, ON PAGE 313?

8     A.   YES, SIXTH AND SEVENTH LINES ON PAGE 313.

9     Q.   THANK YOU.  AND COULD YOU READ THE DATE AND TIME AND THE

10    PHONE NUMBER ON THE FIRST PHONE CALL?

11    A.   2:23 AND 1:24 P.M.

12    Q.   AND WHAT WAS THE PHONE NUMBER CALLED?

13    A.   866-967-6594.

14    Q.   WHAT ABOUT THE SECOND PHONE CALL?

15    A.   THAT'S TO THE SAME NUMBER AT 1:25 P.M.

16    Q.   WHAT TIME DID YOU RECEIVE THE VOICEMAIL?

17    A.   AT 1:25 P.M.

18    Q.   AND DO YOU RECOGNIZE THIS NUMBER HERE?

19    A.   I DO BECAUSE I SEARCHED FOR IT AT THE TIME.

20    Q.   AND WHAT DID YOU FIND FROM THAT SEARCH?

21    A.   I FOUND THAT IT BELONGS TO SPOOFCARD.

22    Q.   AND WHAT IS SPOOFCARD?

23    A.   IT'S A SERVICE THAT ALLOWS YOU TO SPOOF YOUR PHONE NUMBER.

24    Q.   AND COULD YOU DESCRIBE WHAT SPOOF MEANS?

25    A.   IT MEANS --

00062

```
1              MR. ARCHER:  OBJECTION, FOUNDATION.

2              THE COURT:  DO YOU WANT TO ASK HIM HIS UNDERSTANDING

3    OF SPOOF?

4    BY MS. PENNA:

5    Q.   COULD YOU TELL US YOUR KNOWLEDGE ABOUT WHAT THE WORD

6    "SPOOF" MEANS IN THE CONTEXT OF THIS COMPANY?

7    A.   IT MEANS CALLING SOMEONE WITH -- IT WAS SELECT A NUMBER

8    THAT YOU WANT TO SHOW UP ON THE CALLER ID.

9    Q.   OKAY.  HOW DID YOU KNOW ABOUT THIS COMPANY?

10   A.   I BELIEVE I ENCOUNTERED IT IN THE PREVIOUS SEARCH IN THE

11   WESTERN UNION CASE, BUT I IMMEDIATELY, WHEN I SEARCHED THE

12   NUMBER THIS TIME, IT TURNED UP THE SPOOFCARD, AND I LOOKED UP

13   THEIR WEBSITE.

14   Q.   OKAY.  WHAT DID YOU DO NEXT?

15   A.   I SET UP AN ACCOUNT FROM SPOOFCARD MYSELF AND EXPERIMENTED

16   WITH IT.

17   Q.   AND CAN YOU DESCRIBE WHAT IT MEANS THE STEPS OF MAKING AN

18   ACCOUNT ON SPOOFCARD?

19             MR. ARCHER:  OBJECTION, RELEVANCE.

20             THE COURT:  OVERRULED.

21             THE WITNESS:  I CREATED AN ACCOUNT ON THE WEBSITE

22   AND IT REQUESTED AN E-MAIL ADDRESS AND CREDIT CARD NUMBER TO

23   PAY FOR IT.

24   BY MS. PENNA:

25   Q.   DID YOU MAKE ANY CALLS ON THAT SERVICE?
```

1    A.   YES.

2    Q.   AND WHAT KIND OF CALLS?

3    A.   I CALLED MYSELF AND FIRST VERIFIED WHAT IT EXPLAINED THE

4    SPOOFING OF CALLER ID, WHICH IT DID, AND AFTER THAT I TRIED

5    USING THEIR VOICE CHANGING OPTIONS AND PLAYED A RECORDING OF

6    ANOTHER MESSAGE THAT I HAD FROM MR. YORK THROUGH IT.

7    Q.   AND YOU DESCRIBED A VOICE CHANGING OPTION.  CAN YOU

8    DESCRIBE THAT MORE?

9    A.   YES.  THEY OFFERED TWO VOICE CHANGE OPTIONS, ONE FOR MALE

10   AND ONE FOR FEMALE VOICES.

11   Q.   OKAY.  COULD YOU ELABORATE ON -- YOU SAID YOU PLAYED A

12   VOICEMAIL MESSAGE THAT YOU HAD OF THE DEFENDANT?

13   A.   YES, I USED ONE OF THE OTHER RECORDINGS THAT THEY LEFT ON

14   MY ANSWERING MACHINE, AND I CALLED SPOOFCARD THROUGH MY CELL

15   PHONE, CALLED MY HOME PHONE AND PLAYED THE RECORDING OF HIS

16   VOICE THROUGH IT.

17   Q.   AND WHAT HAPPENED NEXT?

18   A.   I LISTENED TO THE RESULT ON MY OWN NUMBER AND WHICH

19   SOUNDED EXACTLY LIKE THE VOICE OF THE I.R.S. AGENT.

20   Q.   MR. HESSENFLOW, COULD YOU NOW TURN TO PAGE 312 OF THESE

21   RECORDS.  IS THIS WHERE THE RECORDS START FOR THE CALLS MADE ON

22   FEBRUARY 23RD, 2012?

23   A.   YES, IT IS.

24   Q.   AND DO YOU SEE OTHER CALLS THAT WERE MADE TO EITHER OF

25   YOUR PHONE NUMBERS?

1    A.   YES, I DO.

2    Q.   WOULD YOU REMIND US WHAT YOUR PHONE NUMBERS ARE,

3    MR. HESSENFLOW?

4    A.   408-761-2742 AND 408-353-6292.

5    Q.   WILL YOU WALK US THROUGH THE RECORDS FOR THIS ONE DAY

6    FEBRUARY 2012, AND HIGHLIGHT FOR US THE TIME THAT THE DEFENDANT

7    DIALLED ONE OF YOUR NUMBERS?

8    A.   IT IS ONE 12:28 A.M., 12:30 A.M., 12:43 A.M., 10:34 A.M.,

9    10:37 A.M., 10:39 A.M., 10:51, 10:52 A.M., 10:56 A.M.

10   Q.   ARE WE TURNING THE PAGE?

11   A.   YES, THE NEXT PAGE.

12   Q.   PAGE 313.

13   A.   3:05 P.M., 5:29 P.M.  I THINK THAT'S IT FOR THAT PAGE.

14   Q.   ARE WE -- OKAY.

15        ON PAGE 314 ARE THERE ANY PHONE CALLS -- I THINK THAT'S

16   WHERE WE WRAP UP ON THE DATE OF FEBRUARY 23RD.

17   A.   NOT ON THE 23RD.

18   Q.   WHAT TIME WAS THE EARLIEST OR THE FIRST TIME THAT THE

19   DEFENDANT DIALED YOUR NUMBER ON FEBRUARY 23RD, 2012?

20   A.   OH, THIS WAS JUST A LITTLE AFTER MIDNIGHT.

21   Q.   DURING THIS TIMEFRAME DID THE DEFENDANT OFTEN CONTACT YOU

22   MULTIPLE TIMES THROUGHOUT THE DAY AND NIGHT?

23   A.   YES.

24   Q.   MANY OF THESE PHONE CALLS SEEM TO BE ONE OR TWO MINUTES.

25   DID YOU ALWAYS ANSWER HIS CALLS?

1    A.   NO, I VERY RARELY ANSWERED THEM.

2    Q.   AND WHY WAS THAT?

3    A.   BECAUSE THEY WERE JUST HARASSING CALLS.

4         MR. ARCHER:  OBJECTION.  MOVE TO STRIKE.

5         THE COURT:  DID YOU WANT TO ASK HIM TO DEFINE WHAT

6    HE MEANT BY "HARASSING"?

7         MS. PENNA:  THANK YOU, YOUR HONOR.

8         THE COURT:  SUSTAIN THE OBJECTION.

9    BY MS. PENNA:

10   Q.   MR. HESSENFLOW, COULD YOU ELABORATE ON WHAT YOU MEANT BY

11   HARASSING?

12   A.   THEY WERE THINGS LIKE TRYING TO LOCATE HIS EX, WHICH I

13   WASN'T WILLING TO GIVE HIM THAT INFORMATION.

14   Q.   IS THERE ANY OTHER REASON WHY YOU WOULD DEFINE THEM AS

15   HARASSING?

16        MR. ARCHER:  OBJECTION, ASKED AND ANSWERED.

17        THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

18        THE WITNESS:  I'D HAVE TO LOOK THROUGH THE CONTENT

19   OF THE ACTUAL MESSAGES TO SEE WHAT HE LEFT TO SEE.

20   BY MS. PENNA:

21   Q.   WOULD YOU SAY THIS WAS BASED ON THE CONTENT OF THE CALLS

22   OR THE TIMES OF THE CALLS?

23   A.   BOTH.

24   Q.   BOTH.

25        COULD I HAVE A FEW MOMENTS, YOUR HONOR.

```
1              THE COURT:  YES.

2          (PAUSE IN PROCEEDINGS.)

3              MS. PENNA:  NO FURTHER QUESTIONS FOR THE WITNESS AT

4      THIS TIME.

5              THE COURT:  CROSS-EXAMINATION.

6              MR. ARCHER:  THANK YOU, YOUR HONOR.

7                       CROSS-EXAMINATION

8      BY MR. ARCHER:

9      Q.   GOOD AFTERNOON, YOUR HONOR.  GOOD AFTERNOON,

10     MR. HESSENFLOW.  MY NAME IS GRAHAM ARCHER, AND I'M MR. YORK'S

11     ATTORNEY.

12          I'D LIKE TO START BACK AT THE BEGINNING OF YOUR TESTIMONY.

13     YOU HAD MENTIONED THAT YOU KNEW ANDREA YORK FOR ABOUT

14     TEN YEARS; IS THAT CORRECT?

15     A.   I KNEW HER, LIKE, TEN YEARS PREVIOUSLY.

16     Q.   TEN YEARS PRIOR TO 2012?

17     A.   YES.

18     Q.   OKAY.  I WANTED TO CLARIFY, AT THE TIME THAT THIS INCIDENT

19     OCCURRED, YOU WERE IN A RELATIONSHIP WITH MS. YORK; IS THAT

20     CORRECT?

21     A.   YOU MEAN BEYOND FEBRUARY 23RD?

22     Q.   CORRECT.

23     A.   I BELIEVE SO, YES.

24     Q.   HAD HER KIDS ACTUALLY BEEN TO YOUR HOUSE AT THAT POINT OR

25     ANY TIME AROUND THAT TIME?
```

1    A.   THEY HAD VISITED BRIEFLY.

2    Q.   SO WE'RE TALKING SPECIFICALLY ABOUT FEBRUARY 23RD, YOU HAD

3    RECEIVED OTHER MESSAGES FROM MR. YORK THAT DAY?

4    A.   YES.

5    Q.   AND THE MESSAGES WERE -- HE MENTIONED THAT HE WANTED TO

6    CONTACT HIS EX-WIFE AND HE WAS TRYING TO SERVE HER WITH

7    PAPERWORK RELATED TO THEIR SEPARATION; IS THAT CORRECT?

8    A.   YES.

9         MS. PENNA:   OBJECTION, RELEVANCE, YOUR HONOR.

10        THE COURT:   WELL, I'LL ALLOW THE ANSWER TO REMAIN.

11   YOU CAN MOVE ON.

12   BY MR. ARCHER:

13   Q.   THE OTHER VOICEMAILS YOU RECEIVED THAT DAY WEREN'T

14   THREATENING TO YOU; IS THAT CORRECT?

15   A.   NO, THEY WEREN'T.

16   Q.   OKAY.  THIS VOICEMAIL THAT YOU SAY YOU PLAYED BACK INTO

17   THE SYSTEM.  YOU NEVER TURNED THAT OVER TO THE I.R.S.

18   INVESTIGATOR?

19   A.   I WAS NOT ASKED FOR IT.

20   Q.   OKAY.  YOU WERE INTERVIEWED BY IS IT AGENT AGUIRRE AS

21   WELL?

22   A.   YES.

23   Q.   OKAY.  AND WHEN YOU TALKED TO AGENT AGUIRRE, YOU TOLD HER

24   THAT WHEN YOU GOT THE VOICEMAIL, THAT YOU KNEW IT WAS NOT

25   ACTUALLY FROM THE I.R.S.; CORRECT?

1     A.   YES.

2     Q.   OKAY.  AND WAS THAT BECAUSE IN PART BECAUSE OF THE ACTUAL

3     TONE OF THE VOICE ON THE VOICEMAIL?

4     A.   THE TONE DIDN'T MAKE ME SUSPICIOUS BUT IT WAS MORE FROM

5     FAILING TO FIND AN I.R.S. OFFICE WITH THAT NUMBER.

6     Q.   DID THE LANGUAGE USED IN THE VOICEMAIL MAKE IT OBVIOUS TO

7     YOU THAT THIS WAS NOT FROM THE I.R.S.?

8     A.   IT MADE ME SUSPICIOUS.

9     Q.   OKAY.  AMONG YOUR SUSPICIONS, WERE YOU SUSPICIOUS THAT

10    THERE WERE OTHER PEOPLE HELPING MR. YORK DEAL WITH, SHALL WE

11    SAY, THE NASTINESS OF THE BREAKUP WITH HIS WIFE?

12              MS. PENNA:  OBJECTION, RELEVANCE, YOUR HONOR.

13              THE COURT:  SUSTAINED.

14    BY MR. ARCHER:

15    Q.   DID YOU HAVE ANY CONTACT WITH ANYBODY ELSE WHO YOU

16    BELIEVED WAS ACTING ON MR. YORK'S BEHALF DURING THIS TIME

17    PERIOD?

18              MS. PENNA:  OBJECTION, RELEVANCE.

19              THE COURT:  OVERRULED.  YOU CAN ANSWER THAT

20    QUESTION, SIR.

21              THE WITNESS:  DURING WHAT TIMEFRAME?

22    BY MR. ARCHER:

23    Q.   DURING THE TIMEFRAME OF YOUR CONTACT WITH MS. YORK AND

24    MR. YORK?  I'M LEAVING IT PRETTY BROAD.

25    A.   I'VE SEEN SOME OF HIS FRIENDS.  I'M NOT SURE I WOULD CALL

1    IT CONTACT.

2    Q.   OKAY.

3         (PAUSE IN PROCEEDINGS.)

4              MR. ARCHER:  IF I MAY HAVE A MOMENT, YOUR HONOR?

5              THE COURT:  YES.

6         (PAUSE IN PROCEEDINGS.)

7    BY MR. ARCHER:

8    Q.   SO YOU RECEIVED A NUMBER OF VOICEMAILS ON THE 23RD.  DO

9    YOU RECALL IF YOU RECEIVED ANY OF MR. YORK'S VOICEMAILS THAT

10   DAY?

11   A.   I DON'T RECALL WITHOUT REFERRING TO MY LOG.

12   Q.   AND OKAY.  DO YOU WANT TO REFER TO YOUR LOG TO REFRESH

13   YOUR RECOLLECTION?

14        (PAUSE IN PROCEEDINGS.)

15             THE WITNESS:  I WOULD SAY I DID NOT ANSWER ANY OF

16   THEM.

17   BY MR. ARCHER:

18   Q.   IS IT FAIR TO SAY THAT THE VOICEMAILS THAT YOU DESCRIBED

19   YOU RECEIVED THAT DAY FROM MR. YORK AS INQUIRIES REGARDING

20   CUSTODY MATTERS WITH HIS DAUGHTER OR ATTEMPTS TO COMMUNICATE

21   WITH MS. YORK?

22   A.   ONCE HE LEFT MESSAGES ON, I THINK YOU COULD SAY THAT FOR

23   SEVERAL OF THEM.

24             MR. ARCHER:  NOTHING FURTHER, YOUR HONOR.  THANK

25   YOU.

```
 1              THE COURT:  REDIRECT?

 2              MS. PENNA:  NO, YOUR HONOR.

 3              THE COURT:  MAY THIS WITNESS BE EXCUSED?

 4              MS. PENNA:  YES, YOUR HONOR.

 5              MR. ARCHER:  YES, YOUR HONOR.

 6              THE COURT:  ALL RIGHT.  IS THIS THE TIME THAT WE

 7     SHOULD TAKE OUR AFTERNOON RECESS?

 8              MS. PENNA:  YES.

 9              MR. SCHENK:  YES, YOUR HONOR.

10              THE COURT:  ALL RIGHT.  LET ME JUST SEE COUNSEL.  I

11     WANT TO TALK WITH -- I THINK WE FINISHED WITH OUR EVIDENCE FOR

12     THE DAY, LADIES AND GENTLEMEN.  I JUST WANT TO TALK WITH

13     COUNSEL ABOUT OUR SCHEDULING.

14          (SIDE-BAR CONFERENCE ON THE RECORD.)

15              THE COURT:  I'M AT SIDE-BAR WITH COUNSEL.

16          SO WE'VE EXHAUSTED THE WITNESSES FOR THE GOVERNMENT TODAY?

17              MR. SCHENK:  YES.

18              THE COURT:  OKAY.  SO WE'RE NOT IN SESSION THURSDAY.

19     IT SOUNDS LIKE IT'S -- SHOULD WE BE DARK ALSO THEN?

20              MR. SCHENK:  YES.

21              THE COURT:  WE'LL BRING THEM BACK ON THE 28TH AT

22     9:00?

23              MR. SCHENK:  YES.

24              THE COURT:  IT SOUNDS LIKE YOUR CASE SHOULD BE

25     FINISHED?
```

```
 1              MS. PENNA:  YES.

 2              MR. ARCHER:  SO WE'LL BE CLOSING WHENEVER THE

 3    DEFENSE CASE IS DONE.

 4              THE COURT:  WELL, I DON'T KNOW WHEN THAT WILL BE.

 5    IT SOUNDS LIKE THERE'S A POSSIBILITY IT COULD BE ON THE 28TH,

 6    BUT LET'S DO THIS, LET'S -- WHY DON'T WE PLAN ON MEETING THE

 7    AFTERNOON OF THE 26TH.  SHOULD WE DO THAT?  YEAH, THAT IS

 8    TOMORROW.  SO WE'VE GOT THIS LOVELY PATENT CASE I THINK IT IS

 9    IN THE MORNING.  I DON'T KNOW WHETHER IT WILL TAKE US INTO THE

10    AFTERNOON OR NOT.

11         CAN I HAVE MS. GARCIA CALL YOU TO LET YOU KNOW WHAT TIME

12    IS GOOD?  WOULD THAT BE ALL RIGHT?

13              MR. ARCHER:  I'M ON SALARY THESE DAYS SO THAT'S

14    FINE.

15              THE COURT:  GREAT.  AND THEN WHAT WE CAN'T

16    ACCOMPLISH ON THE 26TH, WE CAN ACCOMPLISH ON THE 27TH, ON

17    THURSDAY.

18              MR. ARCHER:  AND I THINK WE'RE GOING TO FILE AN

19    AMENDED PROPOSED JURY INSTRUCTION.  IT'S NOT MUCH DIFFERENT.

20              THE COURT:  OKAY.

21              MR. ARCHER:  IT'S AS TO COUNT 2.

22              THE COURT:  SO I'LL GO ON THE RECORD -- I'LL EXCUSE

23    OUR JURY AND HAVE THEM COME BACK ON FRIDAY THE 28TH, AND THEN I

24    NEED TO GO ON THE RECORD.

25         I'VE BEEN CONTACTED BY MAGISTRATE JUDGE COUSINS WHO HAS A
```

```
 1        10:00 A.M. DATE, DO YOU KNOW ABOUT THIS, 10:00 A.M. TOMORROW

 2        MORNING?

 3                    MR. ARCHER:  I UNDERSTAND SOMETHING IS COMING.

 4                    THE COURT:  RIGHT, SOMETHING ABOUT A BAIL HEARING OR

 5        SOMETHING AT THE HALFWAY HOUSE OR SOMETHING IS WHAT THE E-MAIL

 6        SAID.  SO I'LL PUT THAT ON THE RECORD.

 7                    MR. ARCHER:  OKAY.

 8                    THE COURT:  THANK YOU.

 9              (END OF DISCUSSION AT SIDE-BAR.)

10                    THE COURT:  THANK YOU, COUNSEL.

11              AND, LADIES AND GENTLEMEN, SO AS FAR AS SCHEDULE GOES, WE

12        WILL NOT BE IN SESSION TOMORROW, WEDNESDAY THE 26TH.  I THINK I

13        TOLD YOU THAT.

14              IT APPEARS THAT WE WILL NOT BE IN SESSION ON THURSDAY THE

15        27TH.  SO THE NEXT TIME THAT WE WILL ASK YOU TO RETURN WOULD BE

16        FRIDAY THE 28TH.

17              AND IF YOU COULD PLEASE COLLECT YOURSELVES, AGAIN,

18        DOWNSTAIRS IN THE JURY ASSEMBLY ROOM.

19              I'M HOPING THAT WE CAN START WITH TRIAL AT 9:00 O'CLOCK.

20        SO IF YOU COULD COLLECT YOURSELVES DOWNSTAIRS IN THE JURY

21        ASSEMBLY ROOM PRIOR TO 9:00 O'CLOCK SUCH THAT WE CAN BEGIN HERE

22        AT 9:00 A.M., I WOULD BE GRATEFUL.

23              SO YOU HAVE TWO DAYS OFF, AND WE'LL HAVE YOU COME BACK ON

24        FRIDAY.

25              I SHOULD TELL YOU I THINK WE'RE WELL ON SCHEDULE AND I
```

1    THINK -- WELL, WE'RE ON SCHEDULE, AS I SAID, NOTWITHSTANDING

2    THIS BREAK.

3        I DO WANT TO REMIND YOU OF THE ADMONITION, THAT IS THE

4    PRE-INSTRUCTIONS THAT I GAVE YOU, THE PRELIMINARY INSTRUCTIONS

5    ABOUT NOT DISCUSSING THE CASE WITH ANYONE AND NOT COMMUNICATING

6    OR DOING ANYTHING AND DOING ANY RESEARCH ON YOUR OWN IN THIS

7    MATTER.

8        PLEASE RECALL MY ADMONITION AND WITH THAT WE'LL BE IN

9    RECESS FOR THE DAY AND WE'LL SEE YOU FRIDAY MORNING.

10       THANK YOU.

11       (JURY OUT AT 4:19 P.M.)

12           THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

13   THAT THE JURY HAS LEFT FOR THE DAY.  PLEASE BE SEATED, COUNSEL.

14       ALL COUNSEL AND THE DEFENDANT ARE PRESENT.  WE WILL --

15   I'LL HAVE MS. GARCIA CONTACT COUNSEL TOMORROW AS TO OUR MEETING

16   TIME WHETHER IT WOULD BE AT 1:30 SOME TIME TOMORROW AFTERNOON.

17       WE NOW HAVE THURSDAY AVAILABLE TO US ALSO FOR USE FOR OUR

18   CHARGING DISCUSSIONS.

19       ANOTHER ISSUE THAT CAME UP THAT I DID WANT TO INFORM

20   MR. ARCHER AND HIS CLIENT ABOUT, I RECEIVED COMMUNICATION FROM

21   MAGISTRATE JUDGE COUSINS WHO APPARENTLY WAS CONTACTED BY

22   PRETRIAL SERVICES AND HE, MAGISTRATE COUSINS, HAS SET A HEARING

23   DATE TOMORROW MORNING, I BELIEVE, AT 10:00 A.M. AT HIS

24   DEPARTMENT HERE IN SAN JOSE, MR. ARCHER, FOR YOUR CLIENT IN

25   REGARDS TO I THINK IT'S A BAIL REVOCATION HEARING IS WHAT I

 1       SEE.

 2           SO THAT'S AT 10:00 A.M., 10:00 A.M. TOMORROW IN

 3       JUDGE COUSINS'S DEPARTMENT IN THIS BUILDING AND YOUR CLIENT IS

 4       ORDERED TO BE PRESENT AT THAT TIME.

 5           DO YOU UNDERSTAND THAT, SIR?

 6               THE DEFENDANT:  ME?

 7               THE COURT:  YES.

 8               THE DEFENDANT:  YEAH, CLEARLY.

 9               THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

10               MR. SCHENK:  NO, YOUR HONOR.

11               MR. ARCHER:  THANK YOU.

12               THE COURT:  THANK YOU.

13           (COURT CONCLUDED AT 4:21 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

00075

CERTIFICATE OF REPORTER

        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

CERTIFY:

        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

_____
IRENE RODRIGUEZ, CSR, RMR, CRR
CERTIFICATE NUMBER 8074


DATED:  OCTOBOER 2, 2015

00076

INSTRUCTIONS FOR PLAYING AUDIO FILE

The disc containing the audio file has been configured to play on its own (AutoPlay). Place the disc in an open computer's DVD-Rom tray. Close the tray. The AutoPlay window will open. Select Windows Media Player. If the computer has not had the Windows Media Player configured, left-click on default/standard configuration and then on the OK button. A new window will open and the recording will begin to play.



```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

                         SAN JOSE DIVISION
 3

 4      UNITED STATES OF AMERICA,

 5              PLAINTIFF,                CASE NO.  CR-15-226-EJD

 6         VS.                           SAN JOSE, CALIFORNIA

 7      DOUGLAS STROMS YORK,             AUGUST 26, 2015

 8              DEFENDANT.               VOLUME 2

 9                                       PAGES 189 - 215

10

                          TRANSCRIPT OF TRIAL
11            BEFORE THE HONORABLE EDWARD J. DAVILA

              UNITED STATES DISTRICT JUDGE AND A JURY
12

13                    A-P-P-E-A-R-A-N-C-E-S

14

        FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY
15                            BY:   BRIANNA PENNA

                                    JEFFREY SCHENK
16                            50 ALMADEN BOULEVARD, SUITE 900

                              SAN JOSE, CALIFORNIA 95113
17

18      FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER

                              BY:   GRAHAM ARCHER
19                                  HEATHER ANGOVE

                              55 S. MARKET STREET, SUITE 820
20                            SAN JOSE, CALIFORNIA 95113

21

        OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                                 CERTIFICATE NUMBER 8074

23

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
24      TRANSCRIPT PRODUCED WITH COMPUTER.

25
```

```
 1    SAN JOSE, CALIFORNIA                    AUGUST 26, 2015

 2                    P R O C E E D I N G S

 3        (COURT CONVENED WITHOUT THE JURY AT 2:10 P.M.)

 4              THE CLERK:  CALLING CASE NUMBER 15-226, UNITED

 5    STATES VERSUS DOUGLAS YORK.

 6              MR. SCHENK:  GOOD AFTERNOON, YOUR HONOR.  JEFF

 7    SCHENK ON BEHALF OF THE UNITED STATES.

 8              MS. PENNA:  AND BRIANNA PENNA ON BEHALF OF THE

 9    UNITED STATES.

10              THE COURT:  THANK YOU.  GOOD AFTERNOON.

11              MR. ARCHER:  GOOD AFTERNOON.  GRAHAM ARCHER FOR

12    MR. YORK WHO IS PRESENT OUT OF CUSTODY.

13              THE COURT:  THANK YOU.  GOOD AFTERNOON.  PLEASE BE

14    SEATED.

15        AND THE RECORD SHOULD REFLECT THAT WE'RE OUTSIDE OF THE

16    PRESENCE OF THE JURY.

17        WE RECESSED OUR TRIAL YESTERDAY, AND I THOUGHT WE WOULD --

18    WE CAN SPEND TIME GOING OVER AT LEAST LOOKING AT OUR

19    PRELIMINARY INSTRUCTIONS, OR THAT'S WHAT WE WOULD DO IF WE GET

20    THAT FAR.

21        LET ME ASK, WOULD IT BE HELPFUL IF WE PROVIDED YOU COPIES

22    OF THE NINTH CIRCUIT MODEL INSTRUCTIONS TO USE TODAY OR MAYBE

23    BECAUSE YOU'RE YOUNG YOU HAVE ELECTRONIC DEVICES THAT CAN CALL

24    THESE UP IN A MOMENT.

25              MR. ARCHER:  I DIDN'T BRING A DEVICE THAT WOULD MAKE
```

```
 1        IT PARTICULARLY EASY TO LOOK AT MODEL INSTRUCTIONS.

 2             THE COURT:  MS. GARCIA, CAN YOU FIND THIS?  WE

 3   USUALLY HAVE A COPY.

 4        I'M OLD SCHOOL, AND I LIKE TO USE THE HARD COPY.  WE'LL

 5   GET THOSE FOR YOU IN JUST A SECOND.

 6        WHAT I DO HAVE IS DOCKET 37 WAS, I THINK, THE PROPOSED

 7   SUBMITTED INSTRUCTIONS, AND I MADE A CURSORY ATTEMPT AT PUTTING

 8   SOME INSTRUCTIONS TOGETHER BASED ON THOSE.

 9        DOCUMENT 37 ALSO HAD THE PRELIMINARY COPIES OF THE

10   PRELIMINARY INSTRUCTION WHICH -- SUGGESTED PRELIMINARY

11   INSTRUCTIONS WHICH I USED YESTERDAY.

12        SO WE'LL HAVE MS. GARCIA COME BACK IN JUST A MOMENT WITH

13   OUR HARD COPIES OF THE MODEL INSTRUCTIONS THAT I THINK WOULD BE

14   USEFUL AND HELPFUL FOR A GUIDE FOR US.

15        BUT WE CAN START, I THINK, WITH WHAT I THOUGHT WE WOULD DO

16   IS START WITH DOCUMENT NUMBER 37, PAGE 2, THE 3 SERIES WOULD BE

17   THE SERIES THAT I WOULD SUGGEST WE START WITH.

18        AND I DON'T THINK THERE'S ANYTHING -- WELL, WHAT I COULD

19   DO IS JUST GO THROUGH THESE AS I HAVE THEM HERE, AND I'LL

20   INVITE THE PARTIES TO SING OUT IF THERE'S ANYTHING THAT YOU

21   WOULD LIKE TO SAY ABOUT ANY OF THESE INSTRUCTIONS AS WE GO

22   THROUGH THEM.

23        OFF THE RECORD FOR A MOMENT.

24        (PAUSE IN PROCEEDINGS.)

25             THE COURT:  ON THE RECORD.  SO STARTING WITH THE 3
```

```
 1       SERIES, WHAT I INTEND TO GIVE IS 3.1 WHICH IS THE DUTY OF JURY.

 2       AND I NOTE THAT IN YOUR FILING IT HAS IT LISTED WITH AN

 3       INSTRUCTION NUMBER.

 4           SO 3.1 WOULD BE INSTRUCTION NUMBER 1.  THAT WOULD BE NEW

 5       INSTRUCTION NUMBER 1.  SO WE WOULD START WITH 3.1, AND I'LL

 6       GIVE THAT.

 7           3.2 I WOULD GIVE, AND THAT WILL BE INSTRUCTION NUMBER 2,

 8       ET CETERA.  SO YOU CAN FOLLOW ALONG.

 9           3.3, I THINK IS, AT LEAST ON THE PLEADING OF DOCKET NUMBER

10       37 IT SUGGESTS DISPUTED.  OF COURSE, IT'S PREMATURE RIGHT NOW

11       TO MAKE A DECISION AS TO WHICH ONE OF THESE, THAT IS, 3.3 OR

12       3.4, DEPENDING ON WHETHER OR NOT MR. YORK TESTIFIES, BUT WE CAN

13       TALK ABOUT THE LANGUAGE OF THESE IF YOU WOULD LIKE NOW.

14           IS THAT APPROPRIATE TO DO NOW?

15               MR. ARCHER:  YES, YOUR HONOR.

16               THE COURT:  3.3, THEN, IS DEFENDANT'S DECISION NOT

17       TO TESTIFY.  THE MODEL 3.3 IS GIVEN INITIALLY, AND THEN I HAVE

18       THE DEFENDANT'S SUGGESTED WHICH IS ON PAGE 25 OF DOCUMENT

19       NUMBER 37, ECF, PAGE 25.

20           ANYTHING FURTHER ABOUT THIS?

21               MR. ARCHER:  NO, YOUR HONOR.

22               MR. SCHENK:  YOU SHOULD GIVE THE MODEL, YOUR HONOR.

23       THE DEFENDANT'S VERSION REPEATS WHAT APPEARS IN OTHER MODEL

24       INSTRUCTIONS.

25               THE COURT:  ALL RIGHT.  THANK YOU.  AS TO IF NEEDED,
```

1    IF NEEDED TO GIVE 3.3, I WOULD GIVE THE MODEL INSTRUCTION, AND

2    THIS WILL BE INSTRUCTION NUMBER 3.

3        NEXT WOULD BE INSTRUCTION 3.4, AND THAT'S DEFENDANT'S

4    DECISION TO TESTIFY.  AND THE MODEL INSTRUCTION IS 3.4, AND I

5    HAVE THE DEFENSE OFFERED.

6        ANY FURTHER DISCUSSION ON THIS?

7            MR. ARCHER:  WELL, IF WE ARE WEIGHING IN, I THINK

8    OURS IS BETTER SO THE COURT SHOULD GIVE THAT.

9            THE COURT:  OKAY.

10            MR. SCHENK:  SAME ARGUMENTS.

11            THE COURT:  THANK YOU.  IF NEEDED FOR THE 3.4, I

12    WILL GIVE THE MODEL INSTRUCTION.  AND THIS WOULD BE INSTRUCTION

13    NUMBER, EITHER OF THESE WOULD BE INSTRUCTION NUMBER 3, I

14    BELIEVE.

15        NEXT IS 3.5 WHICH IS REASONABLE DOUBT.  I HAVE THE MODEL,

16    AND I HAVE THE DEFENSE OFFERED.

17        ANYTHING EITHER PARTY WISHES TO STATE ON THIS?

18            MR. SCHENK:  SAME ARGUMENT.

19            MR. ARCHER:  NO, YOUR HONOR.

20            THE COURT:  ALL RIGHT.  THANK YOU.  I'LL GIVE THE

21    MODEL INSTRUCTION, NINTH CIRCUIT MODEL REASONABLE DOUBT

22    INSTRUCTION.

23        NEXT IS 3.6, AND I'LL GIVE THAT.

24        3.7 I WOULD ALSO GIVE.  ONLINE, I GUESS IT'S 9, I WOULD

25    STRIKE IN THE MIDDLE THE BRACKETED "WILL SAY IN THEIR CLOSING."

1    "WILL SAY IN THEIR" THAT SHOULD BE STRICKEN.

2        AND I LOOK OUT AT BOTH TABLES HERE AND ASK WHICH ONE OF

3    YOU WOULD LIKE TO PREPARE THE JURY INSTRUCTIONS?  LET ME EXTEND

4    THAT INVITATION.

5            MS. PENNA:  WE HAD PREPARED THE ORIGINAL SO WE CAN.

6            THE COURT:  MR. ARCHER IS UNDER THE TABLE TYING HIS

7    SHOELACES.

8            MS. PENNA:  I SAW THAT.

9            MR. ARCHER:  I WOULD LIKE TO THANK MS. PENNA FOR HER

10   COURTESY.

11           THE COURT:  ALL RIGHT.  THANK YOU.  ON LINE 14

12   THERE'S A BRACKETED PORTION IN REGARDS TO EVIDENCE OFFERED FOR

13   A LIMITED PURPOSE.  I DON'T KNOW IF THAT'S GOING TO COME INTO

14   PLAY OR NOT.

15       IF IT IS, WE'LL LEAVE THAT IN.  IF THERE ISN'T ANY, THAT

16   WILL BE DELETED AND REDACTED, OF COURSE.

17           MR. SCHENK:  YOUR HONOR, WOULD IT BE HELPFUL FOR US

18   TO E-MAIL A SOFT COPY ALSO OF OUR FINAL VERSION TO THE CLERK'S

19   COURT SO IF CHANGES NEED TO BE MADE AT THE LAST MINUTE?

20           THE COURT:  I WOULD APPRECIATE THAT.  I WAS GOING TO

21   REQUEST THAT.

22           MR. SCHENK:  YES.

23           THE COURT:  YOU'LL SEND IT IN WORD FORM?

24           MR. SCHENK:  YES, YOUR HONOR.

25           THE COURT:  GREAT.  GREAT.  THAT WILL BE GREAT.

1          AND WE'LL ALSO GIVE YOU -- THE PARTIES MAY HAVE A SAMPLE

2    OF THE PREVIOUS INSTRUCTIONS THAT I'VE GIVEN IN CASES THAT KIND

3    OF HAS A TEMPLATE AT LEAST OF HOW THEY SHOULD APPEAR, AND

4    MS. GARCIA CAN PROVIDE YOU WITH THAT TODAY.

5          MR. SCHENK:  YES.

6          THE COURT:  OKAY.  LET'S SEE.  3.8, DIRECT AND

7    CIRCUMSTANTIAL EVIDENCE, I'LL GIVE.  I'M NOT GOING TO GIVE THE

8    EXAMPLE OF THE GARDEN HOSE.

9          3.9 IS CREDIBILITY OF WITNESSES, I'LL GIVE THAT.

10          3.10, ACTIVITIES NOT CHARGED.  I THINK IT'S APPROPRIATE TO

11    GIVE THAT AND I WOULD.

12          LET ME ASK YOU TO LOOK AT 3.11 AND ASK YOU IF YOU FEEL

13    IT'S APPROPRIATE TO GIVE 3.11.

14          MS. PENNA:  YOUR HONOR, WE WOULD THINK THAT IS

15    APPROPRIATE.  I THINK WHEN WE FIRST FILED THIS WE ONLY HAD ONE

16    COUNT SO WE DO THINK IT'S APPROPRIATE.

17          THE COURT:  CORRECT.  SO I WILL GIVE 3.11 AS THE

18    NEXT IN ORDER.

19          AND JUST GOING THROUGH THE -- AND SING OUT.  I THINK THAT

20    COMPLETES THE 3 SERIES UNLESS ANYONE WANTS TO SUGGEST ANYTHING

21    FURTHER AS TO APPLICABLE 3 SERIES.

22          I THINK THEN WE MOVE TO THE 4 SERIES AND 4.1 IS STATEMENTS

23    BY DEFENDANT.  I'LL GIVE THAT.

24          THE NEXT ON DOCKET 37, DOCUMENT NUMBER 37 IS OPINION

25    EVIDENCE OF EXPERT WITNESSES.  IS THAT GOING TO BE REQUIRED

1    HERE?

2           MR. SCHENK:  NO, YOUR HONOR.

3           MS. PENNA:  NO, YOUR HONOR.

4           THE COURT:  THAT IS WITHDRAWN AND WILL NOT BE GIVEN.

5        MR. ARCHER, ARE YOU GOING TO HAVE ANY EXPERT TESTIMONY OR

6    OTHERWISE NEED 4.14?

7           MR. ARCHER:  I DON'T BELIEVE SO.

8           THE COURT:  OKAY.  THAT WILL BE WITHDRAWN.

9        THE ONLY OTHER 4 SERIES THAT I WOULD RAISE TO YOUR

10   ATTENTION IS 4.3.  I DON'T THINK THAT APPLIES IN THIS CASE.

11   THAT'S A 404(B) INSTRUCTION.  I DON'T THINK THAT APPLIES.

12       AND THEN 4.4, OF COURSE, IS CHARACTER OF THE DEFENDANT.  I

13   DON'T THINK THERE'S -- I HAVEN'T HEARD THAT THERE WILL BE ANY

14   CHARACTER TESTIMONY REGARDING MR. YORK.  SO I WON'T GIVE THOSE.

15       4.6, I DON'T KNOW IF THAT'S GOING TO COME UP AND BE AN

16   ISSUE.

17          MR. ARCHER:  4.6 AS TO IMPEACHMENT BY PRIOR

18   CONVICTION?

19          THE COURT:  CORRECT.

20          MR. ARCHER:  I THINK THAT THE COURT'S IN LIMINE

21   MOTIONS AND RULINGS HAVE PRECLUDED THAT.

22       IS THAT THE GOVERNMENT'S UNDERSTANDING?

23          MR. SCHENK:  UNLESS THE DEFENDANT TESTIFIES.

24          THE COURT:  THAT'S WHY I SUGGEST THAT.  IF THE

25   DEFENDANT TESTIFIES.  I DON'T KNOW IF THIS WOULD BE AN ISSUE OR

```
1     NOT.
2              MR. ARCHER:  UNDERSTOOD.
3              THE COURT:  OKAY.  SO WE'LL WAIT AND SEE.
4              MR. SCHENK:  YES.
5              THE COURT:  4.8 IS THE GENERAL IMPEACHMENT EVIDENCE.
6     I DON'T KNOW IF THERE'S ANY NEED OF THAT FOR ANY WITNESSES IN
7     THE CASE.
8              MR. ARCHER:  I DON'T KNOW SITTING HERE TODAY, YOUR
9     HONOR.
10             THE COURT:  OKAY.  LOOKING AT 4.15 AND 4.16, ARE
11    THOSE GOING TO BE NEEDED?
12             MR. SCHENK:  NOT FROM THE GOVERNMENT'S PERSPECTIVE.
13             THE COURT:  OKAY.
14             MR. ARCHER:  NO, YOUR HONOR.
15             THE COURT:  OKAY.  AND I THINK DOCUMENT NUMBER 37
16    THEN NEXT TAKES US TO 8.5.
17             MR. ARCHER:  YOUR HONOR, WE'RE A LITTLE -- ON THE
18    DEFENSE SIDE WE'RE A LITTLE BIT IN FLUX ON THAT RIGHT NOW AND
19    WHEN I SAY THAT, IT'S, FRANKLY, BEEN HARD TO GET A HANDLE ON
20    THE STATUTE AND IN PARTICULAR THE FIRST OFFENSE CHARGED 912.
21        SO WE HAVE BEEN IN THE PROCESS OF DRAFTING, AND I THINK WE
22    WOULD BE PREPARED TO SUBMIT SHORTLY AFTER TODAY'S HEARING SOME
23    HOPEFULLY WHAT WE VIEW AS CLARIFYING INSTRUCTIONS.  THE ACTING
24    AS SUCH IS SOMETHING THAT HAS GIVEN OUR OFFICE TROUBLE IN TERMS
25    OF TRYING TO DETERMINE IT.
```

1       AND SO WE HAD NOT YET SUBMITTED BUT WOULD LIKE THE

2   OPPORTUNITY TO SUBMIT SOME INSTRUCTIONS THAT WOULD HOPEFULLY

3   CLARIFY THAT.

4       AND I ACKNOWLEDGE BY DOING SO I'M ASKING THE COURT TO

5   RECONVENE EITHER TOMORROW OR SOME TIME PRIOR TO GIVING THE

6   CHARGE, BUT THAT IS MY REQUEST.

7          THE COURT:  OKAY.  I DO HAVE DOCUMENT 37, PAGE 38 IT

8   DOES HAVE, I THINK, DEFENSE, I THINK THIS IS A DEFENSE REQUEST.

9   THE ONLY DIFFERENCE IS THE THIRD ELEMENT THE INTENT TO DEFRAUD.

10         MR. ARCHER:  MS. ANGOVE JUST INFORMED ME THAT WE DID

11   E-FILE WHAT I JUST MENTIONED WHILE I WAS ON MY WAY OVER HERE.

12   SO OBVIOUSLY THE GOVERNMENT DOESN'T HAVE ANY OPPORTUNITY TO

13   RESPOND TO THAT HAVING JUST BEEN E-FILED.

14         THE COURT:  CAN YOU PULL THAT UP, MS. GARCIA?

15   (DISCUSSION OFF THE RECORD.)

16         THE COURT:  IS IT 67?

17         MS. ANGOVE:  WE FILED THREE THINGS TODAY, YOUR

18   HONOR.  TWO WERE FILED BEFORE NOON, AND WE HAVE COPIES OF THOSE

19   WITH AN E-FILED STAMP AND THE ONE THAT WAS JUST FILED WE HAVE

20   COPIES EXACTLY REPRESENTING THE EXACT SAME THING, THERE JUST

21   ISN'T AN E-FILED COPY.

22       BUT I DID ASK OUR LEGAL ASSISTANT TO E-MAIL IT TO YOUR

23   COURTROOM DEPUTY.

24         THE COURT:  OKAY.

25         MR. SCHENK:  I JUST CHECKED THE DOCKET, AND IT IS

1    DOCKET 67.

2            THE COURT:  OKAY.  OKAY.  I HAVE THAT AND SO WHY

3    DON'T WE TAKE A MOMENT TO LOOK AT THIS.

4        AND THIS IS THE DEFENSE OFFER AS TO COUNT 1, I BELIEVE?

5            MR. ARCHER:  YES, YOUR HONOR.

6        (PAUSE IN PROCEEDINGS.)

7            THE COURT:  OKAY.  WELL, I'VE REVIEWED THIS.  AND I

8    WONDER, MR. ARCHER, YOUR SUGGESTION TO ALLOW THE GOVERNMENT TO

9    LOOK AT THIS AND THE COURT ALSO TO REVIEW THESE CASES MIGHT BE

10   APPROPRIATE, AND WE CAN TAKE THIS UP TOMORROW AS WELL.

11       I'D LIKE TO READ THE CASES THAT ARE CITED IN THE

12   PLEADINGS.

13           MR. ARCHER:  UNDERSTOOD, YOUR HONOR.  AND THIS IS --

14   IT'S A BIT OF A BIZARRE ISSUE BECAUSE CONGRESS, IN RESPONSE TO

15   ONE OF THE CASES CITED HERE, STRUCK THE LANGUAGE ABOUT

16   FRAUDULENT AND COMMITTING A FRAUD UNDER THE AUSPICES OF THE

17   GOVERNMENT AUTHORITY.

18       BUT THEN IT STRUCK IT AS SUPERFLUOUS GIVEN WHAT THE

19   SUPREME COURT INTERPRETED AS SOME FRAUDULENT INTENT THAT IT

20   FELT WAS ALREADY IN THE STATUTE.

21       AND SO WHAT, FRANKLY, WHAT WE'VE BEEN STRUGGLING WITH IS

22   HOW TO BEST STRESS TO THE JURY THAT IT DOES REQUIRE, FROM OUR

23   PERSPECTIVE, FRAUDULENT INTENT AND THE CIRCUIT SPLIT THAT IS

24   REFERENCED IN OUR ORIGINAL DRAFT JURY INSTRUCTION IS ONE WHERE

25   SEVERAL OF THE CIRCUITS HAVE SAID THAT IT ABSOLUTELY REQUIRES A

1        SEPARATE FRAUDULENT ELEMENT.

2        THE NINTH CIRCUIT HAS GONE VERY CLEARLY IN THE OTHER

3    DIRECTION.  AND IN TERMS OF THAT BEING A LATER ELEMENT, BUT I

4    DON'T THINK THAT FROM OUR PERSPECTIVE IT STILL REQUIRES THAT

5    THERE BE SOME FRAUD AND BECAUSE THE SUPREME COURT CASE

6    ORIGINALLY HANDLING IT ADDRESSED THE INHERENT FRAUD IN THE

7    IMPERSONATION AND THE ACTING UNDER THAT AUTHORITY.

8        SO WE DO THINK THAT THERE IS A WAY TO CONVEY WHAT THE

9    SUPREME COURT HELD THE OFFENSE TO MEAN WITHOUT RUNNING AFOUL OF

10   NINTH CIRCUIT AUTHORITY AS TO AN ADDITIONAL ELEMENT OF AN

11   ADDITIONAL FRAUD.

12            THE COURT:  OKAY.

13            MR. SCHENK:  YOUR HONOR, WE CAN ADDRESS THIS MORE

14   WHEN THE COURT HAS AN OPPORTUNITY AND THE GOVERNMENT HAS AN

15   OPPORTUNITY TO READ THE CASES THAT ARE CITED.

16       WE WILL NOTE NOW, THOUGH, THERE IS A NINTH CIRCUIT MODEL

17   INSTRUCTION FOR THIS CRIME AND THERE'S NO CASE THAT SAYS GIVING

18   THE MODEL IS WRONG.

19       IN FACT, THE CASES CITED, JUST LOOKING AT THE DATES, THE

20   CASES CITED BY THE EVENTS PREDATE THE MODEL JURY INSTRUCTION SO

21   WE WOULD EXPECT A CHANGE IN THE MODEL IN LIGHT OF THESE CASES

22   IF THE NINTH CIRCUIT CONCLUDED THAT THE MODEL WAS APPROPRIATE.

23            THE COURT:  ALL RIGHT.  WELL, LET'S, LET'S -- WE'LL

24   DEFER THIS AND ALLOW THE PARTIES A LITTLE MORE TIME TO LOOK AT

25   THIS AND WE CAN TALK ABOUT THIS PROBABLY TOMORROW SINCE WE HAVE

1    SOME TIME OFF FROM THE TRIAL.

2         AND THEN COUNT 2 WHICH, OF COURSE, DOESN'T APPEAR IN

3    DOCUMENT NUMBER 37.  AND I THINK I HAVE A COPY OF THE

4    GOVERNMENT'S DOCUMENT NUMBER 56, I THINK, THE GOVERNMENT FILED

5    OF PROPOSED INSTRUCTION IN REGARDS TO THIS COUNT.

6              MR. SCHENK:  YES, YOUR HONOR.  IT WAS 56.

7              MR. ARCHER:  AND THE CURRENT DEFENSE PROPOSAL, YOUR

8    HONOR, IS AT DOCKET 65.

9              THE COURT:  CORRECT.  ANYTHING FURTHER AS TO COUNT

10   2?

11             MS. PENNA:  YES, YOUR HONOR.  THIS ONE -- THIS

12   PARTICULAR STATUTE DID NOT HAVE MODEL INSTRUCTIONS AND SO IN

13   LOOKING AT OUR TWO PROPOSED INSTRUCTIONS WE WOULD ASK THAT YOU

14   LOOK DIRECTLY TO THE STATUTE, AND I HAVE A COPY RIGHT HERE IF

15   YOU WOULD LIKE TO.

16             THE COURT:  I DO, TOO.

17             MS. PENNA:  OKAY.  AS YOU CAN SEE FROM OUR PROPOSED

18   INSTRUCTIONS WE DIRECTLY TRACK THE LANGUAGE OF THE STATUTE

19   ITSELF AND THE DEFENSE PROPOSED INSTRUCTION CHANGES THE

20   ELEMENTS, ADDS WORDS, OMITS WORDS, AND WE DON'T SEE THE REASON

21   TO FOLLOW THAT.

22             THE COURT:  MR. ARCHER.

23             MR. ARCHER:  YOUR HONOR, THE DEFENSE INSTRUCTION IS

24   CRAFTED TO THIS PARTICULAR CASE.  IT ADDS MR. YORK'S NAME, FOR

25   INSTANCE.  THE CONJUNCTIVE WAS BASED ON THE INDICTMENT IN TERMS

1      OF THE FOURTH ELEMENT.  THAT'S HOW THE CASE WAS CHARGED.

2           BUT THE DEFENSE INSTRUCTION INCLUDES ALL OF THE ELEMENTS

3      OF THE OFFENSE.

4               THE COURT:  ALL RIGHT.  THANK YOU.

5           ONE THING THAT IS MISSING IN BOTH OF THESE SUBMISSIONS,

6      WHEN I LOOK AT THE STATUTE C, THEY DON'T CONTAIN THAT PORTION

7      OF C WHETHER OR NOT CONVERSATION, COMMUNICATION ENSUES.

8           IS THAT IMPORTANT?

9               MS. PENNA:  OUR VIEW WAS BECAUSE THE LANGUAGE SAYS

10     WHETHER OR NOT THE FOLLOWING, THAT THAT SEEMED TO SUGGEST THAT

11     WE'LL BE GIVING THE JURY INFORMATION THAT IS SUPERFLUOUS, THAT

12     IT DOESN'T ACTUALLY NEED TO, THEREFORE, CONCLUDE AND DECIDE AND

13     THAT WAS REALLY OUR LOGIC BEHIND NOT INCLUDING THAT.

14              THE COURT:  IT SEEMS TO BE THAT.  I DON'T KNOW WHY

15     THEY PUT IT IN THE STATUTE IF -- IT'S KIND OF SUPERFLUOUS.

16              MR. SCHENK:  AND WHETHER OR NOT IT HAPPENED ON A

17     TUESDAY.  I DON'T THINK WE WOULD PUT TUESDAY AS AN ELEMENT

18     BECAUSE IT SAYS WHETHER OR NOT IT HAPPENED ON A TUESDAY.

19     AGAIN, THAT'S WHAT WE ASSUMED.

20              THE COURT:  I JUST WANTED TO GIVE YOU AN OPPORTUNITY

21     TO COMMENT ON THIS.

22          MR. ARCHER, DO YOU HAVE ANY COMMENT ON THAT LANGUAGE?

23              MR. ARCHER:  YOUR HONOR, IF I MAY HAVE A MOMENT?

24              THE COURT:  SURE.  OF COURSE.

25          (PAUSE IN PROCEEDINGS.)

```
 1              MR. ARCHER:  YOUR HONOR, WE DON'T HAVE A POSITION AS

 2    TO WHETHER OR NOT CONVERSATION OR COMMUNICATION ENSUES, BUT

 3    MS. ANGOVE HAS REMINDED ME THAT THE GOVERNMENT DID ADD AT THE

 4    CALLED NUMBER OR RECEIVED THE COMMUNICATIONS, WHICH I BELIEVE

 5    IS THE LAST CLAUSE OF 4 WHICH IS SOMETHING IN ADDITION TO THE

 6    LANGUAGE OF THE STATUTE.

 7              THE COURT:  YES, I SEE THAT AS WELL.

 8         SO, MS. PENNA, DO YOU WANT TO BE HEARD AS TO THOSE LAST

 9    WORDS?

10              MS. PENNA:  YOUR HONOR, WE HAVE NO OBJECTION TO

11    CHANGING IT TO MIRROR THE WORDS OF THE STATUTE ON THAT SPECIFIC

12    LINE.

13              THE COURT:  ALL RIGHT.  I'M GOING TO ASK MS. GARCIA

14    TO HAND DOWN COPIES OF -- THE COURT RETYPED THAT FIRST LINE

15    FROM THE GOVERNMENT.  AND LET ME INDICATE THAT I'M INCLINED TO

16    GIVE THE INSTRUCTION I JUST HANDED DOWN TO COUNSEL OVER THE

17    DEFENSE INSTRUCTION.

18         THIS IS JUST A MODIFICATION OF YOUR PREVIOUS SUBMISSION,

19    DOCUMENT 56, BUT I'D STRIKE THAT LAST SENTENCE AT THE WORD

20    "PERSON."

21              MS. PENNA:  AND, YOUR HONOR, I APOLOGIZE.  I FAILED

22    TO UPDATE THE TITLE OF RIGHT UNDER THE DISPUTED INSTRUCTION TO

23    REFLECT THE NEW --

24              THE COURT:  RIGHT.  AND THIS IS -- AND YOU CAN

25    REFORMAT THAT.  WHAT I GAVE YOU WAS A WORD DOCUMENT CREATED
```

1    FROM THE PDF SO THE FORMATTING IS OFF.

2        SO I'LL GIVE THAT IN REGARDS TO COUNT 2, MR. ARCHER.

3          MR. ARCHER:  I THINK THE DEFENSE WOULD LIKE TO

4    MAINTAIN AN OBJECTION TO THAT.

5          THE COURT:  OF COURSE, RIGHT, RECOGNIZING YOUR

6    OBJECTION.

7          MR. ARCHER:  THANK YOU, YOUR HONOR.

8          THE COURT:  LET'S JUST -- THAT TAKES US, ACCORDING

9    TO DOCUMENT NUMBER 37, TO THE 7 SERIES WHICH ARE THE CLOSING

10   INSTRUCTIONS, AND I WOULD GIVE 7.1, DUTY TO DELIBERATE; 7.2,

11   CONSIDERATION OF EVIDENCE; 7.3, USE OF NOTES; 7.4,

12   CONSIDERATION OF PUNISHMENT; 7.5, I WILL REDACT THE BRACKETED

13   PORTIONS.

14       AND ON LINE 6 WE CAN LEAVE IN THE WORD "CLERK" AND

15   MS. GARCIA WILL INFORM THE JURY IF WE HAVE A MARSHAL UP HERE OR

16   SHE WILL INFORM THEM THAT THEY CAN NOTIFY THE MARSHAL AND

17   NOTIFY THE CLERK.

18       7.6 IS COMMUNICATION WITH THE COURT.  AND, AGAIN, THE

19   BRACKETED PORTIONS -- WE CAN LEAVE -- IN THIS SENSE WE CAN

20   LEAVE IN THE CLERK, BAILIFF.

21       NOW, THERE'S SOME SUGGESTED -- OH, EXCUSE ME.  LET ME GO

22   BACK TO 2.7, WHICH IS A TRANSCRIPT OF A RECORDING.

23       WE DIDN'T GIVE A COPY OF THE TRANSCRIPT TO THE JURY

24   ALTHOUGH THERE IS A TRANSCRIPT OF SORT PREPARED BY

25   MR. HESSENFLOW, I THINK HIS NAME IS.

1              MS. PENNA:  YES, YOUR HONOR.

2              THE COURT:  YES.  HE INDICATED IN HIS E-MAIL THAT

3    THERE WAS A TRANSCRIPT.  I DON'T THINK I NEED TO GIVE 2.7 FOR

4    THIS.  THAT IS NOT A CONTEMPORANEOUS TRANSCRIPT.  IT'S HIS

5    OPINION OF WHAT WAS SAID.

6              MR. ARCHER:  THE DEFENSE WOULD REQUEST THAT THIS BE

7    GIVEN BECAUSE HE PROVIDED -- THE COURT ADMITTED INTO EVIDENCE

8    WHAT FUNCTION IS THE TRANSCRIPT.

9              THE COURT:  THE E-MAIL.

10             MR. ARCHER:  THE E-MAIL, CORRECT.  AND SO I THINK

11   THE DEFENSE -- I THINK IT WOULD BE APPROPRIATE TO ALLOW THE

12   JURY TO DRAW THEIR OWN CONCLUSIONS AS TO THE CONTENT OF THE

13   RECORDING, AND I THINK THIS IS AN APPROPRIATE INSTRUCTION IN

14   THAT CASE.

15             THE COURT:  WELL, THE LAST LINE SAYS BECAUSE THE

16   TRANSCRIPTS WILL NOT BE AVAILABLE TO YOU DURING YOUR

17   DELIBERATIONS, AND, OF COURSE, THEY WILL HAVE, AND I THINK IT'S

18   EXHIBIT 4, WHATEVER IT WAS, BEFORE THEM.

19        THIS IS, I THINK WE ALL KNOW, THIS IS DESIGNED TO GO

20   CONTEMPORANEOUS WITH A PREPARED TRANSCRIPT OF A RECORDING.

21        SO IF I WERE TO GIVE THIS, I THINK I WOULD HAVE TO MODIFY

22   IT, PARTICULARLY THE FIRST LINE WHERE TRANSCRIPTS OF THOSE

23   RECORDINGS WERE PROVIDED.  I THINK WE WOULD NEED TO SPECIFY

24   THAT MR. HESSENFLOW'S NOTES OF THAT RECORDING.

25             MR. ARCHER:  I'D BE HAPPY TO SUBMIT A PROPOSED

1    INSTRUCTION --

2              THE COURT:  OKAY.

3              MR. ARCHER:  -- REFLECTING THAT.

4              THE COURT:  OKAY.  I THINK IT SHOULD REFLECT THAT

5    THE WITNESSES -- IT'S NOT AN OFFICIAL TRANSCRIPT.  IT'S NOTES

6    OF THE WITNESS WHO TRANSCRIBED WHAT HE HEARD, BUT WE CAN WAIT

7    UNTIL TOMORROW AND SEE WHAT YOU SUBMIT AND SEE WHETHER OR NOT

8    WE WILL PROVIDE IT.

9              MR. SCHENK:  YOUR HONOR, I DON'T THINK THIS

10   INSTRUCTION NEEDS TO BE GIVEN FOR THE BOTTOM PARAGRAPH OF THE

11   E-MAIL THAT WE'RE DISCUSSING BUT WHETHER WE SHOULD READ IT

12   BECAUSE THERE WAS THE SIMULTANEOUS TRANSCRIPT THAT PLAYED WITH

13   THE CALL THE GOVERNMENT WOULDN'T HAVE ANY OBJECTION TO AND BY

14   READING THEM THIS INSTRUCTION, THE JURY HEARS THE POINT THAT

15   THE TAPE IS THE EVIDENCE WHICH WOULD BE THE CONCERN OF THE

16   TRANSCRIPT EVEN IN THE E-MAIL, THAT IS, THE PIECE OF EVIDENCE

17   IS THE AUDIO REGARDING, NOT THE SYNCED TRANSCRIPT THAT SCROLLED

18   ALONG WITH OR SIMULTANEOUS TO THE PLAYING.

19             THE COURT:  WELL, IT WOULD HAVE HELPED IF THE COURT

20   HAD READ THIS BEFORE WE PLAYED THE TAPE.  THAT WAS THE

21   APPROPRIATE TIME TO DEAL WITH 2.7 AND SOMEHOW THE COURT OMITTED

22   THAT READING AT THE TIME IT WAS PLAYED.

23             MR. SCHENK:  THE COURT WILL HAVE ANOTHER

24   OPPORTUNITY.  ON FRIDAY ANOTHER VERSION IS COMING IN THROUGH

25   OUR SECOND WITNESS ON FRIDAY, AND WE COULD REMEMBER TO REMIND

1    THE COURT TO READ THIS AT THAT TIME.

2         IT SEEMS TO BE --

3              THE COURT:  LET'S DEFER THIS BECAUSE I THINK THAT

4    MIGHT BE THE APPROPRIATE WAY TO HANDLE THIS.  IT'S NOT A REAL

5    TRANSCRIPT PER SE, BUT -- SO I'LL READ THIS.  IF IT'S GOING TO

6    BE PLAYED AGAIN IS WHAT I UNDERSTAND THE TAPE OF WHATEVER IT

7    IS.

8              MR. SCHENK:  YES.

9              THE COURT:  THEN I'LL READ 2.7 AT THAT TIME AND THEN

10   I KNOW GOOD COUNSEL WILL REMIND ALL OF US ABOUT THAT.

11        LET'S LOOK AT, AGAIN, WE'RE TURNING TO DOCKET 37, LINE 26,

12   STIPULATED TESTIMONY, 2.3; 2.5, JUDICIAL NOTICE; 2.10, OTHER

13   ACTS.

14        ANYBODY WISH TO COMMENT ON THOSE?  I DON'T KNOW IF THERE'S

15   GOING TO BE ANY STIPULATED TESTIMONY.

16        IS THERE JUDICIAL NOTICE TO BE TAKEN OF ANY FACTOR?

17              MR. SCHENK:  NO.

18              MR. ARCHER:  I DON'T BELIEVE SO, YOUR HONOR.

19              THE COURT:  AND THEN 2.10.  I DON'T THINK 2.10 IS

20   APPROPRIATE IN THIS CASE EITHER.

21              MR. SCHENK:  NO, YOUR HONOR.

22              THE COURT:  MR. ARCHER.

23              MR. ARCHER:  NO, YOUR HONOR.

24              THE COURT:  AND PAGE 4 OF DOCUMENT 37, 2.11,

25   EVIDENCE FOR A LIMITED PURPOSE.  I DON'T RECALL IF ANYTHING

1   CAME IN.  I DON'T KNOW IF ANYTHING WILL COME IN.  WE CAN

2   RESERVE ON THIS.

3        I THINK WE GAVE SEPARATE CONSIDERATION OF MULTIPLE COUNTS,

4   3.11, AND I THINK WE WENT THROUGH THE 4 SERIES ALREADY, UNLESS

5   THERE IS SOMETHING ELSE THAT SINGS OUT TO YOU.

6        4.13 IS ON THIS DOCUMENT MISSING WITNESS.  IS THAT

7   NECESSARY?

8             MR. SCHENK:  NO, YOUR HONOR.

9             MR. ARCHER:  NO, YOUR HONOR.

10            THE COURT:  OKAY.  I THINK THAT EXHAUSTS ALL OF THE

11   INSTRUCTIONS THAT YOU'VE PRESENTED SAVE FOR THE ONES WE'RE

12   GOING TO LOOK AT.

13        ANYTHING FURTHER ON THE INSTRUCTIONS?

14            MS. PENNA:  NOTHING FURTHER.

15            MR. ARCHER:  NO, YOUR HONOR.

16            THE COURT:  OKAY.  SHOULD WE MOVE TO -- WE HAVE SOME

17   TIME.  SHOULD WE TALK ABOUT VERDICT FORMS?

18            MR. SCHENK:  NO, YOUR HONOR.

19            MR. ARCHER:  THAT WOULD BE FINE, YOUR HONOR.  IT MAY

20   BE A LITTLE BIT PREMATURE GIVEN THE DEFENSE'S RECENT

21   SUBMISSIONS OF OTHER ELEMENTS.

22            THE COURT:  WELL, WE CAN LOOK AT THE -- LET'S SEE.

23   I HAVE THE DEFENSE SUBMISSION 66, AND I THINK THE GOVERNMENT'S

24   IS DOCUMENT 38.

25        ARE THESE THE MOST CURRENT SUBMISSIONS BY THE PARTIES,

1    DOCUMENT NUMBER 66 AND DOCUMENT 38?

2           MR. SCHENK:  YES, FOR THE GOVERNMENT.

3           MR. ARCHER:  YES, FOR THE DEFENSE.

4           THE COURT:  ALL RIGHT.  GOVERNMENT, I HAVE YOUR

5    VERDICT FORM?  ANYTHING YOU WANT TO SAY ABOUT IT?

6           MR. SCHENK:  YES, YOUR HONOR.  FIRST, IF I COULD

7    TURN THE COURT'S ATTENTION TO THE GOVERNMENT'S SUBMISSION, IT'S

8    DOCKET 38 AT LINES 7 AND A HALF TO LINE 10 YOU'LL SEE PHRASES

9    THAT MIRROR EACH OTHER "HARASSING PHONE CALLS" WHICH COME FROM

10   THE STATUTE, BUT THE WAY THAT WE HAVE BEEN REFERRING TO IT

11   EARLIER IN THE TRIAL AND IN THESE INSTRUCTIONS IS INTERSTATE

12   TELECOMMUNICATIONS HARASSMENT.

13      SO WE WOULD PROPOSE THAT THE COURT GIVE THAT GOVERNMENT'S

14   VERSION BUT WITH THAT MODIFICATION AT THOSE TWO PLACES SO THAT

15   IT TRACKS THE WAY THAT WE'VE BEEN REFERRING TO THE DEFENSE.

16           THE COURT:  AND STRIKE THE WORD "OBSCENE"?

17           MR. SCHENK:  NO, YOUR HONOR.  AND IF I COULD RESPOND

18   TO THE DEFENSE'S PROPOSED?

19           THE COURT:  YES.

20           MR. SCHENK:  THE COURT SHOULD NOT GIVE THE DEFENSE

21   VERSION, AND IT SHOULD NOT FOR TWO REASONS:  THE FIRST IS THE

22   DEFENSE'S VERSION LAYS OUT EACH ELEMENT AND ASKS THE JURY TO

23   WRITE OR CHECK WHETHER THAT INDIVIDUAL ELEMENT HAS BEEN FOUND

24   BEYOND A REASONABLE DOUBT.

25      THAT'S NOT JUST NOT NECESSARY BUT WRONG, AND IT'S WRONG

1    FOR A COUPLE OF REASONS.

2        FIRST, WE GIVE THEM THE INSTRUCTIONS.  WE GIVE THEM THE

3    ELEMENTS IN THE JURY INSTRUCTIONS.

4        SO -- AND THERE IS SUPREME COURT CASE LAW.  IT'S WEEKS,

5    WHICH IS W-E-E-K-S, V. ANGELONE, A-N-G-E-L-O-N-E, 528 U.S. 225

6    AND THE PIN CITE I BELIEVE IS 234 WHERE JURIES ARE PRESUMED TO

7    FOLLOW INSTRUCTIONS THAT ARE GIVEN TO IT.

8        THIS SUPREME COURT CASE CITES A 1987 SUPREME COURT CASE

9    FOR THE SAME PROPOSITION.  THE LAW IN THAT AREA IS CLEAR.  SO

10   TO GIVE THEM THE INSTRUCTIONS AGAIN IN THE VERDICT FORM

11   PRESUMES THAT THEY'RE NOT FOLLOWING THE INSTRUCTIONS THE COURT

12   GAVE THEM IN THE JURY INSTRUCTIONS WHERE THE ELEMENTS ARE LAID

13   OUT.  SO THAT'S ONE REASON WHY YOU SHOULDN'T GIVE THIS

14   INSTRUCTION.

15       THE SECOND REASON IS THAT IF WE FOLLOW THE CHOOSE YOUR OWN

16   ADVENTURE BOOK THAT THIS DEFENSE VERDICT FORM IS, AND THAT IS,

17   IF YOU ANSWER YES TO THE FIRST QUESTION THEN YOU GET TO MOVE

18   ONTO THE SECOND QUESTION AND ALL OF THE WAY DOWN, WHEN THEY

19   FINALLY GET TO THE PLACE WHERE THE JURY IS TO DECIDE GUILTY OR

20   NOT GUILTY, PRESUMABLY THE ONLY WAY THE JURY GETS IT THERE IS

21   BECAUSE THEY CHECKED "YES" NUMEROUS TIMES.

22       AND IF YOU READ THE REASONABLE DOUBT INSTRUCTION, IF THEY

23   ACTUALLY CHECK "YES," THE JURY ACTUALLY HAS THE DUTY TO FIND

24   HIM GUILTY.  SO IF THE COURT GAVE THIS, IT SHOULD ACTUALLY

25   ELIMINATE THE NOT GUILTY OPTION FROM THE ULTIMATE DETERMINATION

1    BY THE JURY.

2        IF THE JURY ACTUALLY REACHES PAGE 5 OF THE DEFENSE'S

3    VERSION OF THE VERDICT FORM, AND THE ONLY WAY THEY CAN DO IT

4    BECAUSE THE INSTRUCTIONS TELL THEM PROCEED TO NUMBER 2 ONLY IF

5    "YES," SO IF THE JURY IN THEIR DELIBERATIONS REACHES PAGE 5 BY

6    CHECKING "YES," THE ONLY OPTION THAT THEY HAVE LEFT, THEIR

7    DUTY, IS TO FIND HIM GUILTY BECAUSE THEY WOULD HAVE STOPPED

8    EARLIER ON AND NEVER MADE IT TO THAT PAGE.

9        SO IT'S INTERNALLY INCONSISTENT.  IT IS IN VIOLATION OF

10   THE INSTRUCTIONS, AND THE SUPREME COURT PRECEDENT SAYS THAT YOU

11   DON'T NEED TO GIVE THIS KIND OF VERDICT FORM TO THE JURY.

12   THEY'RE PRESUMED TO FOLLOW THE INSTRUCTIONS THAT THE COURT

13   READS TO THEM ON WHAT THE ELEMENTS ARE.

14           THE COURT:  MR. ARCHER?

15           MR. ARCHER:  YES, YOUR HONOR.  THE GOVERNMENT

16   PRESUMES THAT THE JURY IS NOT GOING TO READ THE VERDICT FORM IN

17   ITS ENTIRETY.  THE JURY WILL HAVE THE VERDICT FORM AND WILL

18   CERTAINLY READ THE WHOLE VERDICT FORM.

19       THIS INSTRUCTS THE JURY.  I CERTAINLY DON'T SEE WHAT THE

20   PREJUDICE IS IN REMINDING THE JURY THAT THEY NEED TO FIND EACH

21   OF THESE INDIVIDUAL ELEMENTS IN ORDER TO FIND MR. YORK GUILTY

22   OF EITHER OF THESE TWO PARTICULAR CRIMES.  I DON'T THINK

23   THERE'S ANYTHING IN HERE THAT IS MISSTATING THE HARM.  I DON'T

24   THINK THERE'S ANY HARM OR PREJUDICE TO THE GOVERNMENT BY MAKING

25   SURE THAT AS THE JURY CONSIDERS THE VERDICT THAT THEY MAKE SURE

1    THAT THE GOVERNMENT HAS MET EACH OF THESE ELEMENTS.

2        SO I DON'T SEE -- I UNDERSTAND THAT THE JURIES ARE

3    PRESUMED TO HAVE LISTENED TO THE JURY INSTRUCTIONS, BUT THERE'S

4    CERTAINLY NO PREJUDICE TO MAKING SURE THAT THE JURY HAS REACHED

5    A DECISION ON EACH OF THOSE ELEMENTS BEFORE THEY FIND MR. YORK

6    GUILTY.

7        SO --

8            THE COURT:  OKAY.

9            MR. ARCHER:  I WOULD NOTE ONE THING ON THE

10   GOVERNMENT'S PROPOSED INSTRUCTION, LINE 7.5, I BELIEVE IT'S 47

11   INSTEAD OF 14.

12           THE COURT:  U.S.C.?  THERE'S A TYPO THERE.

13           MR. ARCHER:  YES.

14           THE COURT:  ALL RIGHT.  THANK YOU.

15       I'M GOING TO USE THE GOVERNMENT'S VERDICT FORM.  I THINK

16   IT IS THE APPROPRIATE VERDICT FORM TO USE IN REGARDS TO

17   AFFIRMING AND MAKING SURE THAT THE JURY HAS REACHED A VERDICT

18   IN EVERY CASE, I POLL THE JURY, AND WE WILL BE POLLING THE JURY

19   IN THIS CASE TO CONFIRM THEIR VERDICT.  SHOULD THERE BE A

20   GUILTY VERDICT IN THE CASE, WE'LL DEFINITELY POLL THE JURY IN

21   THIS CASE.

22       I DON'T KNOW WHAT THEY'RE GOING TO DO, BUT I DON'T THINK

23   THAT IT'S NECESSARY TO HAVE THE JURY GO THROUGH THE FORM, THE

24   VERDICT FORM AS IT APPEARS IN THE DEFENSE SUBMISSION.  THEY

25   WILL HAVE THE INSTRUCTIONS AND THE ELEMENTS OF THE OFFENSES,

00101

1   AND THEY WILL HAVE SEPARATE INSTRUCTIONS AS TO THOSE, AND

2   THEY'LL BE TOLD AT LEAST TWO TIMES, IF NOT MORE, IN THE

3   INSTRUCTIONS THAT THEY CANNOT CONVICT UNLESS THE GOVERNMENT

4   MEETS THEIR BURDEN BY PROOF BEYOND A REASONABLE DOUBT AS TO

5   THOSE ELEMENTS.

6        SO I'M GOING TO GIVE, WITH THE MODIFICATIONS, THE

7   GOVERNMENT'S VERDICT FORM, RECOGNIZING THE OBJECTIONS AND

8   PRESERVING THE DEFENSE OBJECTIONS FOR THE RECORD.

9        (DISCUSSION OFF THE RECORD.)

10            THE COURT:  ALL RIGHT.  ANYTHING FURTHER WE CAN DO

11   TODAY?

12            MR. SCHENK:  YOUR HONOR, THIS IS JUST ONE OTHER

13   ISSUE.  OUR PARALEGAL, MS. HOLLIMAN, HAS A DOCTOR'S APPOINTMENT

14   ON FRIDAY, AND I THINK SHE HAS TO LEAVE AROUND 10:00 OR 10:30,

15   SOMETHING LIKE THAT.  SO ANOTHER PARALEGAL FROM THE U.S.

16   ATTORNEY'S OFFICE WILL SUBSTITUTE IN FOR HER WHEN SHE HAS TO

17   LEAVE.

18        AND I WONDER IF -- THE REASON I'M LETTING THE COURT KNOW

19   IS THAT I KNOW THE COURT LIKES TO ASK IF A JUROR RECOGNIZES

20   SOMEONE AT EITHER COUNSEL TABLE AND IN THE MORNING OR AT THE

21   SUBSTITUTION TIME OR AT THE END OF THE BREAK IF THERE'S A TIME

22   THAT THE COURT WOULD LIKE TO DO THAT TO ASK IF THE JURY KNOWS

23   THE PINCH HITTING GOVERNMENT PARALEGAL, THAT WOULD CERTAINLY BE

24   APPROPRIATE.

25        I JUST DON'T WANT THE COURT TO LOOK UP AND SEE A NEW FACE

```
1        AT THE TABLE AND WONDER.

2                  THE COURT:  MR. ARCHER, DO YOU WANT TO COMMENT ON

3        IT?

4                  MR. ARCHER:  NO, YOUR HONOR.

5                  THE COURT:  ALL RIGHT.  WE'LL FIND AN APPROPRIATE

6        TIME TO DO THAT THEN.

7            ANYTHING FURTHER?

8                  MR. ARCHER:  NO, YOUR HONOR.  SHOULD WE SET A TIME

9        TO COME BACK TOMORROW?

10                 THE COURT:  WE SHOULD.  THAT'S OUR NEXT.  7:00 A.M.?

11           WHAT IS A REASONABLE HOUR FOR YOU TO COME BACK HAVING

12       COMPLETED RESEARCH ON THESE ISSUES?

13           WHAT DO WE HAVE TOMORROW?  DO WE HAVE A SENTENCING?

14                 THE CLERK:  AT 1:30.

15                 THE COURT:  1:30.  OKAY.

16           SO AS I TOLD YOU PREVIOUSLY OUR MORNING OPENED UP SO WE'RE

17       AVAILABLE ALL MORNING.  WE'RE BACK ON THE RECORD IN THE

18       SENTENCING MATTER AT 1:30.  THAT WILL TAKE ANOTHER HALF HOUR,

19       MAYBE.

20           SO IF YOU WANTED TO COME SUBSEQUENT TO THAT, WE CAN DO

21       THAT.

22                 MR. SCHENK:  THE SENTENCING YOU SAID WOULD BE ABOUT

23       A HALF HOUR?

24                 THE COURT:  I THINK SO.

25                 MR. SCHENK:  THAT'S FINE WITH THE GOVERNMENT.
```

1          THE COURT:  2:00 O'CLOCK?

2          MR. ARCHER:  THAT WOULD BE FINE.

3          THE COURT:  2:00 O'CLOCK.

4          MR. ARCHER:  THAT'S GREAT.

5          THE COURT:  ALL RIGHT.  WE'LL SEE YOU TOMORROW AT

6     2:00 O'CLOCK.

7          MS. PENNA:  THANK YOU.

8          MR. ARCHER:  THANK YOU.

9       (COURT CONCLUDED AT 2:59 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, RMR, CRR
           CERTIFICATE NUMBER 8074

17

18

19         DATED:  FEBRUARY 12, 2016

20

21

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT
 2               FOR THE NORTHERN DISTRICT OF CALIFORNIA
                          SAN JOSE DIVISION
 3

 4        UNITED STATES OF AMERICA,

 5                 PLAINTIFF,            CASE NO.  CR-15-00226-EJD

 6           VS.                         SAN JOSE, CALIFORNIA

 7        DOUGLAS STROMS YORK,           AUGUST 27, 2015

 8                 DEFENDANT.            VOLUME 3

 9                                       PAGES 216 - 240

10
                          TRANSCRIPT OF TRIAL
11               BEFORE THE HONORABLE EDWARD J. DAVILA
                      UNITED STATES DISTRICT JUDGE
12

13                     A-P-P-E-A-R-A-N-C-E-S

14

15     FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY
                             BY:   BRIANNA PENNA
16                                 JEFFREY SCHENK
                             50 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18     FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                             BY:   GRAHAM ARCHER
19                                 HEATHER ANGOVE
                             55 S. MARKET STREET, SUITE 820
20                           SAN JOSE, CALIFORNIA 95113

21
       OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                                CERTIFICATE NUMBER 8074

23
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
24     TRANSCRIPT PRODUCED WITH COMPUTER.

25
```

```
 1    SAN JOSE, CALIFORNIA              AUGUST 27, 2015

 2              P R O C E E D I N G S

 3        (COURT CONVENED AT 2:34 P.M.)

 4        THE CLERK:  CALLING CASE NUMBER 15-226, UNITED STATES

 5    VERSUS DOUGLAS YORK.

 6              MS. PENNA:  BRIANNA PENNA FOR THE UNITED STATES.

 7    GOOD AFTERNOON, YOUR HONOR.

 8              THE COURT:  GOOD AFTERNOON.

 9              MR. SCHENK:  AND JEFF SCHENK FOR THE UNITED STATES.

10    GOOD AFTERNOON.

11              THE COURT:  GOOD AFTERNOON.

12              MR. ARCHER:  GOOD AFTERNOON.  GRAHAM ARCHER FOR

13    MR. YORK WHO IS PRESENT OUT OF CUSTODY, AND HEATHER ANGOVE FROM

14    OUR OFFICE HAS ALSO JOINED ME, TOO.

15              THE COURT:  THANK YOU.  GOOD AFTERNOON.  PLEASE BE

16    SEATED.

17        WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.  AND WE

18    RECONVENED TO DISCUSS ADDITIONAL ISSUES REGARDING JURY

19    INSTRUCTIONS.

20        AND LET ME ASK COUNSEL, YOU HAVE A HARD COPY OF THE MODEL

21    NINTH CIRCUIT?

22              MS. PENNA:  YES.

23              THE COURT:  DO YOU NEED A HARD COPY?

24              MR. ARCHER:  AGAIN, YES, YOUR HONOR.

25              THE COURT:  OKAY.  WE'LL GET THAT FOR YOU IN JUST A
```

1   MOMENT.

2       THE YOUTH JUST DON'T READ BOOKS ANYMORE, DO THEY?  THE

3   YOUNG JUST DON'T READ BOOKS.

4       (PAUSE IN PROCEEDINGS.)

5           THE COURT:  ALL RIGHT.  SO I HAVE RECEIVED DOCUMENT

6   NUMBER 69, WHICH WAS FILED BY THE DEFENSE, I THINK, THIS

7   AFTERNOON.

8       HAS THE GOVERNMENT RECEIVED THIS AS WELL?

9           MR. SCHENK:  YES, YOUR HONOR.

10          THE COURT:  ALL RIGHT.  THANK YOU.  SO, MR. ARCHER,

11  DO YOU WANT TO SPEAK TO YOUR DOCUMENT NUMBER 69?

12          MR. ARCHER:  I DO, YOUR HONOR.  AND I WANT TO

13  ACKNOWLEDGE FIRST AND I WANT TO APOLOGIZE FOR THE TIMING OF THE

14  FILING.  WE'RE STILL SORT OF SORTING OUT THE STATUTORY LANGUAGE

15  AS IT HAS COME INTO THE CASE SO FAR, AND I APPRECIATE THE

16  GOVERNMENT'S PATIENCE WITH THE TIMING OF OUR FILING AS WELL.

17      THE DEFENSE'S CONCERN HERE IS THAT THIS IS NOT INTENDED TO

18  BE A STRICT LIABILITY CRIME AND FROM THE NINTH CIRCUIT MODEL

19  INSTRUCTION THERE'S NOT REALLY ANY GUIDANCE FOR THE JURY AS TO

20  WHAT THE MENS REA IS AND SO THAT'S THE PURPOSE OF OUR FILINGS

21  AS TO THE MATERIALITY, THE INTENT TO DECEIVE, ET CETERA.

22      AND WHAT WE PROPOSED AS AN ALTERNATE JURY INSTRUCTION TO

23  THE 2010 MODEL INSTRUCTION IN THE NINTH CIRCUIT IS NOT ONE THAT

24  IS IN CONFLICT WITH NINTH CIRCUIT LAW.  TOMSHA-MIGUEL,

25  T-O-M-S-H-A M-I-G-U-E-L, THE TOMSHA-MIGUEL CASE IS ONE THAT --

1    AND THAT'S AT 766 F.3D 1041, IS A CASE THAT ADDRESSED THE

2    DEFENDANT'S RIGHT TO RAISE AN AFFIRMATIVE DEFENSE AND THE

3    SUFFICIENCY OF AN INDICTMENT THAT DID NOT SPECIFICALLY ALLEGE

4    AN INTENT TO DEFRAUD IN IT.

5         AND IT DID NOT ACTUALLY ADDRESS JURY INSTRUCTIONS.  THE

6    JURY INSTRUCTIONS IN THAT CASE -- MS. TOMSHA-MIGUEL'S COUNSEL

7    STIPULATED TO THE MODEL INSTRUCTIONS IN THAT CASE, AND SO IT

8    WAS NOT SOMETHING THAT WAS RAISED.

9         THE DEFENSE'S PERSPECTIVE HERE IS THAT THE NINTH CIRCUIT

10   MODEL INSTRUCTION, ESPECIALLY IN THIS CASE WHERE WE'RE -- THE

11   BULK OF THE EVIDENCE -- IN FACT, THE TOTALITY OF THE EVIDENCE

12   AS TO THE IMPERSONATION COUNT, OTHER THAN AUTHENTICATING, OTHER

13   THAN THE GOVERNMENT EVIDENCE SUPPORTING THEIR CONTENTION THAT

14   IT WAS MR. YORK THAT MADE THE PHONE CALL, IS THE CONTENT OF A

15   SINGLE VOICEMAIL AROUND 30 SECONDS LONG.

16        IN THIS CASE I THINK IT'S INCREDIBLY IMPORTANT THAT WE

17   HAVE SOME MORE GUIDANCE FOR THE JURY BEYOND WHAT THE MODEL

18   INSTRUCTION IS.  THE ACTING AS SUCH LANGUAGE ALONE IS

19   INSUFFICIENT AND IT DOESN'T -- THE LEOPWITCH CASE,

20   L-E-P-O-W-I-T-C-H, WHICH IS A 1943 CASE, TOMSHA-MIGUEL

21   ACKNOWLEDGES THAT THAT'S STILL GOOD LAW AND ACKNOWLEDGES THE

22   CIRCUITS THAT ARE IN AGREEMENT WITH THE NINTH CIRCUIT AS TO THE

23   INTENT TO DEFRAUD ISSUE BUT ACKNOWLEDGES IN LEPOWITCH THAT

24   THERE IS AN INHERENT ELEMENT OF INTENT TO DECEIVE.

25        AND THAT'S SOMETHING THAT, FROM OUR PERSPECTIVE, IS NOT

1    CONTAINED PROPERLY IN THE 2010 MODEL JURY INSTRUCTION FROM THE

2    NINTH CIRCUIT.

3         OUR CONCERN IS THAT WITHOUT INSTRUCTION TO THE JURY AS TO

4    THE INTENT REQUIRED, THAT IT COULD SEEM AS THOUGH THERE WOULD

5    BE STRICT LIABILITY AND SIMPLY THE UTTERANCE OF THE WORDS BASED

6    ON HOW THE MODEL JURY INSTRUCTION LAYS IT OUT.

7         AND SO WHAT THE DEFENSE HAS OFFERED IS A SLIGHTLY MODIFIED

8    VERSION OF THE EIGHTH CIRCUIT MODEL WHICH THAT DOES NOT INCLUDE

9    ANYTHING THAT WOULD RUN AFOUL OF TOMSHA-MIGUEL SUCH AS A

10   REQUIREMENT OF AN INTENT TO DEFRAUD BUT DOES EXPLAIN TO THE

11   JURY, AS IS ACKNOWLEDGED IN A NUMBER OF OTHER CASES, THAT A

12   REQUIREMENT TO SUSTAIN A CONVICTION UNDER SECTION 912 IS THAT

13   THE PERSON BEING ACCUSED OF DOING SOMETHING IN VIOLATION OF THE

14   STATUTE HAS TO ACTUALLY HAVE TRIED THROUGH DECEIT TO ALTER THE

15   COURSE OF SOMEONE ELSE'S ACTIONS THROUGH THAT DECEIT.

16        AND THAT'S SOMETHING WHICH THE LEPOWITCH CASE -- THE

17   LEPOWITCH CASE EFFECTIVELY SET A FLOOR AS TO THE MINIMUM AMOUNT

18   REQUIRED BY AN INDICTMENT TO PLEAD A VIOLATION OF 912.  SORT OF

19   BIZARRELY CONGRESS REMOVED THE LANGUAGE INTENT TO DEFRAUD BUT

20   NOT BECAUSE IT WAS REMOVING IT FROM THE STATUTE BUT BECAUSE IT

21   FOUND IT TO BE DUPLICATIVE BASED ON THE LEPOWITCH COURT'S

22   FINDING THAT IT WAS NATURALLY WOVEN INTO THE STATUTE ITSELF.

23        SO WITHOUT SOME EXPLANATION TO THE JURY OF A REQUIRED

24   INTENT TO DECEIVE AND TO HAVE SOMETHING ELSE HAPPEN, WE THINK

25   THAT THERE'S A SIGNIFICANT DANGER THAT SOMEONE COULD BE

00110

1    CONVICTED OF THIS COUNT WITHOUT ANY INTENT TO DECEIVE AND BY

2    INTENT TO DECEIVE I MEAN TO THEN ALTER THE COURSE OF SOMEONE'S

3    BEHAVIOR AS IT HAS BEEN DEFINED IN OTHER CIRCUITS AND OTHER

4    CASES ON THE SAME SUBJECT.

5            THE COURT:  ALL RIGHT.  THANK YOU.  DOES THE

6    GOVERNMENT HAVE A POSITION?

7            MS. PENNA:  YES.  THANK YOU, YOUR HONOR.  WE HAVE

8    REVIEWED THE DEFENSE'S MEMORANDUM THIS AFTERNOON AND WE HAVE A

9    FEW BRIEF POINTS OF RESPONSE.

10        IT IS OUR UNDERSTANDING THAT AS DEFENSE HAS DISCUSSED, THE

11   STATUTE BACK IN THE 1940'S DID REQUIRE THIS INTENT TO DEFRAUD.

12        AND THEN WHEN THE LEPOWITCH CASE CAME OUT, IT DEFINED THIS

13   INTENT AND GAVE SOME MORE GUIDANCE ON THAT AS DEFENSE HAS

14   DISCUSSED.  HOWEVER, AFTER THIS CASE CAME OUT, CONGRESS

15   SPECIFICALLY DELETED THAT INTENT REQUIREMENT.

16        AND WE'VE REVIEWED THESE CASES THAT HAVE BEEN PROVIDED AND

17   WHAT SEEMS CLEAR IS THAT THERE IS A CIRCUIT SPLIT, BUT THE

18   CIRCUIT SPLIT SEEMS TO DISCUSS A SPLIT IN THE REASONING AS TO

19   THAT REQUIREMENT AND WHY THAT REQUIREMENT WAS REMOVED AND

20   WHETHER THAT WAS REMOVED TO COMPLETELY DELETE THAT INTENT

21   REQUIREMENT OR RATHER THAT THE -- THAT THAT INTENT REQUIREMENT

22   IS INHERENTLY INCLUDED INTO THE ELEMENTS THAT ARE REQUIRED.

23        AND IT'S OUR UNDERSTANDING THAT HERE IN THE NINTH CIRCUIT

24   IT'S BEEN MADE CLEAR THAT THERE IS NOT AN INTENT ELEMENT

25   REQUIRED THAT THE GOVERNMENT HAS TO PROVE.

00111

1          AND I WOULD LIKE TO POINT OUT SPECIFICALLY THE EXHIBITS

2     THAT THE DEFENSE PROVIDED THIS AFTERNOON IN EXHIBIT B THE VERY

3     LAST PAGE THEY PROVIDED SOME, SOME OTHER CIRCUITS THAT DO

4     INCLUDE AN EXTRA ELEMENT IN THE JURY INSTRUCTIONS BUT IN THAT

5     VERY LAST PAGE IT SPECIFICALLY SAYS THAT THE ELEVENTH CIRCUIT,

6     THE THIRD, THE EIGHTH, AND D.C. CIRCUITS IN DETERMINING THAT

7     THE INTENT TO DEFRAUD REMAINED AN ELEMENT, EVEN THOUGH NOT

8     ALLEGED IN THE INDICTMENT.  NOTE, HOWEVER, THAT THE SECOND,

9     FOURTH, SEVENTH, AND NINTH CIRCUITS HAVE HELD THAT THE INTENT

10    TO DEFRAUD IS NO LONGER AN ELEMENT OF THIS OFFENSE.

11          NOW, THIS IS SUPPORTED BY THE TOMSHA-MIGUEL CASE THAT THE

12    DEFENSE HAS DISCUSSED, BUT WHAT THEY HAVE NOT MENTIONED WAS THE

13    HOLDING AND THERE'S AN ENTIRE SECTION OF THIS CASE THAT

14    DISCUSSES THIS EXACT ISSUE WHETHER OR NOT THIS INTENT TO

15    DEFRAUD IS A REQUIRED ELEMENT FOR THE GOVERNMENT TO PROVE.  AND

16    THEY HELD THAT IT'S NOT.

17          THEY DIRECTLY STATE THAT IN RESPONSE TO THE SAME ARGUMENT

18    THAT THERE'S THIS SPLIT IN THE CIRCUIT THAT THEY -- THE COURT

19    HERE SAYS DIRECTLY, TOMSHA-MIGUEL'S ARGUMENT THAT THIS APPROACH

20    IS INCONSISTENT WITH THE CASE LAW OF OUR CIRCUITS IS

21    UNAVAILING.

22          THE MAJORITY OF OUR SISTER CIRCUITS HAVE HELD THAT THE

23    GOVERNMENT NEED NOT ESTABLISH AN INTENT TO DEFRAUD AS A

24    SEPARATE ELEMENT OF SECTION 912 OF A SECTION 912 OFFENSE.

25          WE'RE HERE.  WE'RE IN THE NINTH CIRCUIT, AND IT'S OUR

```
1     STANCE THAT WE SHOULD GO ALONG WITH THE MODEL -- NINTH CIRCUIT

2     MODEL JURY INSTRUCTION AS IT READS.  THOSE INSTRUCTIONS HAVE

3     NOT BEEN FOUND TO BE OVERTURNED, AND AT THIS POINT IT'S

4     SUPPORTED BY THE CASE LAW THAT WE PROVIDED, AND THAT'S OUR

5     STANCE.

6            THE COURT:  OKAY.

7            MR. ARCHER:  JUST BRIEFLY.  WHAT THE DEFENSE

8     STRUGGLES WITH IN THE TOMSHA-MIGUEL CASE, OTHER THAN THE

9     HOLDING, IS IF I COULD DIRECT TO THIS IS PAGE 4 AT LINE 7

10    THROUGH 10 OF DOCKET 69, THIS IS A QUOTE FROM THE TOMSHA-MIGUEL

11    CASE, AND IT ACKNOWLEDGES THAT 9 -- SECTION 912 STATUTORY

12    ELEMENTS STILL INCORPORATE AN INTENT TO DECEIVE.  AND IT'S,

13    IT'S CERTAINLY -- IT'S A BIT OF A BIZARRE DISTINCTION BECAUSE

14    THEY'RE IN SOME WAYS DISTINGUISHING DEFRAUD AND DECEIT AND

15    OTHER CIRCUITS HAVE, I THINK, THAT THERE'S A DIFFERENCE BETWEEN

16    THE EIGHTH AND THE ELEVENTH CIRCUITS THAT ONE OF THEM HAS THE

17    WORD "DEFRAUD" IN IT AND THE OTHER ONE JUST DEFINES "DECEIVE."

18        AND WE THINK THAT IF -- ALTHOUGH WE THINK TOMSHA-MIGUEL

19    WAS WRONGLY DECIDED AS TO THE FRAUD, WE UNDERSTAND THAT THE

20    COURT WOULD BE FORECLOSED FROM GIVING AN INSTRUCTION THAT

21    INCLUDED DEFRAUD BUT TOMSHA-MIGUEL DRAWS A DISTINCTION BETWEEN

22    THE WORD "DECEIVE" AND THE WORD "DEFRAUD."

23        IT ACKNOWLEDGES THAT LEPOWITCH IS STILL GOOD LAW AND

24    REFERENCING AGAIN THE QUOTE THAT IS INCLUDED ON PAGE 4 OF THE

25    DEFENSE FILING.  IT DISCUSSES WHY IN A STATUTE INVOLVING SPEECH
```

```
1     IT'S SO DANGEROUS TO NOT HAVE THE STATUTE DRAWN IN A WAY THAT

2     NARROWLY TAILORS IT TO ONLY DECEPTIVE SPEECH.

3          SO THE LEPOWITCH CASE IS STILL GOOD LAW.  IT'S VERY CLEAR

4     THAT THERE IS AN INTENT TO DECEIVE.  THERE IS THIS UGLY CIRCUIT

5     SPLIT ABOUT THE DEFRAUD, BUT IN THE NINTH CIRCUIT EVEN HOLDING

6     THAT DEFRAUD DOESN'T NEED TO BE LISTED AS AN ELEMENT, THERE HAS

7     TO BE SOME IMPLICATION TO THE JURY THAT THERE HAS TO BE A

8     DECEPTIVE PURPOSE TO THE COMMUNICATION.  AND I THINK THAT'S

9     CLEAR FROM THE TOMSHA-MIGUEL LANGUAGE THAT IS QUOTED ON PAGE 4

10    HERE.

11              THE COURT:  ANY COMMENT ON THAT?

12              MS. PENNA:  THANK YOU, YOUR HONOR.  IT'S OUR

13    UNDERSTANDING HERE THAT THIS LANGUAGE IS IN RESPONSE TO A FIRST

14    AMENDMENT CHALLENGE, BUT IN THE NEXT PARAGRAPH IT DIRECTLY

15    RESPONDS TO THE ARGUMENT THAT IS BEING RAISED HERE AND THAT'S

16    WHAT SHOULD BE CONTROLLING.

17         AND EVEN JUST IN RESPONSE THE WAY IT'S WORDED IS THAT

18    THE -- THAT THIS INTENT IS INCORPORATED, NOT THAT IT SHOULD BE

19    ADDED INTO WHAT HAS ALREADY BEEN CLEARLY ESTABLISHED AS THE TWO

20    ELEMENTS OF THIS OFFENSE, WHICH ARE LISTED IN THIS -- THE MODEL

21    JURY INSTRUCTIONS HERE.

22              THE COURT:  THE DEFRAUD INTENT IS INCORPORATED?

23              MS. PENNA:  IT'S INCORPORATED.  WHAT DEFENSE IS

24    ASKING IS TO ADD A SEPARATE ELEMENT OR ADD TO THAT THE ELEMENTS

25    THAT HAS CLEARLY HERE BEEN ADDRESSED BECAUSE IF IT'S BEEN
```

00114

1    INCORPORATED, THAT'S ALREADY BEEN TAKEN INTO ACCOUNT IN THESE

2    TWO ELEMENTS.

3         BUT WE STAND BY THE -- THIS CASE AND THE OTHER CASES IN

4    THIS DISTRICT SHOW THAT THERE'S NO ADDED INTENT TO DEFRAUD

5    HERE, AND, THEREFORE, WE SHOULD BE GOING WITH THE MODEL JURY

6    INSTRUCTIONS FOR THIS CIRCUIT IN THIS CASE.

7              THE COURT:  ALL RIGHT.  THANK YOU.

8         MR. ARCHER, ANYTHING FURTHER?

9              MR. ARCHER:  NO, YOUR HONOR.  OTHER THAN JUST TO

10   POINT OUT THAT TOMSHA-MIGUEL WAS NOT ADDRESSING A CHALLENGE TO

11   THE JURY INSTRUCTION.  IT WAS NOT RAISED IN THE DISTRICT COURT.

12   AND SO WE'RE AT A PHASE WHERE THERE IS A CHALLENGE TO THE JURY

13   INSTRUCTIONS NOW, AND THE HOLDING I THINK IN TOMSHA-MIGUEL

14   SHOULD BE LIMITED TO COUNTS IN THE INDICTMENT OR AN AFFIRMATIVE

15   DEFENSE.

16             THE COURT:  WELL, IT DID.  TOMSHA-MIGUEL DID SPEAK

17   TO THE DEFENSE EFFORTS TO DISMISS THE INDICTMENT AND ALSO

18   CALLED UPON THE COURT TO REVIEW WHETHER OR NOT IT WAS OVERBROAD

19   AS TO SPEECH.

20        I THINK THE COURT LOOKED AT THOSE ISSUES, AND AS YOU POINT

21   OUT, COUNSEL, THAT WAS NOT A JURY INSTRUCTION TYPE OF A CASE,

22   BUT IT DOES GIVE GUIDANCE TO US, ALBEIT IT'S -- I DON'T THINK

23   IT'S NOT QUITE A YEAR OLD, PERHAPS A LITTLE OVER A YEAR OLD.  I

24   DON'T REMEMBER THE MONTH THAT IT WAS DECIDED.

25        BUT --

```
 1                    MR. ARCHER:  I BELIEVE IT WAS NOVEMBER OF 2014.

 2                    THE COURT:  2014?

 3                    MR. ARCHER:  I'M SORRY, SEPTEMBER 4TH OF 2014.

 4                    THE COURT:  SO IT'S NOT QUITE A YEAR, A YEAR OLD AND

 5       SO I SUPPOSE IT'S AMBITIOUS TO THINK THAT THE NINTH CIRCUIT

 6       WOULD HAVE LOOKED AT THAT CASE, AND, THEREFORE, MADE A DECISION

 7       SOME 11 MONTHS LATER AS TO WHETHER OR NOT THE JURY INSTRUCTION

 8       FOR 912, THAT IS, THE MODEL INSTRUCTION, SHOULD BE ALTERED OR

 9       CHANGED IN SOME MANNER.

10            IT IS AN INTERESTING QUESTION WHETHER OR NOT THIS

11       DECEPTION ISSUE COMES IN.  I DON'T THINK THAT -- AND I'VE

12       LOOKED AT YOUR PAGE 5 OF DOCUMENT 69 OF YOUR PROPOSED 69

13       SUGGESTS AN INSTRUCTION THAT, IN ESSENCE, ADDS THE THIRD

14       PARAGRAPH TO THE ALREADY MODEL INSTRUCTION.  THAT'S ESSENTIALLY

15       WHAT I THINK YOUR OFFER IS TO ADD A NUMBER 3, THE DEFENDANT DID

16       SO KNOWINGLY WITH INTENT TO DECEIVE ANOTHER.

17            AND THEN YOUR MODEL THEN SUGGESTS THE LANGUAGE AS FOLLOWS:

18       FOR THE PURPOSES OF THIS OFFENSE TO ACT, QUOTE, "WITH INTENT TO

19       DECEIVE," END QUOTE, MEANS THAT THE DEFENDANT, WHILE SO

20       PRETENDING, ACTED WITH THE INTENT TO CAUSE A PERSON TO FOLLOW

21       SOME COURSE OF ACTION OR INACTION.

22            THAT LAST LANGUAGE IS SPECIFICALLY, I THINK, A QUOTE FROM

23       THE LEPOWITCH CASE IF I'M NOT MISTAKEN.

24                    MR. ARCHER:  IT IS, YOUR HONOR.

25                    THE COURT:  RIGHT.  AND THAT'S A 1943 CASE.
```

```
1              MR. ARCHER:  IT IS.

2              THE COURT:  RIGHT.  AND I'M JUST CURIOUS WHY YOU

3    THINK THAT LANGUAGE IS NECESSARY, RECOGNIZING THAT IT'S IN

4    LEPOWITCH AND YOU THINK IT SHOULD FOLLOW HERE, BUT WHY IS IT

5    NECESSARY HERE GIVEN THE FACTS AND CIRCUMSTANCES OF THIS CASE

6    WHICH ARE VASTLY DIFFERENT, OF COURSE, FROM TOMSHA-MIGUEL AND

7    LEPOWITCH?

8              MR. ARCHER:  IN THIS CASE, YOUR HONOR, I THINK IT'S

9    ESSENTIAL BECAUSE THE DEFENSE'S PERSPECTIVE IS THAT YOU HAVE IA

10   SINGLE VOICEMAIL HERE AND THAT THERE IS -- THAT THERE'S A

11   DANGER -- A REAL DANGER HERE THAT THE JURY COULD, WITHOUT THIS

12   SORT OF ADDITIONAL INFORMATION ABOUT INTENT.

13        BECAUSE REALLY WHAT THIS SPEAKS TO IS THE INTENT.  AND, I

14   MEAN, THAT LANGUAGE SPECIFICALLY SAYS THAT THIS IS WHAT THE

15   INTENT TO DECEIVE MEANS.

16        WITHOUT EVEN -- AND SO WITHOUT THAT LANGUAGE ABOUT INTENT,

17   AS THE INSTRUCTION STANDS, COULD A JURY NOT FIND SOMEONE GUILTY

18   OF THIS OFFENSE SIMPLY FOR UTTERING THOSE WORDS WITHOUT ANY --

19   WITHOUT HAVING TO DECIDE WHAT THE PERSON'S INTENT WAS?

20        AND I MEAN, SO THAT, THAT SEEMS TO RUN AFOUL OF WHAT THE

21   LEPOWITCH CASE SAYS.

22        LEPOWITCH -- I DON'T THINK THERE'S ANY -- IT IS AN OLD

23   CASE, BUT THERE'S NOT A LOT OF LAW OUT THERE ON THESE CASES AND

24   IT'S ACKNOWLEDGED BY TOMSHA-MIGUEL AS THE STANDARD.  I THINK

25   IT'S, UNLESS I'M MISTAKEN, IT WAS THE LAST TIME THAT THE UNITED
```

1    STATES SUPREME COURT RULED ON THIS.  IN FACT, THE CIRCUIT SPLIT

2    HAS BEEN FLOURISHING, I THINK, SINCE THE LATE '60S OR EARLY

3    '70S.

4         SO I'M FAIRLY CERTAIN THAT 1943 WAS THE LAST TIME THAT

5    THIS WAS WEIGHED IN ON.  SO IT REMAINS GOOD LAW, AND IT HAS NOT

6    BEEN OVERTURNED.  AND THAT'S OUR REAL FEAR IS THAT THERE'S

7    GOING TO BE SOME PERCEPTION BY THE JURY THAT JUST THE UTTERANCE

8    OF THESE WORDS WITHOUT AN ACCOMPANYING INTENT TO DECEIVE COULD

9    SUSTAIN A CONVICTION AND THAT APPROACH IS REALLY SETTING ASIDE

10   ANY KIND OF FRAUDULENT INTENT.  AN APPROACH IS A STRICT

11   LIABILITY STANDARD WHICH IS CERTAINLY NOT WHAT THE LEPOWITCH

12   COURT IS PUTTING FORTH WHEN IT DISCUSSES HOW INTERWOVEN THE

13   INTENT TO DECEIVE IS IN THE STATUTE.

14        AND SO I DON'T SEE ANYTHING FROM THE PROPOSED MODEL NINTH

15   CIRCUIT JURY INSTRUCTION THAT WOULD TELL THE JURY, HEY, THIS IS

16   NOT STRICT LIABILITY.  SIMPLY UTTERING THESE WORDS IS NOT

17   ENOUGH TO SUSTAIN THIS CRIME.

18        AND THAT'S THE DEFENSE'S CONCERN, AND THAT'S WHY

19   SPECIFICALLY IN THIS CASE THE DEFENSE THINKS IT'S A

20   PARTICULARLY DANGEROUS SITUATION BECAUSE YOU COULD HAVE THE

21   LANGUAGE IN THE VOICEMAIL AND YOU CAN PUT IT IN ALMOST ANY

22   CONTEXT AND WITHOUT SOME ADDITIONAL INSTRUCTION TO THE JURY,

23   HOW ARE THEY TO DETERMINE WHETHER THAT LANGUAGE -- WHETHER THAT

24   LANGUAGE CONSTITUTES A CRIME IN ANY CONTEXT.

25             THE COURT:  WELL, IS THE LANGUAGE OFFENSIVE LANGUAGE

```
 1    WHERE AN INDIVIDUAL -- WHERE THE RECORDING STATES I'M WITH THE

 2    I.R.S., ISN'T THAT THE OFFENSE, THE REPRESENTATION, THE

 3    IMPERSONATION OF A GOVERNMENT OFFICIAL?  ISN'T THAT THE DECEIT?

 4              MR. ARCHER:  BUT THE DECEIT HAS TO BE, ACCORDING TO

 5    LEPOWITCH, THE DECEIT HAS TO BE TAILORED TO ACCOMPLISH SOME

 6    OTHER GOAL, SOME OTHER -- I MEAN, IT HAS TO BE -- THE DECEIT

 7    ITSELF HAS TO BE -- IT'S NOT, YOUR HONOR.  THAT'S THE

 8    IMPERSONATION.

 9              THE COURT:  RIGHT.

10              MR. ARCHER:  BUT THE LANGUAGE FROM LEPOWITCH, WHICH

11    IS INCLUDED IN OUR PROPOSED INSTRUCTION, MAKES IT VERY CLEAR

12    THAT IT'S NOT JUST TELLING AN UNTRUTH.  IN FACT, THERE'S

13    SEVERAL CASES AND IT'S ACKNOWLEDGED IN TOMSHA-MIGUEL THAT MERE

14    BRAVADO IS NOT.

15         SO IF I GO TO A DINNER PARTY AND I BRAG THAT I'M AN AGENT

16    OF THE I.R.S., AND THAT IS -- IN FACT, I AM NOT.  I MEAN, AS A

17    MATTER OF LAW THAT'S NOT A CRIME.  THE ACTING AS SUCH, THE JURY

18    HAS TO HAVE SOME GUIDANCE AS TO WHAT THE ACTING AS SUCH IS AND

19    WHAT THE PURPOSE OF THE STATEMENT IS.

20         BECAUSE AS THE JURY INSTRUCTION STANDS, THERE'S NOTHING IN

21    THERE THAT WARNS THE JURY THAT MERE BRAVADO, AS HAS BEEN HELD

22    PREVIOUSLY, IS NOT SUFFICIENT TO BE A CRIME.

23              THE COURT:  SO DO THE FACTS AS WE KNOW THEM SO FAR,

24    WE'RE STILL MID TRIAL, BUT DO THE FACTS OF THIS CASE SUPPORT

25    GIVING THAT LAST PARAGRAPH THAT YOU'VE SUPPLIED WITH THE INTENT
```

```
 1        TO CAUSE A PERSON TO FOLLOW SOME COURSE OF ACTION OR INACTION?

 2              MR. ARCHER:  I THINK THEY DO.  WELL, THEY'RE THE

 3   GOVERNMENT'S --

 4              THE COURT:  WHAT IS THAT?

 5              MR. ARCHER:  WELL, I THINK IT'S NOT MET FROM THE

 6   DEFENSE'S PERSPECTIVE BUT IT DOESN'T -- IT'S, IT'S SOMETHING

 7   THAT IS --

 8              THE COURT:  I MEAN, AREN'T YOU CREATING ADDITIONAL

 9   ELEMENTS BY INSTRUCTING THE JURY, THEN?

10              MR. ARCHER:  NO, NOT THE ELEMENTS BEYOND WHAT ARE

11   CONSTITUTIONALLY REQUIRED BY THE STATUTE AND FOUND TO BE PART

12   OF THE STATUTE BY THE LEPOWITCH CASE AND THE UNITED STATES

13   SUPREME COURT.

14       I DON'T THINK THAT IT'S -- THERE DOESN'T HAVE TO BE A

15   SHOWING OF PROOF TO ADD -- TO MAKE SURE THAT WE HAVE THE

16   CORRECT LANGUAGE IN THERE; RIGHT?

17       IT'S NOT THAT THE JURY IS GOING TO BE MISLED AND NEEDS TO

18   BE CORRECTED.

19       THESE -- THIS DEFINES THE OFFENSE.  I DON'T -- I'M NOT

20   SURE I QUITE UNDERSTAND THE COURT'S QUESTION BECAUSE I THINK

21   THAT --

22              THE COURT:  WELL, YOU HAVE ADDED TO THE MODEL 912,

23   YOUR PARAGRAPH 3, DID SO KNOWINGLY WITH INTENT TO DECEIVE

24   ANOTHER.

25       AND THEN YOU HAVE BELOW ENUMERATED 3 A SENTENCE.
```

1          MR. ARCHER:  YES.

2          THE COURT:  AND I'M ASKING WHY IS THAT SENTENCE

3     NECESSARY?  I GUESS THAT'S MY QUESTION.

4          MR. ARCHER:  THAT SENTENCE IS NECESSARY BECAUSE

5     IT'S, IT'S -- THAT'S WHAT THE SUPREME COURT HAS INTERPRETED 912

6     TO INCLUDE.

7          I MEAN, THAT IS THAT THE INTENT TO DECEIVE INCLUDES AN

8     ATTEMPT TO STEER SOMEONE ON A COURSE EITHER TO ACTION OR

9     INACTION.

10          AND SO IT'S NOT -- IF THERE IS NO EVIDENCE OF THAT IN THE

11     CASE, THEN THE ELEMENT HASN'T BEEN MET.  IT'S NOT THAT IT IS

12     SORT OF A -- FROM THE DEFENSE'S PERSPECTIVE AN OPTIONAL PORTION

13     OF AN INSTRUCTION WHERE, YOU KNOW, SOMETHING IN THE CASE MIGHT

14     TRIGGER GIVING OF THAT PORTION OF THE INSTRUCTION.  IT'S AT THE

15     CORE OF 912.  IT'S THE CORE OF DECEIT THAT LEPOWITCH REQUIRES.

16          AND IT SHOULD BE GIVEN IN EVERY CASE.  AND THE DEFENSE'S

17     PARTICULAR CONCERN ABOUT THIS CASE IS THAT FROM A SINGLE

18     VOICEMAIL WITHOUT GUIDANCE, THAT THE JURY COULD THINK THAT THE

19     MERE UTTERANCE OF THE WORDS COULD SUSTAIN A CONVICTION.

20          BUT I DON'T THINK THERE NEEDS TO BE ANY CASE SPECIFIC TO

21     TRIGGER GIVING IT, AND I DON'T THINK IT IS SUPERFLUOUS.  AND I

22     THINK IT IS ESSENTIAL TO THE CORE OF THE ELEMENTS OF 912.

23          OTHER CIRCUITS CERTAINLY DISAGREE WITH THE NINTH CIRCUIT

24     AS TO THEIR MODEL INSTRUCTION AND THIS LANGUAGE IS INCLUDED IN

25     BOTH THE EIGHTH OR THE ELEVENTH OR SOME CLOSE VERSION OF THAT.

1              THE COURT:  OKAY.  ANYTHING FURTHER?

2              MS. PENNA:  NOTHING FURTHER.

3              THE COURT:  WELL, THANK YOU FOR THE CONVERSATION.  I

4    APPRECIATE THE INSIGHT, AND I APPRECIATE THE HELP ON THAT.  I

5    THINK WHAT YOU'RE SUGGESTING THE COURT TO DO IS TO DEPART FROM

6    FIDELITY FROM THE NINTH CIRCUIT MODEL INSTRUCTION AND ADOPT THE

7    NOT JUST THE EIGHTH OR THE ELEVENTH CIRCUIT BUT A HYBRID OF

8    BOTH OF THOSE.  I THINK THAT'S WHAT YOUR SUGGESTED

9    INSTRUCTION HAS.

10             MR. ARCHER:  YOUR HONOR, BUT ONLY IN CONCERT.  AND

11   THE DEFENSE'S POSITION IS THAT IT IS NOT -- THAT WHILE IT

12   CONFLICTS WITH THE NONBINDING MODEL INSTRUCTION FROM THE 2010

13   NINTH CIRCUIT INSTRUCTIONS, BUT IT DOES NOT IN EFFECT COMPORT

14   WITH THE ACKNOWLEDGED LAW OF THE LAND UNDER TOMSHA-MIGUEL

15   ACKNOWLEDGING LEPOWITCH BEING GOOD LAW AND THE OTHER STANDARDS

16   REQUIRING AN INTENT TO DECEIVE WOVEN INTO THE STATUTE ITSELF.

17             THE COURT:  OKAY.  ALL RIGHT.  WELL, THANK YOU VERY

18   MUCH.

19        I'M GOING TO USE THE -- I AM GOING TO OWE FIDELITY TO THE

20   NINTH CIRCUIT MODEL, AND I BELIEVE THE NINTH CIRCUIT MODEL DOES

21   PROVIDE SUFFICIENT GUIDANCE TO THE JURY AND SO OVER YOUR

22   OBJECTION I'M GOING TO GIVE THE MODEL 8.50 AND PRESERVE THE

23   ARGUMENT OBVIOUSLY FOR THE RECORD.

24        I WANT TO TURN TO 223 AND I DIDN'T PRINT OUT -- I THINK WE

25   RECEIVED FROM THE GOVERNMENT COPIES OF SAMPLE INSTRUCTIONS, AND

```
1     I DON'T REMEMBER WHAT NUMBER IT IS.  BUT THIS IS FOR COUNT 2.

2              MR. ARCHER:  MAY I ASK A QUICK PROCEDURAL QUESTION,

3     YOUR HONOR?

4              THE COURT:  YES, YES.

5              MR. ARCHER:  AS TO PRESERVING THE OBJECTIONS FROM

6     THE JURY INSTRUCTIONS, MY UNDERSTANDING FROM THE BRAIN TRUSTS

7     AT OUR OFFICE IS THAT I SHOULD PRESERVE THE INSTRUCTION BY --

8     OR PRESERVE THE OBJECTION BUT OBJECT CONTEMPORANEOUSLY AND SO

9     IS IT POSSIBLE THAT WE CAN BREAK AT SOME POINT PRIOR TO THE

10    INSTRUCTION OUTSIDE OF THE PRESENCE OF THE JURY FOR ME TO RENEW

11    MY OBJECTION TO THE PARTICULAR?

12             THE COURT:  SURE, WE CAN DO THAT.  WE'LL ACCOMPLISH

13    THAT.

14        (PAUSE IN PROCEEDINGS.)

15             MR. ARCHER:  YOUR HONOR, IF I MAY, ONE FURTHER THING

16    AS TO COUNT 1.

17             THE COURT:  YES.

18             MR. ARCHER:  THE DEFENSE HAD FILED YESTERDAY

19    PROPOSED INSTRUCTIONS REGARDING INTENT AND MATERIALITY AS WELL

20    AS THE REQUIREMENT OF AN INITIAL ACT.  THOSE ARE COROLLARY

21    INSTRUCTIONS TO COUNT 1.

22        IS IT THE COURT'S INTENT TO DENY THE DEFENSE REQUEST FOR

23    THE --

24             THE COURT:  WHAT DOCUMENT WAS THAT?

25             MR. ARCHER:  THAT WAS DOCUMENT 67, YOUR HONOR.
```

```
 1              (PAUSE IN PROCEEDINGS.)

 2                   THE COURT:  THIS IS PAGE 2 AND 3 OF DOCUMENT 67, I

 3         THINK, MR. ARCHER.

 4                   MR. ARCHER:  YES, YOUR HONOR.

 5                   THE COURT:  AND I THINK WE TALKED ABOUT THIS

 6         YESTERDAY.  DOES THE GOVERNMENT WISH TO ADD ANYTHING?

 7                   MS. PENNA:  YOUR HONOR, IT WAS OUR UNDERSTANDING

 8         THAT WE HAD DECIDED ON THE -- NOTHING FURTHER ON THIS, YOUR

 9         HONOR.

10                   THE COURT:  ALL RIGHT.  THANK YOU.  YES.  SO I'M NOT

11         GOING TO GIVE THOSE, MR. ARCHER.  WE MAY HAVE TALKED ABOUT THAT

12         YESTERDAY.  I THOUGHT WE DID.  IF WE HADN'T, LET ME JUST

13         CLARIFY THAT NOW.

14              YOUR DOCUMENT 67, PAGE 2 AND PAGE 3, INTENT AND

15         MATERIALITY REQUIREMENT, REQUIREMENT OF ADDITIONAL ACT.  IF YOU

16         WOULD POSE THOSE AS JURY INSTRUCTIONS, ADDITIONAL INSTRUCTIONS

17         AS TO THE 912, I'M NOT GOING TO GIVE THOSE, AND AGAIN, PRESERVE

18         YOUR OBJECTION FOR THE RECORD.

19                   MR. ARCHER:  THANK YOU, YOUR HONOR.

20                   THE COURT:  ALL RIGHT.  SO IN THE SAMPLE

21         INSTRUCTIONS THAT WERE SENT VIA E-MAIL, JURY INSTRUCTION NUMBER

22         12 AND JURY INSTRUCTION NUMBER 13 BOTH RELATE TO 912 AND SO AS

23         TO NUMBER, I'M NOT GOING TO GIVE 13 IF THAT MAKES SENSE.  I

24         JUST WANTED TO GIVE GUIDANCE TO THE GOVERNMENT.

25              AND THEN AS TO THE REMAINING INSTRUCTIONS WE WILL WAIT TO
```

1     SEE WHAT -- WHETHER OR NOT ADDITIONAL INSTRUCTIONS WILL BE

2     NECESSARY.

3          I WILL TOMORROW READ 2.7 TO THE JURY WHEN I ASSUME THAT

4     THERE'S GOING TO BE ANOTHER PLAYING OF THE TAPE.

5          MR. SCHENK:  YES, YOUR HONOR.

6          THE COURT:  AND I'LL TRY AND INCORPORATE BY

7     REFERENCE TOMORROW'S READING TO TUESDAY'S READING.

8          ANYTHING ELSE WE NEED TO DO TODAY?

9          MS. PENNA:  NOTHING FURTHER.

10          MR. SCHENK:  OH, THE -- MY RECOLLECTION IS THAT THE

11     COURT GRANTED A GOVERNMENT PRETRIAL MOTION IN LIMINE REGARDING

12     NULLIFICATION ARGUMENTS.

13          AND INSTEAD OF JUMPING UP IN CLOSING AND OBJECTING, I

14     PREVIEWED FOR THE COURT AN ARGUMENT THAT MR. ARCHER'S OPENING

15     MAKES ME WONDER IF IT WILL BE MADE IN CLOSING, AND, THAT IS,

16     THE IMPRESSION THAT I GOT FROM THE OPENING, MR. ARCHER'S

17     ARGUMENT IN OPENING, WERE THAT WE'RE IN FEDERAL COURT FOR A

18     SILLY REASON.  JUST ONE VOICEMAIL, THAT'S NOT A FEDERAL CRIME

19     OR SOMETHING TO THAT EFFECT.

20          AND IT'S THE GOVERNMENT'S POSITION THAT THAT DOES BEG THE

21     JURY TO SAY COURT'S INSTRUCTIONS ASIDE, MR. ARCHER IS RIGHT,

22     THIS IS CRAZY, IT'S SILLY FOR US TO BE IN FEDERAL COURT WASTING

23     OUR TIME OVER A SILLY CASE AND THAT'S THE HEARTLAND OF

24     NULLIFICATION AND, IN FACT, THE REASON THE GOVERNMENT FILED, WE

25     DON'T FILE IN EVERY CASE A NULLIFICATION MOTION IN LIMINE, BUT

1    TO DISCOURAGE THE JURY TO IGNORE ITS DUTY BUT RATHER TO SAY WE

2    HAVE BETTER IDEAS THAN THE WAY COURTS AND RESOURCES SHOULD BE

3    SPENT, AND WE'RE GOING TO EXERCISE OUR VOTE HERE IN AN ATTEMPT

4    TO DEMONSTRATE OUR BELIEFS ABOUT THAT ISSUE.

5         AND REALLY THE HEART OF IT IS THAT IT'S A QUESTION OF

6    PUNISHMENT, YOU KNOW, A MEASUREMENT OF THE SERIOUSNESS OF THE

7    OFFENSE IS A MEASUREMENT THAT THE COURT MAKES SHOULD WE GET TO

8    THAT STAGE.  IT'S WHAT THE COURT TAKES OUT AND MAKES THAT

9    MEASUREMENT AT THAT POINT BUT TO ASK THE JURY TO EVALUATE THE

10   SERIOUSNESS OF THE OFFENSE AND WHY WE WOULD BE IN FEDERAL COURT

11   ON SUCH FACTS REALLY BEGS THEM TO EITHER VIEW PUNISHMENT AND/OR

12   TO NULLIFY OR IGNORE WHAT THE COURT INSTRUCTS THEM ON.

13        AND SO I RAISE IT NOW BECAUSE I DON'T WANT TO HAVE SUCH A

14   LONG SPEAKING OBJECTION IN THE MIDDLE OF CLOSING.

15             THE COURT:  ALL RIGHT.  THANK YOU.

16        MR. ARCHER.

17             MR. ARCHER:  YOUR HONOR, WITHOUT HAVING SEEN THE

18   BALANCE OF THE GOVERNMENT'S EVIDENCE, I HAVE NO INTENTION OF

19   ARGUING IN CLOSING THAT THE JURY SHOULD IGNORE THE LAW AS GIVEN

20   TO THEM BY THE COURT.

21        COMMENTING ON THE PAUCITY OF THE EVIDENCE IS SOMETHING

22   THAT I THINK DEFENSE COUNSEL DOES IN MOST EVERY TRIAL.

23             THE COURT:  THAT'S VERY DIFFERENT.

24             MR. ARCHER:  UNDERSTOOD.  AND THE -- HE'S CHARGED

25   WITH A FEDERAL CRIME AND THE FEDERAL CRIME HAS CERTAIN ELEMENTS

```
1    TO IT.  I DON'T THINK THERE'S ANYTHING THAT SUGGESTS THAT BY

2    REFERRING TO IT AS A FEDERAL CRIME AND PERHAPS NOT BEING

3    PARTICULARLY RESPECTFUL OF THE PARTICULAR CASE THAT IS BEING

4    BROUGHT HERE, SHY OF INSTRUCTING THE JURORS NOT -- YOU KNOW,

5    THAT THEY SHOULD IGNORE THE LAW AND DO SOMETHING ELSE, I DON'T

6    THINK I'M GOING TO COME ANYWHERE CLOSE TO JURY NULLIFICATION

7    SO.

8              THE COURT:  OKAY.  WELL, THAT COMES UP IN SITUATIONS

9    WHERE SOMEONE MIGHT SAY COMPARED TO THIS OFFENSE, THIS IS A

10   MINOR OFFENSE AND WE SHOULDN'T -- WE SHOULD CONSIDER IT AS SUCH

11   AND SOMEHOW DEVALUE IN SOME MANNER THE NATURE OF THE CHARGES AS

12   OPPOSED TO SPEAKING TO THE STRENGTHS AND WEAKNESSES OF THE

13   EVIDENCE.

14             MR. ARCHER:  WELL, I THINK -- I DO WANT TO CLARIFY,

15   YOUR HONOR, BECAUSE I DO THINK IT WOULD BE APPROPRIATE TO

16   COMPARE THE FACTS OF THIS CASE TO FACTS THAT DO CONSTITUTE A

17   CRIME BECAUSE IT'S THE DEFENSE'S PERSPECTIVE, OF COURSE, THAT

18   THESE TWO NOT -- THAT THE OFFENSE HERE, THAT THE EVIDENCE THAT

19   IS GOING TO BE INTRODUCED IS NOT GOING TO FIT THE ELEMENTS, AND

20   THERE ARE CERTAIN CRIMES THAT DO.  AND I THINK THAT DRAWING A

21   CONTRAST BETWEEN THAT AND THE EVIDENCE HERE WOULD BE

22   APPROPRIATE.

23        I DON'T THINK THAT'S JURY NULLIFICATION AND SO I DON'T

24   WANT TO BE FORECLOSED FROM GIVING EXAMPLES OF WHAT THE PURPOSE

25   OF THE STATUTE IS.
```

```
1              THE COURT:  NO.  YOU CAN ARGUE THAT.  BUT TALKING

2    ABOUT OTHER CRIMES AND SAYING THAT THIS CASE DOESN'T MEET THE

3    ELEMENTS OF SOME OTHER OFFENSE IS NOT RELEVANT, NUMBER ONE.

4              MR. ARCHER:  SURE.  I CERTAINLY WAS NOT GOING TO

5    COMPARE THIS TO, YOU KNOW, A MURDER OR A -- ANYTHING LIKE THAT.

6    I MEAN WITHIN THE CONFINES OF 912, YOU KNOW, PERHAPS AN

7    ARGUMENT -- I WANT TO MAKE SURE THAT I WAS NOT FORECLOSED FROM

8    GIVING AN ARGUMENT THAT HERE ARE THE SET OF FACTS THAT WOULD

9    MEET THESE ELEMENTS, AND THIS IS A SET OF FACTS THAT DOES NOT.

10   I THINK THAT'S A COMPLETELY APPROPRIATE ARGUMENT.

11             THE COURT:  I DON'T KNOW WHAT TO TELL YOU OTHER THAN

12   WE'LL SEE.

13             MR. ARCHER:  OKAY.

14             THE COURT:  BUT I APPRECIATE THE DISCUSSION ANYHOW

15   AND FRAMING IT.

16        SO I GUESS THE GOVERNMENT WITH THESE CHANGES TODAY, YOU

17   CAN JUST ROLL ANOTHER SAMPLE SERIES OF INSTRUCTIONS.

18             MR. SCHENK:  YES.  AND I THINK OUR INTENT WAS TO

19   ALSO E-FILE A COPY.  WE WANTED TO HAVE THIS DISCUSSION BEFORE

20   SO WE DON'T HAVE MULTIPLE VERSIONS THAT ARE EDITED.  BUT

21   RENUMBERING -- REMOVING THE TWO VERSIONS AND THEN RENUMBERING

22   THEM AFTER THAT, IF THE COURT WANTS WE'LL E-FILE TODAY AND THE

23   ONLY QUESTION IS THAT THERE IS STILL INSTRUCTIONS TO BE PULLED,

24   FOR INSTANCE, THE FORK IN THE ROAD AT DECISION -- DEFENDANT'S

25   DECISION TO TESTIFY OR NOT.  WE WILL HAVE TO MAKE THAT LATER
```

```
 1    AND SO WE'RE ALSO HAPPY TO WAIT AND E-FILE JUST ONE COPY AT THE

 2    VERY END, ALTHOUGH WE MAY NOT BE ABLE TO DO IT BEFORE THE

 3    INSTRUCTIONS ARE GIVEN DEPENDING ON HOW QUICKLY.

 4             THE COURT:  WELL, I THINK WE CAN -- IF YOU WANT TO

 5    PREPARE AND SEND AN E-MAIL OUT TODAY WITH JUST WHAT WE HAVE,

 6    OUR WORKING PRODUCT NOW, IT SHOULD BE RELATIVELY EASY TO PULL

 7    WHAT WE DON'T NEED AND ADD SOMETHING ALSO, FOR EXAMPLE, THE

 8    LIMITING INSTRUCTIONS, IF THERE IS ONE.  WE CAN ADD THAT AS

 9    NECESSARY.

10         IT WOULD BE NICE TO HAVE KIND OF A ROLLING WORKING COPY.

11             MR. SCHENK:  WE WILL, YOUR HONOR.

12             THE COURT:  YOU DON'T HAVE TO E-FILE IT.

13             MR. SCHENK:  OKAY.

14             THE COURT:  BUT WE'LL GET THAT TO COUNSEL JUST FOR

15    CONVENIENCE SO WE HAVE A WORKING.

16             MR. SCHENK:  THE SAME WITH THE VERDICT FORM OR

17    SHOULD WE -- I DON'T KNOW THAT WE'VE MADE ANY CHANGES TO WHAT

18    WE SENT YESTERDAY.  SO WE CAN E-FILE THAT ONE?

19             THE COURT:  RIGHT.  I THINK THAT CAN BE E-FILED.

20             MR. SCHENK:  YES, SIR.

21             THE COURT:  WHAT TIME IS YOUR WITNESS GOING TO BE

22    HERE, 9:00?

23             MR. SCHENK:  YES, SIR.

24             THE COURT:  9:00 O'CLOCK.  AND THEN WHAT I HEARD IS

25    THAT THE WITNESS -- WHAT I REMEMBER IS THAT THE WITNESS IS
```

```
 1    GOING TO TAKE ALL OF AN HOUR?

 2              MR. SCHENK:  YES.  I THINK THAT OUR REMAINING TWO

 3    WITNESSES WILL -- 90 MINUTES AT MOST FOR BOTH, NOT

 4    INDIVIDUALLY.

 5              THE COURT:  IS THAT DIRECT OR --

 6              MR. SCHENK:  NO.  I WAS PREDICTING THE LENGTH OF

 7    CROSS.

 8              THE COURT:  OKAY.

 9              MR. SCHENK:  ALTHOUGH I MIGHT BE POOR AT THAT.

10              THE COURT:  SO THAT GIVES ME PAUSE TO THINK TOMORROW

11    ARE WE GOING TO HAVE CLOSINGS AND THEN INSTRUCTION TOMORROW?

12              MR. ARCHER:  SHOULD THERE BE NO DEFENSE CASE IT

13    WOULD SEEM THAT WE WOULD BE CLOSING TOMORROW AND INSTRUCTING

14    TOMORROW I WOULD THINK.

15              THE COURT:  OKAY.  GREAT.  ALL RIGHT.  THANK YOU

16    VERY MUCH.

17              MR. SCHENK:  THANK YOU.

18              MR. ARCHER:  THANK YOU, YOUR HONOR.

19         (COURT CONCLUDED AT 3:13 P.M.)

20

21

22

23

24

25
```

1

2

3                      CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16       _____
         IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074
17

18       DATED:  FEBRUARY 12, 2016

19

20

21

22

23

24

25

00131

```
1                    UNITED STATES DISTRICT COURT
2                FOR THE NORTHERN DISTRICT OF CALIFORNIA
                        SAN JOSE DIVISION
3

4      UNITED STATES OF AMERICA,

5              PLAINTIFF,              CASE NO.  CR-15-0226-EJD

6          VS.                        SAN JOSE, CALIFORNIA

7      DOUGLAS STROMS YORK,           AUGUST 28, 2015

8              DEFENDANT.             VOLUME 4

9                                     PAGES 241 - 398

10

                        TRANSCRIPT OF TRIAL
11         BEFORE THE HONORABLE EDWARD J. DAVILA
           UNITED STATES DISTRICT JUDGE AND A JURY
12

13                  A-P-P-E-A-R-A-N-C-E-S

14

       FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY
15                           BY:   BRIANNA PENNA
                                   JEFFREY SCHENK
16                           50 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
17

18     FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                             BY:   GRAHAM ARCHER
19                           55 S. MARKET STREET, SUITE 820
                             SAN JOSE, CALIFORNIA 95113
20

21     OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                   CERTIFICATE NUMBER 8074
22

23        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
       TRANSCRIPT PRODUCED WITH COMPUTER.
24

25
```

INDEX OF PROCEEDINGS

FOR THE GOVERNMENT:


**NATHAN COOPER**
DIRECT EXAM BY MR. SCHENK                    P. 259, 279
CROSS-EXAM BY MR. ARCHER                     P. 270, 303

**DONNA AQUIRRE**
DIRECT EXAM MS. PENNA                         P. 309
CROSS-EXAM BY MR. ARCHER                      P. 331

GOVERNMENT'S CLOSING ARGUMENT                 P. 361

DEFENDANT'S CLOSING ARGUMENT                  P. 367

GOVERNMENT'S REBUTTAL ARGUMENT                P. 274

INDEX OF EXHIBITS

|              | IDENT. | EVIDENCE |
|--------------|--------|----------|
| GOVERNMENT'S |        |          |
| 2            |        | 284      |
| 1            |        | 323      |
| 7            |        | 237      |

```
 1        SAN JOSE, CALIFORNIA                  AUGUST 28, 2015

 2                        P R O C E E D I N G S

 3            (JURY IN AT 9:13 A.M.)

 4              THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

 5      ARE PRESENT, AND THE DEFENDANT AND THE JURY IS PRESENT AND THE

 6      ALTERNATES ARE PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN.

 7              LADIES AND GENTLEMEN, I'M GOING TO ASK YOU TO GO BACK TO

 8      THE JURY ROOM FOR JUST A MOMENT, PLEASE, AND WE'LL CALL YOU OUT

 9      IN JUST A SECOND.  THANK YOU.

10            (JURY OUT AT 9:13 A.M.).

11              THE COURT:  PLEASE BE SEATED.  THE RECORD SHOULD

12      REFLECT THAT THE JURY HAS LEFT.

13            MS. GARCIA INFORMED ME, MR. ARCHER, YOU WANTED TO SAY

14      SOMETHING OR PUT SOMETHING ON THE RECORD OUTSIDE OF THE

15      PRESENCE OF THE JURY?

16              MR. ARCHER:  YES, YOUR HONOR.  I APOLOGIZE FOR

17      BRINGING IT UP.  I WAS IN THE RESTROOM WHEN THE COURT CAME OUT

18      BEFORE, AND SO I APOLOGIZE THAT THE JURY CAME OUT BEFORE THAT.

19            MY UNDERSTANDING IS THAT THE GOVERNMENT IS GOING TO CALL

20      NATHAN COOPER AS THEIR NEXT WITNESS, AND HE'S LISTED AS A

21      CUSTODIAN OF RECORDS.  BUT FROM THE GOVERNMENT'S OPENING

22      STATEMENT IT APPEARS THAT THE GOVERNMENT INTENDS TO OFFER HIM

23      ABOUT THE INTERSTATE NATURE OF THE PHONE CALL AND FROM WHAT HAS

24      BEEN DISCLOSED, WHICH IS EFFECTIVELY NOTHING, THE TWO -- I'M

25      SORRY -- THE ONE RECORDED INTERVIEW WITH MR. COOPER, AS WELL AS
```

1    ONE E-MAIL FROM HIM, I DON'T THINK ANY OF THAT IS APPROPRIATE

2    TESTIMONY.

3         I'D LIKE THE OPPORTUNITY, IF THAT'S THE GOVERNMENT'S

4    PROFFER, TO VOIR DIRE MR. COOPER ABOUT HIS QUALIFICATIONS AND

5    HIS PERSONAL KNOWLEDGE OF THIS SUBJECT OUTSIDE OF THE PRESENCE

6    OF THE JURY.

7              MR. SCHENK:  YOUR HONOR, MR. COOPER WILL TESTIFY

8    THAT THE PHONE CALL MADE ON FEBRUARY 23RD CROSSED STATE LINES

9    AND HIS JOB TITLE IS CUSTODIAN OF RECORD, AND I'M FORGETTING

10   BUT HE HAS A SECOND JOB TITLE THERE AND HE WORKED FOR TELETECH,

11   THE PARENT COMPANY OF SPOOFCARD, IN A PRIOR CAPACITY IN TECH

12   SUPPORT.  SO HE HAS KNOWLEDGE ON HOW IT WOULD BE THAT IN 2012 A

13   CALL WOULD HAVE USED -- WHAT HE WILL TESTIFY IS THAT WE USED A

14   COMPANY CALLED FLOWROUTE, F-L-O-W, AND THEY HAD A DATA SERVER

15   THAT CAUSED THE CALL TO GO TO JERSEY CITY, NEW JERSEY AND HE

16   WILL ALSO TESTIFY THAT SPOOFCARD'S OWN RECORDS ARE HELD IN

17   SOUTHAMBOY, I BELIEVE, NEW JERSEY, AND IN ADDITION TO THE CALL

18   ITSELF, PASSING THROUGH JERSEY CITY, NEW JERSEY, THE MAKING OF

19   THE CALL CAUSED RECORDS TO BE CREATED AT SPOOFCARD'S OWN

20   SERVERS, THEIR OWN DATA SERVER WHICH IS AGAIN IN NEW JERSEY.

21              THE COURT:  LET ME STOP YOU FOR A SECOND.  IS THE

22   WITNESS IN THE COURTROOM NOW?

23              MR. SCHENK:  NO.

24              THE COURT:  I'M SORRY, MR. ARCHER.

25              MR. ARCHER:  HIS BACKGROUND -- FIRST OF ALL, I HAVE

```
1    NOT RECEIVED A CV FROM HIM BUT HIS BACKGROUND, I DON'T

2    BELIEVE -- I'VE DONE MY OWN INVESTIGATION.  HE'S NOT COMPETENT

3    TO TESTIFY TO THESE MATTERS.  HE'S NOT COMPETENT TO -- IT

4    APPEARS THAT HE HAS NO PERSONAL KNOWLEDGE, AND I'M BASING THIS

5    ON A COUPLE OF THINGS:  ONE ARE STATEMENTS THAT HE MADE IN A

6    JULY 10TH, 2015, INTERVIEW WITH AGENT AGUIRRE WHERE, AMONG

7    OTHER THINGS, HE SAID THAT HE DIDN'T KNOW EXACTLY HOW THIS

8    WORKED.  HE ORIGINALLY SAID THAT ALL OF THE SERVERS ARE

9    OVERSEAS AND THEN HE SAID AMAZON HOSTS ALL OF OUR STUFF, NOT

10   FLOWROUTE.

11       HE ALSO SAID THAT -- IT'S KIND OF A LONG LIST, AND I'M

12   HAPPY TO GO THROUGH IT WITH HIM.  HE SAID HE'S NOT THE PERSON

13   TO TESTIFY ABOUT THAT SOMETHING HE TOLD THE AGENT BACK IN JULY

14   AND HE TOLD HER PERHAPS THE CEO WOULD KNOW BETTER.

15       AND THEN THE NEXT COMMUNICATION WE HAVE WITH HIM IS AN

16   AUGUST 20TH E-MAIL ADDRESSED TO AGENT AGUIRRE THAT WAS

17   FORWARDED TO ME BY MR. SCHENK THAT SAID, HI DONNA, AND ACTUALLY

18   I THINK IT'S PROBABLY APPROPRIATE, TOO, IF I MAY APPROACH?

19               THE COURT:  YES.

20               MR. ARCHER:  IT SAYS, HI DONNA, I WAS ABLE TO MEET

21   WITH OUR CTO THIS MORNING, AND I BROUGHT UP THE CONCERNS

22   MENTIONED AS WELL AS THE DISCREPANCIES IN THE CARD REPORT.

23   HERE ARE SOME QUALIFICATIONS, THE CALL FROM FEBRUARY 23RD,

24   2012, WAS MADE USING A TOLL FREE ACCESS NUMBER AND THAT ACCESS

25   NUMBER IS A --
```

```
1                THE COURT:  EXCUSE ME.  DO YOU HAVE A COPY FOR OUR

2      REPORTER?

3                MR. ARCHER:  I APOLOGIZE.  WHAT IT SAYS, IN ESSENCE,

4      YOUR HONOR, IS THAT IT'S PROVIDED BY FLOWROUTE IN WASHINGTON.

5           NOW, MY OWN INVESTIGATION HAS REVEALED THAT IN 2012, THAT

6      FLOWROUTE ACTUALLY NOW TODAY IS LOCATED IN SEATTLE, WASHINGTON

7      AND IN 2012 THEY WERE LOCATED IN IRVINE, CALIFORNIA.

8           WHAT IS APPARENT FROM THE E-MAIL, ASIDE FROM WHATEVER

9      INVESTIGATION HAS BEEN DONE, IS THAT ANYTHING THAT NATE COOPER

10     WOULD TESTIFY TODAY AT A MINIMUM IS SOMETHING HE LEARNED FROM

11     THEIR CTO.  HOW THAT WOULDN'T BE A CONFRONTATION CLAUSE

12     VIOLATION TO SAY THAT HE'S GOING TO TESTIFY ABOUT SOME

13     TELEPHONE CALL TRAVELLING IN INTERSTATE COMMERCE, I MEAN, AN

14     ELEMENT IN THE SECOND COUNT.

15               THE COURT:  I REALIZE THAT'S WHAT IT IS.

16               MR. ARCHER:  OKAY.  SO I'M HAPPY TO GO THROUGH

17     CROSSING HIM AND WE CAN TALK ABOUT HIS LACK OF EXPERIENCE IN

18     COMPUTERS.  HE WAS TRAINED -- HE WENT TO COLLEGE FOR MUSIC

19     PERFORMANCE.  HE WAS A -- YOU KNOW, HE WAS A MANAGER AT A

20     THEATRE FOR FIVE OR SIX YEARS.  HE DIDN'T, IN FACT, WORK FOR

21     TELETCH IN 2012.  HE SIMPLY DIDN'T WORK FOR THE COMPANY IN

22     2012.

23          I'VE NOT BEEN PROVIDED ANY RECORDS IN DISCOVERY THAT SAY

24     THAT THIS CROSSED STATE LINES, PERIOD.

25               MR. SCHENK'S PROFFER THAT BECAUSE SOME RECORD WAS CREATED
```

```
 1    OUTSIDE OF CALIFORNIA BASED ON A PHONE CALL THAT CANNOT BE

 2    PROVEN TO HAVE EXITED THE STATE WITH COMPETENT TESTIMONY DOES

 3    NOT MEAN THAT A TELECOMMUNICATIONS CALL WAS MADE IN INTERSTATE

 4    OR FOREIGN COMMUNICATION.  THAT'S -- IT IS NOT A -- YOU KNOW,

 5    BY COMPARISON IT'S NOT A CHILD PORNOGRAPHY CASE.  IT'S NOT THAT

 6    ANY OF THE DEVICES TRAVELLED IN INTERSTATE COMMERCE AT ANY

 7    POINT.

 8        TO ALLOW HIM TO COME IN AND TESTIFY TO THE JURY THAT,

 9    FIRST OF ALL, IT'S JUST WRONG.  WHAT HE HAS SUGGESTED HERE HE'S

10    RELYING ON A CTO.  FLOWROUTE, THIS COMPANY THAT NEITHER OF THEM

11    WORK FOR, NEITHER OF THEM HAVE ANY PERSONAL KNOWLEDGE OF

12    FLOWROUTE'S BUSINESS OPERATIONS.  I HAVE AN ARTICLE THAT I'M

13    HAPPY TO PROVIDE THAT IS A FEBRUARY 5TH, 2013, ARTICLE FROM

14    GEEKWIRE.COM THAT TALKS ABOUT FLOWROUTE'S MOVE.

15              THE COURT:  WHAT IS THE ATTRIBUTION OF THE ARTICLE?

16              MR. ARCHER:  GEEKWIRE.COM.

17              THE COURT:  I DON'T THINK I'VE EVER HAD GEEKWIRE

18    CITED AS A REFERENCE BEFORE.

19              MR. ARCHER:  AND I DON'T PLAN ON READING FROM IT

20    BUT --

21              THE COURT:  YOU HAVE THIS, COUNSEL?

22              MR. SCHENK:  NOW WE DO.

23              MR. ARCHER:  THE GIST IS THAT THIS COMPANY THAT

24    THEY'RE SAYING WAS IN SEATTLE IN 2012, AND, IN FACT, THERE WAS

25    AN ARTICLE FROM FEBRUARY 5TH, 2013, THAT SAID THAT WE'RE MOVING
```

```
1    TO SEATTLE BECAUSE THE TAX BREAKS ARE BETTER UP THERE.  WE WERE

2    LOCATED IN IRVINE, CALIFORNIA.

3         SO NOT ONLY IS NATHAN COOPER RELYING ENTIRELY ON STUFF

4    THAT HE'S BEING TOLD BY OTHER PEOPLE.  IN HIS TESTIMONY, IF YOU

5    WERE TO TRY TO ESTABLISH AN ELEMENT IN THIS CASE BASED ON

6    INFORMATION, IT WOULD BE HEARSAY TO START WITH AND A DIRECT

7    VIOLATION OF THE CONFRONTATION CLAUSE OF THE UNITED STATES

8    CONSTITUTION BUT APPARENTLY INCORRECT.

9         BUT NOT ONLY INCORRECT, BUT INCONSISTENT WITH HIS PRIOR

10   STATEMENTS TO AGENT AGUIRRE.  SO I DON'T UNDERSTAND HOW WE CAN

11   BEGIN WITH HIS TESTIMONY, AND I'M HAPPY TO VOIR DIRE HIM ABOUT

12   ALL OF THIS INFORMATION.

13              THE COURT:  MR. SCHENK.

14              MR. SCHENK:  YOUR HONOR, JUST TWO THOUGHTS.  FIRST,

15   THIS WAS PERFECT TO FILE A MOTION IN LIMINE SO THAT THE COURT

16   COULD ADDRESS THE ISSUE IF, IN PARTICULAR, THE DEFENSE FEELS

17   THAT AN ELEMENT OF THE OFFENSE IS NOT MET.  THEY COULD HAVE

18   DONE IT IN THAT CASE AND THEY COULD ALSO RAISE THIS ON

19   CROSS-EXAMINATION OF THE WITNESS.

20        THERE'S NO REASON WHY THIS HAS TO BE DONE IN VOIR DIRE

21   BEFORE THE WITNESS TESTIFIES OR WHY THIS NEEDED TO BE BROUGHT

22   UP IN THE MORNING WHEN WE TOLD OUR WITNESS ORDER OVER A WEEK

23   AGO.

24        SO IT WAS KNOWN THAT MR. COOPER WAS GOING TO TESTIFY.  I

25   MEAN, IN FACT, ALMOST TO THE MINUTE MR. ARCHER KNEW WHEN
```

1    MR. COOPER WAS GOING TO TESTIFY, AND THE IDEA THAT HE'S NOW

2    TRYING TO ASK THE COURT TO HOLD THE JURY EVEN LONGER SO THAT HE

3    CAN HAVE AN OPPORTUNITY TO VOIR DIRE MR. COOPER IS JUST NOT

4    APPROPRIATE.

5         MR. COOPER SHOULD TESTIFY AND IF MR. ARCHER WANTS TO CROSS

6    HIM ON THIS, THAT'S FINE.  BUT THE IDEA THAT YOU'RE GOING TO

7    PREVENT MR. COOPER FROM TESTIFYING OR REWARD THE DEFENSE FOR

8    THIS TYPE OF SANDBAGGING JUST DOESN'T SEEM TO BE APPROPRIATE.

9         MR. ARCHER:  YOUR HONOR, MY NOTICE WAS THAT HE WAS A

10   CUSTODIAN OF RECORDS AND HE WAS TESTIFYING TO BUSINESS

11   PRACTICES OF THE COMPANY; RIGHT?

12        I MEAN, FOR THE GOVERNMENT TO COME IN AND SAY THAT I'M

13   SANDBAGGING SOMEHOW BY INVESTIGATING THEIR WITNESS AFTER THEY

14   COME IN AND IN OPENING SAY ALL OF A SUDDEN THAT A CUSTODIAN OF

15   RECORDS IS GOING TO BE EFFECTIVELY AN EXPERT WITNESS BECAUSE

16   HOW ELSE WOULD HE BE SUMMARIZING INFORMATION THAT IT'S

17   CERTAINLY -- IT'S NOT LAY OPINION THAT A PHONE CALL TRAVELLED

18   THROUGH CLOUD SERVERS, THROUGH A DID, THROUGH FLOWROUTE OR SOME

19   OTHER COMPANY.  THAT'S NOT A LAY OPINION.  THAT'S EXPERT

20   OPINION.

21        TO SUGGEST IT'S SANDBAGGING WHEN WE HAVE NO EXPERT NOTICE

22   IS RIDICULOUS.

23        AND, AGAIN, I'VE HEARD OF NO PROFFER FROM THE GOVERNMENT

24   AS TO WHAT ADMISSIBLE EVIDENCE, WHAT NONHEARSAY RELIABLE

25   PERSONAL KNOWLEDGE ADMISSIBLE EVIDENCE MR. COOPER COULD OFFER

1    THIS COURT AND THIS JURY ABOUT THE INTERSTATE COMMERCE.

2        I'M STILL WAITING FOR IT.  I'VE HEARD ACCUSATIONS OF

3    SANDBAGGING AND I DON'T KNOW WHAT -- OTHER THAN TO BRING IN,

4    HE'S, HE'S NOTICED AS THE CUSTODIAN OF RECORDS AND I'M GIVING

5    HIM DISCOVERY, FIVE PAGES OF DISCOVERY OF TELETECH RECORDS AND

6    THEN I'M -- I'M SUPPOSED TO MOVE IN LIMINE AHEAD OF TIME TO SAY

7    I DON'T KNOW IF THIS IS WHAT YOU'RE PLANNING ON DOING, BUT I

8    HOPE YOU DON'T.

9        IT'S NOT THE DEFENSE'S RESPONSIBILITY AT ALL.  IT'S THE --

10           THE COURT:  I NOTICE THAT YOUR GEEKWIRE AD HAS A

11    PRINT DATE OF AUGUST 27, 2015, AT 11:04 P.M.

12           MR. ARCHER:  I WAS UP LATE LAST NIGHT, YOUR HONOR.

13    THAT IS NOT WHEN I WENT TO SLEEP EITHER.

14           THE COURT:  SO I'M CURIOUS WHETHER YOU CAN HELP ME

15    AND TELL ME, MR. ARCHER, WHETHER THESE ARGUMENTS ARE BETTER

16    PLACED AS A DIRECTED VERDICT MOTION AT THE END OF THE

17    GOVERNMENT'S CASE?

18           MR. ARCHER:  ABSOLUTELY NOT, YOUR HONOR.  THEY

19    CERTAINLY -- IF THEY ARE ABLE TO INTRODUCE THESE AS EVIDENCE,

20    THOSE WOULD BE EXCELLENT ARGUMENTS FOR A DIRECTED VERDICT, BUT

21    IT WOULD BE A DIRECT VIOLATION OF MR. YORK'S RIGHT TO

22    CROSS-EXAMINE AND CONFRONT WITNESSES AGAINST HIM BECAUSE WHAT

23    WE HAVE HERE -- AND IT'S UNEQUIVOCAL FROM THIS AUGUST 20TH

24    E-MAIL IS, HEY, YOU GUYS SAID THAT YOU HAD CONCERNS, RIGHT, AND

25    I WANT TO ADDRESS THOSE CONCERNS THAT YOU HAD AND PRESUMABLY

1     IT'S NOT HARD TO FIGURE OUT WHAT THE CONCERNS ARE.

2          THE CONCERNS ARE, AMONG OTHER THINGS, DID THIS CALL

3     ACTUALLY TRAVEL IN INTERSTATE OR FOREIGN COMMUNICATION AND IT

4     SEEMS TO BE WHAT HE'S RESPONDING TO IN THE FIRST LINE THERE.

5          AND HIS RESPONSE IS THAT I TALKED TO THE CTO TO CLEAR THIS

6     UP.  SO HE'S ACKNOWLEDGING THAT PRIOR TO HIS COMMUNICATION WITH

7     THEM ON AUGUST 20TH THAT HE DIDN'T KNOW THE ANSWER TO THESE

8     THINGS; HE'S GONE AND GOTTEN THE INFORMATION FROM THE CTO.

9          IT'S NOT A CREDIBILITY CONTEST HERE.  WHERE IS THE

10    DEFENSE'S OPPORTUNITY TO CROSS-EXAMINE THE CTO?

11         IF THE CTO -- I HAVE NO IDEA WHAT THE CTO'S NAME IS.  IT

12    HASN'T BEEN DISCLOSED TO ME.

13              THE COURT:  I THINK I CAN UNDERSTAND.  YOU CAN RELAX

14    FOR JUST A MOMENT.

15         I COULD SEE THE E-MAIL THAT YOU PROVIDED HERE TO US.  IT'S

16    FROM NATE JOEL.  THE DATE IT WAS SENT WAS THURSDAY, AUGUST 20,

17    2015, AT 10:03 A.M., AND IT'S TO AGENT AGUIRRE IT APPEARS.  THE

18    SUBJECT MATTER IS CLARIFICATION.  HE DOES INDICATE THAT HE MET

19    WITH OUR CTO THIS MORNING.  IT SAYS, I BROUGHT UP THE CONCERNS

20    THAT WERE MENTIONED.  I DON'T KNOW IF THAT'S IN THEIR

21    CONVERSATION IF THAT'S WHAT THAT REFERENCES OR NOT BUT THIS

22    WITNESS AND THE AGENT AS WELL AS THE DISCREPANCIES ON THE CARD

23    REPORT.  AND HERE ARE THE REFERENCES AND THERE ARE THREE

24    CLARIFICATIONS.

25         SO I THINK WHAT I HEAR YOU SAYING IS THAT THIS IS NOT

00142

```
1     KNOWLEDGE OF THE WITNESS, BUT THIS IS INFORMATION HE OBTAINED

2     FROM THE CTO OF THIS COMPANY, AND, THEREFORE, TO ALLOW HIM TO

3     TESTIFY AS TO THE CTO'S KNOWLEDGE IS INAPPROPRIATE.

4          MR. ARCHER:  ABSOLUTELY.

5          MR. SCHENK:  YOUR HONOR, INTERSTATE COMMUNICATION IS

6     NOT SOMETHING THAT ANYONE IS A PERCIPIENT WITNESS TO.

7          THE IDEA THAT THE CTO WATCHED THE ELECTRONIC WIRE BE

8     CREATED WHEN A CALL FROM A 408 NUMBER TO A 408 NUMBER IS A

9     BETTER WITNESS BECAUSE THE CTO HAS FIRST-HAND KNOWLEDGE OF IT

10    IS NOT CORRECT.

11         IT'S COMPLETELY APPROPRIATE FOR A CUSTODIAN OR A WITNESS

12    IN A COMPANY TO LEARN THINGS FROM OTHER INDIVIDUALS AT THE

13    COMPANY.

14         THAT DOESN'T SUGGEST THAT IT'S INADMISSIBLE TESTIMONY.

15    MR. ARCHER IS -- CAN CROSS BASED ON THE WEIGHT THAT THE JURY

16    SHOULD GIVE THAT EVIDENCE.

17         BUT THE CTO HIMSELF LEARNS IT THROUGH KNOWLEDGE THAT HE

18    GAINS.  SO IT ISN'T LIKE WE'RE INTRODUCING DOUBLE HEARSAY HERE

19    OR AN OUT-OF-COURT STATEMENT.  THE CUSTODIAN, MR. COOPER,

20    LEARNS ALL OF THE INFORMATION THAT HE TESTIFIES THROUGH EITHER

21    FROM OBSERVING RECORDS AT THE COMPANY THAT WERE CREATED FROM

22    OTHER STATEMENTS OR OTHER INFORMATION THAT WAS MADE.  IT IS

23    PRECISELY THE KIND OF TESTIMONY THAT IS APPROPRIATE TO HAVE

24    ONE PERSON FROM A COMPANY FLY OUT AND PROVIDE.

25         MR. ARCHER CAN CROSS-EXAMINE HIM ON THE BASIS FOR THAT.
```

1  BUT TO SUGGEST THAT IT'S INAPPROPRIATE FOR MR. COOPER TO

2  TESTIFY ABOUT THE INTERSTATE PHONE CALL BECAUSE HE'S NOT A

3  PERCIPIENT WITNESS TO IT -- WELL, THE GOVERNMENT COULDN'T EVER

4  CALL A WITNESS, THEN.

5         THE COURT:  WELL, I DON'T THINK THAT'S WHAT HE'S

6  SAYING.  I THINK WHAT HE'S SAYING IS THAT THIS WITNESS DID NOT

7  HAVE ANY BACKGROUND INFORMATION ABOUT HOW THIS PROCESS WORKED,

8  AND HE OBTAINED THAT INFORMATION FROM SOMEBODY ELSE SUBSEQUENT

9  TO HIS INTERVIEW WITH THE AGENT AND CLOSER IN TIME TO THE

10  TRIAL, AND, THEREFORE, HE SHOULDN'T BE PERMITTED TO TESTIFY

11  ABOUT HIS KNOWLEDGE OF HOW THE SYSTEM WORKS BASED ON THAT

12  INFORMATION.

13     IS THAT WHAT YOU'RE SAYING, MR. ARCHER?

14         MR. ARCHER:  IT IS, YOUR HONOR.  AND I THINK WHAT

15  MR. SCHENK JUST TOLD THE COURT IS THAT IT SEEMS LIKE IT WOULD

16  BE DIFFICULT FOR THE GOVERNMENT TO SHOW THAT IT ACTUALLY WENT

17  ACROSS INTERSTATE LINES BECAUSE IT'S HARD TO HAVE A PERCIPIENT

18  WITNESS.

19     NOW, I'M NOT THE PROSECUTION.  IT'S NOT MY JOB TO PUT THE

20  EVIDENCE ON, BUT IF I WERE, PERHAPS I WOULD GET AN EXPERT WHO

21  COULD REVIEW RECORDS AND WHO MIGHT BE ABLE TO REVIEW RECORDS,

22  FOR INSTANCE, FROM FLOWROUTE TO VERIFY THAT THEY'RE NOT IN

23  IRVINE AND TO VERIFY RECORDS THAT THEY'RE NOT IN THE CLOUD

24  PROVIDER.  AND CENTURY LINK, I CAN PROFFER TO THE COURT, IS A

25  NATIONAL COMPANY.  I'M CURIOUS WHETHER MR. COOPER KNOWS THAT

1    THEY HAVE FIVE GIGANTIC DATA CENTERS IN THE BAY AREA ALONE.

2         FIRST OF ALL, THEY'RE TALKING ABOUT THEIR CTO IS WRONG,

3    AND THEY'RE TALKING ABOUT A COMPANY THAT WAS ACTUALLY IN

4    CALIFORNIA IN 2012.

5         SECOND, THEY'RE TALKING ABOUT A CLOUD PROVIDER THAT THEY

6    DIDN'T WORK FOR.  THEY HAVE NO PERSONAL KNOWLEDGE OF.

7         IF THE GOVERNMENT -- I JUST DON'T -- IF THE GOVERNMENT HAS

8    A PROVISION OF THE EVIDENCE CODE THAT SAYS THAT SOMEONE WHO IS

9    A CUSTODIAN OF RECORDS GETS TO PUT ON A MAGIC CUSTODIAN OF

10   RECORDS CROWN AND SAY I WAIVE ALL EVIDENTIARY OBJECTIONS

11   BECAUSE I HAVE THIS CROWN ON; I GET TO COLLECT ALL INFORMATION

12   FROM MY COMPANY BECAUSE IT'S CONVENIENT FOR THE GOVERNMENT; I

13   DON'T NEED TO BE DISCLOSED AS AN EXPERT WITNESS; I GET TO

14   RENDER ALL SORTS OF IMPROPER OPINIONS WITHOUT PROPER EXPERT

15   WITNESS DISCLOSURE BECAUSE THAT'S A CONVENIENT WAY FOR THE

16   GOVERNMENT TO ESTABLISH THEIR CASE, THAT'S NOT WHAT IS

17   APPROPRIATE.  IT'S NOT WHAT THE EVIDENCE CODE CALLS FOR.

18        THERE'S NO CUSTODIAN OF RECORDS EXCEPTION THAT ALLOWS

19   SOMEONE TO JUST BRING IN -- I THINK ALL OF THE PATENT TRIALS

20   WOULD BE MUCH MORE INTERESTING IF YOU COULD BRING IN ONE

21   CUSTODIAN OF RECORDS WHO GOT TO TESTIFY ABOUT EVERYTHING THAT

22   WENT ON IN A COMPANY.

23             THE COURT:  THE WITNESSES -- THANK YOU.  THE

24   WITNESSES LISTED ON THE WITNESS LIST AS A CUSTODIAN OF RECORD

25   FROM TELETCH SYSTEMS, IS THAT THIS WITNESS?

1          MR. SCHENK:  YES, SIR.

2          THE COURT:  AND THE WITNESS LIST INDICATES HE'LL

3   TESTIFY TO SUBPOENAED RECORDS AND THAT'S WHAT HE'S -- THAT'S

4   WHAT'S GOING TO HAPPEN THIS MORNING, HE'S GOING TO TESTIFY

5   ABOUT CERTAIN RECORDS.

6          MR. SCHENK:  YES, SIR.

7          THE COURT:  AND IT MAY BE, MR. ARCHER, THAT THAT

8   TESTIMONY ABOUT THOSE RECORDS DOESN'T REACH THE ISSUES THAT

9   YOU'RE RAISING.  I APPRECIATE THE FACT THAT YOU'RE RAISING

10  THESE AS SOMEWHAT PROPHYLACTIC OBJECTIONS THAT YOU MAY MAKE,

11  BUT WHAT YOU'RE TELLING ME AND TELLING THE PROSECUTION IS THAT

12  IF THIS WITNESS IS ELICITED QUESTIONS SUCH THAT THEY GO BEYOND

13  THE -- TESTIFYING ABOUT SUBPOENAED RECORDS, YOU'RE GOING TO

14  OBJECT.

15         MR. ARCHER:  I WILL, YOUR HONOR.  AND I THINK IT

16  WOULD BE -- I'M, I'M VERY CONCERNED THAT THE -- THAT ELICITING

17  TESTIMONY ABOUT THE COMPANY GENERALLY BEING IN NEW JERSEY IS

18  SOMETHING THAT MAY MISLEAD THE JURY AND I CAN TRY TO CORRECT IT

19  ON CROSS.

20         BUT THE GOVERNMENT, IF THEY WERE TO ASK THAT -- IF THEY

21  WERE TO SUGGEST BASED ON THAT -- YOU KNOW, I WITHDRAW THAT LINE

22  OF ARGUMENT.

23         I AGREE, YOUR HONOR, I WOULD ASK THAT THE GOVERNMENT BE

24  PRECLUDED FROM ASKING QUESTIONS AS TO ANYTHING THAT THEY HAVE

25  NOT PROFFERED AT THIS POINT BEYOND THE NOTICE OF THE SUBPOENAED

00146

1    RECORDS.

2            THE COURT:  DO YOU HAVE RECORDS?

3            MR. ARCHER:  I THINK I HAVE FIVE OR SIX PAGES THAT

4    IS GOVERNMENT'S EXHIBIT NUMBER -- I APOLOGIZE, YOUR HONOR, BUT

5    THEY'RE FIVE OR SIX RECORDS THAT ARE PURPORTED TO BE RECORDS

6    FROM TELETCH.

7            MR. SCHENK:  IT'S EXHIBIT 2, YOUR HONOR.

8            MR. ARCHER:  EXHIBIT 2, YOUR HONOR.  NONE OF THEM

9    MENTION NEW JERSEY AND NONE OF THEM MENTION ANYTHING

10    INTERSTATE.  THEY REFERENCE TWO 408 NUMBERS AND A TOLL FREE 226

11    NUMBER, AND THE DEFENSE DID NOT OBJECT TO THEM BEING ADMITTED

12    BASED ON THE CERTIFICATIONS SUBMITTED.

13            THE COURT:  SO I SEE THAT IN EXHIBIT 2 AND THE LIST

14    OF PHONE CALLS AND PHONE NUMBERS AND THAT TYPE OF THING.  THE

15    WITNESS CAN COME IN AND TALK ABOUT THESE THINGS.

16        SO, MR. SCHENK, IT MAY BE THAT THE WITNESS DOESN'T HAVE

17    OTHER KNOWLEDGE ABOUT THESE RECORDS.  AS A CUSTODIAN OF

18    RECORDS, HE CAN CERTAINLY TALK ABOUT THESE RECORDS, BUT IF

19    YOU'RE GOING TO ASK HIM QUESTIONS BEYOND ABOUT THE COMPANY,

20    MAYBE YOU INTEND HIM TO BE PROFFERED AS AN EXPERT WITNESS.

21            MR. SCHENK:  NO, WE CERTAINLY DON'T INTEND TO

22    PROFFER HIM AS AN EXPERT WITNESS, BUT IT'S ON PAGE 2-4 WHERE

23    THE ISSUE IS LIKELY TO ARISE THE LINE OF QUESTIONING ON 2-4

24    WILL INCLUDE THE SECOND AND FOURTH COLUMN, ONE IS REAL CALLER

25    ID, THAT'S THE SECOND COLUMN, AND THE FOURTH COLUMN IS

1    DESTINATION NUMBER.

2         AND WHAT MR. COOPER WILL EXPLAIN TO THE JURY IS REAL

3    CALLER ID IS MR. YORK'S TELEPHONE NUMBER WHEN HE PLACED A CALL;

4    DESTINATION NUMBER IS WHO MR. YORK CALLED OR IN THIS CASE

5    MR. HESSENFLOW.

6         AND WHILE THOSE BOTH HAVE THE SAME 408 AREA CODE, THE

7    ACCESS NUMBER THAT IS THE FIRST COLUMN, WHICH IS THE NUMBER

8    THAT MR. YORK DIALED TO BEGIN THE SPOOFED CALL, HIT A SERVER IN

9    JERSEY CITY AND HE KNOWS THAT THROUGH HIS KNOWLEDGE OF THE

10   COMPANY.

11        AND IF THE COURT AND MR. ARCHER HAVE RAISED CONCERNS ABOUT

12   THAT, WHAT THE COURT SHOULD DO IS TAKE A RECESS AND LET US CALL

13   OUT THE CTO TO TESTIFY TO THAT ISSUE.

14            THE COURT:  WELL, THAT WOULD CERTAINLY SOLVE YOUR

15   CONFRONTATION ISSUE.

16            MR. ARCHER:  YOUR HONOR, THIS IS -- THE TESTIMONY

17   THAT MR. SCHENK IS PROFFERING RIGHT NOW SHOULD BE EXCLUDED AND

18   NO CONTINUANCE SHOULD BE GRANTED DURING THIS TRIAL.

19            THE COURT:  EXCUSE ME.  THIS WITNESS SHOULDN'T BE

20   PERMITTED TO TESTIFY ABOUT THE TWO NUMBERS?

21            MR. ARCHER:  SHOULD NOT BE ABLE TO TESTIFY THAT

22   THESE THINGS HIT A SERVER IN JERSEY CITY.  THAT'S WELL OUTSIDE

23   OF WHAT IS IN THE RECORD HERE.

24            THE COURT:  UNLESS A FOUNDATION CAN BE SHOWN THAT HE

25   HAS KNOWLEDGE OF THAT.

00148

```
 1              MR. ARCHER:  NOTHING HAS BEEN PROFFERED TO THE

 2    DEFENSE AS TO WHAT HIS FOUNDATION WOULD BE OTHER THAN BEING

 3    TOLD BY THE CTO.

 4         AND IF THAT'S A FOUNDATION, THAT'S WHAT I'D LIKE TO GET

 5    OUT RIGHT NOW BECAUSE I DON'T WANT THE JURY TO BE MISLED.  WHY

 6    WOULDN'T WE FIGURE THAT OUT RIGHT NOW WHETHER HE HAS THAT

 7    PERSONAL KNOWLEDGE, INSTEAD OF HAVING THE JURY MISLED WHILE

 8    HE'S UP THERE ON THE STAND IN FRONT OF THEM?

 9              THE COURT:  CAN YOU ANSWER THAT QUESTION,

10    MR. SCHENK?

11              MR. SCHENK:  IF THE QUESTION WAS WHY SHOULD THE JURY

12    BE ALLOWED TO BE MISLED BY HIM --

13              THE COURT:  NOT THAT QUESTION.

14              MR. SCHENK:  OH.

15              THE COURT:  THE QUESTION ABOUT WHETHER OR NOT THIS

16    WITNESS WILL TESTIFY ABOUT THE JERSEY, I'LL CALL IT, SERVER AND

17    HIS PERSONAL KNOWLEDGE OF THAT OR WHETHER WE'LL NEED TO CALL

18    THE CTO?

19              MR. SCHENK:  WELL, I SUPPOSE IT DEPENDS ON THE

20    RULING FROM THE COURT WHETHER THERE'S SUFFICIENT FOUNDATION FOR

21    MR. COOPER TO MAKE THAT TESTIMONY, TO MAKE THAT STATEMENT.

22         BUT HE'S CERTAINLY PREPARED TO SAY THAT COLUMN 1, COLUMN

23    2, COLUMN 4 TAKEN TOGETHER AND WHAT HE KNOWS ABOUT SPOOFCARD

24    AND TELETCH SUGGEST THAT CALL TOUCH NEW JERSEY.

25              THE COURT:  WHY DON'T WE BRING HIM IN.  MAYBE IT'S
```

```
 1     JUST BETTER NOW TO BRING HIM IN NOW, AND WE CAN RESOLVE THIS

 2     THROUGH A FOUNDATIONAL HEARING.

 3               MR. ARCHER:  THANK YOU, YOUR HONOR.

 4               THE COURT:  AND, MR. SCHENK, IF YOU WANT TO LAY A

 5     FOUNDATION TO SEE WHAT HIS KNOWLEDGE IS ABOUT THIS ISSUE.

 6               MR. SCHENK:  YES.

 7               THE COURT:  GOOD MORNING, SIR.  IF YOU WANT TO COME

 8     FORWARD AND IF YOU'LL STAND IN FRONT OF OUR COURTROOM DEPUTY

 9     AND RAISE YOUR RIGHT HAND, AND SHE'LL PLACE YOU UNDER OATH.

10          (GOVERNMENT'S WITNESS, NATHAN COOPER, WAS SWORN.)

11               THE WITNESS:  I DO.

12               THE COURT:  PLEASE HAVE A SEAT HERE AND ADJUST THE

13     CHAIR AND MICROPHONE AS YOU NEED AND WHEN YOU ARE COMFORTABLE,

14     WOULD YOU PLEASE STATE YOUR NAME AND SPELL IT PLEASE.

15               THE WITNESS:  SURE.  NATHAN JOEL COOPER.  IT'S

16     N-A-T-H-A-N, J-O-E-L, C-O-O-P-E-R.

17               THE COURT:  THANK YOU.  MR. SCHENK.

18                         DIRECT EXAMINATION

19     BY MR. SCHENK:

20     Q.   YES.  GOOD MORNING, MR. COOPER.  HOW ARE YOU?

21     A.   DOING WELL.

22     Q.   WHERE ARE YOU CURRENTLY EMPLOYED?

23     A.   I'M EMPLOYED AT TELETECH SYSTEMS IN SOUTHAMBOY, NEW JERSEY.

24     Q.   AND WHAT DO YOU DO FOR TELETECH SYSTEMS?

25     A.   I'M A CUSTODIAN OF RECORDS, AND I'M A TEAM LEADER FOR OUR
```

1    TECHNICAL SUPPORT SYSTEMS.

2            THE COURT:  COULD YOU TELL ME HOW TO SPELL THE CITY.

3            THE WITNESS:  SOUTHAMBOY, S-O-U-T-H-A-M-B-O-Y.

4            THE COURT:  THANK YOU.

5    BY MR. SCHENK:

6    Q.    YOU SAID A CUSTODIAN OF RECORDS.  AND I'M SORRY, THE

7    SECOND JOB TITLE?

8    A.    TEAM LEADER FOR OUR TECHNICAL SUPPORT DEPARTMENT.

9    Q.    AND HOW LONG HAVE YOU WORKED AT TELETCH?

10   A.    I BELIEVE TWO AND A HALF YEARS.

11   Q.    AND ARE THOSE THE ONLY TWO JOB TITLES THAT YOU HAVE HELD

12   WHILE YOU'VE BEEN EMPLOYED AT TELETCH?

13   A.    YES.

14   Q.    AND WOULD YOU FIRST DESCRIBE TO US WHAT YOUR

15   RESPONSIBILITIES AS A CUSTODY OF RECORDS INCLUDE?

16   A.    A CUSTODIAN OF RECORDS BASICALLY MAINTAIN AND HAVE ACCESS

17   TO ALL OF THE RECORDS IN OUR DATABASE, ALL OF OUR CUSTOMERS AND

18   TRANSACTION INFORMATION SORTED IN OUR DATABASE, AND I HAVE

19   ACCESS TO THAT.

20   Q.    DID YOU HAVE TRAINING ON HOW TO ANALYZE THE RECORDS THAT

21   YOU ARE REFERRING TO?

22   A.    I DID.

23   Q.    WHAT DID THAT TRAINING INVOLVE?

24   A.    IT WAS A SIX-MONTH TRAINING, AND IT WAS PART OF A TIER

25   PROGRAM IN OUR TECHNICAL SUPPORT TEAM, AND I BASICALLY TRAINED

```
 1    UNDER OUR LEGAL DEPARTMENT MANAGER, AND SHE BASICALLY

 2    INSTRUCTED ME ON WHAT TO LOOK FOR, HOW TO PREPARE REPORTS, HOW

 3    TO ANALYZE INFORMATION.

 4         SO IT WAS SIX MONTHS THAT I TRAINED WITH HER, WHICH SHE

 5    PROVIDED ME THE KNOW-HOW TO DO THAT.

 6    Q.   DID YOUR TRAINING INCLUDE HOW THE INFORMATION IN THE

 7    RECORDS THAT YOU'RE REFERRING TO GETS POPULATED OR GETS

 8    INCLUDED IN THE RECORD?

 9    A.   YES.

10    Q.   AND WOULD YOU DESCRIBE THAT?

11    A.   SURE.  SO IN OUR DATABASE WE HAVE ACCESS TO CREATE CARD

12    REPORTS AND A CARD REPORT BASICALLY ENTAILS ALL OF THE ACCOUNT

13    INFORMATION, TRANSACTION INFO, CALLS, THE ACCOUNT SUMMARY WHEN

14    THE ACCOUNT WAS CREATED, AND THAT BASICALLY CREATES A

15    SPREADSHEET WITH ALL OF THAT INFORMATION AND DIFFERENT TASKS

16    AND DIRECT USE OF THE APPROPRIATE INFORMATION.

17    Q.   ARE YOU SAYING CARD, C-A-R-D?

18    A.   CARD, YES.

19    Q.   CARD REPORT.

20    A.   UH-HUH.

21    Q.   AND WHEN INFORMATION IN THE CARD REPORT IS CREATED, DO YOU

22    HAVE KNOWLEDGE ON HOW THAT INFORMATION GETS INTO THE CARD

23    REPORT?

24    A.   YES.  IT'S A DATABASE THAT PULLS THE INFORMATION TOGETHER

25    FROM THE -- FROM WHAT WE ALREADY HAVE IN OUR SYSTEM AND IT JUST
```

1    CREATES A CSV FILE, WHICH IS ESSENTIALLY AN EXCEL SPREADSHEET,

2    AND IT JUST POPULATES ALL OF THAT INFORMATION INTO THE

3    SPREADSHEET WHICH WE CAN MATCH AGAINST OUR DATABASE.

4    Q.   OKAY.  AND YOU -- IF WE BACK UP, YOU SAID THAT IN ADDITION

5    TO A CUSTODIAN OF RECORDS YOU'RE ALSO A TEAM LEADER?

6    A.   CORRECT.

7    Q.   AND THERE'S A SECOND PART TO TEAM LEADER FOR?

8    A.   OUR TECHNICAL SUPPORT DEPARTMENT.

9    Q.   AND WHAT IS THAT?

10   A.   WE HAVE A TECHNICAL SUPPORT TEAM SET UP TO ASSIST

11   CUSTOMERS WITH TECHNICAL ISSUES, THAT ARE HAVING AN ISSUE WITH

12   ANY OF OUR SERVICES OR APPLICATIONS, THEY'RE TRAINED TO ASSIST

13   THEM IN RESOLVING THE PROBLEM.

14   Q.   AND WHAT TYPE OF TRAINING DID YOU HAVE BEFORE YOU BECAME A

15   TEAM LEADER FOR TECHNICAL SUPPORT?

16   A.   SO I'VE BEEN IN THE TECHNICAL SUPPORT TEAM SINCE I'VE

17   STARTED BUT IN BEING APART OF THAT TEAM, WE HAVE A TIER SYSTEM

18   SET UP WITH DIFFERENT DEPARTMENTS SUCH AS THE LEGAL DEPARTMENT

19   WHICH I AM THE CUSTODIAN OF RECORDS; WE ALSO HAVE A FRAUD TIER;

20   A SOCIAL MEDIA TIER.  WE HAVE A FEW DIFFERENT TIERS THAT YOU

21   CAN GO THROUGH.  EACH ONE OF THEM IS SIX MONTHS AND ONCE YOU

22   GRADUATE THAT TIER YOU BECOME A PART OF THAT DEPARTMENT.  AND I

23   WAS ABLE TO COMPLETE ALL OF THOSE WHICH PROMOTED ME TO TEAM

24   LEADER OF OUR TECHNICAL SUPPORT TEAM.

25   Q.   OKAY.  IS THERE A BINDER IN FRONT OF YOU?

1    A.   YES.

2    Q.   AND WOULD YOU OPEN IT TO EXHIBIT 2 OR TAB 2?

3    A.   OKAY.

4    Q.   AND IF YOU WOULDN'T MIND, WOULD YOU PLEASE TAKE A MOMENT.

5    I BELIEVE IT'S SEVEN PAGES LONG.  WOULD YOU JUST FLIP THROUGH

6    ALL SEVEN PAGES AND LET ME KNOW WHEN YOU FINISH.

7    A.   OKAY.

8    Q.   DO YOU RECOGNIZE WHAT IS AT TAB 2?

9    A.   I DO.

10   Q.   WHAT IS IT?

11   A.   IT'S A CARD REPORT THAT WE GENERATED.

12   Q.   I'M SORRY.  THIS IS AN EXAMPLE OF A CARD REPORT THAT YOU

13   WERE DESCRIBING TO US EARLIER?

14   A.   CORRECT.

15   Q.   OKAY.  IF YOU WOULDN'T MIND TO TURN TO 2-4, THAT'S THE

16   FOURTH PAGE.

17   A.   OKAY.

18   Q.   WOULD YOU PLEASE DESCRIBE WHAT INFORMATION IS IN THE VERY

19   FIRST COLUMN THAT'S CALLED ACCESS NUMBER?

20   A.   UH-HUH.  SO THAT IS AN ACCESS NUMBER THAT WE PROVIDE FOR

21   OUR CUSTOMERS TO PLACE A CALL TO THE SPOOFCARD, AND THIS

22   SPECIFIC NUMBER IS A TOLL FREE NUMBER THAT WE PROVIDED FOR TOLL

23   FREE CALLS FROM THE INDIVIDUALS'S CELL PHONE OR LAND DEVICE

24   THAT -- WHATEVER THEY'RE USING.

25   Q.   WE MIGHT NEED A LITTLE MORE BACKGROUND.  YOU SAID IT'S A

1    TOLL FREE NUMBER THAT YOU GIVE TO CUSTOMERS TO PLACE CALLS ON

2    THE SPOOFCARD; IS THAT RIGHT?

3    A.   YES.

4    Q.   AND COULD YOU EXPLAIN WHAT THAT MEANS?

5    A.   IN ORDER FOR ANYONE TO PLACE CALLS WITH SPOOFCARD, THERE'S

6    AN ACCESS NUMBER THAT THEY NEED TO CALL FROM THEIR OWN DEVICE.

7         SO IN THIS SITUATION I BELIEVE THIS ACCOUNT IS FROM 2012,

8    AND AT THAT TIME WE ISSUED PHYSICAL CARDS WHICH A USER CAN

9    PLACE CALLS WITH.

10        SO ON THE BACK OF THAT CARD THERE'S AN ACCESS NUMBER THAT

11   WE PROVIDE TO THEM.  THEY WILL CALL THAT NUMBER FROM THEIR OWN

12   DEVICE.  ONCE THEY CALL THAT NUMBER, THIS WOULD THEN PROMPT

13   THEM TO SET UP THEIR CALL.  IT WOULD ASK THEM FOR THE PIN

14   NUMBER THAT IS ALSO LOCATED ON THAT CARD, AND THEN IT WOULD

15   PROMPT THEM TO ENTER THE DESTINATION ON WHICH THEY WOULD CALL.

16   IT WOULD ASK THEM FOR THE NUMBER THAT THEY WOULD LIKE TO

17   DISPLAY AS THE CALLER ID AND ANY FEATURE SUCH AS A VOICE

18   CHANGER OR BACKGROUND NOISE THEY WOULD BE PROMPTED TO CHOOSE

19   ONE OF THOSE AND ALSO PROMPT THEM IF THEY WANT TO RECORD THE

20   CALL.

21        ONCE THEY SET UP ALL OF THAT INFORMATION, THEN IT WILL

22   COMPLETE THE CALL FOR THEM.

23   Q.   OKAY.  THE SECOND COLUMN IS TITLED REAL CALLER ID.  WHAT

24   IS THAT?

25   A.   REAL CALLER ID IDENTIFIES AN ACTUAL PHONE NUMBER THAT

1    THEY'RE CALLING FROM.  SO IT'S GIVING YOU THE ACTUAL NUMBER

2    THAT THEY'RE USING TO PLACE THAT PHONE CALL.

3    Q.    AND WHEN YOU SAY, "THEY," I'M SORRY, WHO DO YOU MEAN?

4    A.    SPOOFCARD.

5    Q.    YOU SAID THAT IT'S THE NUMBER THAT THEY USE WHEN THEY MAKE

6    A CALL?

7    A.    SO ANY OF OUR CUSTOMERS, WHENEVER THEY PLACE A CALL TO AN

8    ACCESS NUMBER, IT'S GOING TO IDENTIFY THEIR PHONE NUMBER.

9    Q.    SO SPOOFCARD KNOWS THE NUMBER THAT SOMEONE IS ORIGINATING

10   A CALL FROM?

11   A.    CORRECT.

12   Q.    AND THAT'S WHAT IS IN THIS COLUMN (INDICATING)?

13   A.    EXACTLY.

14   Q.    THE THIRD COLUMN, WOULD YOU DESCRIBE WHAT INFORMATION IS

15   THERE?

16   A.    YES.  THAT IS A SPOOF NUMBER.  THAT IS A NUMBER THAT WAS

17   MANUALLY SELECTED BY THE USER TO DISPLAY AS THE CALLER ID ON

18   THE RECIPIENT'S PHONE.

19   Q.    OKAY.  AND THE FOURTH COLUMN, WHAT IS THAT?

20   A.    THAT IS THE DESTINATION NUMBER THAT THEY MANUALLY ENTERED

21   TO CONTACT.  SO IT WAS THE PHONE NUMBER OF THE RECIPIENT THAT

22   THEY WERE ACTUALLY CALLING WHILE THEY WERE USING THE SERVICE.

23   Q.    AND WHEN YOU SAY, "THEY," YOU MEAN THE SPOOFCARD CUSTOMER?

24   A.    CORRECT.

25   Q.    AND THAT'S THE NUMBER THAT THEY WANT TO CALL?

```
1    A.   EXACTLY.

2    Q.   NOW, IF WE COMPARE THE SECOND AND FOURTH COLUMNS, THAT IS

3    THE REAL CALLER ID AND THE DESTINATION NUMBER --

4    A.   UH-HUH.

5    Q.   -- DO WE HAVE THE NUMBER THE PERSON IS CALLING FROM AND

6    THE NUMBER THE PERSON IS CALLING TO?

7    A.   CORRECT.

8    Q.   AND WHAT ARE THE AREA CODES OF THOSE TWO NUMBERS?

9    A.   408.

10   Q.   AND DO YOU KNOW WHERE THAT AREA CODE IS?

11   A.   I BELIEVE IT'S CALIFORNIA.

12   Q.   OKAY.  DID A CALL SUCH AS THIS ONE -- AND LET ME ASK YOU

13   ONE MORE QUESTION.  THERE'S A COLUMN ENTITLED START TIME.

14   WOULD YOU READ THAT INFORMATION?

15   A.   YEAH.  WE HAVE FEBRUARY 23RD, 2012, AND 17:26.

16   Q.   IS THAT THE TIME?

17   A.   YES.

18   Q.   AND WHAT IS THAT IN RELATION TO?  WHAT IS THAT THE TIME

19   OF?

20   A.   THAT'S THE ACTUAL START TIME OF THE CALL WHEN IT ACTUALLY

21   CONNECTED.

22   Q.   OKAY.  SO A CALL FROM A 408 NUMBER TO A 408 NUMBER IN

23   FEBRUARY OF 2012, IS WHAT WE'RE LOOKING AT; IS THAT RIGHT?

24   A.   CORRECT.

25   Q.   AND DID THIS CALL CROSS STATE LINES?
```

Case 5:15-cr-00226-EJD Document 68-41 Filed 02/16/18 Page 152 of 159

1      A.   WHAT DO YOU MEAN BY THAT?

2      Q.   DID THIS CALL THAT WENT FROM 408 TO 408 CAUSE ELECTRONIC

3      WIRES TO BE SENT IN A STATE OUTSIDE OF CALIFORNIA?

4              MR. ARCHER:  OBJECTION.  VAGUE.

5              THE COURT:  DO YOU UNDERSTAND THE QUESTION?

6              THE WITNESS:  I'M NOT SURE I UNDERSTAND THE

7      QUESTION.

8              THE COURT:  REPHRASE IT.

9      BY MR. SCHENK:

10     Q.   OKAY.  THE CALL ORIGINATED FROM A 408 NUMBER?

11     A.   UH-HUH.

12     Q.   AND IT ENDED IN A 408 NUMBER?

13     A.   CORRECT.

14     Q.   BUT DID THIS CALL GO TO SOME OTHER SERVER, TO SOME OTHER

15     PHONE, TO SOME OTHER --

16             MR. ARCHER:  OBJECTION.  LEADING.

17             THE COURT:  HE HASN'T FINISHED THE QUESTION.

18        BUT WHY DON'T YOU FINISH YOUR QUESTION, MR. SCHENK, AND

19     THEN I'LL RULE ON THE OBJECTION.

20     BY MR. SCHENK:

21     Q.   DID THIS CALL GO FROM SOME -- BEYOND THE TWO NUMBERS, THE

22     408 THAT IS THE ORIGINATION NUMBER AND THE DESTINATION NUMBER,

23     DID THE CALL GO ANYWHERE ELSE BESIDES THESE TWO NUMBERS?

24     A.   THE CALL GETS SENT TO THE DESTINATION NUMBER BUT IN ORDER

25     FOR THAT TO HAPPEN IT HAS TO GO THROUGH ANOTHER MEDIUM.  IT

```
 1     DOES HAVE TO BE ROUTED THROUGH ANOTHER SERVICE WHICH

 2     ESSENTIALLY IS WHAT THE ACCESS NUMBER DOES.

 3           SO THE CALL IS BEING PLACED TO THE ACCESS NUMBER.  THAT

 4     ACCESS NUMBER IS ACTUALLY REGISTERED WITH ANOTHER COMPANY.  WE

 5     HAVE ANOTHER COMPANY THAT ROUTES OUR CALLS.  THAT COMPANY

 6     BASICALLY ROUTES THAT CALL TO THE SERVER AND THEN IT'S DIRECTED

 7     TO THE DESTINATION NUMBER THAT WE HAVE HERE.

 8     Q.   OKAY.  SO BEFORE THE CALL GOES TO THIS 408-353-6292

 9     NUMBER, YOU'RE SAYING THAT IT GOES TO THE ACCESS NUMBER

10     TELEPHONE NUMBER FIRST?

11     A.   CORRECT.

12     Q.   AND HOW DO YOU KNOW WHAT YOU JUST TESTIFIED TO?  THAT IS,

13     HOW DO YOU KNOW THAT IT IS REQUIRED TO GO TO THE ACCESS NUMBER

14     FIRST BEFORE THE DESTINATION?

15     A.   WELL, THE ACCESS NUMBERS ARE SET UP.  THEY'RE THE ID'S,

16     WHICH THEY STAND FOR DIRECT INWARD DIAL, AND THEY BASICALLY

17     HAVE TO FORWARD THAT CALL TO THE DESTINATION NUMBER ALONG WITH

18     ALL OF THE FEATURES THAT THEY HAVE CHOSEN TO MAKE THAT CALL

19     WITH.

20     Q.   SO --

21           MR. ARCHER:  OBJECTION, YOUR HONOR.  MOVE TO STRIKE.

22     THIS IS NONRESPONSIVE.  THE QUESTION WAS HOW DID HE KNOW WHAT

23     HE TESTIFIED TO IN THE PRIOR QUESTION.

24           THE COURT:  HE MAY NOT BE FINISHED TELLING US ABOUT

25     THIS.  THIS IS BACKGROUND FOR THAT.
```

1              THE WITNESS:  AND HOW I KNOW THAT IS ALL OF OUR

2    ACCESS NUMBERS ARE REGISTERED WITH FLOWROUTE AND WHICH IS A

3    COMPANY THAT WE HAVE SET UP TO PURCHASE THOSE DID'S FROM, AND

4    SO WE PURCHASE THOSE DID'S FROM FLOWROUTE AND FLOWROUTE HAS TO

5    TELL THE CALL WHERE TO BE DIRECTED TO.

6    BY MR. SCHENK:

7    Q.   IS SPOOFCARD A BUSINESS UNDER TELETCH?  ARE WE USING THOSE

8    TWO INTERCHANGEABLY?

9    A.   SPOOFCARD IS AN APPLICATION AND A SERVICE AND THAT IS

10   OWNED BY TELETCH.  SO TELETCH IS THE SYSTEM THAT CREATED

11   SPOOFCARD.

12   Q.   OKAY.  IN YOUR EMPLOYMENT WITH TELETCH, HOW DID YOU HAVE

13   THE OPPORTUNITY TO BECOME FAMILIAR WITH THIS?  WAS IT DIRECT

14   INWARD DIAL?

15   A.   YES.

16   Q.   HOW DID YOU AN OPPORTUNITY TO BECOME FAMILIAR?

17   A.   SO IT'S PART OF THE LEGAL TRAINING AS FAR AS BEING A

18   CUSTODIAN AND IT'S JUST SOMETHING THAT WE HAD TO KNOW AND SO IN

19   MY TRAINING WE WERE INFORMED OF, YOU KNOW, THE ACCESS NUMBER IS

20   GOING TO BE DIRECTED THROUGH FLOWROUTE AND BEING REGISTERED

21   WITH FLOWROUTE AS WELL.

22   Q.   OKAY.  AND, I'M SORRY.  DID YOU SAY THAT YOU KNEW WHERE

23   FLOWROUTE ROUTED THE NUMBER THROUGH?

24   A.   I WAS INFORMED OF WHERE IT WAS ROUTED THROUGH, BUT I DON'T

25   HAVE ACCESS TO KNOW EXACTLY WHERE ALL OF THE CALLS ARE BEING

1    ROUTED THROUGH BUT THE SPECIFIC CALL I WAS INFORMED OF WHERE IT

2    WAS ROUTED THROUGH.

3    Q.   AND FOR THIS SPECIFIC CALL, HOW DID YOU GET THAT

4    INFORMATION?

5    A.   OUR CTO OVERSEAS, OUR ENGINEERS AND DEVELOPER IS AT THE

6    COMPANY AND HE HAS ACCESS TO ALL OF THE RECORDS AS FAR AS WHERE

7    CALLS ARE BEING ROUTED FROM AND TO AND HE WAS THE ONE WHO

8    ACTUALLY PROVIDED ME THE INFORMATION TO KNOW THAT.

9    Q.   AND DID HE PROVIDE YOU WITH THE RECORDS OR DID HE TELL YOU

10   I'VE LOOKED AT THE RECORDS AND I KNOW?

11   A.   HE PROVIDED ME -- WE HAD A MEETING, AND HE PROVIDED

12   KNOWLEDGE TO ME BUT HE DIDN'T ACTUALLY PROVIDE THE RECORDS PER

13   SE TO ME.

14   Q.   OKAY.  SO HE TOLD YOU THAT THIS CALL, THIS SPECIFIC CALL

15   WAS ROUTED INTO JERSEY CITY, NEW JERSEY?

16   A.   CORRECT.

17        MR. SCHENK:  YOUR HONOR, THAT WOULD BE THE

18   FOUNDATION.

19        THE COURT:  OKAY.  CROSS-EXAMINATION?

20        MR. ARCHER:  THANK YOU, YOUR HONOR.

21                    **CROSS-EXAMINATION**

22   BY MR. ARCHER:

23   Q.   GOOD MORNING, MR. COOPER.  MY NAME IS GRAHAM ARCHER, AND

24   I'M MR. YORK'S ATTORNEY.

25   A.   GOOD MORNING.

1    Q.  I WANT TO GO VERY BRIEFLY THROUGH YOUR BACKGROUND.  YOUR

2    EDUCATIONAL EXPERIENCE IS IN MUSIC PERFORMANCE; IS THAT

3    CORRECT?

4    A.    UH-HUH.

5    Q.   YOU HAVE FOUR YEARS OF UNDERGRADUATE IN MUSIC PERFORMANCE;

6    IS THAT CORRECT?

7           MR. SCHENK:  YOUR HONOR, I WOULD OBJECT IN FRONT OF

8    THE JURY.  I'M NOT SURE HOW MUCH I NEED TO OBJECT ON RELEVANCE

9    GROUNDS AT THIS TIME.

10          MR. ARCHER:  MR. SCHENK LAID A FOUNDATION THAT HE

11   HAS SOME SORT OF TRAINING IN TECHNICAL SUPPORT AND BASED ON

12   THAT HE HAS SOME BASIS TO -- WHAT MR. SCHENK ESTABLISHED IS HE

13   WAS TOLD THIS INFORMATION BY SOMEBODY ELSE.  I'M HAPPY TO GO

14   THROUGH, IF THE COURT IS INTERESTED IN THIS INQUIRY BECAUSE I

15   CAN WALK THROUGH THAT MR. COOPER DOES NOT APPEAR TO HAVE ANY

16   FORMAL ENGINEERING TRAINING.

17          THE COURT:  WE KNOW HE WAS TRAINED BY THE COMPANY

18   FOR THE COMPANY BUSINESS, AND WE KNOW THAT.

19       I THINK THE ISSUE IS PERHAPS THE LAST QUESTION THAT

20   MR. SCHENK WAS ENGAGED IN, AND THAT'S PROBABLY THE IMPORTANT

21   ISSUE.

22          MR. ARCHER:  OKAY.

23   Q.   AND JUST VERY BRIEFLY ON YOUR TRAINING BY TELETCH.  THEY

24   DIDN'T TRAIN YOU ON THE RECORDS KEPT BY THE TELETCH SYSTEMS;

25   CORRECT?  IS THAT -- I'M SORRY.  THAT'S A COMPLETELY VAGUE

1    QUESTION.  I APOLOGIZE.

2        YOU SAID THE CTO HANDLES THE ACTUAL ROUTING INFORMATION;

3    RIGHT?

4    A.   YES.

5    Q.   AND THAT'S IN THE CAPACITY AS A NETWORK ENGINEER, I

6    PRESUME?

7    A.   RIGHT.

8    Q.   AND THEY DIDN'T TRAIN YOU AT TELETCH TO BE A NETWORK

9    ENGINEER; CORRECT?

10   A.   NO.

11   Q.   AND YOUR TRAINING IN THE TECHNICAL SUPPORT IS TO

12   PRESUMABLY MANAGE THE TECHNICAL SUPPORT TEAM?

13   A.   RIGHT.

14   Q.   AND AS PART OF THAT YOU'RE REVIEWING THE RECORDS OF THE

15   INDIVIDUAL CUSTOMER TRANSACTIONS; RIGHT?

16   A.   EXACTLY.

17   Q.   BUT THAT DOESN'T INCLUDE REVIEWING THE ACTUAL ROUTING

18   INFORMATION OF ANY OF THE CALLS?

19   A.   RIGHT.

20   Q.   OKAY.  AND THE CTO THAT YOU'RE TALKING TO, HE DIDN'T

21   ACTUALLY -- TO YOUR KNOWLEDGE HE DIDN'T ACTUALLY WORK AT

22   FLOWROUTE AT ANY POINT; CORRECT?

23   A.   NO, NOT THAT I'M AWARE OF.

24   Q.   AND SO THE INFORMATION THAT YOU'RE RELAYING TO US TODAY,

25   WHAT YOU'RE TESTIFYING TO AS TO HOW THIS PARTICULAR CALL WAS

1    ROUTED IS BASED ENTIRELY ON COMMUNICATIONS THAT YOU'VE HAD FROM

2    THE CTO; CORRECT?

3    A.   CORRECT.

4    Q.   AND IT'S NOT FROM YOUR REVIEW OF ANY ACTUAL RECORDS THAT

5    WOULD DOCUMENT THAT ROUTING; CORRECT?

6    A.   THAT'S CORRECT.

7    Q.   OKAY.  THANK YOU.

8            THE COURT:  ANYTHING FURTHER?

9            MR. ARCHER:  NO, YOUR HONOR.

10           THE COURT:  MR. SCHENK?

11           MR. SCHENK:  NO, YOUR HONOR.

12           THE COURT:  ALL RIGHT.  THANK YOU.  SIR, YOU CAN

13   STAND DOWN.  YOU'RE NOT EXCUSED.  WE'RE GOING TO NEED YOU

14   PERHAPS LATER THIS MORNING BUT YOU CAN LEAVE THE COURTROOM NOW,

15   PLEASE.

16           THE WITNESS:  OKAY.  THANK YOU.

17           THE COURT:  WAIT OUT WHEREVER YOU WOULD, PLEASE.

18   THANK YOU.

19       ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE WITNESS HAS

20   LEFT THE COURTROOM.  ALL COUNSEL ARE PRESENT.

21       MR. ARCHER.

22           MR. ARCHER:  YOUR HONOR, WHAT MR. SCHENK ELICITED IN

23   THAT INTERCHANGE IS THAT HE HAS NO PERSONAL KNOWLEDGE ABOUT

24   WHAT HAPPENED WITH THIS PHONE CALL, AND THERE'S NO FOUNDATION

25   THAT HE WORKED THERE IN 2012, AND, IN FACT, IT DOESN'T APPEAR

```
1     THAT HE DID.

2          AND TO ALLOW HIM TO TESTIFY AS TO AN ELEMENT OF THIS CRIME

3     AS A CUSTODIAN OF RECORDS WOULD VIOLATE MR. YORK'S

4     CONFRONTATION CLAUSE.

5              THE COURT:  YOU'RE SPEAKING DIRECTLY OF THE ISSUE OF

6     WHETHER OR NOT THIS PHONE CALL WAS ROUTED TO A DIFFERENT STATE

7     IN SOME MANNER?

8              MR. ARCHER:  RIGHT.  WHAT I'M REFERENCING IS THE

9     PRONG OF COUNT 2, WHICH IS THAT THE COMMUNICATION MUST BE MADE

10    IN INTERSTATE OR FOREIGN COMMUNICATION.

11         WHAT HE'S ACKNOWLEDGED HERE IS THAT THERE ARE TWO 408

12    NUMBERS AND A TOLL FREE ACCESS NUMBER, AND HE'S NOT COMPETENT

13    TO OFFER TESTIMONY ABOUT WHERE THE TOLL FREE ACCESS NUMBER IS.

14         THE DEFENSE INVESTIGATION SEEMS TO INDICATE THAT IT WAS

15    ACTUALLY IN CALIFORNIA AT THE TIME.

16         AND HE'S CERTAINLY NOT COMPETENT TO TESTIFY THAT THE PHONE

17    NUMBER WAS ROUTED TO SOME SERVER BASED ON WHAT HE'S TOLD BY THE

18    CTO.

19             THE COURT:  THAT'S REALLY THE ISSUE.

20             MR. ARCHER:  YEAH, IT IS, YOUR HONOR.

21             THE COURT:  THAT ONE LAST QUESTION.  MR. SCHENK.

22             MR. SCHENK:  MR. COOPER SHOULD CERTAINLY BE ALLOWED

23    TO TESTIFY AS TO EVERY OTHER THAT WE DISCUSSED, AND THE

24    GOVERNMENT SHOULD BE ALLOWED TO BRING THE CTO OUT TO ANSWER

25    THAT QUESTION THAT CANNOT BE ACCOMPLISHED TODAY.
```

1          SO THE QUESTION REALLY IS DO WE PROCEED NOW AND TAKE

2     ADVANTAGE OF OUR JURY HERE AND THE TIME AND HAVE MR. COOPER AND

3     MS. AGUIRRE TESTIFY AND THEN BREAK AND THEN ALLOW THE

4     GOVERNMENT THE OPPORTUNITY TO CALL THE CTO.

5               THE COURT:  THANK YOU.  DO YOU WANT TO BE HEARD ON

6     THAT, MR. ARCHER?

7               MR. ARCHER:  YES, YOUR HONOR.  I'M CURIOUS AS TO

8     WHAT THE GOOD CAUSE IS TO CONTINUE THIS TRIAL.  A MOMENT AGO

9     MR. SCHENK WAS COMPLAINING ABOUT ME DELAYING THE JURY ABOUT ME

10    INQUIRING OF MR. COOPER, WHY THE GOVERNMENT WOULD BE PERMITTED

11    A CONTINUANCE OF A TRIAL, WHICH IS BEING CONDUCTED UNDER THE

12    SPEEDY TRIAL BASIS -- MR. YORK HAS OBJECTED TO FURTHER

13    EXCLUSIONS OF TIME IN THIS MATTER.

14         WHY THE GOVERNMENT IN THINKING PERHAPS THAT THEY COULD

15    SHOEHORN IN EVIDENCE OF ONE OF THE ELEMENTS THROUGH HEARSAY AND

16    SOMEONE WHO CLEARLY DOESN'T HAVE PERSONAL KNOWLEDGE WOULD THEN

17    BE GRANTED A CONTINUANCE MID TRIAL WHEN WE ARE EXPECTED TO

18    FINISH TODAY IS BEYOND ME.

19         I DON'T THINK THERE'S GOOD CAUSE.  THERE'S NOT EVEN A

20    PROFFER THAT THE CTO HAS ANY PERSONAL KNOWLEDGE ABOUT

21    FLOWROUTE.

22         IN FACT, THE INFORMATION HE HAS RELAYED TO MR. COOPER

23    SEEMS TO BE IN DIRECT CONTRAVENTION TO THE DEFENSE

24    INVESTIGATION ABOUT THE ACTUAL LOCATION OF THE FLOWROUTE

25    COMPANY.

1    THAT ASIDE, WHAT IS HIS NAME?  DOES THE GOVERNMENT HAVE

2    SOME GOOD CAUSE BASIS TO BELIEVE THAT THIS GUY IS ACTUALLY

3    GOING TO HAVE COMPETENT EVIDENCE THAT THEY DISCLOSED SOMETHING

4    TO THE DEFENSE OF THE LOGS OF THIS?  IS HE GOING TO BE AN

5    EXPERT?

6          THE COURT:  WELL, LET'S ASK HIM.  LET'S ASK HIM WHAT

7    THIS GUY WILL SAY.

8          MR. SCHENK:  WE HAVE TO INTERVIEW HIM AND PROVIDE A

9    REPORT REGARDING WHAT HE WOULD SAY.

10    THERE IS ABSOLUTELY NO SPEEDY TRIAL ISSUE.  THE SPEEDY

11    TRIAL ACT IS ABOUT BEGINNING THE TRIAL.

12          THE COURT:  WE'RE IN TRIAL NOW.

13          MR. SCHENK:  WE'RE IN TRIAL.  BY MR. ARCHER'S LOGIC

14    NO DEATH PENALTY CASE WOULD EVER BE ABLE TO BE TRIED, AND IT

15    WOULD EXTEND BEYOND 70 DAYS, AND THAT'S NOT AN ISSUE.

16    AND, IN FACT, THIS WAS AN ISSUE THAT MR. ARCHER KNEW

17    ABOUT, AND IF HE WAS CONCERNED ABOUT A POTENTIAL CONTINUANCE IN

18    THE MIDDLE OF THE TRIAL RESULTING FROM A PARTICULAR PIECE OF

19    THE TESTIMONY BEING EXCLUDED, IT'S AN ISSUE THAT COULD HAVE

20    BEEN RAISED TO THE COURT IN ADVANCE TO PREVENT THAT.

21    THE GOVERNMENT COULD HAVE USED THESE PAST TWO DAYS THAT WE

22    HAVE BEEN DARK TO BRING THE CTO AND PROVIDE A REPORT TO

23    MR. ARCHER OF HIS TESTIMONY.

24    IT WAS A DECISION THAT THE DEFENSE MADE, AND IT WAS A

25    DECISION THAT THEY DIDN'T HAVE TO MAKE ONE WAY OR THE OTHER.

```
 1    I'M NOT SAYING THAT THEY HAD TO GIVE US ANY INSIGHT BUT WHAT

 2    THEY DON'T GET TO DO IS TO SIT ON THE INFORMATION AND THEN

 3    OBJECT TO A DELAY.

 4              THE COURT:  LET ME ASK, WE HAVE THE WITNESS HERE.

 5    HE'S FROM NEW JERSEY.

 6              MR. SCHENK:  YES.

 7              THE COURT:  WE SHOULD GO FORWARD WITH HIS TESTIMONY

 8    THIS MORNING AND CROSS-EXAMINATION, OF COURSE.  I DON'T KNOW

 9    HOW LONG -- I THINK BASED ON OUR CONVERSATION YESTERDAY IT

10    SOUNDED LIKE THIS WITNESS WILL PROBABLY BE 90 MINUTES, MAYBE,

11    PERHAPS LESS NOW, BUT BOTH DIRECT AND CROSS.

12         FOLLOWING THAT DOES THE GOVERNMENT HAVE ANY ADDITIONAL

13    WITNESSES PLANNED FOR THIS MORNING?

14              MR. SCHENK:  YES, YOUR HONOR.

15              THE COURT:  WELL, LET'S PROCEED WITH THE TRIAL.

16         WE HAVE ESTABLISHED, LET ME JUST INDICATE THIS, WE HAVE

17    ESTABLISHED THAT THIS WITNESS, MR. COOPER, DOES NOT HAVE

18    PERCIPIENT KNOWLEDGE ABOUT THE INTERSTATE NATURE OF THE PHONE

19    CALL.  SO HE WILL NOT BE PERMITTED TO TESTIFY ABOUT THAT.

20         HE CAN TESTIFY ABOUT ALL OF THE THINGS THAT, IN ESSENCE,

21    EVERYTHING EXCEPT THAT ONE QUESTION THAT YOU ASKED, MR. SCHENK,

22    THAT LAST QUESTION.  THERE WAS INSUFFICIENT FOUNDATION FOR HIM

23    TO RESPOND TO THAT QUESTION.

24         SO HE WON'T BE PERMITTED TO BE ASKED THAT QUESTION, AND WE

25    NEED NOT HAVE MR. ARCHER OBJECT AND HAVE THE OBJECTION
```

1    SUSTAINED IN FRONT OF THE JURY.

2         MR. SCHENK:  YES.

3         THE COURT:  BUT THE OTHER MATTERS YOU CAN CERTAINLY

4    ASK HIM QUESTIONS ABOUT, AND WE'LL SEE WHERE THAT TAKES US THIS

5    MORNING.

6         MY SENSE IS THAT THIS CTO, OR WHOEVER HE OR SHE IS, IS NOT

7    LOCAL.

8         MR. SCHENK:  CORRECT.

9         THE COURT:  AND MAYBE YOUR TEAM CAN START LOOKING

10   INTO THAT SO THAT, YOU KNOW, YOUR TEAM CAN BETTER ADVISE THE

11   COURT AS TO THE TIMING OF THAT.

12        MR. SCHENK:  YES.

13        THE COURT:  OKAY.  ANYTHING FURTHER?

14        MR. ARCHER:  NO, YOUR HONOR.  THANK YOU.

15        THE COURT:  DO WE NEED TO TAKE A BREAK BEFORE WE

16   BRING THE JURY IN?

17        MR. SCHENK:  NO, YOUR HONOR.

18        MR. ARCHER:  NO.

19        THE COURT:  LET'S BRING THEM IN.  THANK YOU.

20      (JURY IN AT 9:59 A.M.)

21        THE COURT:  PLEASE BE SEATED, LADIES AND GENTLEMEN.

22   THE RECORD SHOULD REFLECT THAT WE'RE BACK IN SESSION WITH THE

23   JURY, AND THE JURY AND ALTERNATES ARE PRESENT, AND ALL COUNSEL

24   AND THE DEFENDANT IS PRESENT.

25        LADIES AND GENTLEMEN, THANK YOU FOR THE BREAK.  I NEEDED

```
 1        TO TALK TO THESE LAWYERS ABOUT A COUPLE OF THINGS.

 2            AND I THINK NOW YOU REALIZE WHY I HAVE THE BEST STAFF IN

 3    THE WHOLE COURT BUILDING BECAUSE THEY'VE HAD FRESH -- THEY KNEW

 4    THAT WE WERE GOING TO TAKE THIS BREAK AND THAT'S WHY THEY

 5    PROVIDED YOU THAT BOX OF DONUTS.  SO I HOPE YOU ENJOYED THOSE

 6    DURING THE BREAK.

 7            LET'S CONTINUE WITH THE CASE.  MR. SCHENK.

 8                MR. SCHENK:  THE UNITED STATES CALLS NATHAN COOPER.

 9                THE COURT:  AND, MR. COOPER, WE'RE GOING TO HAVE YOU

10    SWORN IN HERE AGAIN, PLEASE.  IF YOU WOULD FACE OUR COURTROOM

11    DEPUTY, PLEASE.

12        (GOVERNMENT'S WITNESS, NATHAN COOPER, WAS SWORN.)

13                THE WITNESS:  YES.

14                THE COURT:  THANK YOU, SIR.  HAVE A SEAT.  FEEL FREE

15    TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.  I'LL ENCOURAGE

16    YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.  WHEN YOU ARE

17    COMFORTABLE, STATE YOUR NAME AND SPELL IT, PLEASE.

18                THE WITNESS:  NATHAN JOEL COOPER, N-A-T-H-A-N,

19    C-O-O-P-E-R.

20                THE COURT:  THANK YOU.  COUNSEL.

21                        DIRECT EXAMINATION

22    BY MR. SCHENK:

23    Q.   GOOD MORNING.

24    A.   GOOD MORNING.

25    Q.   ARE YOU CURRENTLY EMPLOYED?
```

1    A.   YES.

2    Q.   AND WHERE ARE YOU CURRENTLY EMPLOYED?

3    A.   TELETCH SYSTEMS IN SOUTHAMBOY, NEW JERSEY.

4    Q.   AND WHAT DO YOU DO FOR TELETCH?

5    A.   I'M A CUSTODIAN OF RECORDS AND A TEAM LEADER FOR OUR

6    TECHNICAL SUPPORT DEPARTMENT.

7    Q.   AND WHAT TYPE OF BUSINESS DOES TELETCH SYSTEMS INVOLVE?

8    A.   TELETCH SYSTEMS IS A PORTFOLIO COMPANY THAT DEVELOPS

9    TELEPHONY APPLICATIONS.  WE HAVE MOBILE APPS THAT HAVE BEEN

10   AROUND, CALLING AND PRIVACY APPLICATIONS.

11   Q.   AND WHAT DOES A CUSTODY OF RECORDS FOR TELETCH SYSTEMS DO?

12   A.   WE MANAGE AND MAINTAIN RECORDS FOR ALL OF OUR CUSTOMERS.

13   WE HAVE ACCESS TO TRANSACTION INFORMATION, CALLS, AND ANY

14   ACCOUNT DETAILS.

15   Q.   WHAT DOES A TEAM LEADER FOR TELETCH SYSTEMS DO?

16   A.   BASICALLY A TEAM LEADER OVERSEES THE TECHNICAL SUPPORT

17   DEPARTMENT.  I OVERSEE THE ENTIRE TEAM AND BASICALLY I'M A

18   SUPERVISOR FOR THE TEAM MEMBERS.

19   Q.   OKAY.  SO YOU WEAR BOTH OF THESE HATS?

20   A.   YES.

21   Q.   AND AMONG THE APPLICATIONS OR PRODUCTS OFFERED BY TELETCH

22   SYSTEMS, ARE YOU FAMILIAR WITH ONE CALLED SPOOFCARD?

23   A.   I AM.

24   Q.   WHAT IS SPOOFCARD?

25   A.   SPOOFCARD ALLOWS YOU TO MAKE BOTH INTERNATIONAL AND

1      DOMESTIC CALLS.  YOU PURCHASE CREDITS FOR THIS SERVICE.  IT

2      ALLOWS YOU TO CHANGE YOUR CALLER ID, SOME OF THE FEATURES AS

3      WELL THAT ALLOW YOU TO CHANGE YOUR VOICE.  YOU CAN USE

4      BACKGROUND NOISE ON A CALL.  YOU CAN RECORD IT.  YOU CAN ALSO

5      SEND THE CALL DIRECTLY TO VOICEMAIL.

6      Q.   OKAY.  ARE YOU FAMILIAR WITH HOW AN INDIVIDUAL BECOMES A

7      CUSTOMER OR A MEMBER OF SPOOFCARD?

8      A.   YES.

9      Q.   AND HOW ARE YOU FAMILIAR WITH THAT?

10     A.   JUST IN TRAINING IN THE TECHNICAL SUPPORT TEAM WE LEARN

11     HOW THE ACTUAL PROCESS IS INITIATED.  WE HAVE A FEW DIFFERENT

12     METHODS WHERE SOMEONE CAN HAVE SERVICE.  THEY CAN USE THE

13     WEBSITE, AND THEY CAN APPLY MOBILE APPS FOR ANDROID AND IPHONE

14     DEVICES, AND WE HAVE PREVIOUSLY HAD LITTLE CARDS THAT USERS CAN

15     PURCHASE AND PLACE CALLS USING THE CARD ITSELF, THE ACCESS

16     NUMBER THAT IS ON THE CARD.

17          THEY CAN ALSO USE THE MOBILE SITE FROM THEIR SMARTPHONE.

18     Q.   YOU MENTIONED YOUR TRAINING.  WOULD YOU DESCRIBE FOR THE

19     JURY WHAT YOUR TRAINING AT TELETCH HAS INCLUDED?

20     A.   SURE.  MY TRAINING CONSISTED WHEN I INITIALLY GOT HIRED I

21     WAS TRAINED ON ALL OF THE PRODUCTS WITH OUR PREVIOUS TEAM

22     LEADER WHO IS NOW THE DIRECTOR AND YOU BASICALLY LEARN THE

23     PRODUCT HANDS ON, YOU TEST IT OUT, YOU ARE GIVEN AN ACCOUNT TO

24     USE AND PLACE TEST CALLS, AND IT'S PRETTY MUCH AN ONGOING

25     TRAINING.

1     THERE'S ALWAYS GOING TO INVOLVE -- BUT ONCE YOU'RE

2     PROFICIENT IN THE APPLICATION OF THE SERVICE, THAT TRAINING

3     PORTION IS PRETTY MUCH COMPLETED AND YOU'RE ABLE TO TAKE CALLS

4     AND DO LIVE CHATS WITH CUSTOMERS AND E-MAIL AND CONVERSATIONS

5     WITH CUSTOMER AND ASSIST THEM IN ANY TECHNICAL ISSUES THAT THEY

6     MIGHT HAVE WITH THE APPLICATION AND HOW TO RESOLVE THAT.

7     Q.   AND HOW LONG HAVE YOU WORKED WITH TELETECH?

8     A.   TWO AND A HALF YEARS ABOUT.

9     Q.   AND ARE YOU FAMILIAR WITH THE WAY THAT INDIVIDUALS BECAME

10    CUSTOMERS OF SPOOFCARD EVEN BEFORE YOU STARTED THERE?

11    A.   SURE.

12    Q.   YOU DESCRIBED A MOMENT AGO THAT YOU COULD BECOME A

13    CUSTOMERS THROUGH A WEB APPLICATION OR A MOBILE APPLICATION; IS

14    THAT RIGHT?

15    A.   RIGHT.

16    Q.   AND WHAT DOES THAT MEAN?

17    A.   SO THE DIFFERENCE IS VERY SLIGHT.  IT WOULD INVOLVE GOING

18    TO SPOOFCARD.COM FROM A DESKTOP COMPUTER.  IF IT'S A MOBILE

19    SITE THEN IT WOULD BE SPOOFCARD.COM FROM YOUR CELL PHONE OR

20    TABLET AND IT WOULD REDIRECT THE USER TO A MOBILE VERSION OF

21    THE WEBSITE BUT ESSENTIALLY THE LAYOUT IS PRETTY IDENTICAL.

22    Q.   OKAY.  THERE'S A BINDER IN FRONT OF YOU.  DO YOU SEE THAT?

23    A.   I DO.

24    Q.   AND WOULD YOU PLEASE TURN TO TAB 2.  AND IF YOU WOULD

25    PLEASE TAKE A MOMENT AND LOOK THROUGH THE SEVEN PAGES THAT ARE

1    IN TAB 2 AND LET ME KNOW WHEN YOU FINISH.

2    A.    OKAY.

3    Q.    DO YOU RECOGNIZE THE DOCUMENTS CONTAINED IN TAB 2?

4    A.    I DO.

5    Q.    WHAT ARE THESE DOCUMENTS?

6    A.    IT APPEARS TO BE A COPY OF THE CARD REPORT THAT WE

7    PROVIDED.

8    Q.    CARD, C-A-R-D?

9    A.    CARD, C-A-R-D.

10   Q.    AND WHAT IS A CARD REPORT?

11   A.    A CARD REPORT IS A SUMMARY OF ALL OF THE ACCOUNTS

12   INFORMATION.  IT INCLUDES ALL OF THE TRANSACTION INFORMATION

13   AND ANY CALLS, ANY ACCOUNT DETAILS, NAME, E-MAIL ADDRESS.  IT

14   INCLUDES BASICALLY ALL RECORDS OF THAT ACCOUNT FROM START TO

15   CURRENT.

16   Q.    AND SO CARD REPORTS ARE UNIQUE TO ACCOUNTS.  YOU'RE

17   DESCRIBING IT AS RECORDS OF A PARTICULAR ACCOUNT OR OF

18   MULTIPLE?

19   A.    OF ONE PARTICULAR ACCOUNT.

20   Q.    OKAY.  ARE THE DOCUMENTS CONTAINED IN EXHIBIT 2 RECORDS

21   THAT SPOOFCARD OR TELETCH MAINTAINS IN THE ORDINARY COURSE OF

22   BUSINESS?

23   A.    THAT'S CORRECT.

24         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

25   EXHIBIT 2 IN EVIDENCE.

```
1              THE COURT:  MR. ARCHER?

2              MR. ARCHER:  NO OBJECTION.

3              THE COURT:  IT'S RECEIVED.

4              MR. SCHENK:  AND PERMISSION TO PUBLISH, PLEASE?

5              THE COURT:  IT MAY BE PUBLISHED.

6         (GOVERNMENT'S EXHIBIT 2 WAS RECEIVED IN EVIDENCE.)

7    BY MR. SCHENK:

8    Q.   I WOULD LIKE YOU TO TALK US THROUGH SOME OF THESE

9    DOCUMENTS AND IF WE CAN JUST START WITH THAT VERY FIRST SECTION

10   CARDS DOWN THROUGH AND JUST ABOVE CALLS.  DO YOU SEE THAT?

11   A.   I DO.

12   Q.   OKAY.  WHAT ARE WE LOOKING AT HERE?

13   A.   OKAY.  CARDS IS SPECIFYING THE PARTICULAR CARD ITSELF THAT

14   WE PROVIDE WITH THE ACCESS NUMBER AND A PIN NUMBER.  IT

15   SPECIFIES THE PIN NUMBER ITSELF WHICH IS A NINE DIGIT LEGACY

16   PEN THAT WE PROVIDE AS A UNIQUE PEN FOR THE USER TO USE TO SET

17   UP THE CALL.

18   Q.   OKAY.  LET ME STOP YOU THERE.  YOU SAID LEGACY PIN.  WHAT

19   DOES THAT MEAN?

20   A.   SO LEGACY FOR TELETCH MEANS ACCOUNTS OLDER THAN 2012 AND

21   2012, IS WHEN WE SWITCHED OVER AND MIGRATED TO A NEW SYSTEM IN

22   WHICH ALL OF OUR CURRENT CUSTOMERS ARE NOW ON.  BUT PREVIOUSLY

23   WE USED ANOTHER SYSTEM, AND IT WAS CALLED SECRET GARDEN.  SO

24   ALL OF OUR ACCOUNTS FROM 2012 AND PRIOR ARE CONSIDERED LEGACY

25   ACCOUNTS.
```

1    Q.   ACCOUNTS FROM 2012 AND OLDER?

2    A.   YES.

3    Q.   ARE LEGACY ACCOUNTS?

4    A.   RIGHT.

5    Q.   WHAT IS THE DIFFERENCE NOW?  WHY WOULD SOMEONE HAVE A

6    LEGACY PIN IF THEY'RE FROM THE OLDER VERSION?

7    A.   PREVIOUSLY WE DIDN'T HAVE MOBILE APPLICATION.  WE HAD A

8    VERY BASIC WEBSITE AS WELL.  SO MOST OF OUR SPOOFCARD USERS HAD

9    A PHYSICAL CARD THAT WE PROVIDED TO THEM THAT THEY COULD

10   PURCHASE FROM DIFFERENT RETAILERS.  AND ONCE THEY PURCHASED THE

11   CARD ITSELF, ON THE BACK OF THE CARD IT WOULD HAVE A PHONE

12   NUMBER.  IT WOULD ALSO HAVE THAT PIN NUMBER.  IT WOULD HAVE A

13   NINE DIGIT PIN NUMBER WHICH THEY, WHEN THEY WOULD PLACE A CALL

14   TO THE ACCESS NUMBER, IT WOULD HAVE THAT PIN NUMBER, IT WOULD

15   PROMPT THEM TO SET UP THAT PIN NUMBER TO SET UP A CALL SO IT

16   KNEW WHAT ACCOUNT TO PULL CREDITS FROM.

17   Q.   SO YOU SAID THAT THE CARD, THE PHYSICAL CARD HAS A PHONE

18   NUMBER ON IT?

19   A.   CORRECT.

20   Q.   IS THAT THE SAME THING AS THE ACCESS NUMBER THAT YOU JUST

21   DESCRIBED?

22   A.   YES.

23   Q.   AND WHAT IS THAT?  WHAT IS THE USE OF AN ACCESS NUMBER?

24   A.   SO IN ORDER FOR A SPOOFCARD TO DIRECT A USER'S CALL OR

25   ROUTE A SPECIFIC CALL, THEY NEED THE PHONE ACCESS NUMBER FROM

1    THEIR OWN DEVICE, WHETHER THAT BE A CELL PHONE OR LANDLINE

2    PHONE.

3         ONCE THEY CALL THAT ACCESS NUMBER, IT IS GOING TO ASK THEM

4    TO ESSENTIALLY LOG IN WITH EITHER THAT LEGACY PIN NUMBER OR

5    THEY CAN ALSO CREATE THEIR OWN PHONE NUMBER AND PIN NUMBER TO

6    LOG INTO THEIR ACCOUNT.  ONCE THEY HAVE ENTERED THAT

7    INFORMATION, THEN IT WILL DIRECT THEM TO SET UP THAT CALL.

8    Q.   SO THE FIRST STEP IN MAKING A CALL WITH SPOOFCARD IS TO

9    CALL AN ACCESS NUMBER; IS THAT RIGHT?

10   A.   YES.

11   Q.   AND THEN WHAT IS THE SECOND STEP AFTER YOU CALL THAT

12   ACCESS NUMBER?

13   A.   IF YOU ARE CALLING FROM A NUMBER THAT IS REGISTERED TO

14   YOUR SPOOFCARD ACCOUNT, THE NEXT STEP WOULD JUST BE TO ENTER

15   THAT DESTINATION NUMBER.  BUT IF YOU'RE NOT CALLING FROM A

16   NUMBER THAT IS REGISTERED TO A SPOOFCARD ACCOUNT, THEN IT'S

17   GOING TO ASK YOU TO LOG IN WITH THE PIN NUMBER.

18   Q.   AND THAT'S WHAT WE'RE LOOKING AT IN THIS VERY FIRST

19   COLUMN?

20   A.   YES.

21   Q.   I UNDERSTAND.  THE SECOND COLUMN, WHAT IS THAT?

22   A.   THE SECOND COLUMN IS THE FACE VALUE OR THE CREDIT BALANCE

23   AND AT THE TIME THE REPORT WAS PRINTED, THAT WAS THE BALANCE

24   THAT WAS REMAINING ON THE ACCOUNT.

25   Q.   YOU TESTIFIED A MOMENT AGO THAT INDIVIDUALS COULD PURCHASE

1    CARDS, THESE PHYSICAL CARDS?

2    A.    UH-HUH.

3    Q.    WHAT DO YOU MEAN BY THAT?

4    A.    IN ORDER FOR ANYONE TO MAKE CALLS WITH SPOOFCARD, THEY

5    HAVE TO PURCHASE A CREDIT BALANCE.  SO WE HAVE BALANCES THAT

6    RANGE FROM INITIATION, WHICH IS THEY CAN PURCHASE A 4.95 CREDIT

7    PACKAGE, AND AFTER THEY PURCHASE THAT THEN IT WOULD GO UP TO

8    9.95, AND IT RANGES ALL OF THE WAY UP TO 9.95.  AND SO ONCE

9    THEY PURCHASE A CREDIT PACKAGE, THEN IF THAT'S THE CARD THAT

10   THEY'RE PURCHASING, THAT'S THE BALANCE THAT THEY HAVE ON THEIR

11   ACCOUNT.

12   Q.    AND THE FACE VALUE, THE FIELDS THERE, $7.83 IS WHAT?

13   A.    THAT'S THE REMAINING BALANCES OF CREDITS THAT THEY HAVE

14   NOT USED.

15   Q.    OKAY.  THE NEXT COLUMN IS ENTITLED CREATED.  WHAT DOES

16   THAT MEAN?

17   A.    THAT IS THE DATE THAT THE ACCOUNT ITSELF WAS CREATED.  SO

18   WHEN THE ACCOUNT WAS ACTUALLY REGISTERED WHEN THAT PURCHASE WAS

19   MADE FOR THE CARD ITSELF, THAT WAS THE DATE THAT THE ACCOUNT

20   WAS INITIATED.

21   Q.    OKAY.  AND THIS IS RELATED TO THE ONE ACCOUNT THAT IS

22   EXHIBIT 21 THROUGH 27?

23   A.    CORRECT.

24   Q.    OKAY.  AND THEN THE LAST USED COLUMN, WHAT DOES THAT MEAN?

25   A.    THAT IS THE DATE IN WHICH THE LAST CALL TOOK PLACE ON THE

1    ACCOUNT.

2    Q.   OKAY.  SPOOFCARD KEEPS RECORDS OF WHEN CALLS ARE MADE?

3    A.   YES.

4    Q.   AND THE LAST CARD TYPE, WHAT IS THAT?

5    A.   THAT IS THE TRANSACTION AND THE TRANSACTION WAS MADE

6    THROUGH THE WEBSITE SO THAT THEY COULD ACTUALLY AT THAT TIME

7    PURCHASE USING THE WEBSITE FOR THAT.

8    Q.   OKAY.  NOW, IF WE CAN ZOOM OUT AND ZOOM BACK IN TO CALLS

9    AND JUST THE FIRST TWO ENTRIES UNDER CALLS ALL OF THE WAY UNTIL

10   THE END, PLEASE.

11        NOW, IF WE CAN GO THROUGH -- FIRST OF ALL, WHAT

12   INFORMATION IS LISTED UNDER THIS NEXT HEADING CALLS?

13   A.   SO IT'S IDENTIFYING THAT SAME NUMBER THAT WE SAW UNDER

14   CARDS.  SO IT'S THAT LEGACY PIN THAT WE SAW.  IT IS SPECIFYING

15   THE TYPE OF -- IT'S LOGGING THE TYPE OF CALL THAT IT WAS

16   WHETHER IT WAS AN OUTGOING CALL OR JUST A CALL LISTENING TO A

17   RECORDING.

18        IT HAS THE START DATE AND TIME OF THAT CALL.

19   Q.   OKAY.  LET ME STOP YOU THERE.

20   A.   YES.

21   Q.   HOW MANY CALLS ARE LISTED HERE FOR THIS ACCOUNT?

22   A.   THERE ARE FOUR CALLS LISTED.

23   Q.   OKAY.  AND IS THAT ALL OF THE CALLS THAT SPOOFCARD HAS FOR

24   THIS ACCOUNT?

25   A.   FOR THIS ACCOUNT, NO.  WE ALSO LOGGED WHEN A CALL WAS

1      ACTUALLY LISTENED TO.  SO WHEN THEY LOG INTO THE ACCOUNT AND

2      LISTEN TO A RECORDING, THAT DOES IDENTIFY THAT AS WELL.

3      Q.   YOU SAID "THEY" IN YOUR ANSWER.  WHO IS "THEY"?

4      A.   SPOOFCARD.

5      Q.   OKAY.  AND DID SPOOFCARD PROVIDE THESE RECORDS TO THE

6      GOVERNMENT IN THIS CASE?

7      A.   WE DID.

8      Q.   OKAY.  AND DO YOU KNOW IF THAT WAS IN RESPONSE TO

9      SOMETHING?

10     A.   IT WAS IN RESPONSE TO A SUBPOENA THAT WE RECEIVED.

11     Q.   OKAY.  NOW, IF WE CAN WALK THROUGH THIS VERY FIRST ENTRY,

12     THE ONE THAT IS DATED FEBRUARY 23RD.  IF YOU CAN EXPLAIN TO US

13     WHAT CALL START AND CALL END MEANS FOR THAT FIRST CALL?

14     A.   SO IT ESSENTIALLY MEANS EXACTLY WHAT IT SAYS, WHAT TIME

15     AND DATE THE CALL STARTED AND THE NEXT COLUMN IS WHAT TIME AND

16     DATE THE CALL ENDED.

17     Q.   OKAY.  AND WHAT TIME SYSTEM IS USED TO RECORD THE ACTUAL

18     HOUR?

19     A.   EVERYTHING IS LISTED IN EASTERN STANDARD TIME.

20     Q.   AND THE NEXT COLUMN, DESTINATION NUMBER, WHAT DOES THAT

21     MEAN?

22     A.   THAT IS THE DESTINATION NUMBER THAT THEY WERE ACTUALLY

23     CALLING.  SO THAT IS THE RECIPIENT OF THE CALL.

24     Q.   OKAY.  THAT'S WHO THE CALLER -- THE SPOOFCARD MEMBER WAS

25     CALLING?

1    A.   CORRECT.

2    Q.   REAL CALLER ID, WHAT DOES THAT MEAN?

3    A.   THAT IS THE NUMBER THAT THEY SELECTED TO HAVE -- I'M

4    SORRY.  THAT IS THE NUMBER THAT THEY'RE ACTUALLY CALLING FROM.

5    SO THE DEVICE THAT THEY WERE USING, THAT IS THE PHONE NUMBER

6    THAT IS REGISTERED TO THAT DEVICE.

7    Q.   OKAY.  THE CALLER'S TELEPHONE NUMBER?

8    A.   THE CALLER'S TELEPHONE NUMBER, THAT'S CORRECT.

9    Q.   OKAY.  THE NEXT COLUMN, SPOOF CALLER ID, WHAT DOES THAT

10   MEAN?

11   A.   THAT'S THE NUMBER THAT THEY MANUALLY SELECTED TO ENTER AS

12   THE CALLER ID TO BE DISPLAYED ON THE RECIPIENT'S DEVICE.

13   Q.   OKAY.  WHAT DOES THAT MEAN?  WHAT IS A CALLER ID NUMBER?

14   A.   A CALLER ID IS A NUMBER THAT IS DISPLAYED SO EVERYONE'S

15   PHONE HAS A UNIQUE CALLER ID, WHICH IS A PHONE NUMBER.

16        AND WITH SPOOFCARD YOU HAVE THE ABILITY TO ENTER WHATEVER

17   NUMBER THAT YOU WANT TO HAVE DISPLAYED ON SOMEONE ELSE'S PHONE.

18   Q.   OKAY.  THE NEXT COLUMN VOICE CHANGER, WHAT DOES THAT MEAN?

19   A.   WE OFFER TWO VOICE CHANGERS WITH SPOOFCARD.  YOU HAVE THE

20   ABILITY TO CHOOSE BETWEEN A MALE AND A FEMALE VOICE CHANGER.

21   THE MALE VOICE CHANGER LOWERS THE PITCH OF YOUR NORMAL VOICE

22   MAKING IT SOUND MORE MASCULINE AND FEMALE DOES THE OPPOSITE, IT

23   HEIGHTENS THE PITCH OF YOUR NORMAL VOICE AND RAISES THE

24   FREQUENCY TO MAKE IT SOUND MORE FEMININE.

25   Q.   WHEN A CALLER MAKES A CALL ON SPOOFCARD, A CUSTOMER OR A

```
 1     MEMBER MAKES A CALL, DO THEY HAVE TO PICK MALE OR FEMALE?

 2     A.   THEY DON'T.  THEY CAN CHOOSE TO BYPASS THAT OPTION.  THEY

 3     DON'T HAVE TO SELECT THE VOICE CHANGER.

 4     Q.   AND THEN WHAT WILL THEIR VOICE SOUND?

 5     A.   THE NORMAL -- IT WILL SOUND EXACTLY LIKE IT SOUNDS.

 6     Q.   OKAY.  YOU DESCRIBED TO US A FEW MOMENTS AGO THAT WHEN YOU

 7     INITIATE A CALL, THE FIRST THING YOU DO IS CALL THE ACCESS

 8     NUMBER AND THE SECOND THING IS ENTER A PIN.  WHERE IN THE

 9     PROCESS DO THESE ADDITIONAL OPTIONS COME, THAT IS, WHEN WOULD I

10     ENTER THE DESTINATION NUMBER, THE NUMBER THAT I WANT TO APPEAR

11     ON THE CALLER ID OR THE SPOOF CALLER ID?

12     A.   SO IT'S PRETTY LINEAR.  ONCE THE ACCESS NUMBER IS CALLED

13     AND THE PIN IS ENTERED, IT ASKS THEM FOR THE DESTINATION NUMBER

14     THAT THEY WANT TO CALL, IT ASKS FOR THE SPOOFED CALLER ID THAT

15     THEY WANT TO HAVE DISPLAYED AS THE CALLER ID DEVICE, AND THEN

16     IT WILL ASK FOR THE VOICE CHANGER.  IT WILL ASK IF THEY WANT TO

17     HAVE A VOICE CHANGER ON THAT CALL.

18     Q.   OKAY.  IT SEEMS IN YOUR DESCRIPTION THAT YOU SKIPPED THE

19     REAL CALLER ID.  DOES THE INDIVIDUAL HAVE TO ENTER THAT IN AS

20     WELL?

21     A.   NO.  THE REAL CALLER ID IS NOT SOMETHING THAT IS PROMPTED.

22     SPOOFCARD IDENTIFIES THAT INFORMATION AS SOON AS THEY PLACE A

23     CALL TO THE ACCESS NUMBER SO IT DOESN'T ASK FOR IT.

24     Q.   OKAY.

25     A.   IT KNOWS THE NUMBER THAT THEY'RE CALLING FROM.
```

1    Q.   SO THE INFORMATION ON THIS CARD REPORT IS POPULATED OR

2    GATHERED FROM DIFFERENT SOURCES; IS THAT RIGHT?

3    A.   FROM ONE PRIMARY SOURCE, WHICH WOULD BE THE ACCESS NUMBER.

4    THE ACCESS NUMBER IS IDENTIFYING ALL OF THAT INFORMATION.

5    Q.   I'M SORRY, MY QUESTION WASN'T CLEAR.  WHAT I MEANT WAS THE

6    DESTINATION NUMBER IS SOMETHING THAT THE CARD REPORT GETS FROM

7    THE CUSTOMER.  THE CUSTOMER PICKS THE DESTINATION NUMBER; IS

8    THAT RIGHT?

9    A.   YES.

10   Q.   AND THE SAME IS TRUE FOR THE SPOOF CALLER ID, THE CARD

11   REPORT AT TELETCH DOESN'T POPULATE THAT FIELD.  THAT'S

12   SOMETHING THAT THE CUSTOMER MAKES?

13   A.   THAT'S SOMETHING THAT THE CUSTOMER MAKES.

14   Q.   BUT THAT'S NOT TRUE FOR REAL CALLER?

15   A.   CORRECT, REAL CALLER ID IS WHAT WE GATHERED FROM THE

16   DEVICE THAT THEY'RE USING.

17   Q.   AND AFTER THE CALL IS MADE, WHEN DOES THAT INFORMATION GET

18   POPULATED IN THE CARD?

19   A.   AS SOON AS IT'S ALL COMPLETED, IT GETS LOGGED IN THE

20   ACCOUNT.

21   Q.   THE LAST COLUMN IS RECORDING.  WHAT DOES THAT MEAN?

22   A.   SO WITH A SPOOFCARD, THE CALLER CAN USE RECORD THE CALL.

23   SO AT THE END OF SELECTING THOSE FEATURES THAT I -- THOSE

24   OPTIONS THAT I MENTIONED, AFTER THE VOICE CHANGER THEY WOULD BE

25   PROMPTED TO WHETHER THEY WOULD -- OR TO SELECT WHETHER OR NOT

1    THEY WANT THE CALL RECORDED.

2         IF THEY SELECT YES, THEN ONCE THAT CALL IS AN OUTGOING

3    CALL, IT THEN RECORDS FROM THERE.

4    Q.   OKAY.  SO DID THIS ACCOUNT HOLDER MAKE A CALL AT 4:26 P.M.

5    ON FEBRUARY 23RD, 2012?

6    A.   YES.

7    Q.   AND DID THAT INDIVIDUAL WHO MADE THE CALL ASK THAT THE

8    CALL THAT THEY WERE MAKING BE RECORDED?

9    A.   CORRECT.

10   Q.   AND HOW DO YOU KNOW THAT?

11   A.   BECAUSE IT'S LOGGED AND THOSE ARE THE OPTIONS THAT WERE

12   SELECTED ON THAT SPECIFIC CALL.

13   Q.   OKAY.  WHAT FORMAT IS THE FILE OF THE RECORDING KEPT IN?

14   A.   IT'S AN MP3 FILE.

15   Q.   DO YOU KNOW WHETHER THE GOVERNMENT SUBPOENAED THAT FROM

16   TELETCH IN THIS CASE AS WELL?

17   A.   YES, IT WAS SUBPOENAED AS WELL.

18   Q.   OKAY.  IF WE CAN ZOOM OUT AGAIN AND NOW LET'S GO INTO THE

19   VERY BOTTOM SECTION OF PAYMENTS.

20        I'M GOING TO ASK YOU TO DO A VERY SIMILAR THING.  WOULD

21   YOU WALK US THROUGH THIS BUT BEFORE JUST TELL US GENERALLY WHAT

22   DOES PAYMENTS MEAN?

23   A.   PAYMENTS LOGS AND IDENTIFIES ANY TRANSACTIONS THAT ARE ON

24   THE ACCOUNT.  SO IF THEY ARE USING A CREDIT CARD PURCHASE OR A

25   PAYPAL PURCHASE, THAT WILL BE LOGGED ON THE ACCOUNT AS WELL.

1     Q.   OKAY.  WOULD YOU WALK US THROUGH THIS, NOW THE FIRST

2     COLUMN IS PIN NUMBER?

3     A.   RIGHT.  SO PIN NUMBER IS THE SAME NUMBER ON THE OTHER

4     FIELDS THAT WE WENT THROUGH SO YOU SEE THE PIN THAT THEY WERE

5     PROVIDED.

6          THE NEXT COLUMN OVER IS THE TRANSACTION TIME.  SO, AGAIN,

7     IT'S LOGGING THE DATE AND THE TIME WHEN THE TRANSACTION WAS

8     MADE.  IT WAS LOGGING THE PAYMENT TYPE.  SO IN THIS CASE IT WAS

9     A CREDIT CARD PAYMENT.  THE AMOUNT THAT THEY PURCHASED.  THE

10    FULL NAME ON THE ACCOUNT.  THAT WAS ENTERED BY THE USER.

11         AN AUTHENTICATION NUMBER FIELD IS ALSO LISTED THERE WHICH

12    AT TIMES IT'S NECESSARY FOR A BANK TO PROVIDE AN AUTHENTICATION

13    NUMBER ON A CREDIT CARD TRANSACTION, AND IN THIS CASE IT WAS

14    NOT NECESSARY AND SO WE WERE NOT PROVIDED WITH THAT

15    INFORMATION.

16         IT HAS THE E-MAIL ADDRESS THAT IS REGISTERED TO THAT

17    ACCOUNT, AND WE ALSO LOG THE IP ADDRESS AT THE TIME OF THE

18    TRANSACTION AND ALSO -- I'M SORRY -- UNDERNEATH THE TRANSACTION

19    TIME IT HAS THE ADDRESS THAT IS REQUIRED, THE BILLING ADDRESS

20    THAT IS REQUIRED IN ORDER FOR THE TRANSACTION TO GO THROUGH.

21    Q.   OKAY.  A MOMENT AGO I HAD YOU EXPLAIN TO US THE DIFFERENCE

22    BETWEEN FIELDS THAT A CUSTOMER PROVIDED THE INFORMATION AND

23    THAT SPOOFCARD PULLED ON ITS OWN.

24    A.   UH-HUH.

25    Q.   I'M GOING TO ASK YOU A SIMILAR QUESTION HERE.

```
 1           SO, FOR INSTANCE, THE FULL NAME, WHAT IS THE FULL NAME

 2      HERE?

 3      A.   THE FULL NAME IS DOUG YORK.

 4      Q.   AND IS THAT SOMETHING THAT SPOOFCARD PULLED DURING THE

 5      ACCOUNT OR IS THAT SOMETHING THAT THE CUSTOMER PROVIDED TO

 6      SPOOFCARD?

 7      A.   THAT'S PROVIDED BY THE CUSTOMER.

 8      Q.   OKAY.  HOW ABOUT THE E-MAIL ADDRESS?

 9      A.   THAT'S ALSO PROVIDED BY THE CUSTOMER.

10      Q.   HOW ABOUT THE IP ADDRESS?

11      A.   THAT'S SOMETHING THAT SPOOFCARD POPULATES ON ITS OWN.

12      Q.   AND SPOOFCARD GETS THE IP ADDRESS FROM WHERE?

13      A.   WE GET THE IP ADDRESS FROM THE WEBSITE ON WHICH THEY ARE

14      OR THE COMPUTER THAT IS BEING MADE TO MAKE THE TRANSACTION.  SO

15      WE'RE LOGGING THE IP ADDRESS OF THEIR COMPUTER.

16      Q.   AND WHICH IS THE CASE OF THE ADDRESS THAT IS LISTED THERE?

17      IS THAT SOMETHING THAT THE CUSTOMER PROVIDES OR DOES SPOOFCARD

18      PULL THAT?

19      A.   THEY PROVIDE THE BILLING ADDRESS INFORMATION.

20      Q.   THE CUSTOMER DOES?

21      A.   CORRECT.

22      Q.   IF YOU WOULD NOW TURN TO 2-3 AND IF WE CAN SHOW THAT TO

23      THE JURY.  WHAT ARE WE LOOKING AT HERE?  FIRST OF ALL, IS THIS

24      THE CARD REPORT CONTINUED?

25      A.   YES.
```

Case 5:15-cv-00272-JGB-DTB Document 68-1 Filed 02/16/16 Page 156 of 259

1    Q.    AND WHAT ARE WE LOOKING AT HERE?

2    A.    THAT WOULD BE THE ACCOUNT SUMMARY FIELD OR THE TAB THAT WE

3    PROVIDE ON THE CARD REPORT AND IT IDENTIFIES THE FIRST AND LAST

4    NAME REGISTERED TO THE ACCOUNT AS WELL AS AN E-MAIL ADDRESS;

5    THE REMAINING DOLLAR BALANCE ON THE ACCOUNT.  IT SPECIFIES IF

6    THE ACCOUNT IS CURRENTLY ACTIVE, AND IT ALSO SPECIFIES IF THE

7    ACCOUNT WAS MARKED AS FRAUDULENT AND THE NUMBER SINCE THE ORDER

8    IT ALSO STANDS FOR WHEN THE ACCOUNT WAS CREATED IN OUR NEW

9    DATABASE.

10   Q.    LET'S START WITH THE "IS FRAUD" CATEGORY.  WHAT IS THE

11   ANSWER THERE?

12   A.    NO.

13   Q.    AND HOW DOES SPOOFCARD DETERMINE WHETHER TO POPULATE THAT

14   FIELD WITH A YES OR A NO?

15             MR. ARCHER:  OBJECTION.  FOUNDATION.

16             THE COURT:  OVERRULED.  YOU CAN ANSWER THAT.

17             THE WITNESS:  WE HAVE A FRAUD DEPARTMENT.  WE HAVE A

18   SYSTEM IN PLACE THAT WAS CREATED TO MONITOR AND IDENTIFY

19   FRAUDULENT TRANSACTIONS AND ACTIVITY ON AN ACCOUNT, AND WE HAVE

20   DIFFERENT TEAM MEMBERS THAT GO THROUGH AND MAKE A DETERMINATION

21   OF WHETHER AN ACCOUNT IS FRAUDULENT OR NOT.

22        SO AFTER LOOKING AT THIS ACCOUNT AND ALL OF THE

23   INFORMATION ON IT, IT WAS DECIDED THAT THE ACCOUNT WAS NOT

24   FRAUDULENT.

25   BY MR. SCHENK:

1    Q.   WHAT TYPE OF FRAUD IS SPOOFCARD WORRIED ABOUT?

2    A.   WE'RE MOSTLY CONCERNED ABOUT --

3              MR. ARCHER:  OBJECTION.  RELEVANCE, YOUR HONOR.

4              THE COURT:  OVERRULED.

5              THE WITNESS:  SPOOFCARD IS MOSTLY WORRIED ABOUT

6    CREDIT CARD FRAUD.  SO WHENEVER AN ACCOUNT IS CREATED, WHETHER

7    IT BE A MOBILE SITE, WEBSITE APPLICATION, WHEN A TRANSACTION IS

8    MADE, WE'RE LOOKING TO IDENTIFY WHETHER THAT IS A LEGITIMATE

9    TRANSACTION OR NOT.

10         SO WE'RE GOING THROUGH ALL OF THE CALLS.  WE'RE GOING

11   THROUGH THE TRANSACTION INFORMATION AND LOOKING TO SEE IF

12   ANYTHING DOESN'T MATCH OR IT LOOKS SUSPICIOUS AND MAKING A

13   DETERMINATION WHETHER THEY'RE FRAUDULENT OR NOT.

14   BY MR. SCHENK:

15   Q.   OKAY.  AND THEN THE NEXT AND LAST COLUMN, MEMBER SINCE

16   DATE.  THAT DATE IS WHAT?

17   A.   JUNE 12TH, 2012.

18   Q.   SO IT SAYS THAT THE INDIVIDUAL, DOUGLAS YORK, WAS A MEMBER

19   SINCE JUNE 12TH, 2012, BUT WE JUST LOOKED AT A CALL FROM

20   FEBRUARY OF 2012.  HOW IS THAT POSSIBLE?

21             MR. ARCHER:  OBJECTION.  FOUNDATION.

22             THE COURT:  OVERRULED.

23             THE WITNESS:  SO WE PREVIOUSLY HAD AN OLDER SYSTEM,

24   AS I MENTIONED EARLIER, CALLED SECRET GARDEN AND ALL OF THOSE

25   ACCOUNTS PRIOR TO 2012 AND BEFORE THAT WERE KEPT IN SECRET

1    GARDEN.

2         WE CREATED A NEW SYSTEM AND HAD TO MIGRATE ALL OF THAT

3    INFORMATION OVER TO THE NEW DATABASE THAT WAS CREATED AND

4    JUNE 12TH, 2012, WAS THE DATE THAT THAT MIGRATION ACTUALLY

5    HAPPENED.

6    BY MR. SCHENK:

7    Q.   SO FOR LEGACY ACCOUNTS, THE MEMBER SINCE DATE IS A

8    MIGRATION?

9    A.   CORRECT.

10   Q.   IF YOU WOULD NOW TURN TO 2-4.  IT'S THE VERY NEXT PAGE.

11        WHAT INFORMATION -- IS THIS STILL PART OF THE CARD REPORT?

12   A.   IT IS.

13   Q.   AND WHAT INFORMATION ARE WE LOOKING AT HERE?

14   A.   WE'RE LOOKING AT A SPECIFIC CALL THAT WAS MADE.

15   Q.   BY WHOM?

16   A.   BY THE USER, I GUESS.  THE NAME ON THE ACCOUNT WAS

17   DOUGLAS YORK.

18   Q.   OKAY.  IF YOU WOULD WALK THROUGH THESE DIFFERENT COLUMNS

19   FOR US.  FIRST, WHAT IS ACCESS?

20        MR. ARCHER:  YOUR HONOR, I WOULD OBJECT AND MOVE TO

21   STRIKE THAT LAST ANSWER AS PERSONAL KNOWLEDGE.  HE'S SPECIFYING

22   THAT THE CALL WAS MADE BY SOMEONE.

23        THE COURT:  HE SAID I GUESS.  I'LL SUSTAIN THE

24   OBJECTION, AND YOU CAN ASK A FOLLOW-UP QUESTION.  AND IT'S

25   BASED ON THE RECORDS.

00189

```
 1     BY MR. SCHENK:

 2     Q.   OKAY.  IF YOU WOULDN'T MIND, PLEASE, TELL US WHAT IS THE

 3     FIRST COLUMN?

 4     A.   THE FIRST COLUMN IS THE ACCESS NUMBER THAT WAS CALLED IN

 5     ORDER TO PLACE THE CALL THAT WE'RE LOOKING AT.

 6     Q.   OKAY.  THE SECOND COLUMN?

 7     A.   THAT'S THE ACTUAL CALLER ID THAT WAS LOGGED FROM THE

 8     DEVICE THAT THEY USED TO PLACE THE CALL.

 9     Q.   AND IF YOU WOULDN'T MIND NOW TAKE A MOMENT AND IF YOU

10     COULD KEEP YOUR HAND BOTH AT 2-4 BUT ALSO FLIP BACK TO 2-1 AND

11     TELL ME IF THE, THE REAL CALLER ID MATCHES ON 2-1 AND 2-4.

12     A.   YES.

13     Q.   WHAT IS THAT NUMBER?

14     A.   THAT IS 1-408-710-9450.

15     Q.   AND THAT'S THE SAME NUMBER THAT WE SEE ON 2-04?

16     A.   CORRECT.

17     Q.   AND THE NEXT COLUMN SPOOF NUMBER, WHAT DOES THAT MEAN?

18     A.   THAT IS -- THAT WAS THE NUMBER THAT WAS DISPLAYED AS TO BE

19     THE NUMBER ON THE CALLER ID'S RECIPIENT'S PHONE.

20     Q.   AND WHAT IS THE NUMBER HERE?

21     A.   1-708-565-1040.

22     Q.   AND DESTINATION NUMBER, WHAT IS THAT?

23     A.   THAT IS THE NUMBER THAT WAS ENTERED TO CALL.  SO THAT'S

24     THE PERSON THAT THEY CALLED.

25     Q.   AND WHAT IS THE NUMBER HERE?
```

1    A.   THAT'S 1-408-353-6292.

2    Q.   OKAY.  THE NEXT COLUMN IS STATUS.  WHAT DOES THAT MEAN?

3    A.   THE STATUS AND THE CALL ITSELF WAS COMPLETED.  OFTENTIMES

4    CALLS DON'T GO THROUGH WHETHER IT BE AN ISSUE WITH THE

5    DESTINATION THAT THEY'RE REACHING OR A SYSTEM ERROR.  SO THE

6    LOG SAYS IN THIS CASE IT WAS COMPLETED.

7    Q.   AND THE NEXT ONE IS RECORDING.  WHAT DOES THAT MEAN?

8    A.   THAT MEANS THAT THEY CHOSE TO HAVE THE CALL RECORDED.

9    Q.   AND THE START TIME, PLEASE, WHAT IS THAT?

10   A.   THAT IS FEBRUARY 23RD, 2012, 17:26.

11   Q.   OKAY.  AND THE NEXT COLUMN IS VOICE CHANGER.  WHAT DOES

12   THAT MEAN?

13   A.   THAT MEANS THAT THEY SELECTED EITHER TO HAVE A VOICE

14   CHANGER OR NOT AND IN THIS CASE A FEMALE OR A WOMAN VOICE

15   CHANGE WAS SELECTED.

16   Q.   AND, AGAIN, IF YOU WOULD DO THE SAME THING.  IF WE FLIP

17   BACK TO 2-1, DOES THE INFORMATION THAT WE JUST DISCUSSED MIRROR

18   WHAT APPEARS IN 2-1, THAT IS, THE DESTINATION NUMBER, THE START

19   TIME, THE VOICE CHANGER?

20   A.   IT DOES.

21   Q.   AND THE LAST COLUMN IS DURATION ON 2-4.  WHAT IS THAT?

22   A.   IT WAS THE -- IT'S LISTED AS 56 SECONDS, AND WE LIST THE

23   DURATION OF THE ACTUAL CALL IN SECONDS.

24   Q.   AND WOULD YOU NOW TURN TO 2-6.  IS 2-6 ALSO PART OF THE

25   CARD REPORT?

1    A.   IT IS.

2    Q.   WHAT INFORMATION ARE WE LOOKING AT HERE?

3    A.   WE'RE LOOKING AT THE TRANSACTION INFORMATION.

4    Q.   AND WHAT DOES THAT MEAN?  WHAT IS TRANSACTION INFORMATION?

5    A.   SO THE PAYMENT ITSELF WE'RE IDENTIFYING HOW THAT PAYMENT

6    WAS MADE.

7    Q.   AND WHEN SOMEONE PURCHASED A CARD OR BECAME A MEMBER OF

8    SPOOFCARD?

9    A.   CORRECT.

10   Q.   OKAY.  I'M GOING TO ASK YOU INFORMATION ABOUT A FEW

11   COLUMNS AND IF WE CAN START WITH FIRST AND LAST NAME, WHAT WAS

12   THAT?  WHAT WAS ENTERED?

13   A.   THE FIRST NAME IS DOUG AND THE LAST NAME IS YORK.

14   Q.   AND IS THAT SOMETHING THAT SPOOFCARD POPULATES OR IS THAT

15   GIVEN TO SPOOFCARD BY THE INDIVIDUAL WHO IS BECOMING A MEMBER?

16   A.   IT'S GIVEN BY THE INDIVIDUAL.

17   Q.   OKAY.  THE ADDRESS, CITY, AND STATE.  WOULD YOU PLEASE

18   READ THOSE?

19   A.   SURE.  THE ADDRESS IS 113 LACROSSE DRIVE, THE CITY IS

20   MORGAN HILL, AND THE STATE IS CALIFORNIA.

21   Q.   AND IS THAT SOMETHING THAT THE USER PROVIDES TO SPOOFCARD

22   OR IS THAT SOMETHING THAT SPOOFCARD POPULATES ON ITS OWN?

23   A.   THE USER WILL PROVIDE THAT.

24   Q.   AND THEN THE LAST COUPLE OF COLUMNS, CREDIT CARD TYPE AND

25   CREDIT CARD NUMBER, WHAT IS THAT TYPE OF INFORMATION?

1    A.   SO IT'S IDENTIFYING THE ACTUAL TYPE OF CARD THAT IS BEING

2    USED AND THE NUMBER THAT THEY NEED TO PROVIDE IN ORDER TO MAKE

3    THE PURCHASE.

4         SO WE IDENTIFIED IT WAS A MASTER CARD AND THEN WE HAVE A

5    FULL CREDIT CARD NUMBER AS WELL.

6    Q.   AND DOES THE USER PROVIDE THAT INFORMATION OR DOES

7    SPOOFCARD PULL THAT?

8    A.   THEY WOULD PROVIDE THE CARD NUMBER AND BASED ON THE FIRST

9    FEW DIGITS OF THE CARD, THEY WOULD IDENTIFY THE TYPE OF CARD

10   THAT IT IS.

11   Q.   OKAY.  AND NOW IF YOU WOULD LASTLY TURN TO 2-7.  IS THIS

12   PAGE PART OF THE CARD REPORT?

13   A.   IT IS.  IT IS A CONTINUATION OF 2-6.

14   Q.   SO THE EXHIBIT 2-6 IS A VERY LONG LINE?

15   A.   YES.

16   Q.   AND THIS IS JUST THE END OF THAT LINE?

17   A.   CORRECT.

18   Q.   AND WHAT IS THE REMAINING INFORMATION HERE?  WHAT IS

19   CREDIT CARD EXPIRATION AND AMOUNT?

20   A.   THE CREDIT CARD EXPIRATION IS THE EXPIRATION DATE OF THE

21   CARD AND IN DECEMBER OF 2014, THAT WAS THE DATE THAT THEY

22   ENTERED AS THE EXPIRATION DATE.  IT'S IDENTIFYING THE AMOUNT

23   THAT THEY PURCHASED AS WELL.

24   Q.   OKAY.  AND WHOSE IP ADDRESS IS LOGGED HERE?

25   A.   THAT WOULD BE THE USERS COMPUTER'S IP ADDRESS.

Case 5:15-cr-00226-EJD Document 168-1 Filed 02/16/18 Page 188 of 284
Case 5:15-cr-00226-EJD Document 168-1 Filed 02/16/18 Page 188 of 284
DIRECT COOPER BY MR. SCHENK                                    303

1    Q.   ONE MOMENT, PLEASE.

2         (PAUSE IN PROCEEDINGS.)

3              MR. SCHENK:  NO FURTHER QUESTIONS.

4              THE COURT:  MR. ARCHER, DO YOU HAVE ANY QUESTIONS?

5              MR. ARCHER:  I DO, YOUR HONOR.

6              THE COURT:  CAN WE TAKE A TEN MINUTE BREAK?  LADIES

7    AND GENTLEMEN, WE'RE GOING TO TAKE A TEN MINUTE BREAK, AND THEN

8    WE'LL COME BACK AND ENGAGE IN OUR CROSS-EXAMINATION.

9         SO WE'LL BE IN RECESS.

10        (RECESS FROM 10:31 A.M. UNTIL 10:45 A.M.)

11             THE COURT:  WE'RE BACK ON THE RECORD.  OUR JURY AND

12   ALTERNATES ARE PRESENT.  ALL COUNSEL AND THE DEFENDANT IS

13   PRESENT.  THE WITNESS IS ON THE STAND.

14        CROSS-EXAMINATION, MR. ARCHER?

15             MR. ARCHER:  YES, YOUR HONOR.  THANK YOU.

16                     **CROSS-EXAMINATION**

17   BY MR. ARCHER:

18   Q.   GOOD MORNING AGAIN, MR. COOPER.

19   A.   GOOD MORNING.

20   Q.   SO IN FEBRUARY OF 2012, YOU DID NOT WORK AT TELETCH OR

21   SPOOFCARD; IS THAT CORRECT?

22   A.   I DID NOT.

23   Q.   SO YOU NEVER ACTUALLY USED THE SYSTEM AS IT WAS IN PLACE

24   IN FEBRUARY OF 2012?

25   A.   RIGHT.

1    Q.   AND THERE WAS A SERVICE MIGRATION LATER IN THAT YEAR;

2    CORRECT?

3    A.   CORRECT.

4    Q.   AND YOU DIDN'T WORK THERE WHEN THAT SERVICE MIGRATION

5    OCCURRED; CORRECT?

6    A.   RIGHT.

7    Q.   OKAY.  AND SO ALL OF THE INFORMATION THAT YOU HAVE ABOUT

8    THE RECORDS THAT YOU JUST TESTIFIED TO IS STUFF THAT HAS BEEN

9    TOLD TO YOU BY OTHER PEOPLE; IS THAT CORRECT?

10   A.   YES AND NO.

11   Q.   WELL, YOU DIDN'T ACTUALLY WORK WITH THE SYSTEM IN 2012;

12   CORRECT?

13   A.   I DIDN'T, CORRECT.

14   Q.   OKAY.  SO THESE WERE THINGS THAT WERE RELATED TO YOU BY

15   OTHER PEOPLE LATER ON; CORRECT?

16   A.   CORRECT.  RIGHT.

17   Q.   AND YOU SAID THAT YOU BELIEVED THAT THERE WAS SOME SORT OF

18   PHYSICAL CARD THAT WAS SOLD BACK IN 2012 WITH THE SPOOFCARD

19   NUMBER ON IT?

20   A.   NOT THAT I BELIEVE.  I KNOW.

21   Q.   OKAY.

22   A.   WE STILL HAVE THEM.

23   Q.   AND THAT CARD HAD THE NUMBER THAT WAS REQUIRED TO DIAL

24   INTO THE SYSTEM; CORRECT?

25   A.   CORRECT.

00195

1    Q.   AND THE CARD ALSO HAD ON IT WHAT NUMBER YOU WOULD PUT IN

2    TO MAKE A SPOOFCARD PHONE CALL; RIGHT?

3    A.   RIGHT.

4    Q.   AND SO ANYBODY WITH THAT ACTUAL SPOOFCARD CARD NUMBER,

5    THAT PHYSICAL CARD READING OFF OF IT, COULD MAKE THAT SPOOFCARD

6    CALL; RIGHT?

7    A.   RIGHT.

8    Q.   AND I'M SORRY.  YOU DON'T HAVE ANY INDEPENDENT BASIS TO

9    TELL US TODAY THAT THE INFORMATION IN THE RECORDS THAT YOU JUST

10   TESTIFIED ABOUT IS ACCURATE; CORRECT?

11              MR. SCHENK:  OBJECTION.

12              THE COURT:  DO YOU WANT TO REPHRASE THE QUESTION,

13   PLEASE.

14              MR. ARCHER:  I'D BE HAPPY TO.

15              THE COURT:  ACCURATE AS -- ARE YOU TALKING ABOUT

16   TYPOGRAPHICAL ERRORS ON THE FORM OR THAT'S WHAT I'M SUGGESTING.

17              MR. ARCHER:  SURE.

18   Q.   YOU WEREN'T AT THE COMPANY WHEN THESE LOG ENTRIES

19   OCCURRED; CORRECT?

20   A.   THAT'S CORRECT.

21   Q.   OKAY.  SO YOU DON'T HAVE ANY PERSONAL KNOWLEDGE, THEN,

22   TESTIFYING TODAY THAT THE SYSTEM WAS WORKING CORRECTLY IN

23   LOGGING THESE?

24              MR. SCHENK:  OBJECTION.  IT CALLS FOR SPECULATION.

25              THE COURT:  SUSTAINED.

1           MR. ARCHER:  YOUR HONOR, I'M NOT ASKING WHETHER

2      THESE ARE CORRECT OR NOT.  I'M ASKING WHETHER HE KNOWS FROM

3      PERSONAL KNOWLEDGE WHETHER THESE ENTRIES ARE CORRECT.

4           THE COURT:  HE'S THE CUSTODIAN OF RECORDS.  HE

5      BROUGHT THE RECORDS HERE FROM -- AS THEY WERE SUBPOENAED BY THE

6      GOVERNMENT.

7           ARE YOU ASKING AND TESTING HIS KNOWLEDGE AS TO THE

8      ACCURACY OF THE INFORMATION THAT IS CONTAINED IN THE RECORDS AS

9      THEY APPEAR?

10          MR. ARCHER:  I AM, YOUR HONOR, BECAUSE THE

11     GOVERNMENT WENT THROUGH A SERIES OF QUESTIONS WITH HIM ASKING

12     WHAT THESE MEAN AND WHAT THE ENTRIES WERE AND WHAT THE ENTRIES

13     MEAN AND SO HE TESTIFIED BEYOND JUST INTRODUCING THE RECORD TO

14     BE SHOWN TO THE JURY.

15          I THINK IT'S APPROPRIATE TO ASK HIM WHETHER HE ACTUALLY

16     KNOWS WHETHER THESE ENTRIES ARE ACCURATE OR WHETHER HE'S

17     READING OFF A PIECE OF PAPER.

18          THE COURT:  HE TOLD US ABOUT HIS TRAINING.  HE TOLD

19     US HE WAS TRAINED AND HE HAD EXTENSIVE TRAINING, I THINK, HE

20     SUGGESTS AS TO THE RECORDS.

21          YOU CAN CERTAINLY ASK HIM WHAT HE WAS TRAINED TO DO AND IF

22     THAT INFORMS HIS KNOWLEDGE OF THE RECORDS.  PERHAPS THAT'S WHAT

23     YOU'RE DOING?

24          MR. ARCHER:  MY INTENTION WAS TO ASK WHETHER HE

25     KNOWS WHETHER THESE RECORDS ARE ACCURATE OR NOT OR WHETHER HE'S

00197

1          READING OFF OF A RECORD THAT HE'S PRODUCED IN COURT.

2                  THE COURT:  YOU CAN ASK THAT QUESTION.

3                  MR. ARCHER:  OKAY.

4      Q.   YOU TESTIFIED TO A NUMBER OF THINGS IN THESE RECORDS;

5      CORRECT?

6      A.   CORRECT.

7      Q.   AND YOU DON'T KNOW WHETHER THE COMPUTER SYSTEM WAS

8      ACCURATE IN ENTERING THIS DATA BACK THEN, DO YOU?

9                  MR. SCHENK:  YOUR HONOR, OBJECTION.  THAT CALLS FOR

10     THE WITNESS TO SPECULATE ON THE COMPUTERS.

11                 THE COURT:  SUSTAINED AS TO THAT.

12     BY MR. ARCHER:

13     Q.   YOU DON'T KNOW WHETHER ANY OF THESE ENTRIES ARE CORRECT OR

14     NOT?

15     A.   I DO IN THE SENSE OF WHEN WE GENERATE A REPORT, WE MATCH

16     IT WITH WHAT WE HAVE IN OUR DATABASE SO THE INFORMATION THAT WE

17     HAVE IN THE DATABASE MATCHES THE REPORT THAT WE PRINTED.

18     Q.   AND CAN YOU TESTIFY TODAY THAT THE DATABASE HAS NEVER MADE

19     ANY MISTAKES?

20     A.   AS FAR AS I'M AWARE.  I'M NOT AWARE OF ANY MISTAKES.

21     Q.   SO YOU DON'T -- WHAT YOU'RE TESTIFYING TO TODAY IS THAT --

22     I'M ASKING YOU NOT WHETHER YOU'RE AWARE OF MISTAKES.  I'M

23     ASKING YOU WHETHER YOU CAN TESTIFY TO THIS COURT, TO THIS JURY

24     TODAY, THAT THE DATABASE HAS NEVER MADE ANY MISTAKES?

25                 MR. SCHENK:  OBJECTION.  THAT'S WHY IT'S

1     SPECULATION.  HE ANSWERED WHAT HE COULD TESTIFY TO.

2              MR. ARCHER:  I'M ASKING WHETHER HE CAN ANSWER THAT

3     AND IF HE SAYS I CAN THEN --

4              THE COURT:  WELL, I THINK HIS PREVIOUS ANSWER WAS

5     THAT HE'S NOT AWARE OF ANY MISTAKES.

6              MR. ARCHER:  OKAY.  I HAVE NO FURTHER QUESTIONS.

7              MR. SCHENK:  NO REDIRECT.

8              THE COURT:  IS THIS WITNESS EXCUSED OR SUBJECT TO

9     RECALL?

10             MR. SCHENK:  THE WITNESS MAY BE EXCUSED AND NOT

11    SUBJECT TO RECALL.

12             MR. ARCHER:  YES, YOUR HONOR.

13             THE COURT:  SIR, THANK YOU FOR COMING IN.  YOU'RE

14    EXCUSED.

15             THE WITNESS:  THANK YOU.

16             THE COURT:  YOU'RE WELL.  DOES THE GOVERNMENT HAVE

17    ANOTHER WITNESS TO CALL?

18             MS. PENNA:  YES, YOUR HONOR.  THE GOVERNMENT CALLS

19    SPECIAL AGENT DONNA AGUIRRE.

20             THE COURT:  ALL RIGHT.  IF YOU WOULD COME FORWARD,

21    PLEASE.  AND OUR COURTROOM DEPUTY WILL PLACE YOU UNDER OATH.

22        **(GOVERNMENT'S WITNESS, DONNA AGUIRRE, WAS SWORN.)**

23             THE WITNESS:  I DO.

24             THE COURT:  PLEASE HAVE A SEAT AND MAKE YOURSELF

25    COMFORTABLE.

```
 1            AND FEEL FREE TO THE ADJUST THE MICROPHONE AS YOU NEED.

 2      I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

 3            WHEN YOU ARE COMFORTABLE, PLEASE STATE YOUR NAME AND THEN

 4      SPELL IT PLEASE.

 5                 THE WITNESS:  DONNA AGUIRRE, D-O-N-N-A,

 6      A-G-U-I-R-R-E.

 7                 THE COURT:  THANK YOU.  COUNSEL.

 8                       DIRECT EXAMINATION

 9      BY MS. PENNA:

10      Q.   GOOD MORNING.

11      A.   GOOD MORNING.

12      Q.   WHERE ARE YOU EMPLOYED?

13      A.   I'M WITH THE TREASURY INSPECTOR GENERAL FOR TAX

14      ADMINISTRATION.

15      Q.   AND COULD YOU TELL US WHAT YOU DO IN THIS JOB?

16      A.   WITH TIGTA, THAT'S WHAT WE CALL IT, I'M A SPECIAL AGENT

17      AND WE OVERSEE THE I.R.S., THE TAX ADMINISTRATION OF THE I.R.S.

18      WHERE WE WANT TO UPHOLD THE MISSION OF THE I.R.S. BY MAKING

19      SURE THAT THERE'S NO FRAUD BASED OR ABUSE RELATING TO THE

20      I.R.S.

21      Q.   HOW LONG HAVE YOU HAD THIS POSITION?

22      A.   I'VE BEEN A SPECIAL AGENT FOR 14 YEARS.

23      Q.   WITH THIS AGENCY?

24      A.   NO.  WITH THIS AGENCY IT'S BEEN ABOUT FIVE AND A HALF

25      YEARS.
```

1    Q.   WHERE WERE YOU PREVIOUSLY?

2    A.   PREVIOUSLY I WAS A SPECIAL AGENT WITH THE INTERNAL REVENUE

3    SERVICE CRIMINAL INVESTIGATION DIVISION.

4    Q.   AND DID YOU HAVE SPECIAL TRAINING FOR YOUR CURRENT

5    POSITION?

6    A.   YES.

7    Q.   AND COULD YOU DESCRIBE THAT TRAINING?

8    A.   ALL SPECIAL AGENTS GO THROUGH THE CRIMINAL INVESTIGATION

9    TRAINING PROGRAM AND SO THAT'S ABOUT THREE MONTHS LONG, AND

10   THEN AFTER THAT YOU GO INTO YOUR AGENCY SPECIFIC TRAINING.  SO

11   WITH MY CURRENT AGENCY I HAD TO GO FOR ADDITIONAL TRAINING TO

12   LEARN MORE ABOUT WHAT TIGTA DOES.

13   Q.   ARE YOU FAMILIAR WITH THE CASE AGAINST DOUGLAS YORK?

14   A.   YES, I AM.

15   Q.   AND HOW ARE YOU FAMILIAR WITH THE CASE?

16   A.   I WAS THE CASE AGENT.

17   Q.   AND WHAT WAS THE FIRST THING THAT YOU DID WHEN YOU WERE

18   ASSIGNED AS CASE AGENT?

19   A.   I REVIEWED THE E-MAILS THAT WERE RECEIVED THROUGH OUR

20   TIGTA HOTLINE, AND THEN WE MADE CONTACT WITH THE COMPLAINANT OR

21   IN THIS CASE IT WAS MR. HESSENFLOW.

22   Q.   AND WHAT DID YOU REVIEW ON THAT E-MAIL?

23   A.   I LOOKED AT THE E-MAIL AND I SAW WHERE IT CAME FROM, THE

24   CONTACT INFORMATION FOR THE COMPLAINT.  I READ THE BODY OF THE

25   E-MAIL TO SEE WHAT THE ALLEGATIONS WERE AND FROM THERE I DID MY

Case 5:15-cv-00205-BJD Document 68-1 Filed 02/16/18 Page 196 of 284

```
1     INVESTIGATIVE STEPS TO FIND THE FACTS.

2     Q.   COULD YOU DESCRIBE WHAT YOUR NEXT STEP WAS?

3     A.   WELL, MY NEXT STEP WAS TO CALL MR. HESSENFLOW AND GET MORE

4     DETAILS FROM HIM SO THAT HE COULD ELABORATE MORE ON THE E-MAIL.

5     Q.   COULD YOU ELABORATE ON THAT?

6     A.   SURE.  I MADE CONTACT WITH MR. HESSENFLOW.  HE INDICATED

7     HE HAD A RECORDING OF THE PHONE CALL SO WE REQUESTED A COPY OF

8     THAT AND THEN HE ALSO INDICATED THAT HE HAD LOGS THAT HE HAD

9     KEPT.

10         AND SO, OF COURSE, I ASKED HIM WHY OR WHEN THE LOGS BEGAN.

11    SO I REVIEWED THAT AS WELL.  THEN I WENT THROUGH MY

12    INVESTIGATIVE STEPS.

13    Q.   OKAY.  JUST TO BACK UP A LITTLE BIT.  YOU SAID THAT YOU

14    HAD REQUESTED A RECORDING THAT HAD BEEN REFERENCED AND THAT YOU

15    SPOKE TO MR. HESSENFLOW ABOUT.  DID YOU RECEIVE THAT REPORTING?

16    A.   I DID.

17    Q.   AND DID YOU REVIEW IT?

18    A.   I DID.

19    Q.   AND WHAT DID YOU REVIEW?

20    A.   I LISTENED TO THE RECORDING NUMEROUS TIMES ALONG WITH THE

21    TRANSCRIPT AND THAT MR. HESSENFLOW PROVIDED IN THE E-MAIL, AND

22    THEN I WROTE DOWN NOTES IN TERMS OF WHO THE CALLER SAID THEIR

23    NAME WAS AND WHAT NUMBER THEY WERE CALLING FROM, AND THEN I

24    RESEARCHED TO SEE IF, IN FACT, THE PERSON WHOSE NAME WAS GIVEN

25    ON THE VOICEMAIL WAS AN I.R.S. EMPLOYEE.
```

```
1    Q.   AND WHAT WAS THE NAME GIVEN ON THE -- IN THE SPECIFIC
2    CASE?
3    A.   IT WAS REPORTED -- AND I HEARD GIGI SMITH AND A VARIATION
4    LIKE POSSIBLY JUDY SMITH.
5    Q.   WAS IT UNCLEAR?
6    A.   IT WAS UNCLEAR.
7    Q.   AND YOU STATED THAT YOU DID A SEARCH OF THESE NAMES.  WHAT
8    DID -- COULD YOU ELABORATE ON THAT?
9    A.   WE HAD -- BECAUSE WE OVERSEE THE I.R.S., WE HAVE ACCESS TO
10   DATABASES TO IDENTIFY CURRENT AND PAST I.R.S. EMPLOYEES.  SO I
11   RESEARCHED IN THAT DATABASE.
12   Q.   AND WHAT DID YOU FIND?
13   A.   I FOUND THAT WE DID NOT HAVE ANY CURRENT EMPLOYEES UNDER
14   THE NAME GIGI SMITH OR JUDY SMITH.
15   Q.   AND WHAT DID THAT SIGNIFY IN THE CONTEXT OF THE BEGINNING
16   OF THIS INVESTIGATION?
17   A.   WELL, I ALSO LOOKED TO SEE THE PHONE NUMBER TO SEE IF WE
18   HAD ANY I.R.S. OFFICES WHERE THAT AREA CODE CAME FROM.
19   Q.   ARE YOU REFERRING TO THE PHONE NUMBER THAT WAS PROVIDED AS
20   ON THE CALLER ID OF THE VOICEMAIL THAT YOU HAD BEEN DISCUSSING
21   THAT YOU HAD REVIEWED?
22   A.   THAT'S CORRECT.
23   Q.   AND WHAT WAS THAT PHONE NUMBER?
24   A.   I BELIEVE IT WAS AREA CODE 708-565-1040.
25   Q.   AND WHAT IS THIS PHONE NUMBER?
```

00203

1     A.   WELL, THAT WAS THE PHONE NUMBER THAT MR. HESSENFLOW'S

2     CALLER ID CAPTURED AS THE ORIGINATION OF THE CALL.

3          SO I LOOKED AT THAT PHONE NUMBER, LOOKED AGAIN IN OUR

4     DATABASE TO SEE IF IT -- WE HAD ANY I.R.S. OFFICES ASSIGNED TO

5     THAT PHONE NUMBER AND WHERE IT WAS LOCATED AND I LOOKED AND I

6     SAW THAT AREA CODE 708 CAME FROM AN ILLINOIS AREA, AND SO I

7     LOOKED TO SEE IF WE HAD ANY OFFICES IN ILLINOIS THAT HAD

8     THAT -- THE LAST DIGITS MATCHING THAT PHONE NUMBER.

9     Q.   WHAT WAS THE PURPOSE OF THE STEPS THAT YOU HAD JUST

10    DESCRIBED TO US?

11    A.   WELL, WE DO THIS TO FIND THE FACTS TO MAKE SURE THAT WHAT

12    IF IT WAS A LEGITIMATE PHONE CALL AND THE RECIPIENT MIGHT HAVE

13    JUST ASSUMED THAT, YOU KNOW, IT WAS A SCAM AS OPPOSED TO A

14    LEGITIMATE CALL.

15         SO WE GO THROUGH STEPS TO CORROBORATE AND TO NEGATE ANY

16    FALSE ALLEGATIONS THAT WE MAY RECEIVE SO IN CASE, YOU KNOW,

17    THERE WAS AN I.R.S. EMPLOYEE WHO HAD A LEGITIMATE BUSINESS

18    PURPOSE TO CALL MR. HESSENFLOW.

19    Q.   AND WHAT WERE YOU ABLE TO DETERMINE FROM THIS

20    INVESTIGATION IN THAT REGARD?

21    A.   FROM THOSE INITIAL STEPS I WAS ABLE TO DETERMINE THAT IT

22    WAS NOT A LEGITIMATE I.R.S. PHONE CALL.

23    Q.   OKAY.  YOU ALSO DISCUSSED WITH US THAT YOU'D RECEIVED SOME

24    LOGS FROM MR. HESSENFLOW.  COULD YOU ELABORATE ON THAT?

25    A.   WELL, THESE ARE LOGS THAT MR. HESSENFLOW HAD KEPT WHICH

```
 1    INCLUDED ALL INTERACTION THAT HE HAD WITH MR. YORK, WHETHER IT

 2    BE --

 3             MR. ARCHER:  OBJECTION.  FOUNDATION.

 4             THE COURT:  OVERRULED.  YOU CAN CONTINUE WITH YOUR

 5    ANSWER.

 6             THE WITNESS:  THESE LOGS WERE ALL INTERACTIONS WITH

 7    MR. YORK SO THEY COULD BE PHONE CALLS, TEXT MESSAGES OR CITINGS

 8    OR JUST PERSONAL INTERACTIONS WITH MR. YORK.

 9    BY MS. PENNA:

10    Q.   WHAT DID YOU DO NEXT IN YOUR INVESTIGATION?

11    A.   I DETERMINED THAT BECAUSE THE COMPLAINT CAME IN FROM

12    MR. HESSENFLOW, ALLEGED IT COULD HAVE BEEN MR. YORK WHO MADE

13    THE PHONE CALL.  WHAT I DID WAS IDENTIFIED MR. YORK'S CELL

14    PHONE NUMBER SO THAT I COULD DETERMINE WHETHER INDEED THE

15    CALLER WAS MR. YORK.

16    Q.   AND WHAT DID YOU REVEAL?

17    A.   WELL, I GOT CONFIRMATION FROM A NUMBER OF SOURCES TO LET

18    ME KNOW THAT MR. YORK WAS ASSIGNED A CERTAIN CELL PHONE NUMBER

19    WHICH MR. HESSENFLOW PROVIDED INITIALLY IN HIS E-MAIL.

20             MR. ARCHER:  OBJECTION.  FOUNDATION, HEARSAY, MOVE

21    TO STRIKE.

22             THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR THIS

23    LAST INFORMATION?

24    BY MS. PENNA:

25    Q.   WERE YOU ABLE TO OBTAIN THE DEFENDANT'S PHONE RECORDS --
```

00205

1    A.    YES.

2    Q.    -- AT ANY TIME IN YOUR INVESTIGATION?

3    A.    I DID.

4    Q.    AND HOW WERE YOU ABLE TO OBTAIN THESE?

5    A.    I GOT INFORMATION FROM A NUMBER OF PEOPLE TO IDENTIFY HIS

6    CELL PHONE NUMBER, AND THEN I ALSO GOT INFORMATION ON THE CELL

7    PROVIDER FOR MR. YORK'S CELL PHONE AND HIS ACCOUNT NUMBERS SO I

8    SUBPOENAED VERIZON WIRELESS FOR THOSE RECORDS.

9    Q.    DID YOU RECEIVE RECORDS BASED ON THE SUBPOENA?

10   A.    I DID.

11   Q.    WHAT INFORMATION DID YOU REQUEST SPECIFICALLY?

12   A.    I WAS INTERESTED IN THAT ONE PARTICULAR PHONE CALL SO I

13   REQUESTED FROM VERIZON WIRELESS ABOUT HALF A MONTH BEFORE THAT

14   PHONE CALL AND HALF A MONTH AFTER.

15         SO THE RECORDS ONLY COVERED THE TIME PERIOD FROM FEBRUARY

16   16, 2012 THROUGH MARCH 16, 2012.

17   Q.    AND DID YOU RECEIVE THESE PHONE RECORDS?

18   A.    I DID.

19   Q.    COULD YOU TURN TO THE BINDER IN FRONT OF YOU TO TAB 3.  DO

20   YOU RECOGNIZE THESE DOCUMENTS?

21   A.    I DO.

22   Q.    ARE THESE THE RECORDS THAT YOU REVIEWED?

23   A.    YES.

24   Q.    HOW DO YOU KNOW THAT?

25   A.    BECAUSE THEY WERE E-MAILED TO ME DIRECTLY FROM VERIZON.

1    Q.   AND WHAT DID YOU REVIEW ON THESE RECORDS?

2    A.   I VERIFIED THAT THE ACCOUNT NUMBER WAS WHICH I HAD

3    REQUESTED RECORDS FOR AND THE PHONE NUMBER INFORMATION THAT WAS

4    PROVIDED BY VERIZON IS THE INFORMATION THAT I REQUESTED.

5         I SAW THAT THE SUBSCRIBER INFORMATION WAS PAMELA BEALE,

6    AND I KNEW THAT THAT WAS MR. YORK'S MOM.

7         AND I REVIEWED ALL OF THE PHONE CALLS AND THE LOGS, AND I

8    SPECIFICALLY WAS LOOKING TO PHONE CALLS THAT WERE MADE TO

9    MR. HESSENFLOW'S RESIDENCE AND CELL PHONE NUMBER.

10        THE COURT:   PARDON ME, COUNSEL.  THE OBJECTION IS

11   OVERRULED, AND THE FOUNDATION HAS BEEN LAID.

12   BY MS. PENNA:

13   Q.   AND COULD YOU WALK US THROUGH WHAT YOU LOOKED FOR ON THESE

14   RECORDS IN REGARD TO THOSE PHONE NUMBERS AND WHAT YOU FOUND?

15   A.   WELL, WHAT I ALSO KNEW IS I LOOKED AT MR. HESSENFLOW'S

16   LOG, AND I DID A RECONCILIATION WITH THE VERIZON'S RECORD AND

17   ALL OF THE PHONE CALLS OF MR. HESSENFLOW AS HAVING RECEIVED, I

18   SAW THAT IN THESE VERIZON LOGS.

19        MR. ARCHER:   OBJECTION.  HEARSAY, MOVE TO STRIKE,

20   YOUR HONOR.

21        THE COURT:   OVERRULED.  YOU CAN CONTINUE.

22        THE WITNESS:   I SAW THAT ON THE CALL LOG THAT

23   MR. YORK MADE THOSE PHONE CALLS TO, AGAIN, MR. HESSENFLOW'S

24   RESIDENCE.

25        MR. ARCHER:   AGAIN, SAME OBJECTION.  SHE'S

```
1    TESTIFYING AS TO THE CONTENTS OF THE DOCUMENT THAT SHE RECEIVED

2    FROM MR. HESSENFLOW.  IT'S HEARSAY WITHOUT AN EXCEPTION.

3              THE COURT:  OVERRULED.

4              THE WITNESS:  IN ADDITION -- GO AHEAD.

5    BY MS. PENNA:

6    Q.   SORRY.  GO AHEAD.

7    A.   SO I LOOKED AT ALL OF THOSE PHONE CALLS BUT THEN IN

8    PARTICULAR I WAS VERY INTERESTED IN THE I.R.S. IMPLICATION CALL

9    THAT WAS RECEIVED ON FEBRUARY 23RD, 2012, AT OR AROUND 1:25

10   P.M.

11   Q.   AND WHAT DID YOU FIND IN THESE RECORDS IN REFERENCE TO

12   THAT CALL?

13   A.   I SAW THAT THERE WERE TWO CALLS MADE ON THAT SAME DATE

14   ABOUT THE SAME TIME.  SO THERE WAS -- CAN I FLIP TO THE RIGHT

15   PAGE?

16   Q.   OF COURSE.  I BELIEVE IT'S 313.

17   A.   SO AS I STATED ON THAT DATE AND ABOUT THE SAME TIME, AT

18   1:24 P.M. AND 1:25 P.M. THERE WERE TWO CALLS MADE TO A PHONE

19   NUMBER WHICH I DID NOT RECOGNIZE.

20   Q.   AND WHAT WAS THAT PHONE NUMBER?

21   A.   IT WAS TO 866-967-6594.

22   Q.   OKAY.  AND YOU STATED -- COULD YOU TELL US WHAT TIMES THE

23   TWO CALLS WERE MADE THAT YOU'RE REFERENCING TO?

24   A.   THE FIRST ONE WAS AT 1:24 P.M., AND THE SECOND ONE WAS AT

25   1:25 P.M.
```

```
1              MS. PENNA:  YOUR HONOR, COULD WE HAVE PERMISSION TO

2    PUBLISH THE EXHIBIT?  IT WOULD BE HELPFUL FOR THE JURY.

3              THE COURT:  THE EXHIBIT WAS ADMITTED.

4              MS. PENNA:  YES, YOUR HONOR.

5              THE COURT:  SO IT MAY BE PUBLISHED.

6              MS. PENNA:  THANK YOU.  WE'RE ON PAGE 313.

7    Q.  SO I'LL HAVE YOU START WITH THE FIRST ONE THAT OCCURRED ON

8    1:24.  COULD YOU WALK US THROUGH WHAT YOU REVIEWED IN TERMS OF

9    THIS CALL?

10   A.  I SAW THE DATE OF FEBRUARY 23RD, AND I KNOW THESE RECORDS

11   ARE FOR THE YEAR 2012.  AND THEN FOR THE TIME I SEE THAT THERE

12   IS ONE FOR 1:24 P.M., WHICH IS IN THE NEXT COLUMN, AND THEN THE

13   1:25 P.M., WHICH IS IN THE NEXT ROW, AND THE PHONE NUMBERS

14   DIALED WERE EXACTLY THE SAME FOR BOTH CALLS, WHICH WAS THE

15   866-967-6594.

16   Q.  DO THE RECORDS PROVIDE A DURATION OF THESE CALLS?

17   A.  YES, THEY DO.

18   Q.  WHAT WERE THOSE?

19   A.  THE FIRST CALL MADE ON 1:24 WAS FOR ONE MINUTE AND THE

20   SECOND CALL AT 1:25 WAS FOR THREE MINUTES.

21   Q.  NOW, YOU'VE MENTIONED THAT YOU HAD ALSO REVIEWED THESE

22   RECORDS FOR CORROBORATION FOR OTHER CALLS THAT WERE MADE TO

23   MR. HESSENFLOW.  COULD YOU TELL US WHAT YOU FOUND IN THAT

24   REGARD JUST ON THIS ONE BILL?

25   A.  ON THIS ONE MONTH'S TIME PERIOD I, I NOTED THAT THERE WERE
```

```
1    25 PHONE CALLS MADE TO MR. HESSENFLOW'S RESIDENCE AND DURING

2    THAT SAME TIME PERIOD THERE WERE SIX PHONE CALLS MADE TO

3    MR. HESSENFLOW'S CELL PHONE NUMBER AND THEN THE TWO CALLS MADE

4    TO THIS 866 NUMBER.

5    Q.   AND WERE YOU ABLE TO IDENTIFY THAT 866 NUMBER?

6    A.   I DID.

7    Q.   AND WHAT DID YOU FIND?

8    A.   I WENT ON THE INTERNET AND FOUND AND SEARCHED AND FOUND

9    THAT IT WAS AN ACCESS FOR SPOOFCARD.

10   Q.   AND WHAT IS SPOOFCARD?

11   A.   SPOOFCARD IS A THIRD PARTY SERVICE WHERE YOU CAN GET

12   ACCESS TO IT AND YOU BUY BASICALLY LIKE A MEMBERSHIP OR SERVICE

13   POINTS AND YOU CAN CALL THEIR ACCESS NUMBER AND FROM THERE YOU

14   CAN MAKE PHONE CALLS TO ANYBODY WHERE YOU INDICATE WHATEVER YOU

15   WANT TO SHOW UP ON YOUR -- AS THE CALLER ID FOR THE RECIPIENT'S

16   PHONE LINE.

17          MR. ARCHER:  OBJECTION, YOUR HONOR.  FOUNDATION AND

18   IT'S CUMULATIVE.

19          THE COURT:  OVERRULED.  DO YOU HAVE ANOTHER

20   QUESTION?

21          MS. PENNA:  YES, YOUR HONOR.  THANK YOU.

22   Q.   WHAT INFORMATION DID YOU NEXT REQUEST IN YOUR

23   INVESTIGATION?

24   A.   AFTER I IDENTIFIED THAT PHONE NUMBER AS AN ACCESS FOR

25   SPOOFCARD, I SUBPOENAED RECORDS FOR SPOOFCARD.
```

```
1    Q.   AND WHAT SPECIFICALLY DID YOU SUBPOENA?

2    A.   I SUBPOENAED ACTUALLY JUST SUBSCRIBER INFORMATION, CALL

3    DURATION, FEATURES THAT WERE SELECTED FOR ALL OF THE CALLS, FOR

4    ANY PAYMENT INFORMATION SO I COULD GET THE BILLING INFORMATION

5    AND THE PERSON WHO PURCHASED THE SERVICES FROM SPOOFCARD.

6         MY SUBPOENA REQUEST JUST REQUESTED RECORDS FOR THE

7    SUBSCRIBER WHO HAD THE PHONE NUMBER 408-710-9450.

8    Q.   AND DID YOU RECEIVE RECORDS IN RESPONSE TO THAT SUBPOENA?

9    A.   I DID.

10   Q.   COULD YOU PLEASE TURN TO THE BINDER TAB NUMBER 2.  IT'S

11   BEEN MARKED AS GOVERNMENT'S EXHIBIT 2.  DO YOU RECOGNIZE THESE

12   DOCUMENTS?

13   A.   I DO.

14   Q.   ARE THESE THE RECORDS THAT YOU RECEIVED FROM THE SPOOFCARD

15   SUBPOENA?

16   A.   YES.

17   Q.   AND WHAT DID YOU REVIEW ON THESE DOCUMENTS?

18   A.   I LOOKED AT EVERY LINE AND COLUMN JUST TO GET A BETTER

19   IDEA OF WHAT WAS LAID OUT BEFORE ME AND THEN I SAW THE CALLS

20   THAT MATCHED THE TIME THAT WAS CALLED ON MR. YORK'S VERIZON

21   WIRELESS CALL LOG, AND THEN I SAW THEIR MP3 RECORDINGS.  SO I

22   CLICKED ON THOSE TO LISTEN TO THEM.

23   Q.   SO BACKING UP JUST A LITTLE BIT.  YOU REVIEWED THE

24   DOCUMENTS.  WERE YOU ABLE TO IDENTIFY WHOSE ACCOUNT THIS --

25   THESE DOCUMENTS BELONGED TO?
```

1    A.   YES.

2    Q.   AND THEN YOU SAID THAT THERE WAS AN MP3 RECORDING THAT WAS

3    ATTACHED TO THE DOCUMENTS THAT WERE IN REFERENCE TO THE CALLS

4    THAT WERE MADE.

5         IS THAT CORRECT?

6    A.   CORRECT.

7              MS. PENNA:  YOUR HONOR, AT THIS TIME WE WILL BE

8    SEEKING TO PLAY THE AUDIO FILE AND THE TRANSCRIPT.  I KNOW WE

9    MENTIONED WE WANTED TO HAVE A JURY INSTRUCTION.

10             THE COURT:  IS THERE A TRANSCRIPT?  WHAT TRANSCRIPT

11   ARE YOU REFERENCING?

12             MS. PENNA:  WE WILL -- AS WITH THE GOVERNMENT'S

13   EXHIBIT 4, WE WILL BE PLAYING A RECORDING THAT WILL BE HAVING A

14   TRANSCRIPT SCROLLING ALONG THE BOTTOM OF THE SCREEN.

15             THE COURT:  I SEE.  AND THE TRANSCRIPT, IT'S A

16   VISUAL TRANSCRIPT?  IT'S NOT A HARD COPY TRANSCRIPT?

17             MS. PENNA:  IT IS NOT.  IT IS A VISUAL.

18             THE COURT:  OKAY.  ALL RIGHT.  LADIES AND GENTLEMEN,

19   YOU'RE NOW GOING TO -- YOU'RE ABOUT TO HEAR A RECORDING THAT

20   HAS BEEN RECEIVED IN EVIDENCE.  YOU'LL SEE, AS COUNSEL

21   INDICATED, A VISUAL TRANSCRIPT, WHICH IS BEING PROVIDED TO YOU

22   TO HELP IDENTIFY THE SPEAKERS AND THE WORDS THAT ARE SPOKEN IN

23   THIS.

24        IF YOU HEAR SOMETHING DIFFERENT FROM WHAT APPEARS IN THE

25   TRANSCRIPT, WHAT YOU HEAR IS CONTROLLING.  LISTEN CAREFULLY

```
 1      BECAUSE THE TRANSCRIPT WILL NOT BE AVAILABLE DURING YOUR

 2      DELIBERATIONS.

 3           YOU PREVIOUSLY HEARD, I BELIEVE, THE SAME EXHIBIT, WHEN WE

 4      WERE LAST IN SESSION, AND I DID NOT INSTRUCT YOU AND GIVE YOU

 5      THIS INSTRUCTION BEFORE.  I WANT YOU TO, AS BEST YOU CAN,

 6      INCORPORATE BY REFERENCE THIS INSTRUCTION AS TO THE EVIDENCE

 7      THAT WAS RECEIVED WHEN THIS RECORDING WAS FIRST PLAYED.

 8           AGAIN, WHAT YOU HEAR OF THE RECORDING IS WHAT CONTROLS,

 9      NOT THE TRANSCRIPT.  THERE IS A PIECE OF EVIDENCE THAT I THINK

10      WAS INTRODUCED THAT HAS I BELIEVE IT'S MR. HESSENFLOW'S OWN

11      OPINION ABOUT WHAT THE RECORDING IS.

12           AGAIN, WHAT CONTROLS IS YOUR HEARING OF THE RECORDING.  SO

13      WE CAN PLAY THAT NOW.  DO YOU HAVE THAT CUED UP?

14               MS. PENNA:  YES, YOUR HONOR.  I FIRST NEED TO LAY

15      THE FOUNDATION FOR THE EXHIBIT.

16               THE COURT:  SURE.

17               MS. PENNA:  THANK YOU, YOUR HONOR.  MAY I HAVE

18      PERMISSION TO APPROACH?

19               THE COURT:  YES.  YES.

20               MS. PENNA:  THANK YOU.

21      Q.   I'M HANDING YOU A DISK.  DO YOU RECOGNIZE THAT DISK?

22      A.   YES.

23      Q.   AND WHAT IS IT?

24      A.   IT'S A CD OF THE MP3 RECORDING OF THE PHONE CALL.

25      Q.   HOW DO YOU KNOW THAT?
```

1    A.   BECAUSE I LISTENED TO IT AND THEN I INITIALED IT.

2    Q.   THANK YOU.

3         PERMISSION TO ADMIT THIS EXHIBIT, YOUR HONOR?

4              THE COURT:  YES.  YOU CAN PLAY IT.  I THINK IT'S

5    BEEN ADMITTED.

6              MS. PENNA:  YOUR HONOR, THIS IS GOVERNMENT'S

7    EXHIBIT 1.  IT'S A DIFFERENT RECORDING.  THE PRIOR RECORDING

8    WAS GOVERNMENT'S EXHIBIT 4.

9              THE COURT:  4 WAS ADMITTED.  THIS IS EXHIBIT 1?

10             MS. PENNA:  YES, YOUR HONOR.

11             THE COURT:  ANY OBJECTION?

12             MR. ARCHER:  NO, YOUR HONOR.

13             THE COURT:  IT WILL BE ADMITTED, AND IT MAY BE

14   PUBLISHED AT THIS TIME.

15             MS. PENNA:  THANK YOU, YOUR HONOR.

16        (GOVERNMENT'S EXHIBIT 1 WAS RECEIVED IN EVIDENCE.)

17        (AUDIO PLAYING.)

18             THE COURT:  PARDON ME FOR INTERRUPTING.  LET'S SEE

19   IF WE CAN TURN THE VOLUME UP SOMEHOW.  ADJUST THE SPEAKERS.

20        BEFORE YOU PLAY IT, WOULD IT BE HELPFUL TO PUT IT ON OUR

21   SYSTEM ON THE MICROPHONE?

22        ALL RIGHT.  LET'S TRY IT AGAIN.

23        (AUDIO PLAYING.)

24             THE COURT:  THAT CONCLUDES THE RECORDING?

25             MS. PENNA:  YES, YOUR HONOR.

```
1                    THE COURT:  ALL RIGHT.

2                    MS. PENNA:  THANK YOU.

3      Q.  WAS THIS A COPY OF THE RECORDING THAT YOU REVIEWED DURING

4      YOUR INVESTIGATION THAT YOU RECEIVED FROM SPOOFCARD?

5      A.  YES, IT WAS.

6      Q.  AND HAD YOU ALSO REVIEWED THE RECORDING THAT HAD BEEN

7      PROVIDED BY MR. HESSENFLOW?

8      A.  YES, I DID.

9      Q.  HOW DID THOSE RECORDINGS COMPARE?

10     A.  THEY'RE A LITTLE DIFFERENT IN THE RESPECT THAT

11     MR. HESSENFLOW'S RECORDING HAD THE DATE AND TIMESTAMP THAT HIS

12     PHONE RECEIVED IT AND SO, THEREFORE, YOU DID NOT HEAR

13     MR. HESSENFLOW'S VOICEMAIL GREETING.  IT JUST WENT RIGHT INTO

14     THE CALL FROM -- THROUGH SPOOFCARD.

15     Q.  AND HOW DID THE CONTENT OF THAT CALL COMPARE OF THE TWO

16     RECORDINGS?  SORRY.

17     A.  THE SPOOFCARD CALL WAS A LITTLE MORE CLEAR BUT OTHERWISE

18     IT WAS IDENTICAL.

19     Q.  AND AS PART OF YOUR JOB, ARE YOU FAMILIAR WITH THE JOB

20     FUNCTIONS OF VARIOUS EMPLOYEES OF THE I.R.S.?

21     A.  YES, I AM.

22     Q.  AND HOW ARE YOU FAMILIAR WITH THAT?

23     A.  BECAUSE WE OVERSEE THE I.R.S. AND WE INTERACT WITH THEM

24     PRETTY MUCH ON A DAILY BASIS.  WE HAVE TO UNDERSTAND THE

25     DIFFERENT BUSINESS FUNCTIONS AND POSITIONS WITHIN THE I.R.S.
```

1    Q.   WOULD A PERSON EMPLOYED BY THE I.R.S. REQUEST A TAX RETURN

2    DURING A LEGITIMATE INVESTIGATION?

3    A.   YES, THEY WOULD.

4    Q.   AND WOULD THEY DO THAT OVER THE PHONE?

5    A.   THEY COULD.

6    Q.   WOULD INVESTIGATING TAX RECORDS BE CONSISTENT WITH SOMEONE

7    WHO IS LEGITIMATELY EMPLOYED BY THE I.R.S.?

8    A.   YES.

9    Q.   AND AT ANY TIME WERE YOU ABLE TO DETERMINE IF MR. -- OR IF

10   DOUGLAS YORK -- I KNOW WE DISCUSSED WHETHER THERE WAS A PERSON

11   NAMED GIGI SMITH OR A PERSON NAMED JUDY SMITH THAT WAS EMPLOYED

12   BY THE I.R.S.

13        WERE YOU ABLE TO DETERMINE IF A PERSON NAMED DOUGLAS YORK

14   WAS EMPLOYED BY THE I.R.S.?

15   A.   I DID CHECK INTO THAT, AND WE DON'T HAVE OR HAVE EVER HAD

16   ANYBODY NAMED DOUGLAS SMITH WITH THE I.R.S. OR I MEAN

17   DOUGLAS YORK OR DOUG YORK WITH THE I.R.S.

18   Q.   OKAY.  MOVING BACK TO THE RECORDS THAT YOU REVIEWED FROM

19   SPOOFCARD, DID YOU INVESTIGATE THE IP ADDRESS THAT WAS

20   CONTAINED IN THEIR CARD REPORT?

21   A.   YES.

22   Q.   AND WHAT PAGE WAS THAT ON?

23   A.   EXHIBIT 2-1.

24   Q.   AND CAN YOU TELL US WHAT THAT IP ADDRESS WAS?

25   A.   THE IP ADDRESS IS 71.92.228.25.

1    Q.   THANK YOU.  DID THIS IP ADDRESS LATER BECOME RELEVANT IN

2    THIS INVESTIGATION?

3    A.   YES, IT DID.

4    Q.   AND CAN YOU TELL US?

5    A.   WELL, THIS GOES BACK TO MR. HESSENFLOW'S INFORMATION THAT

6    HE PROVIDED TO ME ON A CD AND THAT INCLUDED THE CRAIGSLIST POST

7    FOR MR. HESSENFLOW'S PORCH FOR A DOLLAR.

8    Q.   AND DID YOU INVESTIGATE THIS?  I TAKE THIS TO BE A CLAIM

9    THAT MR. HESSENFLOW HAD PROVIDED.  AND THEN DID YOU LOOK INTO

10   THE LEGITIMACY OF THAT CLAIM?

11   A.   I DID.

12   Q.   AND WHAT DID YOU DO?

13   A.   I GOT RECORDS FROM CRAIGSLIST AND INCLUDING WHERE THE POST

14   CAME FROM AND JUST INFORMATION RELATED TO THAT ONE PARTICULAR

15   POST ACCORDING TO THAT POSTING ID.

16   Q.   AND YOU SENT THEM A SUBPOENA?

17   A.   I DID.

18   Q.   COULD YOU PLEASE TURN TO WHAT HAS BEEN MARKED AS

19   GOVERNMENT'S EXHIBIT 7.  IT'S THE TAB 7 IN YOUR BINDER.

20        DO YOU RECOGNIZE THAT DOCUMENT?

21   A.   I DO.

22   Q.   WHAT IS IT?

23   A.   PURSUANT TO MY SUBPOENA CRAIGSLIST PROVIDED THIS

24   INFORMATION.

25   Q.   AND HOW WERE YOU ABLE TO RECOGNIZE THAT?

1    A.    BECAUSE I RECEIVED IT VIA E-MAIL TO MY INBOX.

2    Q.    OKAY.

3          PERMISSION TO ADMIT EXHIBIT 7, YOUR HONOR?

4               THE COURT:  ANYTHING FURTHER ON 7?

5               MR. ARCHER:  NO, YOUR HONOR.

6               THE COURT:  IT'S ADMITTED.

7               MS. PENNA:  AND PERMISSION TO PUBLISH?

8               THE COURT:  IT MAY BE PUBLISHED.

9          (GOVERNMENT'S EXHIBIT 7 WAS RECEIVED IN EVIDENCE.)

10              MS. PENNA:  THANK YOU.

11   Q.    WHAT DID YOU REVIEW ON THIS DOCUMENT?

12   A.    I LOOKED AT EVERY LINE TO ATTEMPT TO DETERMINE WHO POSTED

13   THIS AD.

14   Q.    AND CAN YOU WALK US THROUGH WHAT YOU FOUND AND WHAT YOU --

15   A.    SURE.  SO THE POSTING ID MATCHED THE POSTING ID OF THAT

16   SCREEN PRINT THAT MR. HESSENFLOW PROVIDED TO ME.

17         SO THERE'S THE NUMBER.

18         AND THEN THE POSTER E-MAIL IS FROM WHAT I UNDERSTAND FROM

19   CRAIGSLIST SUBPOENAED INFORMATION, AND THAT'S THE INFORMATION

20   THAT THEY HAD INDICATED WHEN THEY CREATED THIS POST.

21              MR. ARCHER:  OBJECTION, FOUNDATION.  MOVE TO STRIKE

22   AND HEARSAY.

23              THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION AS TO

24   THAT LAST PORTION.  THE RECORD SPEAKS FOR ITSELF.

25              MS. PENNA:  THANK YOU, YOUR HONOR.

1    Q.   WE CAN MOVE ON TO THE NEXT LINES THAT YOU REVIEWED THAT'S

2    PERTINENT TO THIS INVESTIGATION.

3    A.   OKAY.  THE POSTER IP, THAT'S WHAT STOOD OUT TO ME BECAUSE

4    THAT MATCHED THE SAME IP ADDRESS AS THE INFORMATION PROVIDED

5    FROM SPOOFCARD.

6    Q.   OKAY.  NOW, LET'S MOVE TO THE DESCRIPTION OF THE POSTING

7    IN ITSELF, AND I BELIEVE THAT'S THE BOTTOM OF THE FIRST PART OF

8    THE TEXT.

9         CAN YOU WALK US THROUGH THAT, THE DATE THAT IT WAS POSTED?

10   A.   THE RECORD CREATED WAS ON FEBRUARY 24TH, 2012.

11   Q.   OKAY.  DOES IT -- WHAT DOES THE POSTED DATE READ?

12   A.   THE POSTED DATE ALSO READS FEBRUARY 24TH, 2012.

13   Q.   DOES IT PROVIDE A DESCRIPTION OF THE POSTING?

14   A.   YES, IT DOES.

15   Q.   AND WHAT DOES THAT SAY?

16   A.   THE AREA?

17   Q.   YES.  COULD YOU JUST WALK US THROUGH THE LINES OF THE

18   DOCUMENT THAT YOU REVIEWED.

19   A.   OKAY.  SO THE AREA DESCRIPTION IS SAN FRANCISCO BAY AREA.

20   THE SUBAREA DESCRIPTION IS THE SOUTH BAY AREA AND THE

21   NEIGHBORHOOD IS LOS GATOS.

22        AND THEN IT MOVES ON TO CATEGORY DESCRIPTION WHICH IS CARS

23   AND TRUCKS BY OWNER AND THE CATEGORY TYPE IS FOR SALE AND THE

24   PRICE IS 1.

25   Q.   WHAT DOES IT READ BY THE PRIVACY?

```
 1        A.   IT SAYS PRIVACY ANONYMIZED E-MAIL ADDRESS.

 2        Q.   AND THE POSTED DATE?

 3        A.   STAFF DELETED.

 4        Q.   AND WHAT ABOUT THE POSTING TITLE?

 5        A.   PORCH.

 6        Q.   CAN YOU READ TO US THE POSTING BODY AT THE BOTTOM OF THE

 7   DOCUMENT?

 8        A.   SURE.  IT STATES '85 TARGA, C-O-N-V, B-L-K, WHICH I WOULD

 9   ASSUME MEANS CONVERTIBLE BLACK.  COME GET IT.  DIVORCE PAYOUT

10   FOR YOU.  YOU MIGHT AS WELL GET IT BEFORE THE EX GETS IT.

11   23097 SUMMIT ROAD, LOS GATOS.  IT'S NOT OK TO CONTACT THIS

12   POSTER WITH SERVICES OR OTHER COMMERCIAL INTERESTS.

13        Q.   OKAY.  ARE YOU AWARE OF THAT LAST LINE THAT PART OF THAT

14   BODY OR IF IT WAS COMPILED BY CRAIGSLIST?

15        A.   I BELIEVE SO.

16        Q.   I'M WONDERING IF THAT LAST LINE WAS PART OF THE POSTING

17   BODY OR IF YOU DON'T KNOW ONE WAY OR THE OTHER?

18        A.   I DON'T KNOW.

19        Q.   OKAY.  AND WHOSE ADDRESS IS POSTED IN THE BODY OF THIS

20   TEXT?

21        A.   IT'S MR. HESSENFLOW'S.

22             MS. PENNA:  COULD I HAVE A FEW MINUTES, YOUR HONOR?

23             THE COURT:  YES.

24        (PAUSE IN PROCEEDINGS.)

25
```

1    BY MS. PENNA:

2    Q.   BACKING UP A FEW STEPS IN THE INVESTIGATION, YOU SAID THAT

3    YOU HAD REVIEWED THE ORIGINAL PHONE DOCUMENTS -- VERIZON

4    DOCUMENTS, OR I APOLOGIZE.  YOU HAD ORIGINALLY BEEN INFORMED OF

5    THE NUMBER THAT APPEARED ON THE CALLER ID OF MR. HESSENFLOW'S

6    VOICE MESSAGE.

7         AND I BELIEVE WE STARTED TO DISCUSS WHAT THAT NUMBER WAS.

8    CAN YOU REMIND US AGAIN WHAT NUMBER DID APPEAR ON THE CALLER

9    ID?

10   A.   IT WAS 708-565-1040.

11   Q.   AND WHAT WAS THE SIGNIFICANCE OF THAT NUMBER?

12   A.   THE 1040 REALLY STOOD OUT.

13   Q.   AND WHY IS THAT?

14   A.   BECAUSE 1040 IS THE I.R.S. TAX FORM FOR INDIVIDUAL INCOME

15   TAX FILERS, BUT IT'S ALSO THE LAST FOUR DIGITS OF THE

16   LEGITIMATE I.R.S. HOT NUMBER.

17   Q.   SO A NUMBER THAT PEOPLE CAN CALL IN ORDER TO GET HELP WITH

18   THEIR TAX RECORDS OR?

19   A.   CORRECT.  IF YOU HAD ANY QUESTIONS REGARDING YOUR

20   INDIVIDUAL TAX RETURN, ANYBODY CAN CALL THE I.R.S. HOT NUMBER

21   AND THAT ALSO ENDS WITH THE NUMBERS 1040 BECAUSE, YOU KNOW, IT

22   RELATES TO THE FORM 1040 THAT YOU WOULD FILE.

23   Q.   OKAY.

24        NO FURTHER QUESTIONS AT THIS TIME.

25             THE COURT:  CROSS-EXAMINATION?

```
 1              MR. ARCHER:  YES, YOUR HONOR.

 2                        CROSS-EXAMINATION

 3     BY MR. ARCHER:

 4     Q.   GOOD MORNING, MS. AGUIRRE.

 5     A.   GOOD MORNING.

 6     Q.   I'D LIKE TO TALK VERY BRIEFLY ABOUT THAT CRAIGSLIST

 7     POSTING.

 8          THE POSTER E-MAIL WAS AN LWILLIS96@YAHOO.COM; IS THAT

 9     CORRECT?

10     A.   THAT'S CORRECT.

11     Q.   AND YOU HAVE NO REASON TO BELIEVE THAT THAT E-MAIL ADDRESS

12     IS ASSOCIATED WITH MR. YORK; CORRECT?  YOU DIDN'T DO ANY

13     INVESTIGATION TO CONFIRM THAT?

14     A.   I DON'T KNOW WHO THAT E-MAIL BELONGS TO, NO.

15     Q.   AND THE LAST NAME WILLIS IS NOT AN AKA OF MR. YORK OR

16     ANYTHING THAT YOU'RE FAMILIAR WITH FROM YOUR INVESTIGATION?

17     A.   NOT THAT I KNOW OF.

18     Q.   OKAY.  AND SO YOU DIDN'T SEEK THE SUBSCRIBER INFORMATION

19     OF THAT E-MAIL ADDRESS TO FIND OUT WHOSE E-MAIL THAT WAS;

20     CORRECT?

21     A.   CORRECT.

22     Q.   CORRECT.  THIS IP ADDRESS, THE 71.93.228.25 IP ADDRESS,

23     YOU DIDN'T SEEK THE SUBSCRIBER INFORMATION OF THAT EITHER;

24     CORRECT?

25     A.   CORRECT.
```

1    Q.   OKAY.  SO YOU DON'T KNOW IF THAT'S A PUBLIC ACCESS

2    WIRELESS OR AN INTERNET CAFE OR ANYTHING LIKE THAT; IS THAT

3    CORRECT?

4    A.   CORRECT.

5    Q.   OKAY.  SO THAT IP ADDRESS COULD HAVE BEEN AVAILABLE TO THE

6    PUBLIC TO YOUR KNOWLEDGE; IS THAT CORRECT?

7    A.   I WOULDN'T KNOW.

8    Q.   OKAY.  AND YOU DIDN'T ASK MR. HESSENFLOW IF HE KNEW AN

9    L. WILLIS, DID YOU?

10   A.   I DID NOT ASK HIM.

11   Q.   OKAY.  THE L. WILLIS E-MAIL, JUST TO BE CLEAR, WAS

12   DIFFERENT THAN THE ONE PROVIDED IN THE SPOOFCARD RECORDS; IS

13   THAT CORRECT?

14   A.   THAT'S CORRECT.

15   Q.   I WANTED TO CLARIFY ONE THING FROM THE -- THIS IS THE

16   PHONE CALL, THE RECORDED PHONE CALL.

17        YOU SAID THAT THE VOICEMAIL WAS ASKING FOR A TAX RETURN.

18   THAT'S NOT CORRECT, IS IT?

19   A.   COULD I REVIEW THE TRANSCRIPT?

20   Q.   SURE.

21        (PAUSE IN PROCEEDINGS.)

22            THE WITNESS:  CAN YOU REPEAT THE QUESTION, PLEASE.

23   BY MR. ARCHER:

24   Q.   I GUESS MORE SIMPLY IN THAT TRANSCRIPT IN THAT VOICEMAIL,

25   YOU NEVER HEARD THE WORDS TAX RETURN MENTIONED, DID YOU?

1    A.   NOT THOSE TWO WORDS.

2    Q.   OKAY.  SO YOUR INVESTIGATION INTO THIS, DID IT BEGIN WHEN

3    MR. HESSENFLOW SENT THE E-MAIL ON THE 24TH OF FEBRUARY?

4    A.   IF THAT'S WHEN THE E-MAIL WAS SENT, YES.

5    Q.   THE E-MAIL THE DAY AFTER THE VOICEMAIL RECORDING?

6    A.   YES.

7    Q.   OKAY.  AND YOU SPOKE TO MR. HESSENFLOW -- SORRY.

8         MY UNDERSTANDING IS THAT MR. HESSENFLOW WAS INTERVIEWED BY

9    AN AGENT HEARTMAN ON FEBRUARY 24TH; IS THAT CORRECT?

10   A.   I DON'T REMEMBER THE DATES, BUT, YES.

11   Q.   BUT SOME TIME SHORTLY AFTER THE REPORT?

12   A.   YES.

13   Q.   OKAY.  AND YOU INTERVIEWED MR. HESSENFLOW ON MAY 4TH OF

14   2012?

15   A.   YES.

16   Q.   AND THAT'S WHEN YOU RETRIEVED THE DISK OF THE SAVED

17   VOICEMAILS; IS THAT CORRECT?

18   A.   YES.

19   Q.   OKAY.  YOU WROTE YOUR FINAL REPORT IN THIS CASE ON

20   NOVEMBER 13TH OF 2012 OR WHAT YOU CONSIDERED A CASE CLOSING

21   REPORT; IS THAT CORRECT?

22   A.   I DON'T REMEMBER THE DATE.

23   Q.   WOULD IT REFRESH YOUR RECOLLECTION TO LOOK AT A COPY OF

24   THAT REPORT?

25   A.   SURE.

1          MR. ARCHER:  MAY I APPROACH THE WITNESS, YOUR HONOR?

2          THE COURT:  YES.

3          MR. ARCHER:  THANK YOU.

4     Q.  I GUESS I'M FOCUSSING MOST NOW ON THE TOP RIGHT-HAND

5     CORNER OF THE FIRST PAGE OF YOUR REPORT.

6     A.  UH-HUH.

7     Q.  BASED ON YOUR REVIEW OF THAT, IS IT ACCURATE TO SAY THAT

8     THAT WAS LISTED AS A FINAL REPORT IN NOVEMBER OF 2012; CORRECT?

9     A.  CORRECT.

10    Q.  OKAY.  AND THERE AGAIN WAS SOME INTERCHANGE BETWEEN YOU

11    AND MR. HESSENFLOW AROUND MAY 17TH OF 2015; IS THAT ACCURATE?

12    A.  I DON'T KNOW THE DATE BUT --

13    Q.  BUT IN MAY OF THIS YEAR AFTER THIS CASE WAS CHARGED, DID

14    MR. HESSENFLOW RESPOND TO AN INQUIRY FROM YOU WITH AN E-MAIL?

15    A.  YES.

16    Q.  OKAY.  AND THEN YOU, AGAIN, E-MAILED MR. HESSENFLOW ON

17    JULY 9TH OF 2015, JULY OF 2015?

18    A.  YES.

19    Q.  OKAY.  AND MR. HESSENFLOW, PRIOR TO JULY 9TH OF 2015, DID

20    NOT MENTION ANYTHING ABOUT HIM DOING AN EXPERIMENT TO IDENTIFY

21    MR. DOUGLAS YORK'S VOICE; IS THAT CORRECT?

22    A.  CORRECT.

23    Q.  OKAY.  AND HE MENTIONED THAT TO YOU IN JULY OF 2015?  NO?

24    A.  YES.

25    Q.  AND YOU DIDN'T ASK HIM FOR A COPY OF THE EXPERIMENT THAT

1    HE HAD DONE; CORRECT?

2    A.   CORRECT.

3    Q.   AND YOU INTERVIEWED ANDREA YORK IN YOUR INVESTIGATION IN

4    THIS CASE AS WELL?

5    A.   I DID.

6    Q.   AND YOU UNDERSTAND THAT MS. YORK IS MR. YORK'S WIFE; IS

7    THAT CORRECT?

8    A.   YES.

9    Q.   AND DID MS. YORK MENTION TO YOU THAT SHE BELIEVED THAT

10   THERE WERE PEOPLE DOING MR. YORK'S DIRTY WORK FOR HIM DURING

11   YOUR INTERVIEW OF HER?

12        MS. PENNA:  OBJECTION, YOUR HONOR.  IT CALLS FOR

13   HEARSAY AND ALSO ON THE GROUNDS OF RELEVANCE.

14        MR. ARCHER:  YOUR HONOR, I'M ASKING THE QUESTION TO

15   ESTABLISH WHETHER IT'S FOR THE EFFECT ON THE HEARER, WHETHER

16   AGENT AGUIRRE RECEIVED THAT INFORMATION FROM MS. YORK, NOT

17   OFFERING IT FOR THE TRUTH OF THE MATTER.

18        THE COURT:  I'LL SUSTAIN THE RELEVANCE OBJECTION.

19        MR. ARCHER:  YOUR HONOR, I'D LIKE TO INQUIRE

20   ABOUT -- AGENT AGUIRRE HAS TESTIFIED ALREADY ABOUT THE --

21        THE COURT:  LET'S GO TO SIDE-BAR.

22        MR. ARCHER:  YES, YOUR HONOR.

23      (SIDE-BAR CONFERENCE ON THE RECORD.)

24        THE COURT:  WE'RE AT SIDE-BAR.  MR. ARCHER.

25        MR. ARCHER:  YES, YOUR HONOR.  THE DEFENSE OFFER OF

1   PROOF AS TO THIS LINE OF QUESTIONING IS THAT AGENT AGUIRRE HAS

2   ALREADY TESTIFIED ABOUT TAKING HER INVESTIGATIVE STEPS AND THE

3   DEFENSE CERTAINLY SHOULD BE ALLOWED LEEWAY TO POINT OUT

4   FAILURES TO INVESTIGATE, ESPECIALLY IF THEY MAY LEAD TO AN

5   ALTERNATE EXPLANATION OF THE EVENTS HERE.

6       I HAVE ON GOOD FAITH BASED ON A REPORT AUTHORED BY THIS

7   AGENT THAT SHE WAS TOLD BY, BY ANDREA YORK THAT THERE WERE

8   OTHER PEOPLE THAT HAD BEEN DOING DOUG'S DIRTY WORK AND THAT SHE

9   RECEIVED PHONE CALLS FROM THESE OTHER PEOPLE, AND I'D LIKE TO

10  ASK HER IF SHE'S FOLLOWED UP ON ANY OF THOSE BECAUSE THERE'S NO

11  INDICATION THAT SHE DID.

12      MR. SCHENK:  IT IS ONLY RELEVANT IF IT'S OFFERED FOR

13  THE TRUTH.  IT'S NOT FOR ITS EFFECT ON THE LISTENER.

14      THE COURT:  I JUST, I JUST DON'T UNDERSTAND HOW THAT

15  COMES IN BASED ON WHAT YOU'VE INDICATED.

16      MR. ARCHER:  WHAT I'M NOT -- I'M NOT ASKING TO PROVE

17  THAT THAT WAS HAPPENING.  I'M ASKING WITHOUT THAT FOUNDATION, I

18  CAN'T JUST ASK HER, YOU DIDN'T FOLLOW UP ON ANYTHING THAT YOU

19  WERE TOLD BY ANDREA YORK.  I MEAN, THAT'S SORT OF WITHOUT

20  MENTIONING THAT THERE WOULD BE A REASON FOR HER TO FOLLOW UP ON

21  THAT.  MY QUESTION DOESN'T MAKE ANY SENSE.

22      SO I'M OFFERING IT ONLY FOR A FOUNDATIONAL MATTER AND THE

23  COURT, AND I THINK A LIMITING INSTRUCTION WOULD BE APPROPRIATE

24  THERE, BUT HOW -- I CERTAINLY DON'T INQUIRE ABOUT HER FAILURE

25  TO INVESTIGATE OTHER LEADS AND OTHER ALTERNATE THEORIES OF THIS

```
 1    CASE AND THAT IS ONE, AND SO WITHOUT THE -- WITHOUT

 2    ESTABLISHING THAT SHE DID HEAR THAT FROM A WITNESS THAT SHE

 3    INTERVIEWED AND THEN DIDN'T FOLLOW UP ON IT, I'M KIND OF

 4    HANDCUFFED SO.

 5             THE COURT:  SO YOU WANT TO ASK THIS WITNESS WHETHER

 6    THIS WITNESS INTERVIEWED HIS WIFE, MR. YORK?

 7             MR. ARCHER:  UH-HUH.

 8             THE COURT:  AND WHETHER HIS WIFE TOLD THE WITNESS

 9    SHE BELIEVED THAT THERE WERE OTHER PEOPLE DOING HER HUSBAND'S

10    DIRTY WORK.

11             MR. ARCHER:  RIGHT.  AND I'D LIKE TO ASK HER WHETHER

12    SHE FOLLOWED UP ON ANY OF THE THINGS THAT SHE WAS TOLD TO

13    UNDERMINE HER INVESTIGATION, WHICH IS CERTAINLY APPROPRIATE FOR

14    CROSS-EXAMINATION.

15             MR. SCHENK:  THAT IS GOING TO OPEN THE DOOR TO THE

16    GOVERNMENT'S RESPONSE WHICH IS WHAT ANDREA YORK WAS REFERRING

17    TO WAS NOT DOUGLAS YORK'S DIRTY WORK IN HARASSING

18    MR. HESSENFLOW BUT RATHER DOUG YORK'S DIRTY WORK IN HARASSING

19    HER THAT WAS THE BASIS FOR THE RESTRAINING ORDER AND THE ENTIRE

20    PARADE OF HORRIBLES THAT WE'RE NOT INTERESTED IN GETTING INTO.

21             MR. ARCHER:  IT'S AN INTERESTING THREAT BUT --

22             THE COURT:  IT COULD -- BASED ON WHAT I UNDERSTAND

23    THERE IS THIS ONGOING DISSOLUTION AND THE RESTRAINING ORDERS

24    AND ALL OF THE OTHER ISSUES ANCILLARY TO THIS CASE, BUT THAT'S

25    THE RISK THAT YOU RUN OF OPENING THE DOOR TO THIS OTHER
```

1    INFORMATION ABOUT HIM, THE RESTRAINING ORDER AND ALL OF THESE

2    OTHER THINGS.

3        IT MAY DEPEND ON WHAT SHE SAYS, IT MIGHT BECOME ADMISSIBLE

4    AGAIN TO EXPLAIN.

5            MR. ARCHER:  MY ONLY OTHER QUESTION REGARDING

6    ANDREA YORK WAS WHETHER SHE WAS ABLE TO IDENTIFY THE VOICEMAIL

7    THAT WAS MENTIONED, THE NAME ON THE VOICEMAIL.

8        I'LL WITHDRAW IT.  I APOLOGIZE.

9            THE COURT:  SO I THINK THAT'S THE -- YOU RUN INTO

10    THAT IF I PERMIT YOU TO ASK THIS QUESTION.  THEY MAY BE ABLE TO

11    ASK QUESTIONS ABOUT WHAT DID SHE REALLY MEAN AND PERHAPS CALL

12    ANDREA YORK TO ASK HER WHAT DID SHE MEAN WHICH THEN GETS INTO

13    HER RESTRAINING ORDER ISSUE WHICH MY SENSE IS THAT EVERYBODY

14    WANTS TO AVOID BUT MAYBE NOT.

15            MR. SCHENK:  THE GOVERNMENT'S VIEW IS THAT REALLY

16    THAT THE COURT'S PRETRIAL RULING WAS THAT THAT STUFF IS 403 AND

17    USING THAT SAME LOGIC SHOULD EXCLUDE THIS LINE OF QUESTIONING

18    RATHER THAN AN OPENING TO THE --

19            THE COURT:  WELL, I DON'T THINK ANY OF US WANT TO

20    GET INTO THAT, BUT I THINK MR. ARCHER IS PERMITTED TO INQUIRE

21    ON CROSS-EXAMINATION AS TO IF THERE ARE ALTERNATIVE, IF THERE

22    ARE VIABLE ALTERNATIVES, INDIVIDUALS WHO MAY HAVE DONE THIS.

23    HE'S CERTAINLY GOING TO PROBE ON THAT.

24        I THINK IT'S INAPPROPRIATE TO SAY THAT, NO, YOU CAN'T

25    INQUIRE AS TO WHETHER OR NOT THERE WERE OTHER INDIVIDUALS WHO

1    HAVE DONE THIS.

2          MR. ARCHER:  BUT I UNDERSTAND THAT THE COURT IS

3    GIVING ME FAIR WARNING THAT I MAY BE THREADING ON DANGEROUS

4    GROUND.

5          THE COURT:  AS I FREQUENTLY SAY, THERE'S A

6    DIFFERENCE BETWEEN TURNING THE KNOB AND OPENING THE DOOR.

7      WELL, I THINK YOU SHOULD BE ABLE TO ASK HER A QUESTION

8    ABOUT WHETHER OR NOT BASED ON ANY INFORMATION THAT SHE

9    RECEIVED, I'M NOT TELLING YOU HOW TO TRY YOUR CASE.

10          MR. ARCHER:  PLEASE DO.

11          THE COURT:  BUT DID ANDREA YORK FIND, AND SHE DID,

12    AND BASED ON ANYTHING SHE LEARNED IN THE INVESTIGATION WHETHER

13    THERE WERE OTHER VIABLE ALTERNATIVES OR OTHER INDIVIDUALS THAT

14    MAY HAVE BEEN INVOLVED BUT THEN, YOU KNOW, YOU WILL RUN THE

15    RISK OF WHO ARE THOSE PEOPLE AND WHY AND THEN WE GET INTO THAT

16    WHOLE ISSUE ABOUT THE RESTRAINING ORDER.

17          MR. ARCHER:  UNDERSTOOD.

18          THE COURT:  BUT YOU CAN CERTAINLY ASK WHETHER THERE

19    WERE OTHER INDIVIDUALS.  I'M NOT PRECLUDING YOU -- IF THE

20    EVIDENCE SUGGESTS THERE MIGHT BE OTHER PEOPLE.  AND I

21    UNDERSTAND HOW THIS MS. YORK'S SUGGESTED DIRTY WORK.

22      BUT, YOU KNOW, THE THREE OF YOU KNOW THE CONTEXT OF THAT

23    BETTER THAN I DO, WHETHER THAT WAS RELATED TO THE DV ISSUE AND

24    HER PERSONAL HARASSMENT AND THIS PHONE CALL.

25          MR. ARCHER:  FOR THE COURT'S BENEFIT, IT IS TWO

1    LINES AT THE END OF THE REPORT AND SO I MAY NOT WANDER DOWN

2    THAT PATH.

3             THE COURT:  YES.  I MEAN, THE JURY MIGHT FIND IT

4    INTERESTING ENOUGH JUST BECAUSE IT'S A DIVORCE CASE BUT -- ALL

5    RIGHT.

6             MR. SCHENK:  SCHEDULING, IS THE COURT THINKING AFTER

7    THIS RECESS WE'LL TAKE A LUNCH BREAK AND WE CAN ADDRESS --

8             THE COURT:  I WOULD LIKE TO KNOW WHAT TO TELL THE

9    JURY, IF AT ALL POSSIBLE, BEFORE LUNCH.

10        IF THEY'RE GOING TO GO HOME TODAY, IN OTHER WORDS, IF WE

11   HAVE RUN OUT OF WITNESSES TODAY, THAT IS, IF THE COURT ALLOWS

12   YOU, ONCE YOU TELL ME WHAT THIS OTHER WITNESS TIMING IS, I

13   DON'T WANT THEM TO HAVE TO STAY FOR LUNCH AND HAVE THEM COME

14   BACK AND SEND THEM HOME.

15            MR. SCHENK:  WE CALLED THE WITNESS DURING THE LAST

16   BREAK AND MAYBE HER PHONE RANG WHILE SHE WAS ON THE STAND, AND

17   SHE DOESN'T KEEP HER PHONE ON IN COURT AND IT'S POSSIBLE WE MAY

18   HAVE SOME INFORMATION.

19            THE COURT:  SO LET'S TAKE A SHORT RECESS, THEN,

20   BEFORE WE TAKE A NOON BREAK, AND WE'LL HEAR WHETHER OR NOT, YOU

21   KNOW, WE'RE GOING TO HAVE THIS WITNESS COME BACK.

22        HOW MUCH LONGER DO YOU THINK YOU HAVE WITH HER?

23            MR. ARCHER:  FIVE MINUTES I WOULD SAY.

24            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

25        (END OF DISCUSSION AT SIDE-BAR.)

```
1              THE COURT:  THANK YOU, COUNSEL.

2              MR. ARCHER:  IF I MAY HAVE A MOMENT, YOUR HONOR?

3              THE COURT:  YES, OF COURSE.

4         (PAUSE IN PROCEEDINGS.)

5              MR. ARCHER:  THANK YOU, YOUR HONOR.

6              THE COURT:  SO YOU CAN ASK THE SAME QUESTION OR

7    ANOTHER QUESTION.

8              MR. ARCHER:  INDEED.

9    Q.   AGENT, DURING YOUR INVESTIGATION HERE YOU NEVER CONSULTED

10   WITH A VOICE ANALYSIS EXPERT; CORRECT?

11   A.   NO, I DIDN'T.

12   Q.   OKAY.  AND YOU UNDERSTAND THAT THE GOVERNMENT HAS THE

13   RIGHT TO SEEK AN ORDER FROM THE COURT TO COMPEL MR. YORK TO

14   GIVE A VOICE SAMPLE IN A CASE LIKE THIS; IS THAT CORRECT?

15   A.   I DON'T KNOW.

16   Q.   OKAY.  THAT WASN'T DISCUSSED WITH THE PROSECUTION, THEN?

17   A.   NOT WITH ME.

18   Q.   OKAY.  AND BEYOND MR. HESSENFLOW'S SUSPICION THAT THE

19   VOICEMAIL IS LEFT BY MR. YORK, NOBODY IN YOUR INVESTIGATION WAS

20   ABLE TO IDENTIFY THE VOICE ON THE VOICEMAIL AS MR. YORK;

21   CORRECT?

22        I CAN CLARIFY.  DID YOU INTERVIEW ANYONE DURING YOUR

23   INVESTIGATION THAT WAS ABLE TO LISTEN TO THE VOICEMAIL AND

24   IDENTIFY THAT THE VOICE ON THERE BELONGED TO MR. YORK?

25   A.   WELL, ACCORDING TO THE SPOOFCARD AND THE INFORMATION THAT
```

```
1     I RECEIVED FROM SPOOFCARD IT WAS ALTERED.

2              MR. ARCHER:  IF I COULD MOVE TO STRIKE THAT AS

3     NONRESPONSIVE, YOUR HONOR.

4     Q.  THE QUESTION THAT I HAVE FOR YOU, AGENT AGUIRRE, IS DURING

5     THE COURSE OF YOUR INVESTIGATION, DID YOU INTERVIEW ANYONE WHO

6     REVIEWED THE RECORDING OF THE VOICEMAIL WITH YOU AND WAS ABLE

7     TO IDENTIFY IT AS MR. YORK'S VOICE?

8     A.  NO.

9     Q.  OKAY.

10             THE COURT:  AND I'M GOING TO -- THE PRIOR ANSWER

11    WILL REMAIN.

12             MR. ARCHER:  OKAY.

13    Q.  AND SO YOU MENTIONED THAT YOU LEARNED FROM SPOOFCARD THAT

14    THE VOICE WAS ALTERED; CORRECT?

15    A.  YES.

16    Q.  AND WAS IT NOT ALSO APPARENT TO YOU AS SOON AS YOU

17    LISTENED TO IT THAT THE VOICE WAS ALTERED?

18    A.  YOU'RE SAYING NOT APPARENT?

19    Q.  I'M SAYING WHEN YOU LISTENED TO THE RECORDING, IT SOUNDED

20    ALTERED TO YOU; RIGHT?

21    A.  YES.

22    Q.  OKAY.  AND THE I.R.S. DOESN'T USE ALTERATION SOFTWARE IN

23    THEIR PHONE COMMUNICATIONS; CORRECT?

24    A.  NOT THAT I KNOW OF.

25    Q.  OKAY.  IT'S, IN FACT, NOT THE I.R.S.'S POLICY TO CALL WHEN
```

```
1     IT'S REGARDING TAX ISSUES; IS THAT CORRECT?

2     A.   COULD YOU REPEAT THAT, PLEASE.

3     Q.   IF THE I.R.S. IS GOING TO CONTACT SOMEBODY ABOUT A TAX

4     ISSUE, THEY DON'T, IN FACT, CALL THEM.  IS THAT THE POLICY?

5     A.   THEY CAN CALL.

6     Q.   THEY CAN CALL.  OKAY.  DURING THE COURSE OF YOUR

7     INVESTIGATIONS, YOU'VE -- IS IT ACCURATE TO SAY THAT YOU'VE

8     INVESTIGATED A NUMBER OF FRAUDULENT IMPERSONATIONS OF I.R.S.

9     EMPLOYEES?

10    A.   YES.

11    Q.   AND IS IT FAIR TO SAY THAT THE VAST BULK OF THOSE

12    INVESTIGATIONS IS PEOPLE TRYING TO EXTORT MONEY FROM THE PERSON

13    ON THE OTHER END?

14    A.   I CAN'T SAY AFFIRMATIVELY OR I CAN'T SAY COLLECTIVELY LIKE

15    IT'S ALWAYS.  I DON'T THINK IT'S ALWAYS.

16    Q.   BUT YOU'RE FAMILIAR WITH THE SCAM THAT SEEMS TO BE QUITE

17    POPULAR OF CALLING UP AND PRETENDING TO BE THE I.R.S. AND THEN

18    DEMANDING IMMEDIATE PAYMENT FOR A TAX LIEN?

19         IS THAT A SCAM THAT YOU'RE FAMILIAR WITH?

20    A.   IT'S ONE OF THE SCAMS.

21    Q.   OKAY.  AND IN THAT CASE IT ONLY WORKS IF THERE'S LIVE

22    COMMUNICATION; CORRECT?

23    A.   NO.

24    Q.   OKAY.  BUT A FAKE PHONE CALL OR A FAKE PHONE NUMBER WOULD

25    NOT BE OF ANY USE TO A SCAMMER, USING A FAKE PHONE NUMBER, THAT
```

```
 1      WOULDN'T BE USE TO A SCAMMER; CORRECT?

 2      A.   IT HAPPENS.

 3      Q.   SO IT HAPPENS THAT SOMEONE WHO IS TRYING TO SCAM SOMEONE

 4      OUT OF MONEY IS SAYING CALL ME BACK TO A NUMBER THAT DOESN'T

 5      EXIST, THAT HAPPENS IN YOUR EXPERIENCE?

 6      A.   IT HAPPENS.

 7      Q.   OKAY.  NOTHING IN THIS VOICEMAIL IS CONSISTENT WITH ANY OF

 8      THE SCAM INVESTIGATIONS THAT YOU'VE DONE AND THOSE EXTORTION

 9      SCHEMES; CORRECT?

10      A.   THEY'RE NOT -- GO AHEAD.

11           MS. PENNA:  YOUR HONOR, OBJECTION.  ASKED AND

12      ANSWERED.

13           THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

14           THE WITNESS:  THEY'RE NOT EXACTLY THE SAME, BUT THIS

15      COULD FALL IN THE REALMS OF SUCH SCAMS.

16      BY MR. ARCHER:

17      Q.   OKAY.  THIS PHONE NUMBER THAT WE'RE TALKING ABOUT, THAT

18      ENDED IN 1040; RIGHT?

19      A.   UH-HUH.

20      Q.   THIS IS NOT A REAL PHONE NUMBER; CORRECT?

21      A.   CORRECT.

22      Q.   BECAUSE YOU CALLED IT AND NOBODY ANSWERED?

23      A.   CORRECT.

24      Q.   OKAY.  SO IN EFFECT THIS VOICEMAIL DOES NOT LEAVE ANY

25      MEANS FOR THE CALLER, THE RECIPIENT, TO CALL BACK; CORRECT?
```

1    A.   CORRECT.

2    Q.   SO IS IT A FAIR CONCLUSION TO DRAW THEN THAT THIS CALLER

3    WAS NOT ACTUALLY TRYING TO ELICIT A PHONE CALL BACK?

4    A.   I CANNOT SPECULATE WHAT HIS INTENT WAS.

5    Q.   OKAY.  SO YOU DON'T KNOW THE INTENT OF THE CALLER WHO LEFT

6    THE VOICEMAIL HERE; CORRECT?

7    A.   CORRECT.

8         MR. ARCHER:  MAY I HAVE A MOMENT, YOUR HONOR.

9         (PAUSE IN PROCEEDINGS.)

10        MR. ARCHER:  THAT'S ALL, YOUR HONOR.  THANK YOU.

11   THANK YOU, AGENT AGUIRRE.

12        THE WITNESS:  THANK YOU.

13        THE COURT:  REDIRECT?

14        MS. PENNA:  NO REDIRECT, YOUR HONOR.

15        THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

16        MR. ARCHER:  YES, YOUR HONOR.

17        MS. PENNA:  YES, YOUR HONOR.

18        THE COURT:  THANK YOU.

19        THE WITNESS:  THANK YOU.

20        THE COURT:  YOU'RE EXCUSED.

21        MR. ARCHER:  MAY I RETRIEVE MY DOCUMENT, YOUR HONOR?

22        THE COURT:  YES, OF COURSE.

23        MR. ARCHER:  THANK YOU, AGENT.

24        THE COURT:  LET ME ASK THE GOVERNMENT, SHOULD WE

25   TAKE A BRIEF RECESS NOW FOR SCHEDULING PURPOSES?

```
 1              MR. SCHENK:  YES.

 2              THE COURT:  ALL RIGHT.  LET'S TAKE A RECESS,

 3    COUNSEL.  I WANT TO GAUGE WHERE WE ARE, LADIES AND GENTLEMEN.

 4    WE'RE PERILOUSLY CLOSE TO THE NOON HOUR.  WE'LL TAKE A RECESS.

 5    I'LL ASK YOU TO -- WE'RE NOT TAKING OUR LUNCH RECESS, AND I'LL

 6    LET YOU KNOW MORE ABOUT THAT WHEN WE RECONVENE PROBABLY IN

 7    SHORT ORDER HERE, PROBABLY BEFORE NOON.

 8         THANK YOU.

 9         (JURY OUT AT 11:45 A.M.)

10              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

11    YOU.  THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE

12    COURTROOM.  ALL COUNSEL AND THE DEFENDANT ARE PRESENT.

13              MR. ARCHER:  YOUR HONOR, MAY I RUN TO THE BATHROOM

14    REALLY QUICKLY?

15              THE COURT:  OF COURSE.  OF COURSE.  LET'S TAKE FIVE

16    MINUTES.  WE'LL BE BACK IN FIVE MINUTES.

17         (RECESS FROM 11:46 A.M. UNTIL 11:57 A.M.)

18              THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

19    RECORD.  ALL COUNSEL ARE PRESENT, AND THE DEFENDANT IS PRESENT.

20    WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

21         AS TO OUR SCHEDULE, MR. SCHENK?

22              MR. SCHENK:  YES, YOUR HONOR.  WE HAVE NOT YET

23    SPOKEN TO -- THE INDIVIDUAL'S NAME IS ELI FINKELMAN.  I BELIEVE

24    IT'S E-L-I, F-I-N-K-E-L-M-A-N.  WE HAVE NOT SPOKEN TO

25    MR. FINKELMAN, AND WE HAVE ATTEMPTED BOTH VIA TELEPHONE AND
```

```
1     E-MAIL TO GET IN TOUCH WITH HIM, AND WE HAVE NOT CONTACTED HIM

2     THIS MORNING.

3          AND MY FEAR IS THAT EVEN IF WE TALKED TO HIM TODAY, THE

4     LIKELIHOOD THAT HE WOULD BE HERE ON MONDAY IS PROBABLY NOT

5     GREAT AND WITHOUT BEING ABLE TO TELL THE COURT WE SHOULD SEND

6     THE JURY HOME AND BRING THEM BACK TUESDAY OR WEDNESDAY, IT

7     SEEMS UNFAIR TO TELL TO THE JURY TO BRING THEM BACK ON MONDAY

8     OR TO LEAVE A RECORDING.

9          SO WHILE I APPRECIATE THE COURT INDICATING AN INITIAL

10    WILLINGNESS TO ENTERTAIN THE GOVERNMENT'S REQUEST FOR A

11    CONTINUANCE, I THINK WHAT IS PRUDENT IS FOR THE GOVERNMENT TO

12    MOVE TO DISMISS THAT COUNT, WHICH IS COUNT 2, AND PROCEED BASED

13    UPON THE REMAINING COUNT 1 IN THE INDICTMENT.  AND THE

14    GOVERNMENT HAS NO MORE WITNESSES.  SO UNLESS THERE'S ARGUMENT,

15    WE WOULD REST ON THAT.

16              THE COURT:  WELL, LET ME HEAR THE OBJECTIONS OF THE

17    DEFENSE.

18              MR. ARCHER:  UNDERSTANDING THAT THE JURY HAVING BEEN

19    SWORN AND THAT THAT WOULD BE A DISMISSAL WITH PREJUDICE, THERE

20    IS NO OBJECTION.

21              THE COURT:  SO DOES THE GOVERNMENT THEN FORMALLY

22    MOVE TO DISMISS COUNT 2?

23              MR. SCHENK:  YES, YOUR HONOR, WE DO.

24              THE COURT:  ALL RIGHT.  ALL RIGHT.  SO COUNT 2 WILL

25    BE DISMISSED THEN IN THIS CASE.
```

```
 1          LET ME JUST ASK THEN, ASK WHAT THE CURRENT POSTURE OF THE
 2     CASE IS WITH COUNT 1?
 3          ARE WE READY TO MOVE INTO ARGUMENT?
 4          MR. SCHENK:  THE GOVERNMENT RESTS.  I DON'T KNOW IF
 5     THE DEFENSE HAS A CASE.
 6          THE COURT:  OKAY.
 7          (PAUSE IN PROCEEDINGS.)
 8          MR. ARCHER:  YES, YOUR HONOR, SAVE FOR THE RULE 29
 9     MOTION, THE DEFENSE DOES NOT INTEND TO PUT ON A CASE.
10          THE COURT:  ALL RIGHT.  SO I CAN SEND THE JURY OUT
11     FOR THEIR NOON RECESS, AND THEN WE COULD RECONVENE FOR
12     ARGUMENT, ASSUMING THE COURT DOESN'T GRANT THE MOTION AT THE
13     OUTSET, THE DEFENSE MOTION AT THE OUTSET.
14          WHEN SHOULD WE SCHEDULE ARGUMENTS, THEN?
15          MR. SCHENK:  IF WE DO -- WE CAN TELL THE JURY TO
16     COME BACK AT 1:30, AND WE CAN DO OUR RULE 29 AT 1:00 AND CLOSE
17     AT 1:30.
18          MR. ARCHER:  I WOULDN'T MIND HAVING THE FULL LUNCH
19     BREAK, THE 1:00 TO 1:30.  SO THE RULE 29 MOTION IS GOING TO BE
20     VERY BRIEF.
21          MR. SCHENK:  CAN WE DO IT RIGHT NOW?
22          MR. ARCHER:  SURE.
23          MR. SCHENK:  IF YOUR HONOR WILL INDULGE.  MAYBE WE
24     SHOULD TELL THE JURY TO GO TO LUNCH.
25          THE COURT:  I'M TRYING TO GET A HANDLE ON WHAT WE'LL
```

1    DO.  SO WE'LL ENGAGE A RULE 29 NOW.  DEPENDING ON THE OUTCOME

2    OF THAT THEN, IF WE ARE TO COME BACK THEN, SHOULD WE BEGIN

3    ARGUMENT AT 1:30, 1:00 O'CLOCK?

4             MR. ARCHER:  1:30 WOULD BE MY PREFERENCE, YOUR

5    HONOR.

6             MR. SCHENK:  THAT'S FINE.

7             THE COURT:  ALL RIGHT.

8             MR. ARCHER:  IF I MAY HAVE A MOMENT, YOUR HONOR?

9    I'M CONSULTING WITH THE BRAIN TRUST.

10            THE COURT:  SURE.

11        (PAUSE IN PROCEEDINGS.)

12        (JURY IN AT 12:01 P.M.)

13            THE COURT:  PLEASE BE SEATED.  THANK YOU, LADIES AND

14   GENTLEMEN.  PLEASE BE SEATED.  ALL RIGHT.  THE RECORD SHOULD

15   REFLECT THAT THE JURY IS BACK AND THE ALTERNATES AND ALL

16   COUNSEL AND THE DEFENDANT ARE PRESENT.

17       LADIES AND GENTLEMEN, WE'LL TAKE OUR NOON RECESS NOW, AND

18   WE WILL RECONVENE AT 1:30.

19       LET ME JUST ASK SOME PRELIMINARY QUESTIONS AS TO THAT.

20       DOES THE GOVERNMENT HAVE ANY ADDITIONAL WITNESSES?

21            MR. SCHENK:  NO, YOUR HONOR.  THE UNITED STATES

22   RESTS.

23            THE COURT:  ALL RIGHT.  THANK YOU.  DOES THE DEFENSE

24   HAVE ANY WITNESSES THEY WISH TO CALL?

25            MR. ARCHER:  NO, YOUR HONOR.  THE DEFENSE RESTS.

1      THE COURT:  THANK YOU.  LADIES AND GENTLEMEN, WHAT

2    THAT MEANS IS THAT THE EVIDENCE, YOU NOW HAVE ALL OF THE

3    EVIDENCE THAT YOU WILL NEED TO DECIDE THE CASE.

4      THE ONLY THING NOW REMAINING PRIOR TO YOUR DELIBERATIONS

5    ARE MY INSTRUCTIONS, THE ARGUMENTS OF COUNSEL, AND THEN MY

6    INSTRUCTIONS.

7      WHAT WE'LL DO IS TAKE OUR NOON RECESS NOW, AND I'LL ASK

8    YOU TO COLLECT YOURSELVES AGAIN DOWNSTAIRS SUCH THAT WE WILL

9    HOPEFULLY BEGIN AT 1:30, AND WE'LL START AT 1:30 WITH CLOSING

10   ARGUMENTS WITH COUNSEL, AND I'LL, SUBSEQUENT TO THAT, INSTRUCT

11   YOU AS TO THE LAW THAT APPLIES TO THE CASE.  SO DO HAVE A GOOD

12   LUNCH, AND WE'LL SEE YOU AT 1:30.  THANK YOU.

13      (JURY OUT AT 12:03 P.M.)

14      THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

15   YOU.  THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE

16   COURTROOM FOR THEIR NOON RECESS.  ALL COUNSEL AND THE DEFENDANT

17   REMAIN PRESENT.

18      MR. ARCHER?

19      MR. ARCHER:  YOUR HONOR, THE DEFENSE MOVES UNDER

20   RULE 29 FOR JUDGMENT OF ACQUITTAL FROM THE COURT.  COUNT 2, I

21   THINK, HAS BEEN DISMISSED.  IT IS THE DEFENSE'S POSITION THAT

22   THE GOVERNMENT HAS FAILED TO ESTABLISH SUFFICIENT EVIDENCE FOR

23   EACH OF THE ELEMENTS CONTAINED WITHIN COUNT 1.

24      THE COURT:  ALL RIGHT.  THANK YOU.

25      MR. SCHENK:  AND AT THIS POINT THE STANDARD IS IN

1     THE EVIDENCE TAKEN IN THE LIGHT MOST FAVORABLE TO THE

2     GOVERNMENT, THERE CERTAINLY IS SUFFICIENT EVIDENCE IF THE JURY

3     IS TO BELIEVE THE EVIDENCE THAT THE GOVERNMENT HAS PRESENTED

4     FOR THEM TO FIND THAT THE GOVERNMENT HAS PROVED THAT THE TWO

5     ELEMENTS AS THE COURT INTENDS TO GIVE THEM FOR A SECTION 912

6     VIOLATION, THE FIRST BEING THAT THE DEFENDANT FALSELY PRETENDED

7     TO BE AN OFFICER OR EMPLOYEE ACTING UNDER THE AUTHORITY OF THE

8     UNITED STATES INTERNAL REVENUE SERVICE.

9         THE EVIDENCE THAT SUPPORTS THAT COUNT INCLUDES THAT IT WAS

10    THE DEFENDANT'S SPOOFCARD ACCOUNT THAT MADE A PHONE CALL ON THE

11    DATE THAT THE VOICEMAIL WAS RECEIVED SO THAT THE GOVERNMENT HAS

12    NOW INTRODUCED EVIDENCE ON BOTH SIDES OF THIS TRANSACTION.

13    EXHIBITS 1 AND 4 ARE AN IDENTICAL VOICEMAILS BUT RECEIVED FROM

14    TWO DIFFERENT SOURCES.

15        ONE COMES FROM SPOOFCARD BECAUSE THE DEFENDANTS SELECTED

16    THE OPTION TO RECORD HIS CALL OR VOICEMAIL OR WHATEVER HE

17    INTENDED TO DO AFTER THE CALL WAS COMPLETED AS WELL AS

18    MR. HESSENFLOW TESTIFIED THAT HE MADE A RECORDING OF THE

19    VOICEMAIL THAT HE RECEIVED.

20        SO WE HAVE BOTH ENDS OF THAT TRANSACTION AND THE ACCOUNT

21    INFORMATION BOTH THROUGH VERIZON AND SPOOFCARD SHOWING THAT IT

22    WAS THE DEFENDANT, DOUGLAS YORK, WHO MADE THAT CALL.

23        THE CONTENT OF THE CALL IN CONJUNCTION WITH THE SPECIAL

24    AGENT'S TESTIMONY SHOWS THAT HE WAS ACTING LIKE AN I.R.S.

25    EMPLOYEE.  MS. AGUIRRE PROVIDED TESTIMONY TO THE JURY ABOUT

00242

1      WHAT AN I.R.S. EMPLOYEE WOULD DO, FOR INSTANCE, AT TIMES THEY

2      WOULD CALL AND ASK PEOPLE TAX QUESTIONS.

3          HE, ON THE VOICEMAIL, SAID THAT MY NAME IS MRS. SMITH FROM

4      THE I.R.S. LOOKING INTO TAX RECORDS LOOKING INTO A TAX AUDIT.

5      SO IT CERTAINLY WAS CONSISTENT WITH SOMEONE PRETENDING TO BE OR

6      ACTING UNDER THE AUTHORITY OF THE I.R.S. AND MUCH OF THAT

7      EVIDENCE DOVETAILS WITH THE SECOND ELEMENT WHICH IS THAT THE

8      DEFENDANT ACTED AS SUCH.

9          BUT IT GOES FURTHER BECAUSE THE DEFENDANT DIDN'T JUST SAY

10     I'M AN I.R.S. EMPLOYEE AND HANG UP.  HE MADE MORE STATEMENTS

11     CONSISTENT WITH WHAT AN I.R.S. EMPLOYEE WOULD DO, WHAT, IN

12     FACT, THEY WOULD DO IF THEY WERE ACTING ON BEHALF OF THE

13     INTERNAL REVENUE SERVICE.

14         THE DEFENDANT TOOK THE ADDITIONAL STEP OF CHOOSING A

15     CALLER ID NUMBER TO MAKE HIS CALL MORE BELIEVABLE.

16         HE KNEW THAT I.R.S. FORMS OR THE I.R.S. HELP LINE NUMBERS

17     ENDED IN 1040 AND PICKED THAT NUMBER SO THE VICTIM WOULD NOTICE

18     THAT -- WOULD BE MORE LIKELY TO BELIEVE IT.  HE WENT A STEP

19     FURTHER AND EVEN IN THE VOICEMAIL DIRECTED THE VICTIM TO PAY

20     ATTENTION TO HIS CALLER ID.

21         SO THE DEFENDANT DIDN'T JUST PICK THE CALLER ID NUMBER BUT

22     NOT REALLY CARE OR KNOW WHETHER THE VICTIM RECOGNIZED BUT ON

23     THE VOICEMAIL SAID CALL ME BACK ON THE NUMBER ON YOUR CALLER

24     ID.

25         THE DEFENDANT'S ARGUMENTS ON CROSS THAT HE COULD HAVE

1    NEVER CALLED HIM BACK, THE VICTIM COULD HAVE NEVER MADE A PHONE

2    CALL BACK IS IRRELEVANT.  THERE'S NO ELEMENT THAT REQUIRES THAT

3    MONEY COULD HAVE EXCHANGED HANDS, AND THE PHONE CALL WOULD HAVE

4    BEEN OR COULD HAVE BEEN RETURNED.  SO IT'S OF NO HARM TO THE

5    GOVERNMENT'S CASE EVEN IF THAT FACT IS TRUE AND THAT RULE 29

6    STANDARD IS TAKING ALL OF THE EVIDENCE THAT THE GOVERNMENT HAS

7    PRESENTED IN THE LIGHT MOST FAVORABLE TO THE GOVERNMENT AND

8    UNDER THAT STANDARD THERE CERTAINLY IS SUFFICIENT EVIDENCE FOR

9    THE JURY TO CONVICT.

10           THE COURT:  ANYTHING FURTHER?

11           MR. ARCHER:  NO, YOUR HONOR.

12           THE COURT:  THANK YOU.  AND, OF COURSE, THE COURT

13    HAS HEARD ALL OF THE EVIDENCE, THE EXTENSIVE EVIDENCE THAT HAS

14    BEEN PRESENTED IN THE CASE AND IN EVALUATING THAT EVIDENCE IN

15    THE LIGHT MOST FAVORABLE TO THE GOVERNMENT THE COURT FINDS THAT

16    THE JURY COULD, ALBEIT THE EVIDENCE MIGHT BE CIRCUMSTANTIAL, OR

17    EVIDENCE OF SOME THINGS, BUT THE COURT IS GOING TO RESPECTFULLY

18    DECLINE THE MOTION TO DISMISS THE COUNT.  THE EVIDENCE IS

19    SUFFICIENT TO MOVE FORWARD TO THE JURY FOR THEIR DELIBERATIONS.

20    SO THE MOTION IS DENIED.

21        LET ME ASK ABOUT THE INSTRUCTIONS, THOUGH, BECAUSE WE'LL

22    NEED TO DO SOME DELETIONS AS TO THE INSTRUCTIONS NOW.

23        INSTRUCTION NUMBER 13 WILL BE PULLED AND REMOVED AND WE

24    WILL HAVE TO GIVE INSTRUCTION 2.13, WHICH IS DISMISSAL OF SOME

25    CHARGES AGAINST THE DEFENDANT.  IT'S MODEL INSTRUCTION 2.13.  I

00244

```
 1        DON'T KNOW IF YOU HAVE A COPY OF THAT AT HAND.

 2                  MR. ARCHER:  YES, YOUR HONOR.

 3                  THE COURT:  AND THIS WILL NEED TO BE PROVIDED TO

 4        YOU, THE JURY, I BELIEVE.

 5                  MR. SCHENK:  WE AGREE.

 6                  MR. ARCHER:  NO OBJECTION, YOUR HONOR.

 7                  THE COURT:  AND, COUNSEL, YOU CAN INSERT THE

 8        APPROPRIATE BRACKETED INFORMATION RELATED TO COUNT 2, AND THIS

 9        ALSO RELATES TO INSTRUCTION NUMBER 10.

10            INSTRUCTION 10 IS NO LONGER NECESSARY.

11                  MR. SCHENK:  YES, YOUR HONOR.

12                  THE COURT:  THAT'S THE MULTIPLE COUNTS INSTRUCTION

13        AND SO THAT SHOULD BE REMOVED.

14            2.13 THEN SHOULD FOLLOW INSTRUCTION 12, I BELIEVE, CURRENT

15        INSTRUCTION 12 WHICH IS THE 9.12 INSTRUCTION THAT WOULD REPLACE

16        13, WHICH IS THE 2.23 INSTRUCTION, AND WE'LL JUST REPLACE 2.13

17        FOR THE INSTRUCTION FOR THAT SECOND COUNT IF THAT MAKES SENSE.

18                  MR. SCHENK:  YES, WE CAN ALSO MAKE THE INSTRUCTION

19        ABOUT THE DEFENDANT NOT TESTIFYING.

20                  THE COURT:  THAT WILL BE REDACTED OR REMOVED.  THE

21        DEFENDANT NOT TESTIFYING IS TAKEN OUT.

22            IS THAT WHAT YOU WERE REFERENCING?

23                  MR. SCHENK:  CORRECT.

24                  THE COURT:  AND THEN IF YOU CAN E-MAIL WITH THOSE

25        CHANGES BACK TO MS. GARCIA A COPY OF THE FINALS, I WOULD
```

1      APPRECIATE THAT, AND TO MR. ARCHER AS WELL.  I WOULD APPRECIATE

2      THAT.

3              MR. ARCHER:  I THINK WE'RE GOING TO BE TRYING TO

4      WORK OVER THE LUNCH BREAK TO TRY TO GET A JOINT COPY.

5              MR. SCHENK:  YES.

6              THE COURT:  OKAY.  GREAT.  ANYTHING ELSE BEFORE WE

7      RECESS?

8              MR. SCHENK:  THE SAME MODIFICATION OBVIOUSLY TO THE

9      VERDICT FORM?

10             THE COURT:  YES, OF COURSE.

11             MR. ARCHER:  AND, YOUR HONOR, THE DEFENSE WAS IN THE

12     PROCESS OF PREPARING OR HAD PREPARED A THEORY OF DEFENSE

13     INSTRUCTION WHICH WE WOULD LIKE TO MAKE MINOR MODIFICATION TO

14     AND THEN SUBMIT TO THE COURT AND THE GOVERNMENT.

15         SO THAT SHOULD BE DONE IN THE NEXT FIVE MINUTES BUT

16     PERHAPS IT CAN BE TAKEN UP AFTER THE RECESS.

17             THE COURT:  OKAY.  SO I SHOULD SEE YOU BACK AT MAYBE

18     1:15 FOR THAT?

19             MR. SCHENK:  THAT WOULD BE FINE.

20             THE COURT:  OKAY.  GREAT.  SEE UP THEN.  THANK YOU.

21             MR. ARCHER:  THANK YOU.

22             THE COURT:  ONE FURTHER THING, JUST OUT OF AN

23     ABUNDANCE OF CAUTION, ARE ALL OF THE EXHIBITS ADMITTED THAT THE

24     PARTIES SOUGHT TO BE ADMITTED?

25         I HAVE 1, 2, 3, 4, 5, 7, AND 8 AS BEING ADMITTED.

```
1                    MS. PENNA:  YES, YOUR HONOR.

2                    MR. SCHENK:  YES.

3                    THE COURT:  DID THE DEFENSE HAVE ANY EXHIBITS THAT

4          THEY WANTED TO ADMIT?

5                    MR. ARCHER:  NO, YOUR HONOR.

6                    THE COURT:  ALL RIGHT.  THANK YOU.

7               (LUNCH RECESS TAKEN AT 12:12 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **AFTERNOON SESSION**

2          (JURY OUT AT 1:23 P.M.)

3              THE COURT:  COUNSEL.  PLEASE BE SEATED.  COUNSEL AND

4      THE DEFENDANT ARE PRESENT.

5          ANYTHING EITHER SIDE WISHES TO PUT ON THE RECORD?

6              MR. ARCHER:  YES, YOUR HONOR.  THE DEFENSE WOULD

7      LIKE TO SAY TWO THINGS.  ONE, THE DEFENSE WOULD LIKE TO, AFTER

8      HAVING HEARD THE EVIDENCE IN THE CASE, BOTH SIDES HAVE RESTED,

9      RENEW OUR REQUEST FOR THE PREVIOUSLY DENIED JURY INSTRUCTIONS

10     YESTERDAY THAT WERE IN DOCKET 67 AND 69.

11             THE COURT:  OKAY.  THANK YOU.

12             MR. ARCHER:  AND ALSO IMPOSE A DEFENSE POSITION OF

13     THE CASE INSTRUCTION.  IF I MAY APPROACH?

14             THE COURT:  YES.

15         AND, COUNSEL, YOU HAVE THIS?

16             MS. PENNA:  YES.

17         (PAUSE IN PROCEEDINGS.)

18             THE COURT:  ANYTHING FURTHER?

19             MR. ARCHER:  NOTHING.

20             MR. SCHENK:  IT'S ARGUMENT.  IT'S THE LINE SECOND

21     AND A HALF, SECOND, THE VOICEMAIL'S MERE STATEMENT OF AN I.R.S.

22     AGENT INVESTIGATING TAX RECORDS, THEN IT SHOULD HAVE GRANTED

23     THE RULE 29 MOTION.  IT'S ESSENTIALLY THE CONCLUSION ABOUT THE

24     EVIDENCE IN THE CASE, AND THAT'S SUFFICIENT.

25         SO IT'S CERTAINLY NOT THE CASE THAT THEY NEED TO BOTH MAKE

1    A RULE 29 MOTION AND HAVE THE JURY READ THIS INSTRUCTION.

2         IF THAT WERE THE CASE, THEN THE CASE SHOULDN'T GO TO THE

3    JURY AT THIS POINT BUT REALLY MORE TO THE POINT IS THAT THIS IS

4    NOT AN INSTRUCTION BY THE COURT.

5         THIS IS ARGUMENT, AND IT'S CERTAINLY ARGUMENT THAT

6    MR. ARCHER CAN MAKE IN HIS CLOSING.  BUT IT SHOULDN'T COME FROM

7    THE COURT WITH A REPEAT OF WHAT BEYOND A REASONABLE DOUBT IS,

8    HOW A DEFENDANT HAS NO OBLIGATION TO MAKE A CASE, AND THEN

9    SUMMARIZING FOR THE JURY THE ARGUMENTS THAT MR. ARCHER HAS

10   ALREADY MADE IN CLOSING WHEN THE COURT DOES THE INSTRUCTIONS.

11             THE COURT:  MR. ARCHER?

12             MR. ARCHER:  THE POSITION IS THAT THIS IS A DEFENSE

13   POSITION OF THE CASE INSTRUCTION.  IT'S NOT SUBMITTED TO BE A

14   NEUTRAL STATEMENT OF THE CASE.  IT'S, IN FACT, LAYING OUT WHAT

15   THE DEFENSE THEORY OF THE CASE IS AND SO, OF COURSE, IT'S GOING

16   TO BE ELEMENTS THAT THE GOVERNMENT FINDS TO BE ARGUMENT BUT

17   DOESN'T MAKE IT ARGUMENT TO GIVE WITH, OF COURSE, THE PREFACE

18   THAT THIS IS NOT THE COURT'S OPINION ON THE EVIDENCE.  IT'S THE

19   DEFENSE'S POSITION AND THE DEFENSE'S THEORY OF THE INSTRUCTION

20   OR THE POSITION OF THE CASE.

21             THE COURT:  ALL RIGHT.  THANK YOU.  WELL, I'M

22   LOOKING AT THE THREE PARAGRAPHS, AND THE COURT HAS ALREADY

23   INFORMED THE JURY ABOUT PARAGRAPH 1 IN THE COURT'S OPENING --

24   DURING VOIR DIRE.

25             THE COURT INDICATED THAT MR. YORK HAD PLED NOT GUILTY TO

1    THE OFFENSE AND HIS ABSOLUTE DENIAL OF THE CHARGES.

2        AND THE GOVERNMENT BEARS THE BURDEN OF PROVING EACH OF THE

3    ELEMENTS AND IF IT THEY FAIL, THE JURY WILL BE INSTRUCTED, AS I

4    TOLD THEM EARLIER IN THE PRELIMINARY INSTRUCTIONS THAT THEY

5    MUST RETURN -- IT'S THEIR DUTY TO RETURN A VERDICT OF NOT

6    GUILTY.

7        THE SECOND PARAGRAPH, MIDDLE PARAGRAPH, APPEARS TO BE,

8    THAT IS, THE DEFENSE POSITION, THAT THE VOICEMAIL'S MERE

9    STATEMENT OF AN I.R.S. AGENT INVESTIGATING TAX RECORDS IS

10   INSUFFICIENT TO PROVE THE ELEMENT OF ACTING AS SUCH BECAUSE

11   THERE WERE NO STEPS TAKEN TO ACT IN THE CONTEXT OF, THAT IS

12   ARGUMENT, AND I REALIZE THAT THAT IS MR. YORK'S POSITION AND

13   ARGUMENT, BUT I THINK ALL OF THESE THINGS, FIRST OF ALL, AS I

14   HAVE SAID, THE COURT HAS PRESENTED IN THE PRELIMINARY

15   INSTRUCTIONS THE POSITIONS STATED IN PARAGRAPH 1 AND 2 AND WILL

16   REAFFIRM THOSE IN THE FINAL INSTRUCTIONS AND THE SECOND

17   PARAGRAPH, THE MIDDLE PARAGRAPH, IS CERTAINLY FAIR ARGUMENT

18   THAT I EXPECT THE DEFENSE WILL MAKE.

19       SO I DON'T FIND IT NECESSARY TO GIVE THIS POSITION OF THE

20   CASE, AND I DON'T THINK THAT PREJUDICES MR. YORK.

21       AS I'VE SAID, THE COURT HAS MADE ITS POSITION OR READ THE

22   INSTRUCTIONS AND CERTAINLY COUNSEL IS GOING TO BE ABLE TO ARGUE

23   THE SUFFICIENCY OF THE EVIDENCE, WHICH I THINK IS THE GRAVAMEN

24   OF THE MIDDLE PARAGRAPH.

25       SO I DON'T FIND IT NECESSARY TO GIVE THE POSITION OF THE

```
1        CASE INSTRUCTION.  SO I WON'T GIVE THIS.

2            AND I, I -- YOU'VE RENEWED YOUR REQUEST FOR THE OTHER

3    INSTRUCTIONS THAT WE DISCUSSED YESTERDAY, AND I'M NOT GOING TO

4    DISTURB THE COURT'S PREVIOUS RULING.

5            BUT YOU'VE PRESERVED YOUR OBJECTION FOR THE RECORD AS TO

6    AT LEAST COUNT 1 NOW, I THINK, WHICH IS REALLY THE GRAVAMEN OF

7    THE CONVERSATION, I THINK.

8            OKAY.  ANYTHING FURTHER?

9                MR. SCHENK:  NO, YOUR HONOR.  WE SUBMITTED DURING

10   THE BREAK THE JOINT --

11               THE COURT:  I DID RECEIVE THAT, AND I HAVE IT HERE.

12   AND I NOTE THAT THIS IS THE TYPE SIZE IN THIS CASE TELLS ME

13   THAT THIS IS AN INSTRUCTION FOR INDIVIDUALS WHO ARE MUCH

14   YOUNGER THAN THE COURT.  SO WE ARE TO HAVE OUR -- OUR COURTROOM

15   DEPUTY IS GOING TO INCREASE THE FONT SIZE FOR SOMETHING THAT

16   WOULD BE MORE CONVENIENT FOR THE JURY, I'LL PUT IT THAT WAY.

17           ANY OTHER COMMENT AS TO THE INSTRUCTIONS, THE ORDER OF THE

18   INSTRUCTIONS, THE CONTENT, THAT IS, THE REVISED INSTRUCTIONS

19   THAT THE COURT NOW HAS?

20               MR. SCHENK:  NO, YOUR HONOR.

21               MR. ARCHER:  NO, YOUR HONOR.

22               THE COURT:  ALL RIGHT.  THANK YOU.  IS THE

23   GOVERNMENT PREPARED TO PRESENT THEIR ARGUMENT?

24               MS. PENNA:  YES, YOUR HONOR.

25               THE COURT:  OKAY.  IS THE JURY DOWNSTAIRS?
```

Case 5:15-cr-00226-EJD Document 141 Filed 02/16/16 Page 246 of 259
Case 5:15-cr-00226-EJD Document 147 Filed 02/16/16 Page 121 of 159
GOVERNMENT'S CLOSING ARGUMENT                                    361

1      SO MS. GARCIA WILL COLLECT OUR JURY, AND THEN WE'LL BEGIN

2   WITH ARGUMENT.

3      PARDON ME.  WE ALSO HAVE THE REVISED VERDICT FORM.  ANY

4   COMMENT ON THE REVISED VERDICT FORM?

5         MR. SCHENK:  NO, YOUR HONOR.

6         MR. ARCHER:  NO, YOUR HONOR.

7         THE COURT:  WHICH I SHOULD NOTE DOES APPEAR IN

8   APPROPRIATE FONT SIZE.

9      ALL RIGHT.  THANK YOU.

10   (RECESS FROM 1:29 P.M. UNTIL 1:39 P.M.)

11   (JURY IN AT 1:39 P.M.)

12         THE COURT:  WE'RE ON THE RECORD, AND ALL COUNSEL ARE

13   PRESENT AND THE DEFENDANT IS PRESENT AND OUR JURY AND

14   ALTERNATES ARE PRESENT.

15      DOES THE GOVERNMENT HAVE AN ARGUMENT?

16         MS. PENNA:  YES, YOUR HONOR.

17      **(GOVERNMENT'S COUNSEL GAVE THEIR CLOSING ARGUMENT.)**

18         MS. PENNA:  LADIES AND GENTLEMEN OF THE JURY, ON

19   FEBRUARY 23RD, 2012, THE DEFENDANT CALLED MR. HESSENFLOW AND

20   REPRESENTED HIMSELF AS AN I.R.S. EMPLOYEE.  IN THIS MESSAGE THE

21   DEFENDANT ACTED IN THE CHARACTER OF THE I.R.S. EMPLOYEE, AND BY

22   LEAVING THAT SPECIFIC VOICE MESSAGE THE DEFENDANT BROKE THE

23   LAW.

24      IN MY OPENING I DISCUSSED WITH YOU THAT THE DEFENDANT'S

25   CONDUCT CAUSED HIM TO COMMIT TWO SEPARATE CRIMES.  NOW I'M

1    GOING TO SHOW YOU HOW THE EVIDENCE THAT WE HAVE PRESENTED HAS

2    PROVEN BEYOND A REASONABLE DOUBT THE DEFENDANT COMMITTED THE

3    FIRST CRIME OF FALSE IMPERSONATION OF A GOVERNMENT EMPLOYEE.

4        YOU WILL HEAR A JURY INSTRUCTION AFTER CLOSING ARGUMENTS

5    ABOUT WHY YOU SHOULDN'T SPECULATE ABOUT THE SECOND CRIME.

6        SO NOW FIRST TURNING TO THE CRIME OF -- ENTITLED TITLE 18

7    UNITED STATES CODE SECTION 912.  THIS CRIME HAS TWO SEPARATE

8    ELEMENTS.  AND WE ARE REQUIRED, AS THE GOVERNMENT, TO PROVE

9    THESE ELEMENTS BEYOND A REASONABLE DOUBT.

10       HERE BEING, FIRST, THAT THE DEFENDANT FALSELY PRETENDED TO

11   BE AN OFFICER OR EMPLOYEE ACTING UNDER THE AUTHORITY OF THE

12   UNITED STATES INTERNAL REVENUE SERVICE; AND, SECOND, THAT THE

13   DEFENDANT ACTED AS SUCH.

14       NOW, THIS FIRST ELEMENT SEEMS TO BE BEST BROKEN DOWN INTO

15   TWO SEPARATE PARTS:  FIRST, WE HAD TO SHOW YOU THAT THE

16   DEFENDANT, HIMSELF, WAS THE ONE WHO COMMITTED THE CRIME; AND,

17   SECOND, THAT HE FALSELY IMPERSONATED AN I.R.S. EMPLOYEE.

18       SO NOW STARTING WITH THE FIRST.  HOW DID WE SHOW YOU THAT

19   THE DEFENDANT HIMSELF LEFT THAT VOICEMAIL?  WE ESTABLISHED THAT

20   IN SEVERAL WAYS.  OUR WITNESSES TESTIFIED AND OUR EVIDENCE THAT

21   WE PRESENTED LINKED THE DEFENDANT DIRECTLY TO THAT VOICE

22   MESSAGE.

23       MR. HESSENFLOW TESTIFIED THAT HE RECEIVED THE VOICE

24   MESSAGE ON FEBRUARY 23RD, 2012, AT AROUND 1:25 P.M. SHOWING A

25   CALLER ID OF 708-565-1040.

1      THE DEFENDANT'S VERIZON WIRELESS BILL SHOWED US THAT THE

2  DEFENDANT MADE TWO OUTGOING CALLS ON THE DATE AND TIME IN

3  QUESTION AND THAT THOSE CALLS WERE MADE TO THE PHONE NUMBER

4  THAT WAS LINKED TO THE SPOOFCARD COMPANY.

5      WE NOW KNOW THAT THE DEFENDANT HAD AN ACCOUNT WITH THAT

6  COMPANY SPOOFCARD.  HOW DO WE KNOW THAT?  THROUGH SPOOFCARD

7  RECORDS THAT NATHAN COOPER TESTIFIED TO TODAY THAT SHOWED THE

8  DEFENDANT, DOUGLAS YORK, MADE AN ACCOUNT USING HIS NAME, HIS

9  PHONE NUMBER, HIS ADDRESS, HIS IP ADDRESS, AND OTHER

10 IDENTIFYING INFORMATION.

11     SPOOFCARD RECORDS SHOWED THAT THE DEFENDANT USED THE

12 SPOOFCARD ACCOUNT ON FEBRUARY 23RD, 2012, TO CALL

13 MR. HESSENFLOW'S HOME NUMBER AT 2:26 P.M.  THE RECORD SHOWED

14 THAT HE USED HIS SPOOFCARD FEATURE TO SELECT THAT VERY SAME

15 NUMBER THAT ENDED IN 1040 TO APPEAR ON MR. HESSENFLOW'S CALLER

16 ID.

17     HE ALSO ELECTED TO DISGUISE HIS VOICE USING THE SPOOFCARD

18 FEATURE IN ORDER TO MAKE HIS VOICE SOUND LIKE A WOMAN.

19     THE AUDIO FILE THAT WAS PROVIDED FROM SPOOFCARD OF THIS

20 RECORDING THAT YOU HEARD TODAY PERFECTLY MATCHES THE VOICE

21 MESSAGE THAT MR. HESSENFLOW RECEIVED AND WE PLAYED FOR YOU BACK

22 ON TUESDAY.

23     WE ALSO PROVIDED EVIDENCE THAT THERE WAS A HISTORY AND A

24 PATTERN HERE AND THIS ALSO HELPS IDENTIFY THAT THE DEFENDANT

25 WAS THE CALLER AND THE ONE THAT LEFT THIS VOICE MESSAGE.

```
 1            MR. HESSENFLOW DISCUSSED WITH YOU PARTICULAR INSTANCES

 2     DEMONSTRATING THE DEFENDANT'S PATTERN OF HARASSMENT OF HIM.

 3            CRAIGSLIST RECORDS WERE PRESENTED TODAY THAT CORROBORATED

 4     MR. HESSENFLOW'S TESTIMONY THAT THE DEFENDANT PUBLICLY POSTED

 5     HIS CAR FOR SALE ON CRAIGSLIST AND ALSO POSTED HIS HOME

 6     ADDRESS.

 7            THE DEFENDANT PUBLICLY POSTED MR. HESSENFLOW'S HOME

 8     ADDRESS A SECOND TIME ON A PUBLIC FACEBOOK POSTING.

 9            MR. HESSENFLOW ALSO TESTIFIED TO INCESSANT TELEPHONE CALLS

10     THAT WERE SOMETIMES IN THE MIDDLE OF THE NIGHT.

11            YOU HAVE SEEN THE EVIDENCE AND YOU HAVE HEARD

12     MR. HESSENFLOW GO THROUGH GOVERNMENT'S EXHIBIT 3, THE

13     DEFENDANT'S VERIZON WIRELESS RECORDS.  HE IDENTIFIED 13

14     TELEPHONE CALLS FROM THE DEFENDANT ON THE VERY DAY THAT HE

15     RECEIVED THAT VOICE MESSAGE.

16            YOU WILL HAVE THAT PHONE BILL AND YOU CAN GO BACK AND YOU

17     CAN LOOK AT THOSE PHONE CALLS AND YOU CAN LOOK AT THE OTHER

18     DATES OF THOSE PHONE CALLS AS WELL AND AS WELL AS THE TIMES OF

19     THOSE PHONE CALLS.

20            ALL OF THESE SOURCES AND THESE RECORDS HAVE VERIFIED THAT

21     IT WAS THE DEFENDANT WHO CALLED MR. HESSENFLOW AND LEFT THAT

22     VOICE MESSAGE ON FEBRUARY 23RD, 2012, AT THE TIME IN QUESTION.

23            NOW THAT WE KNOW THAT THE DEFENDANT WAS THE ONE WHO MADE

24     THE PHONE CALL, HOW DID WE SHOW YOU THAT THE DEFENDANT FALSELY

25     PRETENDED TO BE AN EMPLOYEE ACTING UNDER THE AUTHORITY OF THE
```

```
1    I.R.S.?

2         WELL, LET'S TAKE ONE MORE LISTEN TO THE VOICE MESSAGE.  IT

3    WAS THE GOVERNMENT'S EXHIBIT 1 THAT WE PLAYED FOR YOU TODAY.

4         (AUDIO PLAYING.)

5         MS. PENNA:  THE DEFENDANT JUST SAID MY NAME IS

6    JUDY SMITH.  I'M WITH THE I.R.S., THE INTERNAL REVENUE SERVICE.

7    IT IS IMPORTANT TO NOTE HERE THAT THE DEFENDANT ALSO STATED

8    THAT HE WAS REQUESTING A TAX AUDIT AND WOULD BE INVESTIGATING

9    TAX RECORDS AND INFORMATION FOR PARTICULAR YEARS.

10        FURTHER, HE REQUESTS A CALL BACK FROM MR. HESSENFLOW AT

11   THE NUMBER THAT WAS LISTED ON HIS CALLER ID.

12        NOW, BASED ON WHAT WE HAVE JUST HEARD, THE DEFENDANT

13   REPRESENTED HIMSELF TO BE WORKING UNDER THE AUTHORITY OF THE

14   I.R.S. WHEN HE SAID THOSE SPECIFIC WORDS.  MY NAME IS

15   JUDY SMITH.  I'M WITH THE I.R.S., THE INTERNAL REVENUE SERVICE.

16        THE EVIDENCE I JUST REVIEWED WITH YOU ESTABLISHES ELEMENT

17   1 BEYOND A REASONABLE DOUBT.

18        NEXT, WE MUST DEMONSTRATE BEYOND A REASONABLE DOUBT THAT

19   THE DEFENDANT ACTED AS SUCH.  WHAT DID WE DO TO SHOW YOU THAT

20   DEMONSTRATED THAT THE DEFENDANT ACTED BEYOND JUST STATING THAT

21   HE WORKED FOR THE I.R.S.?

22        WELL, AS I JUST DISCUSSED, ON THIS VOICE MESSAGE, THE

23   DEFENDANT TOOK STEPS BEYOND JUST REPRESENTING THAT HE WAS

24   JUDY SMITH WITH THE I.R.S.  IN FACT, HE MADE SPECIFIC REQUESTS

25   OF MR. HESSENFLOW.
```

```
 1              THE DEFENDANT STATED THAT HE WAS REQUESTING A TAX AUDIT

 2      AND WOULD BE CHECKING INTO MR. HESSENFLOW'S RECORDS FOR

 3      SPECIFIC YEARS.  AS TIGTA SPECIAL AGENT DONNA AGUIRRE TESTIFIED

 4      TODAY, THIS IS ACTING AS AN I.R.S. EMPLOYEE WOULD.

 5              BEYOND THIS, OUR EVIDENCE HAS SHOWN THAT THE DEFENDANT

 6      SELECTED A PHONE NUMBER ENDING IN 1040 TO APPEAR ON

 7      MR. HESSENFLOW'S CALLER ID.

 8              THE SIGNIFICANCE OF THIS, AS DISCUSSED WITH TIGTA SPECIAL

 9      AGENT DONNA AGUIRRE, IS THAT THIS NUMBER IS BOTH A RECOGNIZED

10      I.R.S. PERSONAL INCOME TAX HELP LINE NUMBER AS WELL AS THE

11      WIDELY RECOGNIZED TAX INCOME FORM NUMBER.

12              THIS PHONE NUMBER WAS NOT SELECTED AT RANDOM.  THIS WAS AN

13      ATTEMPT TO MAKE THE MESSAGE MORE BELIEVABLE AND TO FURTHER ACT

14      AS AN INTERNAL REVENUE SERVICE EMPLOYEE WOULD.

15              IN THE VOICE MESSAGE, THE DEFENDANT TOLD MR. HESSENFLOW TO

16      RETURN HIS PHONE CALL AT THE NUMBER THAT APPEARED ON HIS CALLER

17      ID.  NOT ONLY WAS HE REQUESTING THAT MR. HESSENFLOW TAKE STEPS

18      IN RESPONSE TO THE CALL, BUT HE WAS MAKING SURE THAT

19      MR. HESSENFLOW PAID CLOSE ATTENTION TO THE VOICE MESSAGE BY

20      SELECTING THE CALLER ID NUMBER THAT HAD MEANING AND

21      SIGNIFICANCE OF A LEGITIMATE I.R.S. NUMBER.

22              YOU HEARD THAT THIS MESSAGE WAS NOT SOMETHING THAT

23      MR. HESSENFLOW IGNORED OR WROTE OFF AS A PRANK.  MR. HESSENFLOW

24      TOLD YOU THAT WHEN HE RECEIVED THE VOICE MESSAGE, HE WAS

25      SUSPICIOUS.  HE DIDN'T KNOW DEFINITIVELY IF HE HAD A PROBLEM
```

1    WITH THE I.R.S.  HE DIDN'T KNOW UNTIL HE GOOGLED THAT NUMBER

2    AND REALIZED IT WAS A FAKE NUMBER, AND THEN HE TOOK STEPS TO

3    REPORT THE CALL AS SUSPICIOUS, AND THEN HE EXPLAINED THAT HE

4    SUSPECTED THE DEFENDANT WAS BEHIND THE CALL BECAUSE IT FIT THIS

5    ONGOING PATTERN OF HARASSMENT BY THE DEFENDANT.

6         THE TESTIMONY FROM THE WITNESSES AND THE EVIDENCE THAT WE

7    HAVE PRESENTED HAVE DEMONSTRATED EACH OF THE ABOVE ELEMENTS

8    BEYOND A REASONABLE DOUBT.

9         ACCORDINGLY, WE ASK THAT YOU RETURN THE ONLY VERDICT THAT

10   THE EVIDENCE SUPPORTS, A VERDICT FINDING THE DEFENDANT

11   DOUGLAS YORK GUILTY OF THE CRIME OF FALSE IMPERSONATION OF A

12   GOVERNMENT OFFICER OR EMPLOYEE.

13        THANK YOU.

14             THE COURT:  THANK YOU, COUNSEL.

15        DO YOU HAVE A CLOSING ARGUMENT, MR. ARCHER?

16             MR. ARCHER:  YES, YOUR HONOR.

17        **(DEFENDANT'S COUNSEL GAVE THEIR CLOSING ARGUMENT.)**

18             MR. ARCHER:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

19   AS I SAID AT THE BEGINNING OF THIS CASE, THIS IS A CASE

20   INVOLVING A SINGLE VOICEMAIL.  THAT'S THE CASE.

21        WE HAVE A VOICEMAIL THAT YOU HAVE HEARD SEVERAL TIMES, AND

22   I'D ACTUALLY LIKE TO READ THE LANGUAGE OF IT RIGHT NOW.  I KNOW

23   YOU JUST HEARD IT.

24        HELLO ALLAN.  MY NAME IS GIGI SMITH OR JUDY SMITH,

25   DEPENDING OR YOUR PERSPECTIVE ON THE E-MAIL.  I'M WITH THE

```
 1    I.R.S. SERVICE.  I'M CALLING YOU SOMETHING ABOUT A TAX AUDIT

 2    AND SOME INFORMATION, AND WE WOULD LIKE TO CHECK YOUR RECORDS

 3    FOR THE FOLLOWING YEARS:  2005, 2006, 2007.  AND IF YOU COULD

 4    PLEASE RETURN MY CALL AT THE NUMBER LISTED AT YOUR CALLER ID,

 5    THAT WOULD BE APPRECIATED.  AND, ONCE AGAIN, IF WE CANNOT REACH

 6    YOU, WE WILL DEFINITELY BE CHECKING INTO YOUR PAST, AND I'LL BE

 7    LOOKING INTO YOUR RECORDS.  THANKS A LOT, AND WE'LL CALL YOU

 8    BACK TOMORROW.

 9         IN THE UNITED STATES THERE ARE NO SUCH THINGS AS MAGIC

10    WORDS, AND WHAT I MEAN BY THAT IS THAT THERE ARE NO WORDS THAT

11    YOU CAN UTTER WITHOUT CONTEXT THAT CONSTITUTE A CRIME.

12         THE GOVERNMENT IN THEIR CLOSING ARGUMENT AND APPARENTLY

13    THEIR PERSPECTIVE ON THIS CASE BELIEVE THAT THERE ARE WORDS

14    THAT CAN SIMPLY BE UTTERED AND THEIR MERE EXISTENCE CAUSES A

15    CRIME WITHOUT CONTEXT.

16         I'M GOING TO COME BACK TO THAT, BUT LET'S JUST START

17    ABOUT -- LET'S START TALKING ABOUT THE GOVERNMENT'S BURDEN.

18    THE GOVERNMENT HAS THE BURDEN TO SHOW TWO THINGS:  ONE IS THAT

19    BEYOND A REASONABLE DOUBT MR. YORK IS ACTUALLY THE VOICE ON THE

20    VOICEMAIL.  NOT THAT HE'S INVOLVED WITH THE VOICEMAIL OR

21    CONNECTED TO IT OR THAT IT'S HIS SPOOFCARD CALL.

22         AND I'D LIKE TO DISCUSS THEIR BURDEN FOR A SECOND.

23         SO, MS. SENIA, IF YOU CAN PULL UP, WE HAVE A VERY FAVORITE

24    DEFENSE CHART HERE.

25         AND, FOLKS, THIS IS THEIR BURDEN:  IT'S GUILTY BEYOND A
```

1    REASONABLE DOUBT.  AND SOME OF THESE THINGS ON THAT CHART MIGHT

2    BE SURPRISING TO YOU BECAUSE SOME OF THOSE THINGS MIGHT BE

3    SUFFICIENT FOR YOU TO MAKE A DECISION IN YOUR EVERY DAY LIFE,

4    BUT THIS IS NOT AN EVERY DAY LIFE DECISION IF YOU CAN'T BANISH

5    FROM YOUR MINDS A DOUBT THAT HAS SOME REASON TO IT THAT

6    SOMEBODY ELSE MADE THAT PHONE CALL.

7        THE GOVERNMENT HAS INTRODUCED EVIDENCE THAT IT WAS HIS

8    MOM'S CELL PHONE COMPANY AND THAT THERE WERE CALLS FROM HIS

9    PHONE THAT DAY.  THEY HAVE INTRODUCED EVIDENCE FROM THE

10    SPOOFCARD THAT HE SIGNED UP FOR AND HE PAID FOR THE SPOOFCARD.

11        BUT THE GOVERNMENT JUST STOPPED THERE.  MR. HESSENFLOW

12    TESTIFIED THAT HE HAD DONE SOME KIND OF AN EXPERIMENT.

13        OF COURSE HE DIDN'T MENTION IT AT THE BEGINNING OR A

14    REMINDER IF YOU HAD FORGOTTEN THAT MR. HESSENFLOW IS MY

15    CLIENT'S WIFE'S NEW BOYFRIEND AT THE TIME THAT THIS IS ALL

16    GOING DOWN, HE'S CLAIMING THAT HE HAS THIS, I GUESS DEFINITIVE

17    EVIDENCE, THAT THIS IS ACTUALLY DOUG YORK ON THE VOICEMAIL, BUT

18    DIDN'T TURN IT OVER BECAUSE THE GOVERNMENT DIDN'T ASK, WHICH IS

19    STRANGE BECAUSE HE'S SO METICULOUS ABOUT HIS RECORDS AND HE'S

20    PROVIDED ALL OF THESE OTHER RECORDINGS AND YET NOTHING WHEN IT

21    COMES TO THIS ONE SUPPOSEDLY DEFINITIVE PIECE OF PROOF TO SHOW

22    THAT THAT'S ACTUALLY DOUG YORK'S VOICE ON THERE.

23        AND THE AGENT TESTIFIED THAT SHE DID NO VOICE ANALYSIS.

24    YOU HEARD THE REPRESENTATIVE COME OUT FROM TELETECH AND

25    SPOOFCARD AND TELL YOU THAT IT'S A CHANGE IN PITCH.  THE

00260

```
 1    GOVERNMENT HASN'T PRESENTED YOU ANY EVIDENCE SHOWING YOU THAT

 2    THAT VOICEMAIL IS ACTUALLY MR. YORK'S.  THEY'VE SHOWN YOU HIS

 3    CONNECTION TO THE SPOOFCARD, HIS CONNECTION TO THE CELL PHONE,

 4    AND THEY JUST STOP THERE AND ASSUME THAT WOULD BE ENOUGH FOR

 5    YOU.

 6         SO IF YOU HAVE A DOUBT THAT IT WAS MR. YORK THAT LEFT THAT

 7    VOICEMAIL, NOT JUST MR. YORK INVOLVED WITH IT, CONNECTED TO IT,

 8    HE'S NOT GUILTY.  YOUR VOTE IS NOT GUILTY.

 9         LET'S TALK ABOUT THE ELEMENTS OF THE CRIME.

10         AND, MS. SENIA, IF YOU COULD BRING UP THE JURY INSTRUCTION

11    FOR A PERSON IMPERSONATING A FEDERAL EMPLOYEE.

12         THE GOVERNMENT'S PERSPECTIVE SEEMS TO BE ON THIS IF THOSE

13    WORDS WERE UTTERED, CONTEXT ASIDE, YOU'VE COMMITTED A CRIME.

14    THAT'S, OF COURSE, NOT WHAT THIS PUNISHES.  A LAW THAT DID THAT

15    WOULD BE ILLEGAL.

16         A MOMENT AGO I SPOKE THOSE WORDS, I SPOKE THE EXACT WORDS

17    ON THE VOICEMAIL.  TO PUT IT MILDLY, I DON'T HAVE ANY SPECIAL

18    PROTECTIONS FROM THE LAWS AS A DEFENSE ATTORNEY.  BUT NONE OF

19    YOU THINK I'VE COMMITTED THE CRIME OF IMPERSONATING A FEDERAL

20    EMPLOYEE BECAUSE YOU HAVE CONTEXT.  SO LET'S LOOK AT SOME OTHER

21    CONTEXTS AND THEN APPLY THE GOVERNMENT'S APPROACH TO THIS CRIME

22    IN THOSE CONTEXTS.

23         LET'S TAKE, SAY, AN EIGHT-YEAR-OLD BOY RUNNING AROUND A

24    PLAYGROUND WITH A LITTLE PLASTIC BADGE THAT SAID FBI AND HE'S

25    SAYING I'M FBI, I'M FBI.  AND HE'S ARRESTING.  HE'S SAYING
```

```
 1        YOU'RE UNDER ARREST.  HE GOES TO OTHER KIDS ON THE PLAYGROUND

 2     AND HE SAYS YOU'RE UNDER ARREST.

 3        ON ITS FACE JUST TAKE THOSE WORDS, NO CONTEXT.  I'M AN FBI

 4     AGENT.  ACCORDING TO THE GOVERNMENT THAT SIMPLY SATISFIES THEIR

 5     FIRST ELEMENT.  YOU'RE UNDER ARREST.  THAT'S SOMETHING THAT FBI

 6     AGENTS DO.  THEY PLACE PEOPLE UNDER ARREST.  HE'S ACTING AS

 7     SUCH.  BUT THAT'S INSANE.  THE LITTLE BOY IS NOT GUILTY OF THIS

 8     CRIME.  HE'S RUNNING AROUND.  YOU HAVE CONTEXT.  HE'S RUNNING

 9     AROUND PLAYING A GAME.

10        LET'S TAKE A COMEDIAN IN A NIGHTCLUB AND THE COMEDIAN

11     COMES IN AND SAYS IN A VOICE THAT I'M NOT GOING TO ATTEMPT TO

12     DO, MY NAME IS BARRACK OBAMA AND I'M THE SITTING PRESIDENT OF

13     THE UNITED STATES OF AMERICA, AND HE POINTS OUT AND SAYS YOU

14     OVER THERE IN THE RED SHIRT, WHOOPS, YOU, SIR, IN THE RED

15     SHIRT, I'M NOW MAKING YOU MY SECRETARY OF STATE.  I'VE

16     APPOINTED YOU TO MY CABINET.

17        SO HE'S IDENTIFIED HIMSELF AS BARRACK OBAMA, A FEDERAL

18     EMPLOYEE, WHO HE CERTAINLY IS NOT.  HE HAS DONE SOMETHING THAT

19     BARRACK OBAMA DOES, WHICH IS APPOINT PEOPLE TO HIS CABINET AND

20     HE HAS ACTED AS SUCH FROM THE GOVERNMENT'S PERSPECTIVE.  IS HE

21     GUILTY OF A CRIME?  ABSOLUTELY NOT BECAUSE THERE'S CONTEXT.

22        LET'S TAKE WHAT DOUGLAS YORK IS ACCUSED OF DOING.

23     DOUG YORK IS ACCUSED OF LEAVING A VOICEMAIL WITH AN INCREDIBLY

24     HIGH PITCHED HELIUM INJECTED VOICE USING LANGUAGE THAT IS --

25     THAT DOESN'T EVEN APPROACH PROFESSIONAL.  IT'S ALMOST LUDICROUS
```

1    TO SUGGEST THAT THAT LANGUAGE WOULD BE USED BY AN ACTUAL I.R.S.

2    EMPLOYEE, CALL ME BACK ON THE CALLER ID, YOU KNOW, BUT WE'RE

3    GOING TO BE LOOKING INTO IT.  IF YOU DON'T CALL ME BACK, WE'RE

4    GOING TO KEEP LOOKING INTO YOU.  I'LL CALL YOU BACK TOMORROW.

5         IT'S A PRANK VOICEMAIL AND A PRANK CALL.  THAT'S THE

6    CONTEXT.  IT'S NOT AN IMPERSONATION.

7         TO IMPERSONATE SOMEONE YOU HAVE TO TAKE ON THEIR IDENTITY;

8    RIGHT?  I MEAN, IT'S NOT JUST UTTERING WORDS.  YOU HAVE TO HAVE

9    INTENDED TO ACTUALLY IMPERSONATE SOMEBODY.

10        LEAVING A PRANK CALL TO ANNOY MR. HESSENFLOW.  THAT'S NOT

11   IMPERSONATING AN OFFICER.

12        THE GOVERNMENT PRETENDS IT'S NOT A VOICEMAIL LEFT IN A

13   PARTICULAR VOICE.  MR. HESSENFLOW IMMEDIATELY IDENTIFIED THIS

14   VOICE WAS ALTERED, SOMETHING WAS SUSPICIOUS ABOUT IT.  THAT'S A

15   GENEROUS WAY OF PUTTING IT.

16        AGENT AGUIRRE SAID WHEN SHE LISTENED TO IT, IT IMMEDIATELY

17   SOUNDED ALTERED; RIGHT?  SO HOW CAN YOU, IF YOU IMMEDIATELY

18   HEAR IT, IT SOUNDS ALTERED AND THAT'S YOUR IMMEDIATE IMPRESSION

19   AND THEN THINK, OH, THIS IS A GENUINE ATTEMPT TO IMPERSONATE

20   SOMEBODY WITH AN ALTERED VOICE BEFORE YOU GET INTO THE LANGUAGE

21   THAT IS BEING USED THERE?

22        THIS LAW IS INCREDIBLY IMPORTANT, AND IT'S IMPORTANT THAT

23   WE HAVE THIS ON THE BOOKS.  THERE ARE REAL CRIMES THAT OCCUR

24   THAT THIS LAW NEEDS TO PUNISH.

25        IF SOMEBODY GOES TO AIRPORT SECURITY AND SAYS I'M AN AIR

 1    MARSHAL AND CRUISES THROUGH AIRPORT SECURITY UNDER THAT

 2    PRETENSE, THIS IS EXACTLY WHAT THIS IS DESIGNED TO PUNISH.  IF

 3    SOMEONE IS USING THEIR BADGE TO PULL PEOPLE OUT, CLAIMING TO BE

 4    FBI, PULLING PEOPLE OVER.

 5         LEAVING A PRANKED VOICEMAIL?  IT'S NOT IN THAT CATEGORY.

 6         THE GOVERNMENT WANTS YOU TO PERVERT THE LAW, TO CONTORT

 7    THE LAW TO TRY AND FIT THE LAW TO THE FACTS THAT THEY HAVE.

 8    THE FACTS THAT THEY HAVE ARE THAT A VOICEMAIL WAS LEFT FOR

 9    ALLAN HESSENFLOW.  ALLAN HESSENFLOW BELIEVES THAT VOICEMAIL WAS

10    LEFT BY DOUG YORK, AND THEY WANT YOU TO CONTORT THE LAW TO FIT

11    THE FACTS.  IT'S NOT THE CASE.  IT'S IMPOSSIBLE TO IMPERSONATE

12    A FEDERAL EMPLOYEE AND THEN ACT AS SUCH, DO SOMETHING.  ACTING

13    AS A FEDERAL EMPLOYEE -- FEDERAL EMPLOYEES DON'T LEAVE PRANKED

14    VOICEMAILS.  THEY DON'T LEAVE THEM IN RIDICULOUSLY ALTERED

15    VOICES, AND THEY DON'T LEAVE IN THE LANGUAGE THAT THEY USE

16    THERE.

17         A PRANK VOICEMAIL, ESPECIALLY IN THIS CONTEXT, CANNOT BE

18    AN IMPERSONATION AND CERTAINLY CAN'T BE ACTING AS SUCH.  I

19    UNDERSTAND THAT'S A VAGUE TERM, WHAT IS ACTING AS SUCH, BUT YOU

20    GET TO USE YOUR COMMON SENSE.  YOU DON'T HAVE TO CHECK THAT AT

21    THE DOOR HERE.

22         YOU CAN USE YOUR COMMON SENSE AND SAY, THIS DOESN'T MAKE

23    ANY SENSE.  A PRANKED VOICEMAIL CANNOT BE AN IMPERSONATION.

24         FOLKS, IT IS YOUR COMMON SENSE APPLYING THIS LAW TO THE

25    FACTS THAT THE GOVERNMENT HAS BROUGHT BEFORE YOU THAT PROTECTS

1    PEOPLE LIKE AN EIGHT-YEAR-OLD KID RUNNING AROUND IN A

2    PLAYGROUND THAT PROTECTS PEOPLE LIKE MR. YORK WHO IS ACCUSED OF

3    LEAVING THIS VOICEMAIL.

4         SO RETURN A VOTE FROM EACH OF YOU OF NOT GUILTY, NOT FOR

5    MY SAKE, NOT FOR MR. YORK'S SAKE, BUT FOR THE SAKE OF THIS LAW,

6    THIS INCREDIBLY IMPORTANT LAW WHICH EXISTS TO PROTECT SOCIETY

7    FROM PEOPLE WHO ARE ACTUALLY IMPERSONATING EMPLOYEES OF THE

8    FEDERAL GOVERNMENT AND THEN ACTUALLY DOING SOMETHING UNDER THAT

9    GUISE.

10        SO PLEASE VOTE NOT GUILTY.  THANK YOU.

11            THE COURT:  THANK YOU, COUNSEL.

12        DOES THE GOVERNMENT HAVE ANY REBUTTAL?

13            MR. SCHENK:  YES, YOUR HONOR.

14    **(GOVERNMENT'S COUNSEL GAVE THEIR REBUTTAL ARGUMENT.)**

15            MR. SCHENK:  JURIES LIVE TWO LIVES.  YOUR FIRST LIFE

16    IS PASSIVE.  YOU LISTEN TO THE LAWYERS, AND YOU LISTEN TO THE

17    WITNESSES, AND YOU LOOK AT EXHIBITS.  YOU STRAIN TO LISTEN TO

18    VOICEMAILS.  YOU LISTEN TO THE JUDGE.

19        BUT MOMENTS FROM NOW YOU BEGIN YOUR ACTIVE LIFE, THE

20    SECOND LIFE.  YOU'RE ASKED TO ANSWER TWO QUESTIONS:  DID THE

21    GOVERNMENT PROVE THE FIRST ELEMENT BEYOND A REASONABLE DOUBT?

22    AND DID THE GOVERNMENT PROVE THE SECOND BEYOND A REASONABLE

23    DOUBT?

24        YOU AREN'T JUST SENT OFF INTO THE DELIBERATION WITH NO

25    GUIDANCE.  THE JUDGE, WHEN I FINISH, WILL READ YOU

1    INSTRUCTIONS, AND THOSE INSTRUCTIONS ARE GOING TO DEFINE TERMS

2    FOR YOU LIKE BEYOND A REASONABLE DOUBT, DIRECT AND

3    CIRCUMSTANTIAL EVIDENCE, THE ELEMENTS. BOTH OF OUR SIDES HAVE

4    SHOWN YOU SLIDES OF WHAT THOSE ELEMENTS ARE, AND YOU'LL GET

5    THEM FROM THE INSTRUCTIONS THE JUDGE WILL READ TO YOU.

6         BUT YOU'RE NOT SENT OFF TO ANSWER QUESTIONS IN A VACUUM.

7    YOU'RE GIVEN THESE TOOLS, AND YOUR JOB IS TO DECIDE WHETHER THE

8    FACTS IN THE CASE AND THE GOVERNMENT'S WITNESSES, THE

9    GOVERNMENT'S EVIDENCE PROVE BEYOND A REASONABLE DOUBT THOSE TWO

10   ELEMENTS.

11        AND THE INSTRUCTIONS WILL TELL YOU THAT BEYOND A

12   REASONABLE DOUBT IS A DOUBT BASED ON REASON AND COMMON SENSE

13   AND NOT BASED PURELY ON SPECULATION.

14        LET ME GIVE YOU AN EXAMPLE OF A DOUBT BASED PURELY ON

15   SPECULATION.

16        THE EVIDENCE IN THE CASE IS THAT DOUG YORK REGISTERED WITH

17   SPOOFCARD; THAT DOUG YORK MADE A PHONE CALL THROUGH HIS

18   SPOOFCARD ACCOUNT. YOU'VE SEEN EVIDENCE CONNECTING HIS CELL

19   PHONE NUMBER TO THIS SPOOFCARD ACCOUNT; YOU'VE SEEN EVIDENCE OF

20   THEM CONNECTING THAT CALL TO ALLAN HESSENFLOW'S NUMBER BUT THEN

21   YOU HEARD THE VOICEMAIL. BUT YOU'VE HEARD TWO VERSIONS OF

22   EXHIBIT 1 AND EXHIBIT 4.

23        EXHIBIT 1 CAME FROM SPOOFCARD. AND YOU HEARD MR. COOPER

24   TELL YOU THIS MORNING THAT IF THE USER DECIDES TO RECORD A

25   CALL, WHEN IT'S A VOICEMAIL OR LIVE CALL, THEY CAN MAKE THAT

```
1     DECISION AND RECORD THE CALL.  AND THAT DECISION IS SPOOFCARD'S

2     RECORDING THAT DOUG YORK ASKED TO BE MADE.

3          EXHIBIT 4 WAS MR. HESSENFLOW, THE VICTIM, RECORDING HIS

4     VOICEMAIL, AND HE HAS THE COPY AT HOME WITH HIS HOME ANSWERING

5     MACHINE AND HE RECORDED IT AND PROVIDED IT TO THE GOVERNMENT.

6     SO YOU HEARD BOTH SIDES.  YOU KNOW THAT THE ACCOUNT HOLDER AT

7     SPOOFCARD CALLED MR. HESSENFLOW AND LEFT A VOICEMAIL, AND THOSE

8     TWO VOICEMAILS, THE CONTENT OF THEM ARE THE SAME.

9          SO THE SPECULATION THAT THE DEFENSE IS ASKING YOU TO MAKE

10    IS NOT JUST, AND YOU HEARD THIS COME OUT DURING THE

11    CROSS-EXAMINATION OF MR. COOPER, IT'S NOT JUST THE ACCESS PIN

12    CODE THAT USED TO BE ON THE CARD FROM SPOOFCARD AND SO SOMEONE

13    THAT WAS TRAPPED AND SOMEBODY PICKED IT UP.  THAT PERSON WOULD

14    HAVE HAD TO STEAL MR. YORK'S CELL PHONE ALSO BECAUSE YOU HEARD

15    MR. COOPER TELL YOU THAT THE REAL CALLER ID NUMBER WAS

16    SOMETHING THAT WAS PULLED FROM THE CELL PHONE OF THE CALL.

17    THAT'S NOT A NUMBER OF THE CALLER.  THE MEMBER OF SPOOFCARD

18    ENTERED INTO THE SYSTEM.  THEY GET TO DECIDE WHAT CALLER ID

19    THEY WANT, WHETHER THEY WANT TO SOUND LIKE A MAN OR WOMAN WHEN

20    THEY MAKE A CALL, BACKGROUND NOISES OR OTHER OPTIONS.

21         BUT THE ORIGINAL NUMBER THAT THEY'RE ORIGINATING THE CALL

22    FROM IS FROM SPOOFCARD BY SPOOFCARD.

23         SO NOT ONLY DO THEY HAVE TO FIND THIS CARD, AND THERE'S NO

24    EVIDENCE OF THAT, BUT THEY ALSO HAVE TO STEAL MR. YORK'S PHONE.

25         BUT MORE THAN, THEY HAVE TO CALL AND KNOW TO CALL
```

1    MR. HESSENFLOW, AND THERE'S NO EVIDENCE OF THAT.

2         THE DEFENSE WANTS YOU TO BELIEVE THAT BECAUSE THERE'S NO

3    DIRECT EVIDENCE IN THE CASE, THERE WASN'T SOMEONE SITTING NEXT

4    TO DOUG YORK WHEN HE MADE THAT PHONE CALL, THAT THE GOVERNMENT

5    HAS FAILED TO MEET ITS BURDEN, AND, THEREFORE, THAT IS NOT

6    PROOF BEYOND A REASONABLE DOUBT.

7         THE INSTRUCTIONS THAT YOU ARE GOING TO GET TELL YOU

8    DIFFERENT.  THE INSTRUCTIONS THAT YOU ARE GOING TO GET THAT THE

9    JUDGE WILL READ TO YOU THAT YOU USE WHEN YOU DELIBERATE ARE

10   GOING TO TELL YOU THAT THERE ARE DIFFERENT KINDS OF EVIDENCE,

11   DIRECT AND CIRCUMSTANTIAL, AND YOU'RE ALLOWED TO THEM GIVE BOTH

12   WEIGHT, AND THE LAW MAKES NO DISTINCTION BETWEEN IN THE AMOUNT

13   OF AMOUNT OF WEIGHT THAT YOU'RE TO GIVE.

14        IS THE EVIDENCE THAT DOUG YORK MADE THAT PHONE CALL

15   CIRCUMSTANTIAL?  OF COURSE, IT IS.  WE DO NOT HAVE A WITNESS TO

16   CALL AND SAY, I WAS SITTING NEXT TO DOUG YORK WHEN HE MADE THAT

17   PHONE CALL OR A MAGIC VOICE DESCRIPTION TECHNOLOGY THAT REVERTS

18   THE CALL FROM A WOMAN BACK TO THE ORIGINATING CALL.  THAT

19   EVIDENCE IS NOT IN FRONT OF YOU.

20        THE EVIDENCE THAT YOU HAVE IS THAT DOUGLAS YORK HAD MOTIVE

21   TO MAKE THE CALL.  YOU KNOW AT THAT TIME HE'S POSTING THE

22   VICTIM'S ADDRESS ON CRAIGSLIST, ON FACEBOOK.  HE'S CALLING HIM

23   DOZENS, IF NOT MORE TIMES, IN THAT 30-DAY PERIOD OF TIME BOTH

24   AT HIS HOME AND ON HIS CELL PHONE NUMBER.  THAT'S

25   CIRCUMSTANTIAL EVIDENCE THAT HE MADE THE CALL.

1        BUT MORE THAN THAT, YOU KNOW THAT YOU PEOPLE HAVE SEEN

2   BOTH SIDES OF THE CARD, THAT DOUG YORK OPENED AN ACCOUNT WITH

3   SPOOFCARD, HIS CELL PHONE BILL HAD A CALL AT THAT TIME TO THE

4   SPOOFCARD ACCESS NUMBER AND THEN THE SPOOFCARD REFERENCE SHOWED

5   THE CALL FROM SPOOFCARD TO THE NUMBER THAT MR. YORK ASKED IT TO

6   CALL, AND THEN THE NUMBER THAT MR. YORK ASKED TO APPEAR ON THE

7   CALLER ID.

8        AND THAT'S WHERE I'LL TURN NOW, THE SECOND ARGUMENT THAT

9   THE DEFENSE RAISED TO YOU IN THEIR CLOSING, AND THAT WAS NOT

10  ONLY WAS THERE NO EVIDENCE THAT MR. YORK MADE THIS CALL BUT

11  THAT HE DIDN'T ACT AS SUCH, THAT HE WAS JUST PRETENDING.  THAT,

12  IF YOU WILL, IT WAS A HALLOWEEN COSTUME.  HE WAS DRESSING UP

13  LIKE AN I.R.S. AGENT BUT THAT'S WHERE IT ENDS, HE'S AN

14  EIGHT-YEAR-OLD ON A PLAYGROUND.  AND, UNFORTUNATELY, AGAIN, THE

15  EVIDENCE TELLS YOU OTHERWISE.

16       IN THE VOICEMAIL AND THE EVIDENCE BEFORE YOU FROM SPECIAL

17  AGENT AGUIRRE IS THAT I.R.S. AGENTS, I.R.S. EMPLOYEES DO AT

18  TIMES CALL PEOPLE AND ASK FOR INFORMATION.  THAT'S WHAT

19  HAPPENED ON THIS CALL.  SO HE CERTAINLY WAS ACTING LIKE I.R.S.

20  AGENTS ACT.

21       THE VICTIM TOLD YOU WHEN HE GOT THE MESSAGE.  THE FIRST

22  TIME HE LISTENED TO THE VOICEMAIL MESSAGE, HE WAS SUSPICIOUS.

23  HE DID NOT KNOW WHETHER HE WAS ON INVESTIGATION BY THE I.R.S.

24  THE FIRST THING HE DID WAS GOOGLE THE NUMBER THAT APPEARED ON

25  HIS VOICEMAIL, ON HIS CALLER ID.

1            AND THE REASON HE DID THAT IS BECAUSE HE FIGURED IF WHEN I

2       GOOGLE THIS, IT COMES BACK TO A REAL I.R.S. OFFICE, I MIGHT

3       HAVE SOME TAX PROBLEMS.  AND IF, ON THE OTHER HAND, I CAN'T

4       FIND IT, THAT PROBABLY MEANS I DON'T HAVE TAX PROBLEMS AND AS A

5       RESULT THERE WAS A PERIOD OF TIME WHERE MR. HESSENFLOW, THE

6       VICTIM, DIDN'T KNOW.  MAYBE I HAVE TAX PROBLEMS AND MAYBE I

7       DON'T.

8            SO THE DEFENSE'S ARGUMENTS TO YOU THAT THE VOICE SOUNDED

9       SILLY OR HE SAID THINGS THAT OTHER I.R.S. EMPLOYEES ACTING IN

10      THEIR JOB WOULD DO, THAT'S NOT THE EVIDENCE BEFORE YOU.

11           THE EVIDENCE IS THAT THE VICTIM HEARD THE VOICEMAIL AND

12      WONDERED WHETHER HE HAD TAX PROBLEMS.  THE EVIDENCE BEFORE YOU

13      IS THAT HE MADE REQUESTS THAT I.R.S. EMPLOYEES MAKE, THAT

14      PEOPLE WHO DO, IN FACT, WORK FOR THE I.R.S. MAKE AND WHAT'S

15      MORE IMPORTANT IS THAT THE DEFENDANT WAS SO PROUD OF HIMSELF

16      USING THE SPOOFCARD SYSTEM WANTED TO DRAW THE ATTENTION OF THE

17      VICTIM TO HIS CALLER ID.

18           WE PLAYED FOR YOU, AND THEN MR. ARCHER JUST READ IT TO

19      YOU, YOU'LL RECALL IN IT, HE SAYS CALL ME BACK ON A NUMBER THAT

20      IS ON YOUR CALLER ID.  HE SET OFF A FLARE.  HE WANTED TO DRAW

21      THE VICTIM'S ATTENTION TO THAT CALLER ID.  HE DIDN'T PICK THIS

22      NUMBER THAT ENDED IN 1040 AND NOT CARE IF THE VICTIM NOTED

23      THIS.  HALF OF THE VALUE OF HIS SCHEME WAS NOT JUST CAN I

24      CHANGE MY VOICE SO IF I'VE GOT BAD BLOOD WITH HIM AND I CALL

25      HIM AND USE MY GENUINE VOICE, I, MR. YORK, HE'S GOING TO KNOW

1    AND SO PART OF MY SCHEME IS THAT I CHANGE MY VOICE TO A WOMAN

2    SO HE DOESN'T SUSPECT ME, AND I WANT TO MAKE SURE THAT HE LOOKS

3    AT THE CALL.  I WANT HIM TO BE WORRIED FOR SOME PERIOD OF TIME.

4    I WANT HIM TO LOOK AT THAT CALLER ID AND SEE THE 1040 NUMBER.

5         AND THE REASON YOU KNOW THAT WAS IMPORTANT TO MR. YORK IS

6    BECAUSE HE DREW THE VICTIM'S ATTENTION TO IT.

7         IN THE VOICEMAIL HE SAYS CALL ME BACK ON THE NUMBER ON

8    YOUR CALLER ID.  AND AT THE END OF THE VOICEMAIL HE SAYS IF YOU

9    DON'T, IF WE DON'T HEAR BACK FROM YOU, WE'LL CALL YOU TOMORROW.

10   HE COULD HAVE LEFT IT.  HE DIDN'T.  HE WANTED TO MAKE SURE THAT

11   THE VICTIM KNEW THAT HE HAD TAKEN THIS ADDITIONAL STEP BECAUSE

12   EVEN MORE ACTING LIKE AN I.R.S. EMPLOYEE, EVEN MORE APPEARED TO

13   LOOK LIKE IT WAS GENUINE AND AUTHENTIC AND SO HE PICKED THE

14   NUMBER THAT MATCHED AS BOTH THE INDIVIDUAL INCOME TAX FORM BUT

15   ALSO THE I.R.S. LINE, IF THE PERSON HAS QUESTIONS, YOU CAN CALL

16   THAT NUMBER AND THAT ENDS IN 1040.

17        THE DEFENDANT KNEW THAT, AND HE WANTED THE VICTIM TO

18   APPRECIATE THAT.  HE WANTED THE VICTIM TO KNOW THAT HE HAD

19   TAKEN THE TIME TO CREATE THE CALLER ID NUMBER TO REFLECT THAT.

20        BECAUSE THE EVIDENCE FOR BOTH COUNT 1 AND -- I'M SORRY --

21   BOTH ELEMENTS OF COUNT 1 IS OVERWHELMING, THE GOVERNMENT ASKS

22   YOU TO RETURN A VERDICT OF GUILTY ON THAT COUNT.  THANK YOU.

23             THE COURT:  THANK YOU, COUNSEL.

24        MEMBER OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE

25   EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES

```
1    IN THIS CASE.  A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE

2    IN THE JURY ROOM FOR YOU TO CONSULT.

3        IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL OF THE

4    EVIDENCE RECEIVED IN THE CASE AND IN THAT PROCESS TO DECIDE THE

5    FACTS.  IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE IT TO

6    YOU TO THE FACTS AS YOU FIND THEM WHETHER YOU AGREE WITH THE

7    LAW OR NOT.

8        YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE

9    LAW AND MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

10   DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.  YOU WILL RECALL

11   THAT YOU TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING OF

12   THE CASE.

13       YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE

14   OUT SOME AND IGNORE OTHERS.  THEY ARE ALL IMPORTANT.  PLEASE DO

15   NOT READ INTO THESE INSTRUCTIONS OR INTO ANYTHING I MAY HAVE

16   SAID OR DONE ANY SUGGESTION AS TO WHAT VERDICT YOU SHOULD

17   RETURN.  THAT IS A MATTER ENTIRELY UP TO YOU.

18       THE INDICTMENT IS NOT EVIDENCE.  THE DEFENDANT HAS PLEADED

19   NOT GUILTY TO THE CHARGE.  THE DEFENDANT IS PRESUMED TO BE

20   INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES THE DEFENDANT

21   GUILTY BEYOND A REASONABLE DOUBT.  IN ADDITION, THE DEFENDANT

22   DOES NOT HAVE TO TESTIFY OR PRESENT ANY EVIDENCE TO PROVE

23   INNOCENCE.  THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY

24   ELEMENT OF THE CHARGE BEYOND A REASONABLE DOUBT.

25       A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL RIGHT
```

1    NOT TO TESTIFY.  YOU MAY NOT DRAW ANY INFERENCE OF ANY KIND

2    FROM THE FACT THAT THE DEFENDANT DID NOT TESTIFY.

3         PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

4    FIRMLY CONVINCED THAT THE DEFENDANT IS GUILTY.  IT IS NOT

5    REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE

6    DOUBT.  A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND

7    COMMON SENSE AND IS NOT BASED PURELY UPON SPECULATION.

8         IT MAY ARISE FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF

9    ALL OF THE EVIDENCE OR FROM LACK OF EVIDENCE.

10        IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF

11   THE EVIDENCE YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT

12   THAT THE DEFENDANT IS GUILTY, IT IS YOUR DUTY TO FIND THE

13   DEFENDANT NOT GUILTY.

14        ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

15   CONSIDERATION OF ALL OF YOUR EVIDENCE, YOU ARE CONVINCED BEYOND

16   A REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, IT IS YOUR

17   DUTY TO FIND THE DEFENDANT GUILTY.

18        THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

19   FACTS ARE CONSISTS OF:

20        THE SWORN TESTIMONY OF ANY WITNESS; AND,

21        THE EXHIBITS RECEIVED IN EVIDENCE; AND,

22        ANY FACTS TO WHICH THE PARTIES HAVE AGREED.

23        IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

24   TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.  THE FOLLOWING

25   THINGS ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER THEM IN

1   DECIDING WHAT THE FACTS ARE:

2        1.  QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY

3   THE LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.

4   ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND

5   THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT

6   EVIDENCE.

7        SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

8   STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED

9   TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.

10       IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THAT

11  THE LAWYERS STATE THEM, YOUR MEMORY OF THEM CONTROLS.

12       2.  ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN OR

13  INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE.  IN ADDITION, SOME

14  EVIDENCE WAS RECEIVED ONLY FOR A LIMITED PURPOSE.  WHEN I HAVE

15  INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY,

16  YOU MUST DO SO.

17       ANYTHING THAT YOU MAY HAVE SEEN OR HEARD WHEN THE COURT

18  WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

19  SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

20       EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.

21       DIRECT EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS

22  TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW

23  OR HEARD OR DID.

24       CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT

25  IS PROOF OF ONE OR MORE FACTS FROM WHICH YOU CAN FIND ANOTHER

1    FACT.

2         YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

3    EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.

4         THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE

5    GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR

6    YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

7         IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

8    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

9    YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE

10   OF IT.

11        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

12   INTO ACCOUNT:

13        THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR

14   KNOW THE THINGS TESTIFIED TO;

15        THE WITNESS'S MEMORY;

16        THE WITNESS'S MANNER WHILE TESTIFYING;

17        THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

18        THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

19        WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

20   TESTIMONY;

21        THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF

22   ALL OF THE EVIDENCE; AND,

23        ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

24        THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

25   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

```
 1     WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

 2     MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

 3          YOU ARE HERE ONLY TO DETERMINE WHETHER THE DEFENDANT IS

 4     GUILTY OR NOT GUILTY OF THE CHARGE IN THE INDICTMENT.  THE

 5     DEFENDANT IS NOT ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT

 6     CHARGED IN THE INDICTMENT.

 7          YOU HAVE HEARD TESTIMONY THAT THE DEFENDANT MADE

 8     STATEMENTS.  IT IS FOR YOU TO DECIDE, ONE, WHETHER THE

 9     DEFENDANT MADE THE STATEMENTS; AND, TWO, IF SO, HOW MUCH WEIGHT

10     TO GIVE TO THEM.

11          IN MAKING THOSE DECISIONS, YOU SHOULD CONSIDER ALL OF THE

12     EVIDENCE ABOUT THE STATEMENTS, INCLUDING THE CIRCUMSTANCES

13     UNDER WHICH THE DEFENDANT MAY HAVE HAD MADE THEM.

14          THE DEFENDANT IS CHARGED IN COUNT 1 OF THE INDICTMENT WITH

15     FRAUD WHILE IMPERSONATING A FEDERAL OFFICER OR EMPLOYEE IN

16     VIOLATION OF SECTION 912 OF TITLE 18 OF THE UNITED STATES CODE.

17          IN ORDER TO BE FOUND GUILTY OF THAT CHARGE, THE GOVERNMENT

18     MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE

19     DOUBT.

20          FIRST, THAT THE DEFENDANT FALSELY PRETENDED TO BE AN

21     OFFICER OR EMPLOYEE ACTING UNDER THE AUTHORITY OF THE UNITED

22     STATES INTERNAL REVENUE SERVICE; AND,

23          SECOND, THE DEFENDANT ACTED AS SUCH.

24          AT THE BEGINNING OF THE TRIAL, I DESCRIBED THE CHARGES

25     AGAINST THE DEFENDANT.  FOR REASONS THAT DO NOT CONCERN YOU,
```

1    COUNT TWO, INTERSTATE TELECOMMUNICATIONS HARASSMENT IS NO

2    LONGER BEFORE YOU.  DO NOT SPECULATE ABOUT WHY THAT CHARGE IS

3    NO LONGER PART OF THIS TRIAL.

4         THE DEFENDANT IS ONLY ON TRIAL FOR THE CHARGE OF FALSE

5    IMPERSONATION OF FEDERAL OFFICER OR EMPLOYEE, COUNT 1.  YOU MAY

6    CONSIDER THE EVIDENCE PRESENTED ONLY AS IT RELATES TO THE

7    REMAINING COUNT.

8         WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE

9    JURY AS YOUR FOREPERSON WHO WILL PRESIDE OVER YOUR

10   DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

11        YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

12   REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER GUILTY

13   OR NOT GUILTY, MUST BE UNANIMOUS.

14        EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF BUT YOU

15   SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE

16   EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

17   LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

18        DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION

19   PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION

20   SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

21        IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

22   VERDICT BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

23   HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

24   HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

25   SIMPLY TO REACH A VERDICT.

1    BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

2    RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

3    THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE

4    CASE OR TO THE ISSUES THAT IT INVOLVES.

5    EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS

6    DURING YOUR DELIBERATIONS:

7    DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

8    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

9    THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES DISCUSSING

10   THE CASE IN PERSON, IN WRITING, BY PHONE, OR ELECTRONIC MEANS,

11   VIA E-MAIL, TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG,

12   WEBSITE OR OTHER FEATURE.  THIS APPLIES TO COMMUNICATING WITH

13   YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS AND THE

14   PEOPLE INVOLVED IN THE TRIAL.  IF YOU ARE ASKED OR APPROACHED

15   IN ANY WAY ABOUT YOUR JURY SERVICE, OR ANYTHING ABOUT THIS

16   CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO

17   DISCUSS THE MATTER AND TO REPORT THE CONTACT TO THE COURT.

18   DO NOT READ, WATCH OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS

19   OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.  DO NOT

20   DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

21   INTERNET, OR USING OTHER REFERENCE MATERIALS AND DO NOT MAKE

22   ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

23   CASE ON YOUR OWN.

24   THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THAT THE

25   PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH

1    PARTY HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES

2    THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE

3    PROCEEDINGS AND A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE

4    ENTIRE TRIAL PROCESS TO START OVER.

5         IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

6    NOTIFY THE COURT IMMEDIATELY.

7         SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.  WHETHER OR

8    NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT

9    WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD

10   NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW

11   JURORS.

12        THE PUNISHMENT PROVIDED BY LAW FOR THIS CRIME IS FOR THE

13   COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING

14   WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST THE

15   DEFENDANT BEYOND A REASONABLE DOUBT.

16        A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE

17   REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON

18   SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR

19   DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE CLERK THAT YOU

20   ARE READY TO RETURN TO THE COURTROOM.

21        IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

22   COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK

23   SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY SHOULD

24   EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING,

25   AND I WILL RESPOND TO THE JURY CONCERNING THE CASE IN WRITING

```
1     OR HERE IN OPEN COURT.

2          IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

3     LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.

4          YOU MAY CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE

5     ANSWER TO ANY QUESTION.

6          REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING ME,

7     HOW THE JURY STANDS NUMERICALLY OR OTHERWISE ON ANY QUESTION

8     SUBMITTED TO YOU, INCLUDING THE QUESTION OF THE GUILT OF THE

9     DEFENDANT UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT OR

10    HAVE BEEN DISCHARGED.

11         THAT CONCLUDES THE READING OF THE INSTRUCTIONS.  ANY

12    OBJECTION TO THE COURT'S READING OF THE INSTRUCTIONS FROM THE

13    GOVERNMENT?

14              MR. SCHENK:  NO, YOUR HONOR.

15              THE COURT:  THE DEFENSE?

16              MR. ARCHER:  OTHER THAN PRIOR PREVIOUSLY PRESERVED,

17    NO, YOUR HONOR.

18              THE COURT:  ALL RIGHT.  THANK YOU.  LADIES AND

19    GENTLEMEN OF THE JURY, THAT IS THE 12 OF YOU, YOU WILL NOW

20    RETIRE TO DELIBERATE THE MERITS OF THE CASE.  AND MS. GARCIA

21    WILL ESCORT YOU TO THE DELIBERATION ROOM.

22         MR. MCNAMARA AND MR. WOOD, IF YOU WOULD JUST PLEASE STAY

23    SEATED FOR JUST A MOMENT, PLEASE.

24         (JURY OUT AT 2:24 P.M.)

25              THE COURT:  PLEASE BE SEATED, COUNSEL.  ALL RIGHT.
```

1    THE RECORD SHOULD REFLECT THAT OUR 12 JURORS HAVE LEFT TO

2    DELIBERATE ON THE CASE.

3         MR. WOOD AND MR. MCNAMARA, I SHOULD REFERENCE YOU AS OUR

4    LOU GEHRIGS.  AS I TOLD YOU PREVIOUSLY, WE MAY NEED YOUR

5    SERVICE SHOULD ONE OF THE SEATED JURORS BE UNABLE TO CONTINUE

6    WITH THE DELIBERATIONS.

7         IF THAT WERE TO OCCUR, WE WOULD CONTACT YOU TO RETURN AND

8    TAKE THAT JUROR'S PLACE.

9         AS OF NOW, HOWEVER, I'M GOING TO ALLOW YOU TO LEAVE THE

10   COURTROOM.  HOWEVER, I WOULD ASK YOU TO PLEASE PROVIDE

11   MS. GARCIA WITH YOUR CURRENT CONTACT INFORMATION AND TO PLEASE

12   HAVE THAT INFORMATION, THAT IS, YOUR MOBILE PHONES OR WHATEVER

13   THE CONTACT IS AVAILABLE SHOULD WE NEED TO REACH YOU.

14        I DO REMIND YOU OF THE ADMONITION AS TO THIS CASE AND YOUR

15   ROLE AS JURORS HERE IS STILL IN PLACE AND SO YOU MAY NOT

16   DISCUSS THE CASE WITH ANYONE, AS I PREVIOUSLY ADVISED.

17        MS. GARCIA WILL CONTACT YOU, OF COURSE, IF YOU'RE NEEDED

18   TO RETURN TO SUBSTITUTE A SEATED JUROR.

19        SHE WILL ALSO CONTACT YOU WITH UPDATES ON THE CASE AS TO

20   WHETHER OR NOT YOUR SERVICE WILL BE NEEDED ONGOING.

21        ONCE YOU'RE NOTIFIED THAT YOUR SERVICES WILL NOT BE

22   NEEDED, ASSUMING YOU HAVEN'T BEEN CALLED BACK, AND THE

23   ADMONITION WILL NO LONGER BE IN PLACE AND YOU WILL BE RELEASED

24   FROM YOUR JURY SERVICE AND FROM THAT ADMONITION.

25        ANY QUESTION ABOUT THAT, MR. MCNAMARA AND MR. WOOD?

1              ALTERNATE JURORS:  NO.

2              THE COURT:  ALL RIGHT.  THANK YOU.  IN THE EVENT I

3    DON'T GET TO SEE YOU AGAIN, I WANT TO THANK YOU FOR YOUR

4    SERVICE THIS WEEK.  IT'S A PLEASURE MEETING YOU AND ON BEHALF

5    OF COUNSEL ALSO, I THINK I CAN SPEAK FOR THEM, AND PARDON MY

6    PRESUMPTION, BUT I'M SURE THEY JOIN ME IN THANKING YOU FOR YOUR

7    SERVICE TO THE COMMUNITY.

8         SO WITH THAT YOU'RE FREE TO GO, AND WE'LL CONTACT YOU

9    LATER SHOULD THAT BE NECESSARY.  THANK YOU VERY MUCH.

10        (JURY OUT AT 2:27 P.M.)

11             THE COURT:  THANK YOU.  PLEASE BE SEATED.  THE

12   RECORD SHOULD REFLECT THAT OUR JURORS ARE DELIBERATING AND THE

13   TWO ALTERNATES LEFT THE COURTROOM NOW.

14        COUNSEL, SHOULD THERE BE A QUESTION, I'D LIKE YOU TO BE

15   ABLE TO REPORT BACK TO COURT WITHIN 15 MINUTES, NO LONGER THAN

16   15 MINUTES, SO IF YOU WOULD OTHERWISE MAKE YOURSELF AVAILABLE I

17   WOULD APPRECIATE THAT.

18             MR. SCHENK:  WE WILL, YOUR HONOR.

19             THE COURT:  ANYTHING FURTHER?

20             MR. SCHENK:  WE HAVE AGREED ON THE EXHIBITS THAT

21   SHOULD GO BACK TO THE DELIBERATION ROOM.  I CAN GIVE THEM.

22             THE COURT:  MS. GARCIA WILL TAKE CHARGE OF THOSE.

23        ANYTHING FURTHER?

24             MR. SCHENK:  NO, YOUR HONOR.

25             MR. ARCHER:  NO.  THANK YOU.

```
1              THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.  THANK

2       YOU.

3              (RECESS TAKEN PENDING THE DELIBERATIONS OF THE JURY.)

4              (JURY IN AT 3:15 P.M.)

5              THE COURT:  WE'RE BACK ON THE RECORD.  OUR JURY IS

6       PRESENT, AND ALL COUNSEL AND THE DEFENDANT IS PRESENT.

7           WHO SPEAKS FOR YOU?  MR. DUVERNAY?

8              JUROR:  THAT'S CORRECT.

9              THE COURT:  I'VE BEEN INFORMED THAT THE JURY HAS

10      REACHED A VERDICT.

11             JUROR:  THAT'S CORRECT.

12             THE COURT:  ALL RIGHT.  THANK YOU.  I'M NOW GOING TO

13      ASK MS. GARCIA TO NOW PUBLISH THE VERDICT, THAT IS, SHE IS

14      GOING TO READ YOUR VERDICT INTO THE RECORD.

15          BUT BEFORE SHE DOES THAT, LADIES AND GENTLEMEN, LET ME ASK

16      YOU, PLEASE LISTEN CLOSELY TO THE VERDICT AS IT'S READ BY

17      MS. GARCIA.  I AM GOING TO POLL THE JURY SUBSEQUENT TO THE

18      READING TO ASK WHETHER OR NOT THIS IS YOUR TRUE AND CORRECT

19      VERDICT.

20          MS. GARCIA.

21             THE CLERK:  LADIES AND GENTLEMEN OF THE JURY,

22      HEARKEN TO YOUR VERDICT AS IT WILL STAND RECORDED.

23          IN CASE NUMBER 15-226, UNITED STATES VERSUS DOUGLAS YORK.

24          COUNT 1.  TITLE 18 UNITED STATES CODE SECTION 912, FALSE

25      IMPERSONATION OF A FEDERAL OFFICER OR EMPLOYEE, WE, THE JURY,
```

```
1      FIND THE DEFENDANT DOUGLAS YORK IN THE ABOVE-ENTITLED CASE

2      GUILTY OF FALSE IMPERSONATION OF A FEDERAL OFFICER OR EMPLOYEE

3      AS CHARGED IN COUNT 1.

4             DATED AUGUST 28TH, 2015.  FOREPERSON, BRAD DUVERNAY.

5             JUROR NUMBER 1, IS THIS YOUR TRUE VERDICT?

6                    JUROR:  YES.

7                    THE COURT:  I DIDN'T HEAR THE ANSWER, I'M SORRY.

8                    JUROR:  YES.

9                    THE CLERK:  JUROR NUMBER 2, IS THIS YOUR TRUE

10     VERDICT?

11                   JUROR:  YES.

12                   THE CLERK:  JUROR NUMBER 3, IS THIS YOUR TRUE

13     VERDICT?

14                   JUROR:  YES.

15                   THE CLERK:  JUROR NUMBER 4, IS THIS YOUR TRUE

16     VERDICT?

17                   JUROR:  YES.

18                   THE CLERK:  JUROR NUMBER 5, IS THIS YOUR TRUE

19     VERDICT?

20                   JUROR:  YES.

21                   THE CLERK:  JUROR NUMBER 6, IS THIS YOUR TRUE

22     VERDICT?

23                   JUROR:  YES.

24                   THE CLERK:  JUROR NUMBER 7, IS THIS YOUR TRUE

25     VERDICT?
```

```
1                     JUROR:  YES.

2                     THE CLERK:  JUROR NUMBER 8, IS THIS YOUR TRUE

3         VERDICT?

4                     JUROR:  YES.

5                     THE CLERK:  JUROR NUMBER 9, IS THIS YOUR TRUE

6         VERDICT?

7                     JUROR:  YES.

8                     THE CLERK:  JUROR NUMBER 10, IS THIS YOUR TRUE

9         VERDICT?

10                    JUROR:  YES.

11                    THE CLERK:  JUROR NUMBER 11, IS THIS YOUR TRUE

12        VERDICT?

13                    JUROR:  YES.

14                    THE CLERK:  JUROR NUMBER 12, IS THIS YOUR TRUE

15        VERDICT?

16                    JUROR:  YES.

17                    THE COURT:  ALL RIGHT.  THANK YOU.  THE JURY HAS

18        BEEN POLLED, AND I'LL ORDER THE VERDICT RECORDED AT THIS TIME.

19             LADIES AND GENTLEMEN, I WANT TO THANK YOU, THANK YOU FOR

20        YOUR SERVICE.  AS JURORS IN THIS CASE WHEN WE MET ON TUESDAY, I

21        THINK I TOLD YOU MY EXPECTATION WAS THAT THIS CASE WOULD BE

22        RATHER BRIEF, AND I THINK -- OBVIOUSLY I THINK THE EVIDENCE

23        CAME IN, IN A RATHER SHORT ORDER, AND I APPRECIATE THAT.  I

24        HOPE YOU HAVE ENJOYED YOUR JURY SERVICE HERE THIS AFTERNOON.

25             IN JUST A MOMENT I'M GOING TO RELEASE YOU FROM YOUR
```

```
1    SERVICE AND ALSO FROM THE ADMONITION THAT I PREVIOUSLY PLACED

2    IN THE CASE, MEANING THAT IF YOU RECALL THE ADMONITION WAS THAT

3    YOU WERE NOT PERMITTED TO DISCUSS THE CASE WITH ANYONE.

4         ONCE YOU ARE RELEASED, YOU MAY, IF YOU WISH, DISCUSS THE

5    CASE AMONGST YOURSELVES, WITH ANYONE ELSE, INCLUDING THE

6    LAWYERS HERE.  THE LAWYERS -- SOMETIMES THE LAWYERS HAVE

7    QUESTIONS THAT THEY MAY WANT TO POSE TO THE JURORS AND YOU MAY

8    SPEAK TO ANYONE IF YOU WISH.  HOWEVER, YOU'RE NOT OBLIGATED TO

9    SPEAK TO ANYONE IF YOU DO NOT WISH TO DO SO.

10        IF SOMEONE CONTACTS YOU ABOUT THE CASE AND WANTS TO TALK

11   TO YOU AND YOU DO NOT WANT TO TALK TO THAT PERSON, YOU CAN JUST

12   SIMPLY SAY THAT.

13        IF ANYONE IN YOUR OPINION CONTINUES TO, NOTWITHSTANDING

14   YOUR REFUSAL, TO SPEAK BUT CONTINUES TO IN ANY WAY BOTHER YOU

15   ABOUT THAT, YOU SHOULD REPORT THAT TO THE COURT IMMEDIATELY SO

16   THAT THE COURT CAN TAKE ACTION ON THAT.

17        SO ON BEHALF OF BOTH COUNSEL I DO WANT TO THANK YOU, THANK

18   YOU FOR YOUR SERVICE.

19        ANYTHING FURTHER, COUNSEL, BEFORE I RELIEVE THE JURY?

20             MR. SCHENK:  NO, YOUR HONOR.

21             MR. ARCHER:  NO, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  THANK YOU.  ONE THING I DO,

23   WITH SOME REGULARITY, LADIES AND GENTLEMEN, IS I DO INVITE

24   JURORS TO MY CHAMBERS AND MY OFFICE FOR JUST A MOMENT TO ALLOW

25   ME AN OPPORTUNITY TO PERSONALLY THANK YOU FOR YOUR SERVICE AND
```

```
 1        ALSO TO ASK YOU YOUR THOUGHTS AS TO HOW WE CAN IMPROVE YOUR

 2        JURY SERVICE.

 3             SO IF ANYONE -- AND THIS IS NOT MANDATORY, BUT IF ANYONE

 4        WOULD LIKE TO DO THAT, I'LL EXTEND AN INVITATION FOR YOU TO

 5        COME TO MY OFFICE.

 6             MS. GARCIA WILL SHOW YOU AND ESCORT YOU BACK TO THE

 7        OFFICE.  I'M NOT GOING TO KEEP YOU LONG.  AS I SAID, I JUST

 8        WANT TO PERSONALLY THANK YOU FOR YOUR SERVICE AND ASK YOU IF

 9        YOU HAVE ANY THOUGHTS OR OPINIONS ABOUT WHAT WE IN THIS

10        COURTHOUSE CAN DO TO ENHANCE THE JURY SERVICE AND THE SERVICE

11        OF THE JURIES ONGOING, AND I'D BE GRATEFUL AND HAPPY TO RECEIVE

12        THAT INFORMATION.

13             NOW, AS I SAID, I DON'T INTEND TO KEEP YOU, AND THIS IS

14        NOT AN ORDER.  YOU DON'T HAVE TO COME BACK IF YOU DON'T WANT

15        TO.  IF YOU'D LIKE TO, I'D BE HAPPY TO MEET YOU, AND AS I SAID,

16        IF NOT, YOU'RE FREE TO GO.

17             I SHOULD TELL YOU, SOMETIMES LAWYERS DO LIKE TO SPEAK WITH

18        JURORS AND TO GET THEIR IMPRESSION, CANDIDLY, AND IF YOU'LL

19        PARDON THE PRESUMPTION, SOMETIMES THEY'LL WANT TO KNOW "HOW DID

20        I DO?  HOW WAS MY PERFORMANCE?  HOW DID I DO IN THE CASE?"

21        AND, OF COURSE, YOU'RE THE BEST JUDGES OF THAT, AND THEY MIGHT

22        ASK YOU THOSE QUESTIONS.  I DON'T KNOW.

23             BUT FEEL FREE TO ANSWER THOSE QUESTIONS IF YOU WISH AS

24        WELL AS TO COME TO MY OFFICE FOR JUST A MOMENT IF YOU WISH.

25             IF I DON'T SEE YOU, THANK YOU VERY MUCH, AND I APPRECIATE
```

```
 1        YOUR SERVICE AND ON BEHALF OF THE JUDGES OF THE NORTHERN

 2    DISTRICT OF CALIFORNIA, I THANK YOU, THANK YOU VERY MUCH FOR

 3    YOUR SERVICE.  AND YOU ARE NOW EXCUSED.  THANK YOU.

 4        COUNSEL, IF YOU COULD REMAIN.

 5        (JURY OUT AT 3:22 P.M.)

 6            THE COURT:  PLEASE BE SEATED.  THANK YOU.  WE'RE

 7    BACK ON THE RECORD WITH AND COUNSEL IS PRESENT, AND THE

 8    DEFENDANT IS PRESENT.  EXCUSE ME.

 9        THE JURY HAS RETURNED A VERDICT.  THE VERDICT HAS BEEN

10    RECORDED.

11        MR. ARCHER, YOUR CLIENT IS REFERRED TO PROBATION FOR

12    PREPARATION OF A PRESENTENCE REPORT.

13        DO COUNSEL HAVE A DATE THAT THEY WOULD LIKE TO SUGGEST FOR

14    SENTENCING?

15            MR. ARCHER:  NINETY DAYS.

16            THE CLERK:  DECEMBER 14, 2015.

17            MR. SCHENK:  NO, YOUR HONOR.

18            MR. ARCHER:  YES.

19            THE COURT:  I'M SORRY, MS. GARCIA?

20            THE CLERK:  DECEMBER 14TH.

21            THE COURT:  DECEMBER YOU SAID?

22            THE CLERK:  DECEMBER.

23            THE COURT:  DOES THAT DATE WORK FOR COUNSEL?

24            MS. PENNA:  YES, YOUR HONOR.

25            MR. ARCHER:  YES, YOUR HONOR.
```

00288

1          THE COURT:  ALL RIGHT.  WE'LL SET SENTENCING FOR

2     DECEMBER 14TH, DECEMBER 14TH AT 1:30.

3          AND, MR. YORK, MR. ARCHER WILL TAKE YOU TO THE PROBATION

4     DEPARTMENT THIS AFTERNOON SO YOU CAN BEGIN SOME PRELIMINARY

5     PAPERWORK IN REGARDS TO YOUR REPORT.

6          I'M GOING TO ASK JUST BECAUSE I THINK I NEED TO ASK, IS

7     THE GOVERNMENT REQUESTING A REMAND AT THIS TIME?

8          MR. SCHENK:  NO, WE ARE NOT, YOUR HONOR.

9          THE COURT:  THANK YOU.  AND THE COURT DOES NOT FIND

10    ANY REASON TO REMAND MR. YORK INTO CUSTODY NOTWITHSTANDING THE

11    VERDICT HERE.

12         SO HE'LL REMAIN AT LIBERTY IN HIS CURRENT STATUS.

13         MR. ARCHER:  THANK YOU, YOUR HONOR.

14         THE COURT:  ANYTHING FURTHER?

15         MR. SCHENK:  NO.  THANK YOU VERY MUCH, YOUR HONOR.

16         MR. ARCHER:  NO, YOUR HONOR.

17         THE COURT:  ALL RIGHT.  THANK YOU.

18         (COURT CONCLUDED AT 3:42 P.M.)

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15                        _Irene Rodriguez_

16                        _____
                         IRENE RODRIGUEZ, CSR, RMR, CRR
17                       CERTIFICATE NUMBER 8074

18

19                        DATED:  FEBRUARY 12, 2016

20

21

22

23

24

25